# EXHIBIT 1

William M. Audet (SBN 117456)
waudet@audetlaw.com
"David" Ling Y. Kuang (SBN 296873)
lkuang@audetlaw.com
Kurt D. Kessler (SBN 327334)
kkessler@audetlaw.com
**AUDET & PARTNERS, LLP**
711 Van Ness Avenue, Suite 500
San Francisco, CA 94102-3275
Telephone: (415) 568-2555
Facsimile: (415) 568-2556

*Attorneys for Plaintiff Sagi Cezana, on behalf of himself and all others similarly situated*

[Additional Counsel on Signature Block]

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN JOSE DIVISION**

| | |
|---|---|
| SAGI CEZANA, on behalf of himself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>ROBINHOOD FINANCIAL LLC, ROBINHOOD SECURITIES, LLC, and ROBINHOOD MARKETS, INC.,<br><br>Defendants. | Case No:<br><br>**CLASS ACTION COMPLAINT**<br><br>**FOR:**<br>**(1) BREACH OF CONTRACT;**<br>**(2) BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING;**<br>**(3) NEGLIGENCE PER SE;**<br>**(4) NEGLIGENCE;**<br>**(5) BREACH OF FIDUCIARY DUTY;**<br>**(6) CONSTRUCTIVE FRAUD; and**<br>**(7) VIOLATION OF CALIFORNIA'S UNFAIR COMPETITION LAW**<br><br>**<u>DEMAND FOR JURY TRIAL</u>** |

A&P AUDET & PARTNERS LLP

Plaintiff SAGI CEZANA, individually, and on behalf all others similarly situated, bring this class action lawsuit (collectively “Plaintiffs”) against Defendants ROBINHOOD FINANCIAL LLC, ROBINHOOD SECURITIES, LLC, and ROBINHOOD MARKETS, INC. (“Robinhood,” and together “the Parties”), based upon personal knowledge of the facts pertaining to themselves, and upon information and belief as to all other matters, and do hereby allege as follows:

**NATURE OF THE ACTION**

1. In late 2020, stocks for various companies began to fluctuate greatly, including the stock for the company American Movie Company (“AMC”), which experienced an extreme downturn due to the COVID-19 pandemic’s effect on its users’ ability to attend its theatres. AMC began to dramatically rise when retail investors began buying the stock in January 2021.

2. This rise was due in part to the efforts of individual investors using Robinhood’s App, purchasing a stock they believed had value, in addition to efforts from retail investors originating online to combat the actions of hedge funds to short the stock, who viewed AMC as a prime “short” target, or a stock to bet against to profit from as it fell. Various hedge funds had begun to “short” AMC, or borrowing and subsequently selling a stock at a current price, and promising to buy the stock back from the lender at a later date, with the goal that the value of the stock falls, giving the short seller the difference between the initial value of the stock and the lower, current value of the stock in profit.

3. This led to a later phenomenon known as a “short squeeze,” where a stock that had been heavily shorted quickly jumps significantly higher, placing short sellers in great distress as they began to owe immense sums of money.

4. This short squeeze benefited the aforementioned retail investors, who were reaping the gains of a stock shooting up at an incredible rate. However, the firms that were shorting AMC were soon in debt for billions as the stock continued to grow immensely along with their liability.

5. Robinhood is an online brokerage firm on which many retail investors invest, given its consumer-friendly label as a firm that allows open trading and does not charge fees.

6. Robinhood purposefully, willfully, and knowingly removed its users' ability to purchase AMC from its trading platform in the midst of the short squeeze, depriving retail investors of the ability to invest in the open-market and manipulating the open-market to artificially lower the price.

7. Robinhood's actions harmed Plaintiffs and the Class.

## THE PARTIES

8. Plaintiff Sagi Cezana was and is a citizen of the State of California.

9. Defendant Robinhood Financial LLC is a Delaware corporation with its principal place of business at 85 Willow Road, Menlo Park, California 94025. It is a wholly-owned subsidiary of Robinhood Markets, Inc. Robinhood Financial LLC is registered as a broker-deal with the U.S. Securities & Exchange Commission ("SEC"). Defendant Robinhood Financial LLC acts as an introducing broker and has a clearing arrangement with its affiliate Defendant Robinhood Securities, LLC.

10. Defendant Robinhood Securities, LLC is a Delaware corporation with its principal place of business at 500 Colonial Center Parkway, Suite 100, Lake Mary, Florida 32746. It is a wholly owned subsidiary of Defendant Robinhood Markets, Inc. Defendant Robinhood Securities, LLC is registered as a broker-dealer with the SEC. Defendant Robinhood Financial LLC acts as a clearing broker and clears trades introduced by its affiliate Defendant Robinhood Financial.

11. Defendant Robinhood Markets, Inc. is a Delaware corporation with its principal place of business at 85 Willow Road, Menlo Park, California 94025. Defendant Robinhood Markets, Inc. is the corporate parent of Defendants Robinhood Financial LLC and Robinhood Securities, LLC.

12. The above-named corporate defendants herein are referred to collectively as "Robinhood."

## JURISDICTION AND VENUE

13. This Court has subject matter jurisdiction over the claims asserted herein pursuant to the Class Action Fairness Act, 28 U.S.C. §1332(d)(2), since some of the members of the Proposed

Class (defined *infra*) are citizens of a State different from that of the Defendant and, upon the original filing of this Complaint, members of the putative class resided in states around the country; there are more than 100 putative class members; and the amount in controversy exceeds $5 million, exclusive of interest and costs.

14. The Court also has personal jurisdiction over the parties because Defendant Robinhood conducts a major part of their national operations, advertising, and sales through continuous business activity in this District.

15. Venue is further appropriate pursuant to 28 U.S.C. §1391 because Defendant conducts a large amount of their business in this District, because it has specifically marketed, advertised, and made substantial sales in California, and because Defendant has substantial relationships in this District. Venue is also proper in this Court because a substantial part of the events and actions giving rise to the harm suffered by members of the Proposed Class occurred in this District.

## FACTUAL ALLEGATIONS

### I. Robinhood's Origins

16. Robinhood is an online brokerage firm. Its users place securities trades through the firm's website, by using a web-based application (or "app"). Robinhood permits users to purchase and sell securities, including futures contracts.

17. Robinhood was founded in 2013 and launched as a product 2015, and soon grew immensely because it pioneered commission-free trading for stocks – or trading stocks for no charge.

18. Robinhood has experienced significant growth as a relatively new online brokerage firm. In 2019, Robinhood raised $323 million in funding at a $7.6 billion valuation. The firm markets itself primarily to younger investors and claims over 10 million users of its trading app.

19. On or about March 23, 2016, Robinhood's official Twitter account stated: "Let the people trade."[1]

[1] @RobinhoodApp, Twitter Post, Twitter (March 23, 2016) available at https://twitter.com/RobinhoodApp/status/712708069369782272

20. Robinhood's mission statement "is to democratize finance for all. We believe that everyone should have access to the financial markets, so we've built Robinhood from the ground up to make investing friendly, approachable, and understandable for newcomers and experts alike."[2]

21. While Robinhood makes its users sign a "Customer Agreement" – the stock traders on Robinhood are not its customers, but its product. Robinhood does not charge for trades, but instead sells trades to "market makers" or firms such as Citadel Securities (Robinhood's largest customer) who act as middleman and make a profit on this transaction. Simply put – Robinhood's customers are financial firms, and the users are the product.[3]

## II. The Rise of AMC

22. In January of 2021, AMC stock rose steadily, gaining nearly 50% in the first 3 weeks of the year.

23. On Monday, January 25th, AMC announced that it had raised $917 million in capital to see it through the pandemic.[4] This news led to a 26% jump on the 25th and a 12 percent jump on the 26th.

24. After news broke that AMC was one of Wall Street's most shorted stocks, retail investors began to invest heavily in AMC, shooting it up 360% overnight to a value of $20.36 per share. Within an hour into the trading day, more than 500 million shares of AMC had changed hands – compared to a 30-day average volume of 86 million shares today. By the end of the trading day, more than 1.1 billion shares of AMC had changed hands.[5]

25. This rise was distributing wealth to smaller, retailer investors away from the hands of hedge funds and massive Wall Street firms that were losing money in droves as the stocks they had shorted continued to rise.

---

[2] Robinhood, Our Mission, (January 28, 2021), available at https://robinhood.com/us/en/support/articles/our-mission/

[3] Edward Ongweso Jr., *Robinhood's Customers Are Hedge Funds Like Citadel, Its Users Are Its Products*, Vice News (January 28, 2021), available at https://www.vice.com/en/article/qjpnz5/robinhoods-customers-are-hedge-funds-like-citadel-its-users-are-the-product

[4] https://www.businesswire.com/news/home/20210125005273/en/AMC-Raises-917-Million-of-Fresh-Investment-Capital-Since-Mid-December-of-2020

[5] https://www.cnbc.com/2021/01/27/amc-shares-triple-as-retail-investor-raid-of-hedge-fund-short-targets-spreads-from-gamestop.html

Case 3:21-cv-00693-TSH Document 1 Filed 01/28/21 Page 6 of 21

26. CNBC's Jim Cramer, a financial markets pundit, noted the success of the online retail investors and praised them, saying "It's incredible to watch. I think they're succeeding beyond their wildest dreams." Cramer noted that they were crushing the short holdings from the major firms and profiting at their expense.[6]

27. Melvin Capital received a $2.8 billion bailout after the precipitous rise of some of the stocks on January 26.

28. One firm that bailed out Melvin Capital, to the tune of $2 billion, was Citadel, the aforementioned biggest customer of Robinhood.

29. Throughout the dramatic rise of AMC and other stocks, Robinhood users continuously complained of delays in trades or outages in the service, making them unable to execute trades at the precise time and price they desired.

**III. <u>January 28th</u>**

30. On or about the morning of January 28, 2021, in order to slow the growth of AMC and deprive their users of the ability to use their service, Robinhood abruptly, purposefully, willfully, and knowingly pulled AMC from their app.[7]

31. This led to a massive fall in AMC, as despite soaring as much as 570% over the course of the week, AMC fell by 55% after Robinhood restricted their users' ability to purchase new AMC stock.[8]

32. By restricting their users from purchasing, there were suddenly more sellers than buyers, and various stocks fell.

33. Upon doing so, there was bipartisan outcry from across the country as it was seen as a sign of market manipulation that Robinhood was restricting its users from purchasing new stock.

---

[6] https://www.cnbc.com/2021/01/14/jim-cramer-gamestop-bed-bath-beyond-are-surging-on-short-busting.html

[7] Robinhood, *Keeping Customers Informed Through Market Volatility*, (January 28, 2021), available at https://blog.robinhood.com/news/2021/1/28/keeping-customers-informed-through-market-volatility

[8] https://www.forbes.com/sites/jonathanponciano/2021/01/28/meme-stocks-begin-to-crumble-gamestop-market-value-falls-14-billion-amc-crashes-55-while-dow-jumps-600-points/?sh=4b3d8b2f4283

34. Representative Rashida Tlaib, Congresswoman from Michigan, said that "This is beyond absurd. @FSCDems need to have a hearing on Robinhood's market manipulation. They're blocking the ability to trade to protect Wall St. hedge funds, stealing millions of dollars from their users to protect people who've used the stock market as a casino for decades."[9]

35. Representative Alexandria Ocasio-Cortez, Congresswoman from New York, tweeted that "This is unacceptable. We now need to know more about @RobinhoodApp 's decision to block retail investors from purchasing stock while hedge funds are freely able to trade the stock as they see fit. As a member of the Financial Services Cmte, I'd support a hearing if necessary.", to which Senator Ted Cruz of Texas indicated his support.[10]

36. Committees in both houses of Congress published that they will be holding hearings on the stock market after Robinhood restricted trading.[11]

37. The New York Attorney General's office published that they would be looking into Robinhood and activity on the app in relation to AMC and other stocks.[12]

38. The SEC assertedthat they would "closely review actions taken by regulated entities that may disadvantage investors or otherwise unduly inhibit their ability to trade certain securities" and "act to protect retail investors when the facts demonstrate abusive or manipulative trading activity that is prohibited by the federal securities laws."[13]

---

[9] @RashidaTlaib, Twitter Post, Twitter (January 28, 2021), available at https://twitter.com/RashidaTlaib/status/1354807292667981828?s=20

[10] @AOC, Twitter Post, Twitter (January 28, 2021), available at https://twitter.com/AOC/status/1354830697459032066

[11] David Shepardson, *U.S. Congress to hold hearings on GameStop trading, state of stock markets*, Reuters (January 28, 2021), available at https://www.reuters.com/article/us-retail-trading-usa-congress/u-s-congress-to-hold-hearings-on-gamestop-trading-state-of-stock-markets-idUSKBN29X33T

[12] New York State Attorney General Press Release, *Attorney General James Reviewing Robinhood App Activity*, (January 28, 2019), available at https://ag.ny.gov/press-release/2021/attorney-general-james-reviewing-robinhood-app-activity

[13] Securities And Exchange Commission Public Statement, *Statement of Acting Chair Lee and Commissioners Peirce, Roisman, and Crenshaw Regarding Recent Market Volatility*, (January 29, 2021), available at https://www.sec.gov/news/public-statement/joint-statement-market-volatility-2021-01-29

39. On January 29, 2021, while ostensibly reinstating the purchases of previously restricted securities, upon information and belief, Robinhood in fact continued to limit the purchase of fractional shares and only allowed a maximum of one share to be purchased.

40. Upon information and belief, Robinhood's actions were done purposefully and knowingly to manipulate the market for the benefit of people and financial intuitions who were not Robinhood's users.

41. Since pulling the stock from their app, AMC prices have gone up from a low point of approximately $7.51, with the stock ending the trading day at $8.68 and shooting up to over $14 in after-hours trading, depriving investors of potential gains.

42. In sum, Robinhood has restricted retailer investors from purchasing AMC in the Robinhood app for no legitimate reason, depriving retailer investors from full use and enjoyment of Robinhood's services to purchase securities.

43. The Financial Industry Regulatory Authority ("FINRA"), which governs brokers like Robinhood, espouses rule 5310 regarding "Best Execution and Interpositioning." Rule 5310.01 requires that brokers, such as Robinhood "must make every effort to execute a marketable customer order that it receives promptly and fully." By failing to respond at all to users that have placed timely trades on its app, in addition to completely preventing users from even attempting trades at all, Robinhood has breached its obligations under FINRA § 5310.01 and caused its users substantial losses.

44. Robinhood continues to arbitrarily pull other securities, such as Gamestop, American Airlines, Blackberry, Bed Bath & Beyond, Castor Maritime, Express, Koss Corporation, Naked Brand Group, Nokia, Sundial Growers, Tootsie Roll, and Trivago ("Additional Stocks") from its app for the same illegitimate reason.

45. Upon information and belief, Robinhood is pulling securities like AMC and Additional Stocks from its platform in order to slow the growth of stocks and help institutional investors and firms with a connection to Robinhood's revenue stream, such as Citadel, at the expense of Robinhood's devoted base of retail investors. Simply put, Robinhood is helping its corporate and

financial firm customers, not its retail end-users. Robinhood reported raising a $1 billion dollar financing round from institutional investors in the midst of the foregoing debacle.

46. On or about January 28, 2021, Plaintiff Cezana attempted to purchase additional shares of AMC stocks. Without prior notice or warning, Robinhood failed to execute the Plaintiff Cezana's buy order for AMC stock. Plaintiff Cezana is a member of the class and has suffered damages as a result of the failure to execute his buy order and other buy orders of similarly situated class members.

47. Thus, Plaintiff, like so many other retail investors, lost out on earning opportunities and the opportunity to buy shares of AMC on Robinhood at the price he desired.

## CLASS ACTION ALLEGATIONS

48. Plaintiff brings claims pursuant to Federal Rule of Civil Procedure 23 on behalf of the following Class, as defined as: **All Robinhood retail users within the United States.**

49. Additionally, or in the alternative, Plaintiff brings claims pursuant to Federal Rule of Civil Procedure 23 on behalf of the following Subclass(es), as defined as:

a. ***Restricted Trading Subclass*: All Robinhood retail users within the United States who were not able to execute trades on AMC, American Airlines, Blackberry, Bed Bath & Beyond, Castor Maritime, Express, GameStop, Koss Corporation, Naked Brand Group, Nokia, Sundial Growers, Tootsie Roll, and Trivago after Robinhood restricted their ability to make stock purchases on the app.**

b. ***California Subclass*: All Robinhood retail users within the State of California who were not able to execute trades on AMC, American Airlines, Blackberry, Bed Bath & Beyond, Castor Maritime, Express, GameStop, Koss Corporation, Naked Brand Group, Nokia, Sundial Growers, Tootsie Roll, and Trivago after Robinhood restricted their ability to make stock purchases on the app.**

50. Excluded from the Class and Subclass(es) are the Robinhood entities and their current employees, counsel for either party, as well as the Court and its personnel presiding over this action.

51. This action has been brought and may properly be maintained as a class action against Robinhood pursuant to the provisions of Federal Rule of Civil Procedure 23.

52. **Numerosity:** The precise number of members of the proposed Class is unknown to Plaintiff at this time, but, based on information and belief, Class members are so numerous that their individual joinder herein is impracticable. Based on information and belief and publicly available reports, Class members number in the hundreds of thousands if not millions. Subclass members are likely in the thousands. All Class and Subclass members may be notified of the pendency of this action by reference to Robinhood's records, or by other alternative means.

53. **Commonality:** Numerous questions of law or fact are common to the claims of Plaintiff and members of the proposed Class. These common questions of law and fact exist as to all Class members and predominate over questions affecting only individual Class members. These common legal and factual questions include, but are not limited to the following:

a. Whether Robinhood knowingly failed to provide the financial services that were needed to handle reasonable consumer demand in high-volume trading times, including trading securities that are available on every other competitive trading platform;

b. Whether Robinhood failed to uphold its duty of care to its users when it purposefully restricted purchases of AMC and Additional Stocks on their app;

c. Whether Robinhood restricted purchases of AMC and Additional Stocks purposefully or at the direction of others to benefit the finances of those it is associated with at the expense of holders of AMC stock and Additional Stocks, many of which are Robinhood users;

d. Whether Robinhood violated FINRA § 5310, alongside numerous other FINRA rules, state laws, and federal regulations;

e. Whether Robinhood violated consumer protection laws in failing to disclose to its users that the services it advertised as open would not include the ability for Robinhood to arbitrarily restrict the purchasing of certain securities;

f. Whether Robinhood was in breach of its legal, regulatory, and licensing requirements by failing to provide adequate access to financial services;

g. Whether Robinhood was in breach of its contracts and/or the implied covenant of good faith and fair dealing in connection with its failure to provide financial services;

  Case 5:21-cv-00693-HSG Document 9-2 Filed 02/05/21 Page 12 of 106

h. Whether Robinhood was negligent or grossly negligent by failing to provide financial services in a timely manner;

i. Whether Robinhood breached its fiduciary duty to its users by failing to provide adequate access to financial services;

j. Whether Robinhood was unjustly enriched by its conduct prohibiting its users from purchasing AMC stock and Additional Stocks and from artificially limiting the purchases of AMC stock and Additional Stocks by the overall market;

k. Whether and to what extent Plaintiff and the Class were injured by Robinhood's conduct and the appropriate class-wide measure of damages, restitution, and other appropriate relief, including injunctive relief; and

l. Whether Plaintiff and the Class are entitled to injunctive and declaratory relief.

54. **Typicality:** The claims of the named Plaintiff are typical of the claims of the proposed Class in that the named Plaintiff was a Robinhood user during the class period and was unable to purchase AMC and Additional Stocks and make time-sensitive trades on AMC and Additional Stocks and thus sustained damages as a result of Robinhood's wrongful conduct in restricting the purchase of AMC and Additional Stocks.

55. **Adequate Representation:** Plaintiff will fairly and adequately represent the interests of the Class in that he has no conflicts with any other Class members. Plaintiff has retained competent counsel experienced in prosecuting complex class actions in federal court, including those involving financial services, and they will vigorously litigate this class action on his behalf and on behalf of the class.

56. **Predominance and Superiority:** There is no plain, speedy, or adequate remedy other than by maintenance of this class action. A class action is superior to other available means, if any, for the fair and efficient adjudication of this controversy. Prosecution of separate actions by individual Class members would create the risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for the Defendant. Additionally, given the relatively modest damages sustained by most individual Class members, few, if any, proposed Class members could or would sustain the economic burden of pursuing individual remedies for Robinhood's wrongful

conduct. Treatment as a class action will achieve substantial economies of time, effort, and expense, and provide comprehensive and uniform supervision by a single court. This class action presents no material difficulties in management.

57. A class action is superior to other available methods for the fair and efficient adjudication of this controversy. A class action will permit an orderly and expeditious administration of the claims of the Class, will foster economies of time, effort, and expense, and will insure uniformity of decisions. The prosecution of individual actions by Class members would create the risk of (a) inconsistent or varying adjudications with respect to individual Class members; and (b) be grossly impracticable because the cost of vindicating an individual Class member's claim would likely exceed the value of the claim.

58. Class action certification is warranted under Fed. R. Civ P. 23(b)(1)(A) because the prosecution of separate actions by individual members of the proposed Class would create a risk of inconsistent or varying adjudications with respect to individual Class members, which may produce incompatible standards of conduct for Defendants. 34. Class action certification is warranted under Fed. R. Civ P. 23(b)(1)(B) because the prosecution of separate actions by individual members of the proposed Class would create a risk of adjudications with respect to individual Class members which may, as a practical matter, be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

59. The prerequisites to maintaining a class action for injunctive or equitable relief pursuant to Fed. R. Civ. P. 23(b)(2) are met as Robinhood has acted or refused to act on grounds generally applicable to the Class, thereby making final injunctive, declaratory, or equitable relief appropriate with respect to the Class as a whole. Class action certification is also warranted under Fed. R. Civ P. 23(b)(3) because questions of law or fact common to the Class members predominate over any questions affecting only individual members, and a Class action is superior to other available remedies for the fair and efficient adjudication of this controversy.

60. The amount of damages available to the individual Plaintiff is insufficient to make litigation addressing Robinhood's conduct economically feasible for most in the absence of the class action procedure. Individualized litigation also presents a potential for inconsistent or contradictory

judgments and increases the delay and expense to all parties and the court system presented by the legal and factual issues of the case. By contrast, the class action device presents far fewer management difficulties and provides the benefits of a single adjudication, economy of scale, and comprehensive supervision by a single court.

61. Class action certification is also warranted under Fed. R. Civ P. 23(c)(4) because questions of law or fact common to the Class members may be certified and decided by this Court on a class wide basis.

## CAUSES OF ACTION

### Count I

### Breach of Contract

62. Plaintiffs hereby incorporate by reference the factual allegations set forth above.

63. In order to use the Robinhood trading platform, a potential user must enter into the Customer Agreement with Robinhood.

64. Plaintiff and all class members did enter into a Customer Agreement with Robinhood before beginning to use the app.

65. Robinhood breached its Customer Agreement by failing to disclose that its platform was going to arbitrarily restrict a security from being purchased on the app; that Robinhood failed to provide adequate explanation to its users as to why the security was being pulled; that Robinhood knowingly put their users at a disadvantage in the high-stakes and fast moving stock market compared to users who used other trading apps or services; that Robinhood's prohibited Plaintiff and the Class from performing trades on the stock market in a timely manner (or at all) under the contract; that Robinhood failed to comply with all applicable legal, regulatory, and licensing requirements in the running of a stock trading marketplace; and that Robinhood failed to exercise trades and actions requested by users as is required under law.

66. As such, Robinhood breached its Customer Agreement with Plaintiff and the Class.

67. Robinhood's failure to perform its duties and its breaches of the Customer Agreement resulted in damages and losses to Plaintiff and the Class members and exposes them to continuing

harm due to Robinhood's ongoing failure to perform its obligations under the Customer Agreement. These losses reflect damages to Plaintiff and Class members in an amount to be determined at trial or separate proceedings as necessary.

## Count II

## Breach of Implied Covenant of Good Faith & Fair Dealing

68. Plaintiffs hereby incorporate by reference the factual allegations set forth above.

69. Plaintiffs and the Class and Subclass entered into the Customer Agreement with Defendant Robinhood to open a Robinhood trading account. They agreed to Robinhood's Terms and Conditions in order to use Robinhood's website and trading platform.

70. Plaintiffs and members of the Class and Subclass fulfilled their obligations under these contracts by adhering to the agreed upon terms and by using Robinhood's trading services through its website, app, and trading platform.

71. Robinhood was obligated to provide the trading services required under those contracts at all times, including but not limited to, trades for AMC and Additional Stocks.

72. When initially signing up for Robinhood, Plaintiff and all those similarly situated could and most actually did trade AMC and Additional Stocks.

73. Robinhood unfairly interfered with the rights of Plaintiffs and members of the Class and Subclass to receive the benefits of the Customer Agreement by, among other things, (i) failing to provide services necessary to timely execute a trade on the stock market; (ii) failing to allow its users to trade certain securities at all; (iii) failing to inform its users in a timely and effective manner of the drastic changes in trading abilities; and (iv) prohibiting plaintiffs from buying AMC and other stocks for Robinhood's own pecuniary interest and not disclosing that interest to Plaintiffs and all Class and Subclass members.

74. Robinhood acted in bad faith by placing its interests, and the interests of its associates, over its contractual duties to its users.

75. Robinhood's conduct has caused Plaintiffs and members of the Class and Subclass harm, losses, and damages. These losses reflect damages to Plaintiffs and members of the Class and Subclass in an amount to be determined at trial or separate proceedings as necessary.

**Count III**

**Negligence Per Se**

76. Plaintiffs hereby incorporate by reference the factual allegations set forth above.

77. Robinhood had a duty to exercise reasonable care in conducting and facilitating transactions for its users.

78. Robinhood had a statutory duty to exercise reasonable care in providing trades on the free, open market for its users.

79. Robinhood unlawfully breached its statutory duties when it (i) restricted the purchases of AMC and Additional Stocks on its app; (ii) failed to provide its users services related to AMC and Additional Stocks; (iii) failed to notify users in a timely manner of the AMC and Additional Stocks "blackout," or the total restriction of AMC and Additional Stocks purchases on its app.

80. Robinhood's conduct as set forth in this Complaint was devoid of even the most minimum level of care, and its acts and omissions were and continue to be an extreme departure from the ordinary standard of care. Their actions breach the duty of care to their users, but are also inconsistent with the standard of care expected from similar firms in the stock marketplace industry.

81. Robinhood completely disregarded the interests of its users by restricting their ability to purchase AMC and Additional Stocks, a breach of the standard of care that falls so far below normal conduct for a brokerage service that it amounts to a complete dereliction of its duties.

82. Robinhood not only violated the relevant statute, ordinance, or regulation but failed to do what might reasonably be expected of a person of ordinary prudence, acting under similar circumstances, who desired to comply with the law.

83. Robinhood's grossly negligent and wrongful breaches of its duties owed to Plaintiffs and members of the Class and Subclass proximately caused losses and damages that would not have occurred but for Robinhood's gross breach of its duty of due care. These losses reflect damages to Plaintiffs and the Class and Subclass in an amount to be determined at trial or separate proceedings as necessary.

**Count IV**

**Negligence [Cal. Civ. Code § 1714]**

84. Plaintiffs hereby incorporate by reference the factual allegations set forth above. Robinhood had a duty to exercise reasonable care in conducting and facilitating transactions for its users.

85. Robinhood had a common law duty to exercise reasonable care in providing trades on the free, open market for its users.

86. Robinhood unlawfully breached its common law duties when it (i) restricted the purchases of AMC and Additional Stocks on its app; (ii) failed to provide its users services related to AMC and Additional Stocks; (iii) failed to notify users in a timely manner of the AMC and Additional Stocks "blackout," or the total restriction of AMC and Additional Stocks purchases on its app.

87. Robinhood's conduct as set forth in this Complaint was devoid of even the most minimum level of care, and its acts and omissions were and continue to be an extreme departure from the ordinary standard of care. Their actions breach the duty of care to their users, but are also inconsistent with the standard of care expected from similar firms in the stock marketplace industry.

88. Robinhood completely disregarded the interests of its users by restricting their ability to purchase AMC and Additional Stocks, a breach of the standard of care that falls so far below normal conduct for a brokerage service that it amounts to a complete dereliction of its duties.

89. Robinhood's grossly negligent and wrongful breaches of its duties owed to Plaintiffs and members of the Class and Subclass proximately caused losses and damages that would not have occurred but for Robinhood's gross breach of its duty of due care. These losses reflect damages to Plaintiffs and the Class and Subclass in an amount to be determined at trial or separate proceedings as necessary.

**Count V**

**Breach of Fiduciary Duty**

90. Plaintiff hereby incorporates by reference the factual allegations contained herein.

91. As a licensed provider of financial services, Robinhood at all times relevant was a fiduciary to Plaintiff and the Class members and owed them the highest level of good faith and

integrity in the course of performing financial services on their behalf, services that include the buying and selling of stock. Robinhood also acted as a fiduciary to all users who agreed to the Customer Agreement.

92. Robinhood breached its fiduciary duties to Plaintiff and the Class by failing to disclose that it would restrict AMC and Additional Stocks purchases in a timely manner; actually restricting new purchases of AMC and Additional Stocks; restricting purchases of AMC and Additional Stocks for its own pecuniary benefits; failing to provide access to its financial services in a timely manner; failing to comply with all applicable legal, regulatory, and licensing requirements; failing to exercise trades and actions requested by users in a complete and timely manner (also required by FINRA § 5310).

93. Robinhood's conduct caused and continues to cause Plaintiff and the Class members' harm, losses, and damages. These losses reflect damages to Plaintiff and Class members in an amount to be determined at trial or separate proceedings as necessary.

**Count VI**

**Constructive Fraud**

94. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

95. Robinhood owed Plaintiff and the Class fiduciary duties as their broker for selling securities.

96. Robinhood owed Plaintiff and the Class the utmost duty of care as their fiduciary, including the duty to fully disclose material facts relating to their brokerage relationship.

97. Robinhood represented to Plaintiff and the class that it was a brokerage service dedicated to free trading and democratizing the stock market.

98. Plaintiff and the Class chose Robinhood as their brokerage service in part due to Robinhood's assurances that it was consumer friendly as a firm that allows open trading.

99. Robinhood subsequently restricted what Plaintiff and the Class were able to buy on their brokerage, contrary to their representations.

100. Plaintiff and the Class' s reliance on Robinhood's false representations were substantial factors in causing Plaintiff harm, as they were unable to trade with freedom given Robinhood's restrictions.

**Count VII**

**Violation of California's Unfair Competition Law [Cal. Bus. & Prof. Code § 17200 et seq.]**

**(California Subclass)**

101. Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

102. California's Unfair Competition Law ("UCL") is designed to protect consumers from unlawful, fraudulent, and/or unfair business practices. Robinhood's restrictions on the trade of securities within its app constitutes an unlawful business practice.

103. **Unlawful Practices**: A practice is "unlawful" if it violates a law other than the UCL. Robinhood violated Plaintiff and the Class's common law and California statutory rights when it failed to provide complete trading services as to AMC and other stocks. Robinhood's negligence, breach of contract, and breach of fiduciary duty made Plaintiff and the Class unable to trade stock in AMC and Additional Stocks and lose out on massive potential gains.

104. These violations of common and state as the predicate violations under the unlawful prong of the UCL, as Robinhood created private causes of action against it by damaging the property rights of Plaintiff and the Class via its unlawful conduct.

105. **Fraudulent Practices**: A practice is "fraudulent" if members of the general public were or are likely to be deceived. Robinhood's messaging that it was an open platform and its mission to "democratize" trading is likely to deceive users into believing that they are truly open to purchase how they please on Robinhood's marketplace, when in fact Robinhood will arbitrarily restrict what stocks its users can purchase.

106. **Unfair Practices**: The UCL gives courts maximum discretion to address improper business practices that are "unfair." Robinhood's business practices have become, and will continue to be, unfair because Robinhood users were assured that they would be able to trade freely on the Robinhood service and not have what stocks they were able to trade in be arbitrarily restricted at the potentially nebulous whims of Robinhood. The gravity of the harm caused to Robinhood users, such

as Plaintiff, far outweighs any business reason, justification, or motive Robinhood may have had for engaging in its unfair business practices.

107. As a result of Robinhood's unlawful, fraudulent, and/or unfair business practices, Plaintiffs suffered injury in fact and have lost a property interest in the values of their stock portfolios given their inability to effectively purchase new stock on the Robinhood platform.

108. Accordingly, Plaintiffs and the other Class members have suffered injury in fact including lost money or property as a result of Robinhood's misconduct.

109. Plaintiff and the Class seek to enjoin further unlawful, unfair, and/or fraudulent acts or practices.

110. Plaintiff and the Class requests that this Court enter such orders or judgments as may be necessary to enjoin Robinhood from continuing its unfair, unlawful, and/or deceptive practices and to restore to Plaintiff and members of the Class any money it acquired by unfair competition, including restitution and/or restitutionary disgorgement, as provided in Cal. Bus. & Prof. Code § 17203 and Cal. Bus. & Prof. Code § 3345; and for such other relief set forth below.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of himself and the Class, demands a jury trial and prays for relief that this Court enter judgment in their favor and that of the Proposed Class and the proposed Subclass, as defined herein, and against Defendant Robinhood as follows:

i. Enter an immediate injunction requiring Robinhood to fully reinstate AMC and all the other stocks it restricted in the announcement on January 28, 2021 on their trading platform;

ii. Restrain Robinhood, their officers, agents, servants, employees, attorneys, and those in active concert or participation with them, from the continued and unauthorized restriction of trading ability of the Plaintiff and Proposed Class and proposed subclasses, as defined herein;

iii. Certify the Proposed Class as well as any suitable subclasses, under Fed. R. Civ. P. 23;

iv. Appoint Plaintiff and their legal counsel as both named representatives for the Proposed Class (or for any suitable subclasses), and as Class Counsel, respectively;

v. Award Plaintiffs and the Proposed Class (or any suitable subclass): (i) actual, compensatory, and consequential damages, (ii) punitive and treble damages, as allowed for under the relevant laws, (iii) restitution, disgorgement, reimbursement, and/or other equitable relief as the Court deems just and proper, (iv) costs, including experts' fees and attorneys' fees and expenses, and any other reasonable costs, and (v) pre- and post-judgment interest, to the extent allowed under the relevant laws;

vi. For any such other and additional relief that this Court should deem as just and proper.

Dated: January 29, 2021

Respectfully submitted,

s/ *William M. Audet*

William M. Audet (SBN 117456)
waudet@audetlaw.com
"David" Ling Y. Kuang (SBN 296873)
lkuang@audetlaw.com
Kurt D. Kessler (SBN 327334)
kkessler@audetlaw.com
**AUDET & PARTNERS, LLP**
711 Van Ness Avenue, Suite 500
San Francisco, CA 94102-3275
Telephone: (415) 568-2555
Facsimile: (415) 568-2556

Robert L. Lieff (SBN 037568)
rlieff@lchb.com
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339
Telephone: (415) 956-1000
Facsimile: (415) 956-1008

Jack Russo (SBN 096068)
jrusso@computerlaw.com
**COMPUTER LAW GROUP, LLP**
401 Florence Street
Palo Alto, CA 94301

Telephone: (650) 327-9800
Facsimile: (650) 618-1863

*Attorneys for Plaintiff Sagi Cezana, on behalf of himself and all others similarly situated*

20
**CLASS ACTION COMPLAINT**

# EXHIBIT 2

Joseph R. Saveri (State Bar No. 130064)
Steven N. Williams (State Bar No. 175489)
Christopher K.L. Young (State Bar No. 318371)
Anupama K. Reddy (State Bar No. 324873)
**JOSEPH SAVERI LAW FIRM, INC.**
601 California Street, Suite 1000
San Francisco, California 94108
Telephone: (415) 500-6800
Facsimile: (415) 395-9940
Email: jsaveri@saverilawfirm.com
swilliams@saverilawfirm.com
cyoung@saverilawfirm.com
areddy@saverilawfirm.com

*Counsel for Individual and Representative Plaintiffs Shane Cheng and Terell Sterling*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

SHANE CHENG and TERELL STERLING, individually and on behalf of others similarly situated,

Plaintiffs,

v.

ALLY FINANCIAL INC.;
ALPACA SECURITIES LLC;
CASH APP INVESTING LLC;
SQUARE INC.;
DOUGH LLC;
MORGAN STANLEY SMITH BARNEY LLC;
E*TRADE SECURITIES LLC;
E*TRADE FINANCIAL CORPORATION;
E*TRADE FINANCIAL HOLDINGS, LLC;
ETORO USA SECURITIES, INC.;
FREETRADE, LTD.;
INTERACTIVE BROKERS LLC;
M1 FINANCE, LLC;
OPEN TO THE PUBLIC INVESTING, INC.;
ROBINHOOD FINANCIAL, LLC;
ROBINHOOD MARKETS, INC.;
ROBINHOOD SECURITIES, LLC; IG GROUP HOLDINGS PLC;
TASTYWORKS, INC.;
TD AMERITRADE, INC.;
THE CHARLES SCHWAB CORPORATION;
CHARLES SCHWAB & CO. INC.;
FF TRADE REPUBLIC GROWTH, LLC ;
TRADING 212 LTD.;

Case No.

CLASS ACTION COMPLAINT

DEMAND FOR JURY TRIAL

TRADING 212 UK LTD.;
WEBULL FINANCIAL LLC;
FUMI HOLDINGS, INC.;
STASH FINANCIAL, INC.;
BARCLAYS BANK PLC;
CITADEL ENTERPRISE AMERICAS, LLC;
CITADEL SECURITIES LLC;
MELVIN CAPITAL MANAGEMENT LP;
SEQUOIA CAPITAL OPERATIONS LLC;
APEX CLEARING CORPORATION;
THE DEPOSITORY TRUST & CLEARING CORPORATION,

Defendants.

## TABLE OF CONTENTS

Page(s)

INTRODUCTION ....... 1

JURISDICTION AND VENUE ....... 3

PARTIES ....... 5

A. Plaintiff Shane Cheng ....... 5

B. Plaintiff Terell Sterling ....... 5

C. Brokerage Defendants ....... 5

D. Fund Defendants ....... 10

E. Clearinghouse Defendants ....... 11

AGENTS AND CO-CONSPIRATORS ....... 11

CLASS ALLEGATIONS ....... 12

FACTUAL ALLEGATIONS ....... 14

CLAIMS FOR RELIEF ....... 38

COUNT ONE ....... 38

COUNT TWO ....... 40

COUNT THREE ....... 42

COUNT FOUR ....... 43

COUNT FIVE ....... 44

COUNT SIX ....... 45

COUNT SEVEN ....... 46

COUNT EIGHT ....... 47

COUNT NINE ....... 48

PRAYER FOR JUDGMENT ....... 48

JURY TRIAL DEMANDED ....... 50

Plaintiffs Shane Chang and Terell Sterling, on behalf of themselves and all others similarly situated, bring this Class Action Complaint against Defendants for violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, Section 16 of the Clayton Act, 15 U.S.C. § 26, state antitrust and consumer protection laws, and the common law as follows:

**INTRODUCTION**

1. This case is about individual investors (the "Retail Investors") who invested their hard-earned money in the stock market and were stripped of the rights to control their investments due to a large, overarching conspiracy to prevent the market from operating freely and to stop the Defendants from hemorrhaging losses as a result of their highly speculative short selling strategies.

2. Retail Investors or individual investors are non-professional investors that make individual investments on their own behalf. Retail Investors purchase assets such as stocks, bonds, securities, mutual funds, and exchange traded funds (ETFs). They execute their personal trades through websites, apps and trading platforms provided by brokerage firms or other investment service providers. Retail Investors tend to invest smaller amounts, in contrast as compared to institutional investors, and have little ability to influence market prices or market dynamics on their own.

3. Generally, Retail Investors pay brokerages a fee or commission for personal trades to their brokerages.

4. Some brokerages, like Defendant Robinhood, do not charge their investors a fee per transaction, but instead earn revenue through rebates, kickbacks and other payments from market makers like the Clearinghouse Defendants.

5. Some individual investors are members of online financial discussion forums on Reddit, Facebook, TikTok and elsewhere, where they are able to share and discuss their market research and observations and help like-minded peers benefit from their research and potentially identify good opportunities for investment.

6. Based on their research, and observations, the Retail Investors, through stock brokerages, including the Brokerage Defendants, purchased and invested in certain stocks—Gamestop (GME), AMC Theaters (AMC), American Airlines (AAL), Bed Bath & Beyond (BBBY), Blackberry (BB), Express (EXPR), Koss (KOSS) Naked Brand Group (NAKD), Nokia (NOK),

Sundial Growers Inc. (SNDL), Tootsie Roll Industries (TR), and Trivago NV (TRVG) (the "Relevant Securities")—that they believed would grow, increase in price and serve as good investment opportunities.

7. Several large hedge funds and investment firms, including Citadel Enterprise Americas LLC, Citadel Securities LLC, Melvin Capital Management LP, and unnamed co-conspirators, acquired and possessed massive "short" positions in the Relevant Securities.

8. "Short" sellers borrow shares or other interests in corporate stock, securities, or other assets. In so doing, they bet that prices of the securities will decrease. If the stock prices in fact drop, a short seller buys the stock back at a lower price and returns it to the lender. The difference between the sell price and the buy price is the profit. Short sellers essentially bet on a stock's failure or decline rather than its success or increase.

9. The Fund Defendants and other unnamed co-conspirators made short selling investments in the Relevant Securities. In so doing, they made highly speculative bets. When the Relevant Securities increased in value, due in large part to Retail Investors purchasing the Relevant Securities and increasing stock prices, the Fund Defendants, Clearinghouse Defendants and unnamed co-conspirators were exposed to potential losses of several billion dollars.

10. As Retail Investors and others continued to purchase the Relevant Securities, the Fund Defendants, Clearinghouse Defendants and unnamed co-conspirators were caught in a classic "short squeeze." A "short squeeze" occurs when a stock or other asset rises sharply in value, distressing short positions. Short selling investors are faced with a rapid increase in the shorted asset's value, exposing the short seller to increased and theoretically limitless loss. As the price of the asset rises, short sellers may face pressure to buy back stock to exit their short positions to mitigate their potential losses. In the absence of intervention, as short sellers exit their short positions to buy back stocks to cover their shorts, the purchase of stock further increases the price of the stock.

11. The Brokerage Defendants, Fund Defendants and Clearinghouse Defendants (together the "Defendants") conspired to prevent the Retail Investors from buying any further stock and forcing Retail Investors to sell their Relevant Securities to artificially suppress stock prices of the Relevant Securities.

12. On January 27, 2021, after the close of the stock market and before the open of the market the next day, the Fund Defendants coordinated and planned increased short volumes in anticipation of short calls on January 28, 2021.

13. The Brokerage Defendants—that operate through websites and mobile applications—disabled all buy features on their platforms and thereby left the Retail Investors with no choice but to sell or hold their rapidly dwindling stocks. The Brokerage Defendants did so to ensure that the stock prices for the Relevant Securities go down in furtherance of the conspiracy. Other Brokerage Defendants displayed loading graphics on the landing pages for these Relevant Securities to prevent users from purchasing any more Relevant Securities. Plaintiffs and Class members, faced with an imminent decrease in the price of their positions in the Relevant Securities due to the inability of Retail Investors to purchase shares, were induced to sell their shares in the Relevant Securities at a lower price than they otherwise would have. Additionally, Class members that would have purchased more stock in the Relevant Securities given the upward trend in price could not do so.

14. By doing so, the Defendants and their co-conspirators forced Retail Investors to choose between selling the Relevant Securities at a lower price or holding their rapidly declining positions in the Relevant Securities. Defendants did so to drive the price of the Relevant Securities down.

15. Defendants and their co-conspirators conspired to prevent the Retail investors from buying further stock in order to mitigate the Fund Defendants' exposure in their short positions. By forcing the Retail Investors to sell their Relevant Securities at lower prices than they otherwise would have, Defendants artificially reduced the value of the Relevant Securities that Retail Investors either sold or held on to.

## JURISDICTION AND VENUE

16. Plaintiffs bring this action on their own behalf as well on behalf of the members of the Class to recover damages, including treble damages, costs of suit, and reasonable attorneys' fees arising from Defendants' violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, Section 16 of the Clayton Act, 15 U.S.C. § 26, as well as any and all equitable relief afforded to them under the federal laws pleaded herein.

17. This Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331 because the case arises under the Constitution, laws, or treaties of the United States.

18. This Court also has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1332(d) and 1367, in that (a) this is a class action in which the matter or controversy exceeds the sum of $5,000,000, exclusive of interest and costs, and in which some members of the proposed Class are citizens of a state different from some defendants; and (b) Plaintiffs' state law claims form part of the same case or controversy as their federal claims under Article III of the United States Constitution.

19. Jurisdiction and venue are proper in this judicial District pursuant to 28 U.S.C. § 1391(b), (c) and (d), because a substantial part of the events giving rise to Plaintiffs' claims occurred in this District, a substantial portion of the affected interstate trade and commerce was carried out in this District, and one or more of the Defendants reside in this District or are licensed to do business in this District. Each Defendant has transacted business, maintained substantial contacts, or committed overt acts in furtherance of the illegal scheme and conspiracy throughout the United States, including in this District. The conspiracy occurred in this judicial District. The conspiracy has been directed at, and has had the intended effect of, causing injury to persons residing in, located in, or doing business throughout the United States, including in this District.

20. This Court has personal jurisdiction over each Defendant because, each Defendant: (a) transacted business throughout the United States, including in this District; (b) transacted in substantial amounts of the Relevant Securities throughout the United States; (c) had substantial contacts with the United States, including this District; and/or (d) engaged in an antitrust conspiracy that was directed at and had a direct, foreseeable, and intended effect of causing injury to the business or property of persons residing in, located in, or doing business throughout the United States, including in this District.

21. The activities of the Defendants and all co-conspirators—whether unnamed or as of yet unknown—as described herein, were within the flow of, were intended to, and did have direct, substantial, and reasonably foreseeable effects on the foreign and interstate commerce of the United States.

## PARTIES

**A. Plaintiff Shane Cheng**

22. Plaintiff Shane Cheng is a resident of the State of California. Before January 28, 2021, Plaintiff Cheng purchased and owned option contracts in Gamestop, AMC Theaters and Blackberry on Robinhood and TD Ameritrade.

23. On January 28, 2021, Plaintiff Cheng attempted to purchase securities but was unable to do so because Defendants had deactivated the "buy" features on their applications due to the anticompetitive scheme.

24. Plaintiff Cheng was unable to search for the Relevant Securities on Defendant Robinhood's platform on January 28, 2021.

**B. Plaintiff Terell Sterling**

25. Plaintiff Terell Sterling is a resident of the State of California. Before January 28, 2021, Plaintiff Sterling purchased and owned stocks and option contracts in AMC Theaters, Blackberry, Gamestop, Naked Brand Group, and Nokia on Robinhood and E*Trade. Plaintiff Sterling bought these Relevant Securities with cash and not on margin.

26. On January 28, 2021 Plaintiff Sterling attempted to purchase the Relevant Securities on Defendants Robinhood and E*Trade's web-based and mobile-based platforms but was prohibited from doing so by the Defendants due the anticompetitive scheme.

27. On January 29, 2021, Plaintiff Sterling sold positions in Gamestop as a result of the anticompetitive scheme.

**C. Brokerage Defendants**

**a. Defendant Ally Financial Inc.**

28. Defendant Ally Financial Inc. ("Ally") is a Delaware corporation, with its headquarters located at Ally Detroit Center 500, Woodward Ave., Floor 10, Detroit, Michigan. Ally provides financial services including an electronic trading platform to trade financial assets. Ally sold Relevant Securities directly to members of the Class during the Class Period.

**b. Defendant Alpaca Securities LLC**

29. Defendant Alpaca Securities LLC ("Alpaca") is a Delaware corporation, with its headquarters at 20 N San Mateo Drive Suite 10, San Mateo, California. Alpaca provides financial services including an electronic trading platform to trade financial assets. Alpaca sold Relevant Securities directly to members of the Class during the Class Period.

**c. Defendant Cash App**

30. Defendant Cash App Investing LLC ("Cash App Investing") is a Delaware corporation headquartered at 920, SW 6th Avenue Ste. 1200, Portland, Oregon. Cash App Investing is a wholly owned subsidiary of Square Inc. Cash App Investing provides financial services including an electronic trading platform to trade financial assets. Cash App Investing sold Relevant Securities directly to members of the Class during the Class Period. Square Inc. and Cash App Investing LLC are referred collectively as "Cash App."

31. Defendant Square Inc. is a Delaware corporation with its headquarters located at 1455 Market Street, Suite 600, San Francisco, California.

**d. Defendant Dough**

32. Defendant Dough LLC ("Dough") is a Delaware limited-liability corporation, with its headquarters located at 327 N. Aberdeen Street, Chicago, Illinois. Dough provides financial services including an electronic trading platform to trade financial assets. Dough sold Relevant Securities directly to members of the Class during the Class Period.

**e. Defendant E*Trade**

33. Defendant Morgan Stanley Smith Barney LLC ("Morgan Stanley") is a Delaware limited-liability corporation and parent company of E*Trade, with its headquarters located at 1585 Broadway Avenue, New York, New York. Morgan Stanley is the owner and ultimate parent of E*Trade Securities LLC, E*Trade Financial Corporation, and E*Trade Financial Holdings. Morgan Stanley, E*Trade Securities LLC, E*Trade Financial Corporation, and E*Trade Financial Holdings are collectively referred to as "E*Trade."

34. Defendant E*Trade Securities LLC is a Delaware limited-liability corporation, with its headquarters at 671 North Glebe Road, Ballston Tower, Arlington, Texas.

35. Defendant E*Trade Financial Corporation is a Delaware corporation, with its headquarters at 671 North Glebe Road, Ballston Tower, Arlington, Texas.

36. Defendant E*Trade Financial Holdings, LLC is a Delaware limited-liability corporation, with its headquarters at 671 North Glebe Road, Ballston Tower, Arlington, Texas.

**f. Defendant eToro**

37. Defendant Etoro USA Securities, INC. ("eToro") is a Delaware corporation and owner of the application eToro, headquartered at 221 River St., 9th floor, Hoboken, New Jersey. eToro provides financial services including an electronic trading platform to trade financial assets. eToro sold Relevant Securities directly to members of the Class during the Class Period.

**g. Defendant Freetrade**

38. Defendant Freetrade, Ltd. ("Freetrade") is a company incorporated in the United Kingdom, headquartered at 32-38 Leman Street, London, United Kingdom. Freetrade provides financial services including an electronic trading platform to trade financial assets. Freetrade sold Relevant Securities directly to members of the Class during the Class Period.

**h. Defendant Interactive Brokers**

39. Defendant Interactive Brokers LLC ("Interactive Brokers") is a Delaware limited-liability corporation headquartered at 1 Pickwick Plaza, Greenwich, Connecticut. Interactive Brokers provides financial services including an electronic trading platform to trade financial assets. Interactive Brokers sold Relevant Securities directly to members of the Class during the Class Period.

**i. Defendant M1 Finance**

40. Defendant M1 Finance, LLC ("M1 Finance") is a Delaware corporation headquartered at 200 North La Salle Street, Suite 800, Chicago, Illinois. M1 Finance provides financial services including an electronic trading platform to trade financial assets. M1 Finance sold Relevant Securities directly to members of the Class during the Class Period.

**j. Defendant Public.com**

41. Defendant Open To The Public Investing, Inc. ("Public.com") is a New York corporation, headquartered at 1 State Street Plaza, 10th Floor, New York, New York. Public.com

provides financial services including an electronic trading platform to trade financial assets. Public.com sold Relevant Securities directly to members of the Class during the Class Period.

**k. Defendant Robinhood**

42. Defendant Robinhood Markets, Inc. is a Delaware corporation with its principal place of business at 85 Willow Road, Menlo Park, California. Defendant Robinhood Markets, Inc. is the corporate parent of and controls the affairs of Defendants Robinhood Financial, LLC and Robinhood Securities, LLC.

43. Defendant Robinhood Financial, LLC is a Delaware corporation with its principal place of business at 85 Willow Road, Menlo Park, California. It is a wholly- owned subsidiary of Robinhood Markets, Inc.

44. Defendant Robinhood Securities, LLC is a Delaware corporation with its principal place of business at 500 Colonial Center Parkway, Suite 100, Lake Mary, Florida. It is a wholly owned subsidiary of Defendant Robinhood Markets, Inc. Defendant Robinhood Financial (collectively, with Robinhood Financial, LLC and Robinhood Markets, Inc. as "Robinhood").

45. Robinhood provides financial services including an electronic trading platform to trade financial assets. Robinhood sold Relevant Securities directly to members of the Class during the Class Period.

**l. Defendant Stash**

46. Defendant Barclays Bank PLC is a company incorporated in the United Kingdom, and headquartered at 745 7th Ave New York, New York. Barclays Bank PLC is the ultimate corporate parent of, and controls the affairs of Stash Financial, Inc.

47. Defendant Stash Financial, Inc. ("Stash") is a Delaware corporation and owner of the application Stash, headquartered at 500 7th Avenue,18th Floor, New York, New York. Stash is a wholly-owned subsidiary of Barclays Bank PLC. Stash provides financial services including an electronic trading platform to trade financial assets. Stash sold Relevant Securities directly to members of the Class during the Class Period.

**m. Defendant Tastyworks**

48.     Defendant IG Group Holdings PLC is a Delaware public limited company and ultimate corporate parent of and controls the affairs Tastyworks, Inc., headquartered at 200 West Jackson Blvd., Suite 1450, Chicago, Illinois.

49.     Defendant Tastyworks, Inc. is a Delaware corporation and wholly-owned subsidiary of IG Group Holdings PLC, headquartered at 100 West Fulton Market Street, Suite 220, Chicago, Illinois (IG Holdings and Tastyworks, Inc. collectively, "Tastyworks").

50.     Tastyworks provides financial services including an electronic trading platform to trade financial assets. Tastyworks sold Relevant Securities directly to members of the Class during the Class Period.

**n. Defendant TD Ameritrade**

51.     Defendant The Charles Schwab Corporation is a Delaware corporation with its principal place of business at 211 Main Street, San Francisco, California. The Charles Schwab Corporation is the ultimate corporate parent of and controls the affairs of Charles Schwab & Co., Inc. and TD Ameritrade Inc.

52.     Defendant Charles Schwab & Co. Inc. is a California corporation with its principal place of business at 211 Main Street, San Francisco, California. Charles Schwab & Co. Inc. is a wholly owned subsidiary of The Charles Schwab Corporation.

53.     Defendant TD Ameritrade, Inc., is a New York corporation with its principal place of business in Illinois. As of October 2020, The Charles Schwab Corporation acquired TD Ameritrade, Inc. The Charles Schwab Corporation, Charles Schwab & Co., Inc. and TD Ameritrade, Inc. collectively, "TD Ameritrade." TD Ameritrade provides financial services including an electronic trading platform to trade financial assets. TD Ameritrade sold Relevant Securities directly to members of the Class during the Class Period.

**o. Defendant Trade Republic**

54.     Defendant FF Trade Republic Growth, LLC ("Trade Republic") is a Delaware corporation, headquartered at One Letterman Drive, Building D, 5th Floor, San Francisco, California. Trade Republic provides financial services including an electronic trading platform to trade financial

assets. Trade Republic sold Relevant Securities directly to members of the Class during the Class Period.

**p. Defendant Trading 212**

55. Defendant Trading 212 Ltd. is a Bulgarian company headquartered at 3 Lachezar Stanchev Str., Litex Tower, Floor 10, Sofia 1797, Bulgaria. Trading 212 Ltd. is the ultimate corporate parent of and controls the affairs of Trading 212 UK Ltd.

56. Defendant Trading 212 UK Ltd. is a company incorporated in the United Kingdom headquartered at 107 Cheapside, London, United Kingdom. Trading 212 UK Ltd. a wholly-owned subsidiary of Trading 212 Ltd. (Trading 212 Ltd. and Trading 212 UK Ltd. collectively, "Trading 212"). Trading 212 provides financial services including an electronic trading platform to trade financial assets. Trading 212 sold Relevant Securities directly to members of the Class during the Class Period.

**q. Defendant WeBull**

57. Defendant Fumi Holdings, Inc. is a Chinese corporation. Fumi Holdings, Inc. and headquartered in Hunan, China. Fumi Holdings, Inc. is the corporate parent of, and controls the affairs of Webull Financial LLC.

58. Defendant Webull Financial LLC ("WeBull") is a Delaware corporation and wholly-owned subsidiary of Fumi Holdings, Inc., headquartered at 44 Wall Street, Ste 501, New York, New York. WeBull is a wholly-owned subsidiary of Fumi Holdings, Inc. WeBull provides financial services including an electronic trading platform to trade financial assets. WeBull sold Relevant Securities directly to members of the Class during the Class Period.

**D. Fund Defendants**

**a. Defendant Citadel**

59. Defendant Citadel Enterprise Americas LLC is a Delaware limited-liability corporation, headquartered at 131 South Dearborn Street, Chicago, Illinois. Citadel Enterprise Americas LLC is the corporate parent of, and controls the affairs of Citadel Securities LLC.

60. Defendant Citadel Securities LLC is a Delaware limited-limited corporation, headquartered at 131 South Dearborn Street, Chicago, Illinois. Citadel Securities LLC is a wholly-

owned subsidiary of Citadel Enterprise Americas LLC. Citadel Enterprise Americas, LLC and Citadel Securities LLC collectively, "Citadel."

61. Defendant Citadel took short positions in the Relevant Securities. Citadel actively participated in the conspiracy and the wrongful acts alleged herein.

**b. Defendant Melvin Capital**

62. Defendant Melvin Capital Management LP (hereinafter "Melvin Capital") is a Delaware limited partnership headquartered at 535 Madison Avenue, 22nd Floor, New York, New York.

63. Defendant Melvin Capital took short positions in the Relevant Securities. Melvin Capital actively participated in the conspiracy and the wrongful acts alleged herein.

**c. Defendant Sequoia**

64. Defendant Sequoia Capital Operations LLC ("Sequoia") is a Delaware limited-liability corporation, headquartered at 2800 Sand Hill Road, Suite 101, Menlo Park, California.

65. Defendant Sequoia actively participated in the conspiracy and the wrongful acts alleged herein.

**E. Clearinghouse Defendants**

**a. Defendant Apex**

66. Defendant Apex Clearing Corporation ("Apex") is a New York corporation headquartered at One Dallas Center, 350 N. St. Paul, Suite 1300, Dallas, Texas.

67. Defendant Apex participated in the conspiracy and the wrongful acts alleged herein.

**b. Defendant Depository Trust & Clearing Corporation**

68. Defendant The Depository Trust & Clearing Corporation ("DTCC") is a New York company headquartered at 55 Water Street, New York, New York.

69. Defendant DTCC participated in the conspiracy and the wrongful acts alleged herein.

## AGENTS AND CO-CONSPIRATORS

70. The anticompetitive and unlawful acts alleged against the Defendants in this class action complaint were authorized, ordered or performed by the Defendants' respective officers, agents, employees, representatives, or shareholders while actively engaged in the management, direction, or control of the Defendants' businesses or affairs.

71. The Defendants' agents operated under the explicit and apparent authority of their principals.

72. Each Defendant, and its subsidiaries, affiliates and agents operated as a single unified entity.

73. Various persons and/or firms not named as Defendants herein may have participated as co-conspirators in the violations alleged herein and may have performed acts and made statements in furtherance thereof.

74. Each Defendant acted as the principal, agent, or joint venture of, or for other Defendants with respect to the acts, violations, and common course of conduct alleged herein.

## CLASS ALLEGATIONS

75. Plaintiffs bring this action for damages and injunctive relief on behalf of themselves and all others similarly situated as a class action pursuant to Rules 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure, on behalf of the following Class:

> All persons or entities in the United States that directly purchased securities in GameStop Corp. (GME), AMC Entertainment Holdings Inc. (AMC), American Airlines Group Inc. (AAL), Bed Bath & Beyond Inc. (BBBY), BlackBerry Ltd. (BB), Express, Inc. (EXPR), Koss Corporation (KOSS), Naked Brand Group Ltd. (NAKD), Nokia Corp. (NOK), Sundial Growers Inc. (SNDL), Tootsie Roll Industries, Inc. (TR), or Trivago N.V. (TRVG) from one or more of the Defendants between January 1, 2021 through and until the anticompetitive effects of Defendants' unlawful conduct cease (the "Class Period").

76. This Class definition specifically excludes the following person or entities:

a. Any of the Defendants named herein;

b. Any of the Defendants' co-conspirators;

c. Any of Defendants' parent companies, subsidiaries, and affiliates;

d. Any of Defendants' officers, directors, management, employees, subsidiaries, affiliates, or agents;

e. All governmental entities; and

f. The judges and chambers staff in this case, as well as any members of their immediate families.

Case 3:21-cv-00739-JSC Document 1 Filed 02/01/21 Page 13 of 53

77. Plaintiffs do not know the exact number of Class members, because such information is in the exclusive control of Defendants. Plaintiffs are informed and believe that, due to the nature of the trade and commerce involved, there are millions of Class members geographically dispersed throughout the United States and elsewhere, such that joinder of all Class members in the prosecution of this action is impracticable.

78. Plaintiffs' claims are typical of the claims of their fellow Class members because Plaintiffs directly purchased stocks and instruments via the Brokerages. Plaintiffs and all Class members were damaged by the same wrongful conduct of Defendants as alleged herein, and the relief sought herein is common to all members of the Class.

79. Plaintiffs will fairly and adequately represent the interests of the Class because they purchased the Relevant Securities directly from the one or more of the Defendants and have no conflicts with any other members of the Class. Furthermore, Plaintiffs have retained sophisticated and competent counsel who is experienced in prosecuting antitrust class actions, as well as other complex litigation.

80. Numerous questions of law or fact common to the entire Class—including, but not limited to those identified below—arise from Defendants' anticompetitive and unlawful conduct:

a. whether Defendants combined or conspired with one another to artificially suppress prices for the Relevant Securities at any time during the Class Period to purchasers in the United States;

b. whether Defendants combined or conspired with one another to fix, raise, maintain, stabilize and/or suppress prices for Relevant Securities at any time during the Class Period to purchasers in the United States;

c. whether Defendants' conduct caused the prices of the Relevant Securities, sold or held by the Retail Investors in the United States at any time during the Class Period to be artificially fixed, suppressed, maintained or stabilized;

d. whether Plaintiffs and the other members of the Class were injured by Defendants' conduct and, if so, the appropriate Class-wide measure of damages; and

e. whether Plaintiffs and other members of the Class are entitled to, among other things, injunctive relief, and, if so, the nature and extent of such relief.

81. These and other questions of law and fact are common to the Class and predominate over any questions affecting the Class members individually.

82. Defendants have acted on grounds generally applicable to the Class, thereby making final injunctive relief appropriate with respect to the Class as a whole. This class action is superior to alternatives, if any, for the fair and efficient adjudication of this controversy. Prosecuting the claims pleaded herein as a class action will eliminate the possibility of repetitive litigation. There will be no material difficulty in the management of this action as a class action.

83. The prosecution of separate actions by individual Class members would create the risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

## FACTUAL ALLEGATIONS

84. Retail Investors participate in online financial discussion forums, including but not limited to Reddit, Facebook, and TikTok. Through these forums, and elsewhere, Retail Investors are able to trade information about their market observations and help like-minded peers benefit from their research. During the Relevant Period, Retail Investors communicated and exchanges information regarding the Relevant Securities, among other things.

85. Based on their research, the Retail Investors, through stockbrokers such as the Brokerage Defendants, invested in the Relevant Securities that they believed would increase in price and grow.

86. The Fund Defendants and unnamed co-conspirators purchased and held "short" positions in the Relevant Securities. By the nature of the short positions, the Fund Defendants, the Clearinghouse Defendants and certain unnamed co-conspirators stood to benefit and substantially profit were the prices of the Relevant Securities to decrease. Short-selling is highly speculative. In a free and open market, there would be substantial financial risk that prices might increase causing the short sellers to cover the contract at a loss.

87. The Fund Defendants, Clearinghouse Defendants and unnamed co-conspirators predicted incorrectly. The Relevant Securities grew in value, exposing the Defendant Funds and Clearing Houses to billions of dollars in losses.

88. Rather than facing the consequences of their risky bets, the Fund Defendants, Clearinghouse Defendants and their co-conspirators entered into an agreement and conspiracy to prevent the market from operating, to prevent decrease in prices of the Relevant Securities, to avoid their own financial losses and to cause financial losses to Plaintiffs and the members of the Class.

***Background***

89. Retail Investors or individual investors are non-professional investors that execute their personal trades through brokerage firms or investment accounts.

90. Retail Investors discuss and exchange information regarding investments including the Relevant Securities on financial discussion forums on social networking sites like Reddit, Facebook, Twitter, TikTok and Discord.

91. Many of the Brokerage Defendants represented to the Retail Investors that they were offering free brokerage services to facilitate fair trading in the stock market.

92. The Brokerage Defendants are stockbrokers that run online platforms from which Plaintiffs and other Retail Investors directly purchase and sell securities during the Class Period.

93. The Retail Investors identified as early as 2019, that Gamestop's (GME) stock value was lower than they expected it to be based on Gamestop's publicly available financial disclosures and future prospects.

94. Gamestop for example, despite being a brick-and-mortar store specializing in video games that can now be downloaded from a person's home, possessed ample cash reserves, was regularly paying off its debts and was presented new opportunity with the release of the next generation of gaming platforms. Despite this, in 2019, Gamestop's stock was valued as low as $3 per share. Retail Investors correctly deduced that Gamestop was undervalued because large financial institutions had taken large short positions, essentially betting on Gamestop's failures. Due to Gamestop's low stock price, the Retailer Investors correctly determined Gamestop represented a good investment opportunity.

95. In addition to Gamestop, Retail Investors invested in the other Relevant Securities based on their valuation and anticipated business performance. For example, Retail Investors invested in Nokia (NOK) because Nokia, which had historically focused its business on the manufacture and sale of mobile phone handsets, had been expanding in other industries, including investing in 5G communication networks, including towers and other infrastructure.

96. Like other Retail Investors, Plaintiffs purchased "long" positions in these companies, including stocks, option contracts and other securities.

97. In a free and open market, stock prices are determined by the laws of supply and demand as purchasers and sellers bid and ask stock prices. As more investors buy a certain stock, and bid up the stock's prices, the market price for the stock rises. Conversely, as investors sell stock, the stock price is bid down and the market price for the stock declines.

98. If an investor has long positions, it means that the investor has bought and owns those shares of stocks (in contrast to a short position, where the investor owes those stocks to someone, but does not actually own them yet). Investors holding long positions generally own the stock with the expectation that it will rise in value and it will be worth more than they paid for it. When the investor sells a long position, the profit or loss from the same is the difference between the purchase price of the security and the sale price of the security.

99. Retail Investors took long positions in the Relevant Securities with the expectation that the stock would increase in value, generally because they believed that the respective companies' business prospects were improving. Investors in the Relevant Securities generally believed they were good investment opportunities, and that prices of their securities would rise as can be expected when a market is operating freely, without fraud, conspiracy or manipulation.

100. Institutional investors, including the Fund Defendants and unnamed co-conspirators, acquired massive "short" positions in the Relevant Securities.

101. As indicated above, "short" sellers borrow shares of an asset that they believe will fall in price only to buy them after the asset depreciates in value. Short sellers essentially bet on an asset's failure rather than its success. Profit is made in the difference between the value lost at the time sold versus when the time when the short position is bought. For example, a short seller borrows a share of

Company X (for a fee) from a broker which is presently valued at $10. The short seller immediately sells the share and waits for the value of the share to drop. The share price then falls to $4. The short seller then purchases the share at the reduced value of $4 and returns it to the lender and earns the difference of $6. Short sales are often time limited. On the other hand, if the price of the share rises to $20, the short seller would need to purchase the share at $20 to return it to the lender, thereby incurring a loss of $10.

102. To a short seller, the more a stock price increases, the greater the loss to the short seller. The theoretical loss to a short investor who predicts wrongly is potentially infinite. Should a short seller want to exit a short position in the face of rapidly increasing stock price, they must "buy back" the stock at the higher price to return to the institution they borrowed the share from. Risk from bad short selling investments is potentially ruinous and catastrophic.

103. On the other hand, an investor who purchases a stock "long" is limited to a maximum loss of the price of an asset potentially decreasing to zero.

104. Defendant Melvin Capital, for example, shorted approximately 140% of Gamestop's total stock. The practice of short selling more shares than exists is itself an illegal practice known as "naked shorting." In a "naked" short sale, a seller does not borrow or arrange to borrow the necessary securities in time to deliver them to the buyer within the standard three-day settlement period. Although abusive "naked" short selling is not defined in the federal securities laws, it refers generally to selling short without having stock available for delivery and intentionally failing to deliver stock within the standard three-day settlement period.

105. As a result of Retail Investors purchasing long positions in the Relevant Securities, the stock price of these companies began to rise. As the value of the Relevant Securities increased, this resulted in a "short squeeze."

106. A short squeeze occurs when a stock or other asset rises sharply in value, distressing short positions in the asset. A short squeeze therefore is when investors in short positions are faced with a rapid increase in the shorted asset's value, exposing the short seller to increased loss. As the price of the asset rises, short sellers may face pressure to buy back stock to exit their short positions to mitigate

their losses. In the absence of intervention, as short sellers exit their short positions to buy back stocks to cover their shorts, the purchase of stock further increases the price of the stock.

107.    For example, with regards to Gamestop, a popular Reddit user who also creates content on Youtube under the handle Roaring Kitty ("Roaring Kitty") had reason to believe that hedge funds had entered into these short positions with respect to Gamestop's stock. Based on his own financial analysis, Roaring Kitty determined that Gamestop was actually undervalued due to coordinated shorting of Gamestop by numerous funds and made an initial purchase of $50,000 of Gamestop stock and published his investments on the Reddit financial discussion forum WallStreetBets.

108.    WallStreetBets is a financial discussion forum on Reddit. WallStreetBets is characterized by a particular culture centered around discussion of financial investments and memes. Many users on WallStreetBets are sophisticated, financially savvy Retail Investors with business acumen.

109.    Roaring Kitty regularly updated and continued to publish information and analysis that Gamestop stocks were undervalued. In August 2020, Roaring Kitty posted an in-depth analysis of Gamestop's stock on his Youtube channel, walking his subscribers through his extensive analysis of the value proposition of the stock.

110.    Attention to Gamestop's stock was not limited to online financial communities and discussion forums. Dr. Michael Burry (who gained fame for his investment decisions in relation with correctly predicting the 2008 financial crisis as presented in the film *The Big Short*) and his investment firm Scion Asset Management, LLC spent nearly $15 million to purchase stock in Gamestop in 2019 at share prices between $2 and $4.20 per share for a 5% ownership position in Gamestop. Retail Investors took notice and Gamestop's price steadily increased.

111.    Ryan Cohen, the co-founder and former CEO of the pet e-commerce website Chewy.com, invested $76 million and acquired a 12.9% stake in Gamestop in 2020. Several Retail Investors were optimistic about Ryan Cohen's involvement in Gamestop, who joined the board of directors on January 11, 2021.

112.    Institutional investors, holding large short positions in Gamestop's stock and other Relevant Securities began to push back and attempted to message on media and elsewhere that the Relevant Securities were not as valuable as the Retail Investors thought. For example, on January 21,

2021, when Gamestop was valued at approximately $20 per share, Andrew Left, the founder of Citron Research, a capital research and investment firm, gave an interview explaining why he was shorting Gamestop.

113. In response, Retail Investors further went long on Gamestop and other Relevant Securities. Given the operation of a free and open market, the prices of Gamestop and other Relevant Securities was bid up and prices increased. This exposed short sellers in those stocks, including the Fund Defendants, to substantial loses. It was a textbook short squeeze.

114. On January 21, 2021, the Relevant Securities' stock prices increased substantially. For example, on January 8, 2021, Gamestop's stock was priced at $17.69 per share. On January 27, 2021, driven by investments from Retail Investors, Gamestop's stock closed at $347.51. Other Relevant Securities experienced similar increases.

115. The figure below summarizes the prices of Gamestop's stock from December 28, 2020 through January 29, 2021.

116. The figure below summarizes the prices of Nokia Corporation's stock from December 28, 2020 through January 29, 2021.

117. The figure below summarizes the prices of American Airlines Group Inc.'s stock from December 28, 2020 through January 29, 2021.

118.     The figure below summarizes the prices of Sundial Growers Inc.'s stock from December 28, 2020 through January 29, 2021.



119.     The figure below summarizes the prices of Naked Brand Group Limited's stock from December 28, 2020 through January 29, 2021.



120. The figure below summarizes the prices of AMC Entertainment Holdings, Inc.' stock from December 28, 2020 through January 29, 2021.

121. The figure below summarizes the prices of Koss Corporation's stock from December 28, 2020 through January 29, 2021.

122.    The figure below summarizes the prices of Trivago stock from December 28, 2020 through January 29, 2021.



123.    The figure below summarizes the prices of Bed Bath & Beyond stock from December 28, 2020 through January 29, 2021.



124. The figure below summarizes the prices of Express stock from December 28, 2020 through January 29, 2021.

125. The figure below summarizes the prices of Tootsie Roll Industries Inc.'s stock from December 28, 2020 through January 29, 2021.

126. The figure below summarizes the prices of Blackberry's stock from December 28, 2020 through January 29, 2021.

127. The tremendous growth in the Relevant Securities' stock price resulted in significant and potentially disastrous exposure of institutional investors, and hedge funds, including the Fund Defendants and their co-conspirators holding short positions in the Relevant Securities.

128. Defendant Citadel Investments, for example, holds a significant interest in Defendant Melvin Capital (who had the illegal naked 140% short position) and was forced to inject around $3 billion along with another fund, Point72, to bailout Melvin Capital from its distressed short position.

129. In essence, small Retail Investors concluded that institutional investors had severely undervalued the Relevant Securities by shorting them, presenting a good investment opportunity. By investing in the undervalued Relevant Securities, the Retail Investors were outfoxing Wall Street at its own game.

***The Illegal Scheme***

130. Rather than use their financial acumen to compete and invest in good opportunities in the market to recoup the loss in their short positions the growth in the Relevant Securities' prices

represented, or paying the price for their highly speculative bad bets, Defendants instead hatched an anticompetitive scheme to limit trading in the Relevant Securities.

131. After the market closed on January 27, 2021, after-hours revealed suspicious coordinated trading activity. After-hours trading is not permitted for individual Retail Investors and is restricted to institutional investors such as hedge funds.

132. Analytics revealed a significant volume of GME short volume immediately prior to the markets opening on January 28, i.e., after-hour traders were taking more short positions suggesting after-hour traders were trading in anticipation of a GME sell-off. The grey lines in chart below represent the volume of short positions in GME. As demonstrated by the grey lines below, the volume of short positions was much higher before January 28, 2021 than any of the prior days and had steadily increased the week prior.

133. As described above, Retail Investors cannot engage in after-hours trading. It is likely that this increase in short volume is the result of institutional investors, like the Fund Defendants, taking new short positions.

134. The dramatic increase in short positions was counterintuitive. Chatter in various financial discussion forums indicated high excitement and motivation on the part of Retail Investors to continue investing in the Relevant Securities. Many Retail Investors announced plans to increase positions in the Relevant Securities on January 28, 2021, which would mean the prices for the Relevant Securities were likely to go further up, not down.

***The Events of January 28, 2021***

135. As the markets opened on January 28, 2021, the Retail Investors woke up to find that the Brokerage Defendants and other unnamed brokerages had suddenly and without notice restricted their ability to buy long positions in the Relevant Securities. Pursuant to the anticompetitive scheme, the Brokerage Defendants implemented these changes on or about the same time. It would not have been in their economic interest to do so, but for the illegal conspiracy.

136. Retail Investors that used Robinhood as their brokerage could no longer click on the "buy" option for any of the Relevant Securities. The "buy" button was deactivated as a feature, leaving users with no option but to sell their securities.

137. Defendant Robinhood addressed the "Why don't I see a buy button?" question on its website here: https://robinhood.com/us/en/support/articles/why-dont-i-see-a-buy-button/. It offers three reasons for the buy button being unavailable on a user's account. The three reasons are: a) "It's a foreign stock, which we don't support." b) "It's an over-the-counter (OTC) stock or a warrant, which Robinhood generally doesn't support." c) "It's a stock undergoing corporate action. The stock will be tradable again once the corporate action has been finalized." Defendant Robinhood's explanations made little sense, however, because the Relevant Securities were not foreign stocks, OTC stocks or stocks undergoing corporate actions during the Class Period. Robinhood does not warn users of any situation where it could prevent users from buying stock out of its own volition. This explanation was incomplete and untrue and did not disclose the conspiracy underlying the change.

138. Retail Investors who had queued purchase orders overnight on January 27, 2021 to purchase stock when the markets opened on January 28, 2021 discovered that their purchase orders had been cancelled without their consent. Some received messages that claimed "You canceled your order" despite having never having affirmatively done so.

Jan 27, 18:04

We've received your order to buy $100.00 of NOK.

If this order isn't filled by the end of market hours (4pm ET) on the next trading day, it will expire.

Jan 28, 08:27

You've canceled your order to buy $100.00 of NOK.

08:27

139. The restrictions on trading took different forms but had the same effect. Retail Investors were prohibited from opening new long positions in the Relevant Securities. In other words, Retail Investors were not permitted to purchase new positions but only permitted to sell their long positions but not buy more.

140. On Defendant Robinhood's web platform and mobile app, Retail Investors were blocked from searching for the Relevant Securities in Robinhood's app. In fact, their respective ticker symbols were not even searchable by Retail Investors. The market was essentially shut down with the purpose of benefitting the participants in the conspiracy and with the intent to harm Plaintiffs and the members of the Class.

141. Defendant Stash prohibited users from viewing tickers for the Relevant Securities, and the pages only displayed loading graphics. Other tickers were under no such restriction and were easily searchable on the platform. Because of the Stash platform's design, a Retail Investor who cannot view the page for a particular asset cannot trade in that asset. As a result, Retail Investors were unable to access the page for the Relevant Securities to open new long positions in the Relevant Securities.

142. While there had been reports of increasing government attention from the SEC and even the administration in relation to these rapidly increasing prices of the Relevant Securities, there was no formal governmental guidance issued to restrict trading in these stocks in advance of January 28, 2021.

143.     Reporting throughout January 28, 2021, revealed that the ban on purchasing stock of the Relevant Securities was widespread among brokerages. On information and belief, the Brokerage Defendants adopted similar if not identical restrictions to Retail Investors from opening new positions in all, or at least one or more of the Relevant Securities. It is unlikely that they would have done so, but for the conspiratorial agreement. The market was essentially shut down with the purpose of benefitting the participants in the conspiracy and with the intent to harm Plaintiffs and the members of the Class.

144.     Pursuant to the illegal anticompetitive scheme, the coordinated prohibition on buying any new Relevant Securities—through the Brokerage Defendants' forced foreclosure on Retail Investors from buying Relevant Securities—led to a massive sell-off. This resulted in a steep decline in the stock prices for the Relevant Securities.

145.     For example, on January 28, 2021, Gamestop's stock fell 44.11% and closed at $193.60 per share. Retail Investors who wanted to take advantage of the price drop to buy more stock were unable to due to the coordinated ban on purchasing.

146.     The prohibition on purchasing stock did not apply to all investors. Large investment firms such as the Fund Defendants faced no restrictions to purchasing the Relevant Securities. Whereas Retail Investors were excluded from purchasing securities at the reduced rate. Investment firms holding short positions were permitted to cover their short positions by buying securities at the artificially reduced price.

147.     The coordinated prohibition on purchasing placed on Retail Investors quickly resulted in scrutiny from journalists and lawmakers. Defendant Robinhood in particular drew criticism from lawmakers on both sides of the aisle, including calls for congressional and DOJ investigation.

148.     In response to the events of January 28, 2021, the SEC issued a formal letter that it was investigating the situation on January 29, 2021.

149.     Robinhood's conflict-ridden relationship with the Fund Defendants quickly came to light. In addition to its financial interest in Defendant Melvin Capital, it was revealed that Defendant Citadel regularly worked closely with Defendant Robinhood, serving as Defendant Robinhood's market maker over 60% of the time.

150. Defendant Citadel also pays Defendant Robinhood for order flow. Payment for order flow is a kickback that a brokerage firm receives for directing orders to third party-market makers, like Citadel, for trade execution.

151. Reporting revealed that Defendant Citadel had "reloaded" their short positions before instructing Defendant Robinhood to prohibit the purchases of Gamestop and other stocks.

152. Employees of the Brokerage Defendants began to emerge as whistleblowers in online forums. A purported Robinhood employee reported on Reddit that Robinhood's founder and other c-level executives had received calls from Defendant Sequoia Capital pressuring Robinhood into restricting trading in one or more of the Relevant Securities.

153. Other brokerage firms took other overt acts in furtherance of the anticompetitive scheme. Certain brokerages sold off long positions in stocks without the permission of the investor.

154. The Verge reported that several Retail Investors reported that they had purchased and filled orders of GME and AMC on Robinhood, but discovered that the stock had been sold without their permission on January 28, 2021. Another Retail Investor reported that a purchase of Naked Brand stock (NAKD) had been filled but subsequently sold without their consent. While Robinhood had warned investors that it may automatically sell off option contracts or assets purchased on margin, these investors denied that they had purchased stocks on margin and did not purchase option contracts. These Retail Investors had purchased cash positions in the Relevant Securities that were sold off without their consent.

Robinhood

Important Information About Your Robinhood Account

Hi [redacted]

In light of recent volatility, we are restricting transactions for certain securities to position closing only. However, due to the unreasonable risk involved in brokering your position, we have closed your 4,500 shares of GME for an average price of $118.93 on January 28th, 2021 at 11:24 AM.

155. Defendants were aware that they were colluding to manipulate the market. In an interview given by Defendant Interactive Brokers' chairman Thomas Peterffy, Mr. Peterffy admitted that Interactive Brokers had restricted trading in order to "protect ourselves."

156. The anticompetitive conspiracy was authorized, ordered or performed by the Defendants' respective officers, agents, employees, representatives, or shareholders while actively engaged in the management, direction, or control of the Defendants' businesses or affairs.

157. At least 18 brokerages together prohibited Retail Investors from opening new positions in GME, AMC and other Relevant Securities on January 28, 2021. Some restricted Retailer Investors from opening new long positions in securities wholesale, whereas others restricted purchasing options only. No brokerages restricted selling of Relevant Securities by any investor, whether by a retail investor or large institutional investor.

158. Not all brokerages banned the purchase of the Relevant Securities. Even in the cases where brokerages were allowing Retail Investors to open new long positions, however, the Clearinghouse Defendants began to raise fees to purchase securities or otherwise instruct brokerages to not consummate purchase orders.

159. Brokerages route trades through clearinghouses which streamlines the trading process. Some brokerages, such as Defendant Robinhood, serve as their own clearinghouse. By increasing fees to purchase a particular stock, the clearinghouse can suppress the amount of purchases of that stock and affect the stock's price.

160. The Clearinghouse Defendants raised the fees for consummating purchases of the relevant stocks to the non-conspiring brokerages, further facilitating the Fund Defendants covering of their short positions in furtherance of the conspiracy.

161. Nondefendant brokerage SoFi momentarily had trading in the Relevant Securities forcibly suspended by Clearinghouse Defendant Apex.

162. SoFi quickly objected to Defendant Apex's attempt to restrict trading in the Relevant Securities on SoFi's platform and trading was soon permitted on SoFi without restriction.

163. Anthony Denier, the CEO of Defendant Webull Financial LLC, a brokerage which had restricted trading in the Relevant Securities, placed the blame squarely on its clearinghouse, Defendant Apex Clearing, for the restrictions on trading the stocks. According to Denier, the collateral required by Apex for Gamestop increased by 100% and Apex had informed him that Webull needed to shut off the ability to open new positions in certain stocks. Denier further said that the restrictions originated the morning of January 28, 2021 and was informed that Apex was instructed by the Defendant Depository Trust & Clearing Corporation that it was increasing the collateral needed to settle trades for the Relevant Securities.

164. Denier further said that the restrictions originated the morning of January 28, 2021 and was informed that Defendant Apex was instructed by the Defendant Depository Trust & Clearing Corporation that it was increasing the collateral needed to settle trades for stocks such as Gamestop.

165. Other brokerages such as Defendants Ally Financial Inc., M1 Finance, Tastyworks, and Public.com also reported that Defendant Apex had halted all opening transactions of Gamestop, AMC and Koss, which they blamed for trading restrictions of the Relevant Securities on their platforms.

166. Similarly, Defendant Freetrade blamed Clearinghouse Defendant Barclay's PLC for its restrictions of the Relevant Securities on its platform.

167. Defendant Trading212 uses Defendant Interactive Brokers as its intermediary and said Defendant Interactive Brokers was at fault for Defendant Freetrade's restrictions on the Relevant Securities.

168. Defendants' conspiratorial acts resulted in lockstep price movements of the Relevant Securities that can only be explained by coordinated lockstep actions by Defendants, in particular when considering Retail Investors were only permitted to sell positions in the Relevant Securities.

169. As demonstrated by the charts below, the stock prices of the Relevant Securities moved almost in parallel with each other throughout January 28, 2021. The charts revealed a coordinated rise in the prices of the Relevant Securities at approximately 11:00-11:30 a.m. after the Relevant Securities took a steep dive after the markets opened. At that time, few if any Retail Investors were permitted to purchase positions in the Relevant Securities and only institutional investors such as the Fund Defendants were permitted to purchase.

//

//

//

//

//

//

//

//

### *The Anticompetitive Scheme is Ongoing*

170. Even in the face of increased scrutiny, Defendants continued their anticompetitive scheme to suppress the price of the Relevant Securities.

171. Partly as a result of criticism, the Brokerage Defendants nearly all permitted Retail Investors to open new long positions in the Relevant Securities as the market opened on January 29, 2021.

//

//

//

//

//

//

//

//

//

172.    Defendant Freetrade, a brokerage based in the United Kingdom, citing concerns from its foreign exchange provider, restricted trades in United States securities altogether on January 29, 2021, after restricting purchases on January 28, 2021.



173.    While purchases were permitted, they were heavily restricted by the Brokerage Defendants. Nevertheless, Retail Investors, still believing in the value of these assets, continued to purchase stock in the Relevant Securities once they were permitted to.

174.    Many of the Brokerage Defendants restricted trading of long option contracts and announced to Retail Investors they would close out their profitable option positions automatically.



175. The Relevant Securities began to regain the value lost the prior day as a result of Defendants' coordinated action to suppress the value of the stocks.

176. Because the Fund Defendants and other unnamed conspirators still had distressed short positions outstanding, this threatened their ill-gotten gains achieved the day before.

177. Defendant Robinhood limited users to purchasing a limited amount of stock. With respect to Gamestop, for example, Defendant Robinhood first restricted Retail Investors to purchasing only five shares of Gamestop, which resulted in a rapid decline in the value of Gamestop. As Gamestop's stock price recovered, Defendant Robinhood further limited purchases to two shares.

Error

This order will exceed the maximum allowed GME shares you can hold at this time. You currently have 5 shares purchased or pending - including this order - which exceeds the limit of 2 shares.

Dismiss

178. When the value of Gamestop again began to recover, Defendant Robinhood later instituted a one share limit to acquisitions of Gamestop, further causing the value of Gamestop to decrease.

179. Brokerage Defendants instituted similar restrictions as to other Relevant Securities.

Error

This order will exceed the maximum allowed AMC shares you can hold at this time. You currently have 17 shares purchased or pending - including this order - which exceeds the limit of 1 share.

Done

180. Each artificial limitation in the amount of securities a Retail Investor could purchase correlated with a subsequent decrease in stock value. As purchases of the Relevant Securities were limited, more investors were pressured to sell who otherwise would not have in the presence of a free and open market.

181. The extent and scope of the conspiracy is still as of yet unknown. Plaintiffs believe the anticompetitive scheme is ongoing. In the evening of January 29, 2021, Defendant Robinhood announced it was increasing the number of restricted stocks from 13 to 50. On January 30, 2021, Reuters reported that Defendant IG Group was continuing to suspend trading in the Relevant Securities.

## CLAIMS FOR RELIEF

## COUNT ONE

## CONSPIRACY TO RESTRAIN TRADE IN VIOLATIONOF SECTION 1 OF THE SHERMAN ACT, 15 U.S.C. § 1 (Against all Defendants)

182. Plaintiffs hereby incorporate by reference the factual allegations as set forth above.

183. On information and belief, the Defendants conspired and entered into an anticompetitive scheme to fix, raise, stabilize, maintain or suppress the price of the Relevant Securities.

184. Faced with potentially disastrous losses due to their illegal short position, the Fund Defendants, rather than engage in competition, conspired, combined, agreed and colluded with the Brokerage Defendants and Clearinghouse Defendants to restrict purchases in stocks by retailer investors and to manipulate and artificially suppress the price of stock, through which they could cover their short positions.

185. Defendants conspired and agreed with one another with the intent to artificially lower the price of the relevant stocks.

186. Defendants coordinated a collective shutdown of the stock brokerage market with respect to the Relevant Securities, prohibiting market participants with the exception of the Fund Defendants from purchasing stock in the Relevant Securities. Pursuant to the conspiracy, the restriction of stock purchases resulted in a sell-off of stocks, driving down prices in the Relevant Securities to levels that would not have been obtained, but for the conspiracy, combination, agreement and restraint of trade.

187. In furtherance of the conspiracy, combination, agreement and restraint of trade, on January 27, 2021, after the close of the stock market and before the open of the market the next day, the Fund Defendants coordinated and planned increased short volumes in anticipation of short calls on January 28, 2021.

188. In furtherance of the conspiracy, combination, agreement and restraint of trade, the Brokerage Defendants have prohibited, continue to prohibit, or unreasonably restrict the purchases of shares of the Relevant Securities by Plaintiffs in restraint of trade.

189. As a direct and intended result of Defendants contract, combination, agreement and restraint of trade or conspiracy, Defendants caused injury to Plaintiffs by restricting purchases of Relevant Securities. The Brokerage Defendants deactivated the buy option on their platforms and left Plaintiffs with no option but to sell shares of the stocks on their platforms. Plaintiffs and Class members, faced with an imminent decrease in the price of their positions in the Relevant Securities due to the inability of Retail Investors to purchase shares, were induced to sell their shares in the Relevant Securities at a lower price than they otherwise would have, but for the conspiracy, combination,

agreement and restraint of trade. Additionally, Class members that would have purchased more stock in the Relevant Securities given the upward trend in price could not do so.

190. Pursuant to the contract, combination, agreement, conspiracy and restraint of trade, the Brokerage Defendants permitted the Fund Defendants to purchase stocks at the artificially deflated prices. The Fund Defendants, who were in exposed short positions due to the short squeeze, purchased the artificially price-suppressed stocks to cover their short positions.

191. Not all brokerages joined in the anticompetitive scheme with the Brokerage Defendants. To induce compliance and to limit the effects non-complying brokerages could have in disrupting Defendants' anticompetitive scheme, the Clearinghouse Defendants raised the fees and/or removed the ability to fill purchases of the Relevant Securities to the non-conspiring brokerages, further facilitating the Fund Defendants covering of their short positions in furtherance of the conspiracy.

192. Defendants' anticompetitive and unlawful conduct is per se illegal.

193. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and Class members were injured in their business and property.

194. Plaintiffs and the Class further seek equitable and injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable law, to correct the anticompetitive effects caused by Defendants' unlawful conduct.

## COUNT TWO

## CONSPIRACY TO RESTRAIN TRADE IN VIOLATION OF THE CALIFORNIA CARTWRIGHT ACT, CAL. BUS. & PROF. CODE § 16700 et seq. (Against all Defendants)

195. Plaintiffs hereby incorporate by reference the factual allegations as set forth above.

196. On information and belief, the Defendants and their conspirators entered into an unlawful agreement and engaged in a continuing unlawful trust in restraint of trade and commerce as described herein in violation of California Business and Professions Code § 16720 to fix, stabilize, maintain or suppress the price of the Relevant Securities.

197. Faced with potentially disastrous losses due to their illegal short position, the Fund Defendants, rather than engage in competition, conspired, combined, agreed and colluded with the

Brokerage Defendants and Clearinghouse Defendants to restrict purchases in stocks by retailer investors and to manipulate and artificially suppress the price of stock, through which they could cover their short positions.

198.    Defendants conspired and agreed with one another with the intent to artificially lower the price of the Relevant Securities. Defendants agreed to pool, combine or directly or indirectly unite their interests such that the price of the Relevant Securities would be fixed, stabilized, maintained, suppressed.

199.    Defendants coordinated a collective shutdown of the stock brokerage market with respect to the Relevant Securities prohibiting market participants with the exception of the Fund Defendants from purchasing stock in the Relevant Securities. Pursuant to the conspiracy, the restriction of stock purchases resulted in a sell-off of stocks, driving down prices in the Relevant Securities to levels that would not have been obtained, but for the conspiracy, combination, agreement and restraint of trade.

200.    In furtherance of the unlawful trust and restraint of trade, on January 27, 2021, after the close of the stock market and before the open of the market the next day, the Fund Defendants coordinated and planned increased short volumes in anticipation of short calls on January 28, 2021.

201.    In furtherance of the unlawful trust and restraint of trade, the Brokerage Defendants have prohibited, restricted, and continue to prohibit and unreasonably restrict the purchases of shares of the Relevant Securities by Plaintiffs in restraint of trade.

202.    As a direct and intended result of Defendants' unlawful trust and restraint of trade, Defendants caused injury to Plaintiffs by restricting purchases and sales of shares Relevant Securities. The Brokerage Defendants deactivated the buy option on their platforms and left Plaintiffs with no option but to sell shares of the stocks on their platforms. Plaintiffs and Class members, faced with an imminent decrease in the price of their positions in the Relevant Securities due to the inability of Retail Investors to purchase shares, were induced to sell their shares in the Relevant Securities at a lower price than they otherwise would have, but for the conspiracy, combination, agreement and restraint of trade. Additionally, Class members that would have purchased more stock in the Relevant Securities given the upward trend in price could not do so.

203. Pursuant to the unlawful trust and restraint of trade, the Brokerage Defendants permitted the Fund Defendants to purchase stocks at the artificially deflated prices. The Fund Defendants, who were in exposed short positions due to the short squeeze, purchased the artificially price-suppressed stocks to cover their short positions.

204. Not all brokerages joined in the anticompetitive scheme with the Brokerage Defendants. To induce compliance and to limit the effects non-complying brokerages could have in disrupting Defendants' anticompetitive scheme, the Clearinghouse Defendants raised the fees for consummating purchases of the relevant stocks to the non-conspiring brokerages, further facilitating the Fund Defendants covering of their short positions in furtherance of the conspiracy.

205. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and Class members were injured in their business and property.

206. Plaintiffs and the Class seek treble damages and their cost of suit, including attorneys' fee, equitable and injunctive relief pursuant to California Business and Professions Code § 16750(a), and other applicable law, to correct the anticompetitive effects caused by Defendants' unlawful conduct.

## COUNT THREE

## UNFAIR COMPETITION IN VIOLATION OF CALIFORNIA BUSINESS AND PROFESSIONS CODE § 17200 et seq. (Against All Defendants)

207. Plaintiffs hereby repeat and incorporate by reference each preceding and succeeding paragraph as though fully set forth herein.

208. The California Unfair Competition Law ("UCL") codified at California Business and Professions Code § 17200 et seq. prohibits any unlawful, unfair or fraudulent business practices and unfair, deceptive, untrue or misleading advertisement.

209. Under California Business and Professions Code § 17200 et seq., a business act or practice is "unlawful" if it violates any established state or federal law.

210. Defendants engaged in an unlawful contract, combination or conspiracy in the restraint of trade to artificially suppress the stock price of the Relevant Securities.

211. Brokerage Defendants violated the UCL by engaging in unlawful, unfair, and fraudulent business acts or practices in furtherance of the conspiracy, including but not limited to: (a) knowingly and intentionally prohibiting Retailer Investors from purchasing any Relevant Securities; (b) forcing Retail Investors to sell their Relevant Securities by deactivating several features on their platforms; and (c) selling Retail Investors' Relevant Securities without their consent.

212. The Clearinghouse Defendants violated the UCL by engaging in unlawful, unfair, and fraudulent business acts or practices in furtherance of the conspiracy by increasing fees and inducing brokerages to restrict trading in the Relevant Securities to Retail Investors.

213. The Fund Defendants, by engaging in unlawful, unfair, and fraudulent business acts or practices in furtherance of the conspiracy by directing the Brokerage Defendants and Clearinghouse Defendants to restrict trading in the Relevant Securities to Retail Investors in order to artificially suppress the share price of the Relevant Securities.

214. Defendants engaged in and continue to engage in exclusionary, anticompetitive conduct that is deleterious to consumers and to the benefit of Defendants.

**COUNT FOUR**

**DISSEMINATION OF UNTRUE AND MISLEADING PUBLIC STATEMENTS IN VIOLATION OF CALIFORNIA BUSINESS AND PROFESSIONS CODE § 17500 et seq.**
**(Against All Defendants)**

215. Plaintiffs hereby repeat and incorporate by reference each preceding and succeeding paragraph as though fully set forth herein.

216. Defendants violated the California Business and Professions Code § 17500 et seq. by making or disseminating, or causing to be made or disseminated, before the public, untrue or misleading statements in connection with the sale of goods or services, that Defendants knew or should have known were untrue or misleading, including but not limited to statements concerning the reliability, fairness, and accuracy of the value of the Relevant Securities, and continue to do so with the intent to induce the Retail Investors to sell their shares of the Relevant Securities at artificially suppressed prices.

217. Brokerage Defendants executed trades on their customers' behalves without their consent and made false and misleading statements regarding the reasons for executing such trades.

Case 3:21-cv-00739-SK Document 1-2 Filed 02/01/21 Page 47 of 53

218. Fund Defendants made misstatements about their role in the conspiracy to the public.

219. Clearinghouse Defendants made misleading statements to the public about their involvement in the conspiracy while demanding significantly more collateral from member brokers to facilitate the conspiracy.

**COUNT FIVE**

**BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING (Against the Brokerage Defendants)**

220. Plaintiffs hereby repeat and incorporate by reference each preceding and succeeding paragraph as though fully set forth herein.

221. Plaintiffs and members of the Class entered into agreements with the Brokerage Defendants. They agreed to Brokerage Defendants' Terms and Conditions by using the Brokerage Defendants' websites, apps and trading platforms.

222. Plaintiffs and members of the Class fulfilled and performed their obligations under these contracts by adhering to their terms and using Brokerage Defendants' trading services through its website and trading platform.

223. The Brokerage Defendants made the implied promise that they would not do anything to unfairly interfere with the rights of any other party to receive the benefits of the contract.

224. The Brokerage Defendants did not act in good faith or with honesty of purpose. To the contrary, they acted with the intention of misleading or taking unfair advantage of plaintiffs and the Class. The Brokerage Defendants was obligated to provide the trading services required under those contracts at all times, including but not limited to, trades for Relevant Securities.

225. When initially signing up to use the Brokerage Defendants' websites, apps and trading platforms, Plaintiffs and all those similarly situated could and actually did trade in the Relevant Securities.

226. The Brokerage Defendants unfairly interfered with the rights of Plaintiffs to receive the benefits of the agreements by, among other things: (i) failing to provide services necessary to carry out a trade; (ii) failing to provide certain trading services whatsoever; (iii) failing to inform individuals in a timely member of the drastic changes in trading abilities; and (iv) prohibiting plaintiffs from buying

Relevant Securities for the Brokerage Defendants own interest and not disclosing those interest to Plaintiffs and all Class members.

227. The Brokerage Defendants' conduct has caused Plaintiffs and members of the Class harm, losses, and damages.

**COUNT SIX**

**NEGLIGENCE**
**(Against the Brokerage Defendants)**

228. Plaintiffs hereby repeat and incorporate by reference each preceding and succeeding paragraph as though fully set forth herein.

229. The Brokerage Defendants had a common law duty to exercise reasonable care in conducting and facilitating transactions for its customers.

230. The Brokerage Defendants had a common law duty to exercise reasonable care in providing trades on the free and open market for its customers.

231. The Brokerage Defendants unlawfully breached their duties by, among other things, (i) removing the Relevant Securities without notice from their websites, apps and trading platforms; (ii) failing to provide financial services related to Relevant Securities; and (iii) failing to notify Retail Investors in a timely manner of the prohibition in purchasing of the Relevant Securities.

232. The Brokerage Defendants' conduct departed from the ordinary standard of care expected of a stockbroker. If volatility was truly a concern, trading entirely should have been halted in the Relevant Securities. Instead, the Brokerage Defendants permitted Retail Investors to only sell their positions in the Relevant Securities. Further, non-Retail Investors were permitted to trade in the Relevant Securities without restriction.

233. The Brokerage Defendants breached their duty of care to the Retail Investors by selectively restricting purchases of Relevant Securities to the Retail Investors who wanted to purchase more stock in the Relevant Securities.

234. Brokerage Defendants negligent and wrongful breaches of its duties owed to Plaintiffs and Class members proximately caused losses and damages that would not have occurred but for the Brokerage Defendants' gross breach of their duty of care.

235. Plaintiffs and Class members suffered actual injury as a result of Brokerage Defendants' breach of their duty.

236. Plaintiffs and Class members' injury was proximately and directly caused by Brokerage Defendants breach of their duty.

**COUNT SEVEN**

**NEGLIGENCE PER SE**
**(Against Brokerage Defendants)**

237. Plaintiffs hereby repeat and incorporate by reference each preceding and succeeding paragraph as though fully set forth herein.

238. The Brokerage Defendants had a statutory duty to exercise reasonable care in conducting and facilitating transactions for its customers.

239. The Brokerage Defendants had a statutory duty to exercise reasonable care in providing trades on the free and open market for its customers.

240. The Brokerage Defendants unlawfully breached their duties by, among other things, (i) removing the Relevant Securities without notice from their websites, apps and trading platforms; (ii) failing to provide financial services related to Relevant Securities; and (iii) failing to notify Retail Investors in a timely manner of the prohibition in purchasing of the Relevant Securities.

241. The Brokerage Defendants' conduct departed from the ordinary standard of care expected of a stockbroker. If volatility was truly a concern, trading entirely should have been halted in the Relevant Securities. Instead, the Brokerage Defendants permitted Retail Investors to only sell their positions in the Relevant Securities. Further, non-Retail Investors were permitted to trade in the Relevant Securities without restriction.

242. The Brokerage Defendants breached its duty of care by selectively restricting purchases of Relevant Securities to the Retail Investors who wanted to purchase more stock in the Relevant Securities.

243. The Brokerage Defendants' negligent and wrongful breaches of the duties owed to Plaintiffs and Class members proximately caused losses and damages that would not have occurred but for the Brokerage Defendants' gross breach of their duty of care.

244. Plaintiffs and Class members suffered actual injury as a result of Brokerage Defendants' breach of their duty.

245. Plaintiffs and Class members' injury was proximately and directly caused by Brokerage Defendants' breach of their duties.

## COUNT EIGHT

## BREACH OF FIDUCIARY DUTY
**(Against Brokerage Defendants)**

246. Plaintiffs hereby repeat and incorporate by reference each preceding and succeeding paragraph as though fully set forth herein.

247. As licensed providers of financial services, the Brokerage Defendants at all relevant times herein were fiduciaries to the Plaintiffs and Class members and owed them the highest good faith and integrity in performing its financial services on their behalf. Each Brokerage Defendant also acted as a fiduciary to each and every customer who agreed to their respective terms and conditions.

248. The Brokerage Defendants breached their fiduciary duties to Plaintiff and Class members by, among other things, failing to disclose that its platform was going to remove Relevant Securities purchases in a timely manner; actually removing Relevant Securities; removing Relevant Securities for their own pecuniary benefits; misrepresenting and omitting material information; that the Brokerage Defendants failed to provide access to its financial services in a timely manner; that Brokerage Defendants failed to comply with all applicable legal, regulatory, and licensing requirements; and that Brokerage Defendants failed to exercise trades and actions requested by customers in a complete and timely manner.

249. The Brokerage Defendants' conduct has caused the Plaintiffs and Class members' harm, losses, and damages and continues to expose them to harm because the Brokerage Defendants continue to breach their fiduciary duties.

## COUNT NINE

## CONSTRUCTIVE FRAUD
## (Against Brokerage Defendants)

250. Plaintiffs hereby repeat and incorporate by reference each preceding and succeeding paragraph as though fully set forth herein.

251. The Brokerage Defendants had a duty to exercise reasonable care in conducting and facilitating securities transactions for its customers.

252. The Brokerage Defendants owed the Plaintiffs and Class members a fiduciary duty to fully disclose material facts as relates to their brokerage relationship.

253. The Brokerage Defendants represented to Plaintiffs and Class members that they were brokerage services offering free and fair trading in the stock market.

254. Plaintiffs and Class members chose to use the Brokerage Defendants websites, apps and trading platforms in part due to assurances that they would be able to trade on the stock market.

255. The Brokerage Defendants subsequently and selective restricted and limited the securities that Plaintiffs and Class members were able to buy on their websites, apps and trading platforms, contrary to their representations.

256. Plaintiffs and Class members' reliance on the Brokerage Defendants' false representations were substantial factors in causing Plaintiffs' harm as they were prohibited from trading freely given the Brokerage Defendants' restrictions.

## PRAYER FOR JUDGMENT

**WHEREFORE,** Plaintiffs request that the Court enter judgment on their behalf and on behalf of the Class defined herein, by adjudging and decreeing that:

257. This action may proceed as a class action, with Plaintiffs serving as Class Representatives, and with Plaintiffs' counsel as Class Counsel;

258. Defendants have contracted, combined, and conspired in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and that Plaintiffs and the Class have been injured in their business and property as a result of Defendants' violations;

259.    Plaintiffs and the Class are entitled to pre-judgment and post-judgment interest on the damages awarded them, and that such interest be awarded at the highest legal rate from and after the date this class action complaint is first served on Defendants;

260.    Defendants are to be jointly and severally responsible financially for the costs and expenses of a Court-approved notice program through post and media designed to give immediate notification to the Class;

261.    Plaintiffs and the Class recover their costs of this suit, including reasonable attorneys' fees as provided by law;

262.    Plaintiffs and the Class are entitled to equitable relief appropriate to remedy Defendants' past and ongoing restraint of trade, including:

a.    A judicial determination declaring the rights of Plaintiffs and the Class, and the corresponding responsibilities of Defendants;

b.    Issuance of a permanent injunction against Defendants and their parents, subsidiaries, affiliates, successors, transferees, assignees and the respective officers, directors, partners, agents, and employees thereof and all other persons acting or claiming to act on their behalf from continuing and maintaining the conspiracy or agreements herein;

c.    A constructive trust over any ill-gotten property or assets, including but not limited to stocks in the Relevant Securities received as a result of the conspiracy or agreement or other wrongful conduct as alleged herein;

263.    Plaintiffs and the Class receive such other or further relief as may be just and proper.

//
//
//
//
//
//
//

**JURY TRIAL DEMANDED**

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury of all the claims asserted in this Complaint so triable.

Dated: February 1, 2021

By: /s/ *Joseph R. Saveri*
Joseph R. Saveri

Joseph R. Saveri (State Bar No. 130064)
Steven N. Williams (State Bar No. 175489)
Christopher K.L. Young (State Bar No. 318371)
Anupama K. Reddy (State Bar No. 324873)
**JOSEPH SAVERI LAW FIRM, INC.**
601 California Street, Suite 1000
San Francisco, California 94108
Telephone: (415) 500-6800
Facsimile: (415) 395-9940
Email: jsaveri@saverilawfirm.com
swilliams@saverilawfirm.com
cyoung@saverilawfirm.com
areddy@saverilawfirm.com

*Counsel for Individual and Representative Plaintiffs Shane Cheng and Terell Sterling*

# EXHIBIT 3

William M. Audet (SBN 117456)
waudet@audetlaw.com
"David" Ling Y. Kuang (SBN 296873)
lkuang@audetlaw.com
Kurt D. Kessler (SBN 327334)
kkessler@audetlaw.com
**AUDET & PARTNERS, LLP**
711 Van Ness Avenue, Suite 500
San Francisco, CA 94102-3275
Telephone: (415) 568-2555
Facsimile: (415) 568-2556

*Attorneys for Plaintiff Elvia Curiel-Ruth, on behalf of herself and all others similarly situated*

[Additional Counsel on Signature Block]

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

ELVIA CURIEL-RUTH, on behalf of herself and all others similarly situated,

Plaintiffs,

v.

ROBINHOOD FINANCIAL LLC; ROBINHOOD SECURITIES, LLC; ROBINHOOD MARKETS, INC.; THE CHARLES SCHWAB CORPORATION; CHARLES SCHWAB & CO. INC.; TD AMERITRADE, INC.; WEBULL FINANCIAL LLC; E*TRADE FINANCIAL CORPORATION; INTERACTIVE BROKERS, LLC; CITADEL ENTERPRISE AMERICAS, LLC; and MELVIN CAPITAL MANAGEMENT LP,

Defendants.

Case No:

**CLASS ACTION COMPLAINT**

**FOR:**

**(1) VIOLATION OF SECTION 1 OF THE SHERMAN ACT;**
**(2) VIOLATION OF SECTION 2 OF THE SHERMAN ACT;**
**(3) RESTRAINT OF TRADE VIOLATION OF THE CARTWRIGHT ACT;**
**(4) ATTEMPTED MONOPOLIZATION IN VIOLATION OF THE CARTWRIGHT ACT;**
**(5) BREACH OF CONTRACT;**
**(6) BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING;**
**(7) NEGLIGENCE PER SE;**
**(8) NEGLIGENCE;**
**(9) BREACH OF FIDUCIARY DUTY;**
**(10) CONSTRUCTIVE FRAUD; and**
**(11) VIOLATION OF CALIFORNIA'S UNFAIR COMPETITION LAW**

**DEMAND FOR JURY TRIAL**

Plaintiff ELVIA CURIEL-RUTH (hereinafter Plaintiff) individually, and on behalf all others similarly situated (collectively "Plaintiffs"), bring this class action lawsuit (collectively "Plaintiffs"), bring this class action lawsuit against Defendants ROBINHOOD FINANCIAL LLC, ROBINHOOD SECURITIES, LLC, and ROBINHOOD MARKETS, INC. (together, "Robinhood"), Defendants THE CHARLES SCHWAB CORPORATION, CHARLES SCHWAB & CO. INC. (together, "Schwab"), Defendants TD AMERITRADE, INC. ("TDAmeritrade"), WEBULL FINANCIAL LLC ("Webull"), E*TRADE FINANCIAL CORPORATION ("ETrade"), INTERACTIVE BROKERS, LLC ("IB"), CITADEL ENTERPRISE AMERICAS, LLC ("Citadel"), and MELVIN CAPITAL MANAGEMENT LP ("Melvin"), (collectively with all other named defendants, "the Defendants" and together with Plaintiffs, "the Parties"). This class action lawsuit is based upon personal knowledge of the facts pertaining to themselves, and upon information and belief as to all other matters, and do hereby allege as follows:

## NATURE OF THE ACTION

1. In late 2020, stocks for various companies began to fluctuate greatly, including the stocks for the company GameStop Corp. ("GME") and American Movie Company ("AMC"), which experienced an extreme downturn due to the COVID-19 pandemic's effect on consumer's abilities to show in-store and to attend theatres. GME and AMC began to dramatically rise when retail investors began buying the stock in January 2021.

2. In a free and open market, stock prices are determined by the laws of supply and demand as purchasers and sellers bid and ask stock prices. As more investors buy a certain stock, and bid up the stock's prices, the market price for the stock rises. Conversely, as investors sell stock, the stock price is bid down and the market price for the stock declines.

3. This rise was due in part to the efforts of individual investors using the services provided by Defendants, purchasing a stock they believed had value, in addition to efforts from retail investors originating online to combat the actions of hedge funds to short the stocks, who viewed GME, AMC and other similar stocks as a prime "short" target, or a stock to bet against to profit from as it fell. Various hedge funds had begun to "short" AMC, or borrowing and subsequently selling a

stock at a current price, and promising to buy the stock back from the lender at a later date, with the goal that the value of the stock falls, giving the short seller the difference between the initial value of the stock and the lower, current value of the stock in profit.

4. This led to a later phenomenon known as a "short squeeze," where a stock that had been heavily shorted quickly jumps significantly higher, placing short sellers in great distress as they began to owe immense sums of money.

5. This short squeeze benefited the aforementioned retail investors, who were reaping the gains of a stock shooting up at an incredible rate. However, the firms that were shorting GME, AMC and other stocks were soon in debt for billions as the stock continued to grow immensely along with their liability.

6. Robinhood, Schwab, TDAmeritrade, Webull, ETrade, and IB (collectively, hereinafter the "Trading Platform Defendants") are online brokerage firms on which many retail investors invest, given its consumer-friendly label as a firm that allows open trading and does not charge fees.

7. Trading Platform Defendants purposefully, willfully, and knowingly removed its users' ability to purchase certain stocks from its trading platform in the midst of the short squeeze, depriving retail investors of the ability to invest in the open-market and manipulating the open-market to artificially lower the price.

8. Trading Platform Defendants' actions, along with other Defendants' conduct, harmed Plaintiffs.

## THE PARTIES

9. Plaintiff ELVIA CURIEL-RUTH was and is a citizen of the State of California. Plaintiff resides in Los Angeles County.

10. Defendant ROBINHOOD FINANCIAL LLC is a Delaware corporation with its principal place of business at 85 Willow Road, Menlo Park, California 94025. It is a wholly-owned subsidiary of ROBINHOOD MARKETS, INC. ROBINHOOD FINANCIAL LLC is registered as a broker-deal with the U.S. Securities & Exchange Commission ("SEC"). Defendant ROBINHOOD

FINANCIAL LLC acts as an introducing broker and has a clearing arrangement with its affiliate DEFENDANT ROBINHOOD SECURITIES, LLC.

11. Defendant ROBINHOOD SECURITIES, LLC is a Delaware corporation with its principal place of business at 500 Colonial Center Parkway, Suite 100, Lake Mary, Florida 32746. It is a wholly owned subsidiary of Defendant ROBINHOOD MARKETS, INC. Defendant ROBINHOOD SECURITIES, LLC is registered as a broker-dealer with the SEC. Defendant ROBINHOOD FINANCIAL LLC acts as a clearing broker and clears trades introduced by its affiliate Defendant ROBINHOOD FINANCIAL.

12. Defendant ROBINHOOD MARKETS, INC. is a Delaware corporation with its principal place of business at 85 Willow Road, Menlo Park, California 94025. Defendant ROBINHOOD MARKETS, INC. is the corporate parent of Defendants ROBINHOOD FINANCIAL LLC and ROBINHOOD SECURITIES, LLC.

13. The above-named corporate defendants herein are referred to collectively as "Robinhood."

14. Defendant THE CHARLES SCHWAB CORPORATION is a Delaware corporation with its principal place of business at 211 Main Street, San Francisco, CA 94105.

15. Defendant CHARLES SCHWAB & CO. INC. is a California corporation with its principal place of business at 211 Main Street, San Francisco, CA 94105.

16. The two above-named corporate defendants herein are referred to collectively as "Schwab."

17. Defendant TD AMERITRADE, INC. ("TD Ameritrade"), is a New York corporation with its principal place of business registered in Illinois, but is not in good standing.

18. As of October 2020, The Charles Schwab Corporation acquired TD Ameritrade.

19. WEBULL FINANCIAL LLC ("Webull") is a Delaware corporation with headquartered at 44 Wall St, New York, New York, 10005-2450.

20. E*TRADE FINANCIAL CORPORATION ("ETrade") is a Delaware corporation with its principal place of business at 671 N. Glebe Road, Arlington, Virginia, 22203.

21. INTERACTIVE BROKERS, LLC ("IB") is a Delaware corporation headquartered at One Pickwick Plaza, Greenwich, CT 06830.

22. Defendant CITADEL ENTERPRISE AMERICAS, LLC ("Citadel") is a Delaware corporation with its principal place of business at 131 South Dearborn Street, Chicago, IL 60603. Defendant Citadel is the largest customer of Robinhood.

23. Defendant MELVIN CAPITAL MANAGEMENT LP ("Melvin") is a Delaware corporation with its principal place of business at 535 Madison Avenue, 22nd Floor, New York, New York, 10022. Defendant Citadel is a hedge fund that owns Defendant Melvin.

24. Each of the Defendants had actual and/or constructive knowledge of the acts of the other Defendants as described herein, and ratified, approved, joined in, acquiesced in, and/or authorized the acts of the other, and/or retained the benefits of the said acts.

## **JURISDICTION AND VENUE**

25. This Court has subject matter jurisdiction over the claims asserted herein pursuant to the Class Action Fairness Act, 28 U.S.C. §1332(d)(2), since some of the members of the Proposed Class (defined *infra*) are citizens of a State different from that of the Defendant and, upon the original filing of this Complaint, members of the putative class resided in states around the country; there are more than 100 putative class members; and the amount in controversy exceeds $5 million, exclusive of interest and costs.

26. The Court also has personal jurisdiction over the parties because Defendants conduct a major part of their national operations, advertising, and sales through continuous business activity in this District.

27. Venue is further appropriate pursuant to 28 U.S.C. §1391 because Defendants conduct a large amount of their business in this District, because they have specifically marketed, advertised, and made substantial sales in California, and because Defendants have substantial relationships in this District. Venue is also proper in this Court because a substantial part of the events and actions giving rise to the harm suffered by members of the Proposed Class occurred in this District.

## FACTUAL ALLEGATIONS

### I. Rise of Online, Commission-Free Trading

28. Robinhood is an online brokerage firm. Its users place securities trades through the firm's website, by using a web-based application (or "app"). Robinhood permits users to purchase and sell securities, including futures contracts.

29. Robinhood was founded in 2013 and launched as a product 2015, and soon grew immensely because it pioneered commission-free trading for stocks – or trading stocks for no charge.

30. Many other brokerages (traditional and online) soon followed in Robinhood's steps to allow for commission-free trading of stocks, including the other named Trading Platform Defendants herein, as well as other market share leaders like Vanguard.

31. Robinhood has experienced significant growth as a relatively new online brokerage firm. In 2019, Robinhood raised $323 million in funding at a $7.6 billion valuation. The firm markets itself primarily to younger investors and claims over 10 million users of its trading app.

32. On or about March 23, 2016, Robinhood's official Twitter account stated: "Let the people trade."[1]

33. Robinhood's mission statement "is to democratize finance for all. We believe that everyone should have access to the financial markets, so we've built Robinhood from the ground up to make investing friendly, approachable, and understandable for newcomers and experts alike."[2]

34. While Robinhood makes its users sign a "Customer Agreement" – the stock traders on Robinhood are not its customers, but its product. Robinhood does not charge for trades, but instead sells trades to "market makers" or firms such as Defendant Citadel (Robinhood's largest customer) who act as middleman and make a profit on this transaction. Simply put – Robinhood's customers are financial firms, and the users are the product.[3]

---

[1] @RobinhoodApp, Twitter Post, Twitter (March 23, 2016) available at https://twitter.com/RobinhoodApp/status/712708069369782272

[2] Robinhood, Our Mission, (January 28, 2021), available at https://robinhood.com/us/en/support/articles/our-mission/

[3] Edward Ongweso Jr., *Robinhood's Customers Are Hedge Funds Like Citadel, Its Users Are Its Products*, Vice News (January 28, 2021), available at https://www.vice.com/en/article/qjpnz5/robinhoods-customers-are-hedge-funds-like-citadel-its-users-are-the-product

35. Many of the Defendants represented to Plaintiffs that they were offering free brokerage services to facilitate fair trading in the stock market.

## II. The Rise of GME/AMC

36. In its final quarterly filing of 2020, Defendant Melvin, one of the best performing hedge funds in recent years, revealed that it had a substantial short interest in GME, or that it was in position to profit if GME fell.[4]

37. Retail investors took note of this, and realizing its potential, began to invest heavily in GME.

38. Subsequently, in the latter stages of 2020 and January 2021, GME began to rise, from an individual value of about $17 per share to a peak value of nearly $500 per share. Throughout this time, Robinhood allowed retail investors to trade GME on the open market.

39. In January of 2021, AMC stock also rose steadily, gaining nearly 50% in the first 3 weeks of the year.

40. After news broke that AMC was also one of Wall Street's most shorted stocks, retail investors began to invest heavily in AMC, shooting it up 360% overnight to a value of $20.36 per share. Within an hour into the trading day, more than 500 million shares of AMC had changed hands – compared to a 30-day average volume of 86 million shares today. By the end of the trading day, more than 1.1 billion shares of AMC had changed hands.[5]

41. On January 14, 2021, the "short squeeze" came to a head, with purchases by both retail investors and firms looking to short GME sent the stock soaring 27 percent.[6]

---

[4] Juliet Chung, *Short Bets Pummel Hot Hedge Fund Melvin Capital*, Wall Street Journal (January 22, 2021), available at https://www.wsj.com/articles/short-bets-pummel-hot-hedge-fund-melvin-capital-11611349217

[5] https://www.cnbc.com/2021/01/27/amc-shares-triple-as-retail-investor-raid-of-hedge-fund-short-targets-spreads-from-gamestop.html

[6] David Ingram & Jason Abbruzzese, *Robinhood and Reddit: A timeline of two apps tormenting Wall Street*, NBC News (January 28, 2021), available at https://www.nbcnews.com/tech/tech-news/robinhood-reddit-timeline-two-apps-tormenting-wall-street-n1256080

42. On January 19, 2021, a major short-selling investment firm known as Citron Research tweeted that the retail investors backing GME were "suckers" and that the short sellers would prevail, enraging the retail investors and giving them new motivation.[7]

43. On January 22, 2021, trading was halted as the stock soared by more than 70 percent.[8] At the close of trading that day, the stock was at $64.75.

44. Before trading, billionaire Chamath Palihapitiya showed support for the movement of retail investors, joining them by buying $125,000 in call options for GME, further displaying the legitimacy of the rise.[9]

45. This rise was distributing wealth to smaller, retailer investors away from the hands of hedge funds and massive Wall Street firms that were losing money in droves as the stocks they had shorted continued to rise.

46. CNBC's Jim Cramer, a financial markets pundit, noted the success of the online retail investors and praised them, saying "It's incredible to watch. I think they're succeeding beyond their wildest dreams." Cramer noted that they were crushing the short holdings from the major firms and profiting at their expense.[10]

47. On Monday, January 25th, AMC announced that it had raised $917 million in capital to see it through the pandemic.[11] This news led to a 26% jump on the 25th and a 12 percent jump on the 26th.

---

[7] @CitronResearch, Twitter Post, Twitter (January 19, 2021), available at https://twitter.com/CitronResearch/status/1351544479547760642

[8] Kim Lyons, *GameStop stock halts trading after Reddit drama*, The Verge (January 22, 2021), available at https://www.theverge.com/2021/1/22/22244900/game-stop-stock-halted-trading-volatility

[9] Matthew Fox, *Chamath Palihapitiya follows Reddit investors into GameStop with purchase of bullish options that start paying out if the stock soars another 28%*, Markets Insider (January 26, 2021), available at https://markets.businessinsider.com/news/stocks/chamath-palihapitiya-gamestop-investment-buys-115-call-options-reddit-wallstreetbets-2021-1-1030005801

[10] https://www.cnbc.com/2021/01/14/jim-cramer-gamestop-bed-bath-beyond-are-surging-on-short-busting.html

[11] https://www.businesswire.com/news/home/20210125005273/en/AMC-Raises-917-Million-of-Fresh-Investment-Capital-Since-Mid-December-of-2020

48. On January 26, 2021, the stock rose 92.7 percent, with a tweet by richest man in the world Elon Musk leading to the stock exceeding $200 after hours.[12]

49. Defendant Melvin received a $2.8 billion bailout after the precipitous rise of some of the stocks on January 26.

50. One firm that bailed out Defendant Melvin, to the tune of $2 billion, was Defendant Citadel, the aforementioned biggest customer of Robinhood.

51. On January 27, 2021, the stock began trading at $351, up a staggering $200 from market close on the 26th, with the world beginning to take notice of the immense rate at which the stock was gaining value, gains that were driven by retail investors. This surge was the result of retail investors that "have beaten Wall Street at its own game", a win for the common man against the overwhelming infrastructure on Wall Street and its billion-dollar hedge funds. The retail investors knew that it was their presence in purchasing GME stock "en masse" that kept it rising despite the short presence against it.[13]

52. Throughout the dramatic rise of GME, AMC, and other stocks, retail investors continuously complained of delays in trades or outages in the service, making them unable to execute trades at the precise time and price they desired.

## III. Thursday, January 28th

53. Rather than use their financial acumen to compete and invest in good opportunities in the market to recoup the loss in their short positions due to the growth of the stocks they had shorted, or by paying the price for their bad bets, Defendants instead hatched an anticompetitive scheme to limit trading in stock.

54. After the market closed on January 27, 2021, after-hours trading revealed suspicious coordinated trading activity. After-hours trading is not permitted for individual retail investors, but only for institutional investors such as hedge funds.

---

[12] Allison Morrow, *Elon Musk tweet fuels frenzied GameStop surge*, CNN (January 28, 2021), available at https://www.cnn.com/2021/01/26/investing/gamestop-stock-elon-musk-reddit/index.html

[13] Alicia Adamczyk, *'You will lose your money very, very quickly': What investors need to know about GameStop's stock surge*, CNBC (January 27, 2021), available at https://www.cnbc.com/2021/01/27/what-to-know-about-gamestops-stock-spike.html

55. Analytics revealed a significant volume of GME short trading immediately prior to the markets opening on January 28, i.e., after-hours traders were taking more short positions suggesting after-hour traders were training in anticipation of a GME sell-off.

56. As articulated above, retail investors cannot engage in after-hours trading, so the increase in short volume is likely the result of institutional investors taking short positions, such as Defendants Melvin and Citadel.

57. The dramatic increase in short positions was counterintuitive. Chatter in various financial online forums indicated high excitement and motivation on the part of retail investors to continue investing – with a desire to see them go "to the moon". The retail investors announced plans to buy – which would mean the prices were likely to go up, not down.

58. On or about the morning of January 28, 2021, in order to slow the growth of AMC and deprive their users of the ability to use their service, Robinhood abruptly, purposefully, willfully, and knowingly pulled GME and AMC from their app.[14]

59. Also on January 28, TDAmeritrade placed restrictions on the trading of GME, AMC, and other securities on its platforms.[15]

60. Also on January 28, Webull blocked GME and AMC trades on their platform despite being suggested as the more open alternative to Robinhood.[16]

61. Also on January 28, IB restricted trading in GME and AMC, among other stocks.[17]

---

[14] Robinhood, *Keeping Customers Informed Through Market Volatility*, (January 28, 2021), available at https://blog.robinhood.com/news/2021/1/28/keeping-customers-informed-through-market-volatility

[15] ThinkAdvisor, *Schwab, TD Ameritrade Put Brakes on Some GameStop Trading*, (January 28, 2021), available at https://www.thinkadvisor.com/2021/01/28/schwab-td-ameritrade-put-brakes-on-some-gamestop-trading/

[16] Newsweek, *Webull Follows Robinhood in Blocking GameStop, AMC Trades After Being Suggested as Alternate Trading Platform*, (January 28, 2021), available at https://www.newsweek.com/webull-blocks-gamestop-amc-transactions-stock-market-robinhood-1565172

[17] CNBC, *Interactive Brokers restricted GameStop trading to protect the market, says Chairman Peterffy*, (January 28, 2021), available at https://www.cnbc.com/2021/01/28/interactive-brokers-restricted-gamestop-trading-to-protect-the-market-says-chairman-peterffy.html

62. Also on January 28, ETrade halted trading in GME and AMC, preventing users from purchasing stock. [18]

63. This led to a massive fall in AMC, as despite soaring as much as 570% over the course of the week, AMC fell by 55% after the Trading Platform Defendants restricted their users' ability to purchase new AMC stock.[19]

64. By restricting their users from purchasing, there were suddenly more sellers than buyers, and various stocks fell.

65. Upon doing so, there was bipartisan outcry from across the country as it was seen as a sign of market manipulation that Robinhood and the rest of the Trading Platform Defendants were restricting its users from purchasing new stock.

66. Representative Rashida Tlaib, Congresswoman from Michigan, said that "This is beyond absurd. @FSCDems need to have a hearing on Robinhood's market manipulation. They're blocking the ability to trade to protect Wall St. hedge funds, stealing millions of dollars from their users to protect people who've used the stock market as a casino for decades."[20]

67. Representative Alexandria Ocasio-Cortez, Congresswoman from New York, tweeted that "This is unacceptable. We now need to know more about @RobinhoodApp 's decision to block retail investors from purchasing stock while hedge funds are freely able to trade the stock as they see fit. As a member of the Financial Services Cmte, I'd support a hearing if necessary.", to which Senator Ted Cruz of Texas indicated his support.[21]

---

[18] The Verge, *E-Trade confirms it halted GameStop and AMC stock, will let you buy some Friday*, (January 28, 2021), available at https://www.theverge.com/2021/1/28/22254863/etrade-gamestop-amc-stock-reddit-wallstreetbets-robinhood.

[19] https://www.forbes.com/sites/jonathanponciano/2021/01/28/meme-stocks-begin-to-crumble-gamestop-market-value-falls-14-billion-amc-crashes-55-while-dow-jumps-600-points/?sh=4b3d8b2f4283

[20] @RashidaTlaib, Twitter Post, Twitter (January 28, 2021), available at https://twitter.com/RashidaTlaib/status/1354807292667981828?s=20

[21] @AOC, Twitter Post, Twitter (January 28, 2021), available at https://twitter.com/AOC/status/1354830697459032066

68. Committees in both houses of Congress published that they will be holding hearings on the stock market after Robinhood and the rest of the Trading Platform Defendants restricted trading.[22]

69. The New York Attorney General's office published that they would be looking into Robinhood and activity on the app in relation to AMC and other stocks.[23]

70. The SEC asserted that they would "closely review actions taken by regulated entities that may disadvantage investors or otherwise unduly inhibit their ability to trade certain securities" and "act to protect retail investors when the facts demonstrate abusive or manipulative trading activity that is prohibited by the federal securities laws."[24]

71. On January 29, 2021, while ostensibly reinstating the purchases of previously restricted securities, upon information and belief, Trading Platform Defendants in fact continued to limit the purchase of fractional shares and only allowed a maximum of one share to be purchased.

72. Upon information and belief, Trading Platform Defendants' actions were done purposefully and knowingly to manipulate the market for the benefit of people and financial intuitions who were not Trading Platform Defendants' users.

73. Since pulling the stock from their app, GME prices have gone up from a low point of approximately $120, with the stock ending the trading day at $193 and shooting up to over $340 in after hours trading, depriving investors of potential gains.

74. Since pulling the stock from their app, AMC prices have gone up from a low point of approximately $7.51, with the stock ending the trading day at $8.68 and shooting up to over $14 in after-hours trading, depriving investors of potential gains.

---

[22] David Shepardson, *U.S. Congress to hold hearings on GameStop trading, state of stock markets*, Reuters (January 28, 2021), available at https://www.reuters.com/article/us-retail-trading-usa-congress/u-s-congress-to-hold-hearings-on-gamestop-trading-state-of-stock-markets-idUSKBN29X33T

[23] New York State Attorney General Press Release, *Attorney General James Reviewing Robinhood App Activity*, (January 28, 2019), available at https://ag.ny.gov/press-release/2021/attorney-general-james-reviewing-robinhood-app-activity

[24] Securities And Exchange Commission Public Statement, *Statement of Acting Chair Lee and Commissioners Peirce, Roisman, and Crenshaw Regarding Recent Market Volatility*, (January 29, 2021), available at https://www.sec.gov/news/public-statement/joint-statement-market-volatility-2021-01-29

75. In sum, Trading Platform Defendants have restricted retailer investors from purchasing stock in their services for no legitimate reason, depriving retailer investors from full use and enjoyment of the Trading Platform Defendants' services to purchase securities.

76. The Financial Industry Regulatory Authority ("FINRA"), which governs brokers like Robinhood, espouses rule 5310 regarding "Best Execution and Interpositioning." Rule 5310.01 requires that brokers, such as Robinhood "must make every effort to execute a marketable customer order that it receives promptly and fully." By failing to respond at all to users that have placed timely trades on its app, in addition to completely preventing users from even attempting trades at all, Robinhood has breached its obligations under FINRA § 5310.01 and caused its users substantial losses.

77. Trading Platform Defendants continues to arbitrarily pull other securities, such as GameStop, AMC American Airlines, Blackberry, Bed Bath & Beyond, Castor Maritime, Express, Koss Corporation, Naked Brand Group, Nokia, Sundial Growers, Tootsie Roll, and Trivago ("Additional Stocks") from their services for the same illegitimate reason.

78. Upon information and belief, Trading Platform Defendants are pulling securities like AMC and Additional Stocks from its platform in order to slow the growth of stocks and help institutional investors and firms with a connection to Trading Platform Defendants' revenue stream, such as Defendant Citadel, at the expense of Trading Platform Defendants' devoted base of retail investors. Simply put, Trading Platform Defendants are helping their corporate and financial firm customers (Defendants Melvin and Citadel), not its retail end-users. Robinhood reported raising a $1 billion dollar financing round from institutional investors in the midst of the foregoing debacle.

79. The extent and scope of the conspiracy is still as of yet unknown. Plaintiffs believe the anticompetitive scheme is ongoing. In the evening of January 29, 2021, Defendant Robinhood announced it was increasing the number of restricted stocks from 13 to 50.

80. Plaintiff owns shares in AMC, BB and Nokia. Plaintiff's share purchases were purchased through another outfit. Trading Platform Defendants' coordination to exclude users of their platforms to purchase these same shares damaged the property interests of Plaintiff, artificially

preventing the stocks from rising and actually leading to their decline, directly lowering the value of Plaintiff's investments.

81. Thus, Plaintiff, like so many other retail investors, lost out on earning opportunities. The Class lost its opportunity to buy shares of those same stocks and others through the trading services offered by Trading Platform Defendants.

## CLASS ACTION ALLEGATIONS

82. Plaintiff brings claims pursuant to Federal Rule of Civil Procedure 23(a), (b)(2), (b)(3), (c)(4), on behalf of the following Class, defined as:

> **All persons or entities within the United States who, through a Trading Platform Defendant or another retail brokerage company, directly purchased securities of AMC Entertainment Holdings Inc. (AMC), American Airlines Group Inc. (AAL), BlackBerry Ltd. (BB), Bed Bath & Beyond Inc. (BBBY), Castor Maritime, Inc. (CTRM), Express, Inc. (EXPR), GameStop Corp. (GME), Koss Corporation (KOSS), Naked Brand Group Ltd. (NAKD), Nokia Corp. (NOK), Sundial Growers Inc. (SNDL), Tootsie Roll Industries, Inc. (TR), or Trivago N.V. (TRVG) between January 1, 2021 to and until anticompetitive effects of Defendants' unlawful conduct ceases ("the Class Period).**

83. Excluded from the Class and Subclass(es) are the Defendants' entities and their current employees, counsel for either party, as well as the Court, its personnel presiding over this action, their immediate family members, and governmental entities.

84. This action has been brought and may properly be maintained as a class action against Defendants pursuant to the provisions of Federal Rule of Civil Procedure 23.

85. **Numerosity:** The precise number of members of the proposed Class is unknown to Plaintiff at this time, but, based on information and belief, Class members are so numerous that their individual joinder herein is impracticable. Based on information and belief and publicly available reports, Class members number in the hundreds of thousands if not millions. Subclass members are likely in the thousands. All Class and Subclass members may be notified of the pendency of this action by reference to Defendants' records, or by other alternative means.

86. **Commonality:** Numerous questions of law or fact are common to the claims of Plaintiff and members of the proposed Class. These common questions of law and fact exist as to all

Class members and predominate over questions affecting only individual Class members. These common legal and factual questions include, but are not limited to the following:

a. Whether Trading Platform Defendants knowingly failed to provide the financial services that were needed to handle reasonable consumer demand in high-volume trading times, including trading securities that are available on every other competitive trading platform;

b. Whether Trading Platform Defendants failed to uphold its duty of care to its users when it purposefully restricted purchases of AMC and Additional Stocks on their services;

c. Whether Defendants restricted purchases of AMC and Additional Stocks purposefully or at the direction of others to benefit the finances of those it is associated with (Defendants Melvin and Citadel) at the expense of holders of AMC stock and Additional Stocks, many of which are Defendants' users;

d. Whether Defendants violated FINRA § 5310, alongside numerous other FINRA rules, state laws, and federal regulations;

e. Whether Trading Platform Defendants violated consumer protection laws in failing to disclose to its users that the services it advertised as open would not include the ability for Trading Platform Defendants to arbitrarily restrict the purchasing of certain securities;

f. Whether Trading Platform Defendants were in breach of its legal, regulatory, and licensing requirements by failing to provide adequate access to financial services;

g. Whether Trading Platform Defendants was in breach of its contracts and/or the implied covenant of good faith and fair dealing in connection with its failure to provide financial services;

h. Whether Trading Platform Defendants was negligent or grossly negligent by failing to provide financial services in a timely manner;

i. Whether Trading Platform Defendants breached its fiduciary duty to its users by failing to provide adequate access to financial services;

j. Whether Defendants was unjustly enriched by its conduct prohibiting its users from purchasing AMC stock and Additional Stocks and from artificially limiting the purchases of AMC stock and Additional Stocks by the overall market;

k. Whether and to what extent Plaintiffs were injured by Defendants' conduct and the appropriate class-wide measure of damages, restitution, and other appropriate relief, including injunctive relief; and

l. Whether Plaintiffs are entitled to injunctive and declaratory relief.

87. **Typicality:** The claims of the named Plaintiff are typical of the claims of the proposed Class in that the named Plaintiff was a user of Trading Platform Defendants' trading services during the class period and was unable to purchase AMC and Additional Stocks and make time-sensitive trades on AMC and Additional Stocks and thus sustained damages as a result of Trading Platform Defendants' wrongful conduct in restricting the purchase of AMC and Additional Stocks.

88. **Adequate Representation:** Plaintiff will fairly and adequately represent the interests of the Class in that he has no conflicts with any other Class members. Plaintiff has retained competent counsel experienced in prosecuting complex class actions in federal court, including those involving financial services, and they will vigorously litigate this class action on his behalf and on behalf of the class.

89. **Predominance and Superiority:** There is no plain, speedy, or adequate remedy other than by maintenance of this class action. A class action is superior to other available means, if any, for the fair and efficient adjudication of this controversy. Prosecution of separate actions by individual Class members would create the risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for the Defendant. Additionally, given the relatively modest damages sustained by most individual Class members, few, if any, proposed Class members could or would sustain the economic burden of pursuing individual remedies for Defendants' wrongful conduct. Treatment as a class action will achieve substantial economies of time, effort, and expense, and provide comprehensive and uniform supervision by a single court. This class action presents no material difficulties in management.

90. A class action is superior to other available methods for the fair and efficient adjudication of this controversy. A class action will permit an orderly and expeditious administration of the claims of the Class, will foster economies of time, effort, and expense, and will insure uniformity of decisions. The prosecution of individual actions by Class members would create the risk of (a) inconsistent or varying adjudications with respect to individual Class members; and (b) be grossly impracticable because the cost of vindicating an individual Class member's claim would likely exceed the value of the claim.

91. Class action certification is warranted under Fed. R. Civ P. 23(b)(1)(A) because the prosecution of separate actions by individual members of the proposed Class would create a risk of inconsistent or varying adjudications with respect to individual Class members, which may produce incompatible standards of conduct for Defendants. 34. Class action certification is warranted under Fed. R. Civ P. 23(b)(1)(B) because the prosecution of separate actions by individual members of the proposed Class would create a risk of adjudications with respect to individual Class members which may, as a practical matter, be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

92. The prerequisites to maintaining a class action for injunctive or equitable relief pursuant to Fed. R. Civ. P. 23(b)(2) are met as Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making final injunctive, declaratory, or equitable relief appropriate with respect to the Class as a whole. Class action certification is also warranted under Fed. R. Civ P. 23(b)(3) because questions of law or fact common to the Class members predominate over any questions affecting only individual members, and a Class action is superior to other available remedies for the fair and efficient adjudication of this controversy.

93. The number of damages available to the individual Plaintiff is insufficient to make litigation addressing Defendants' conduct economically feasible for most in the absence of the class action procedure. Individualized litigation also presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system presented by the legal and factual issues of the case. By contrast, the class action device presents far fewer

management difficulties and provides the benefits of a single adjudication, economy of scale, and comprehensive supervision by a single court.

94. Class action certification is also warranted under Fed. R. Civ P. 23(c)(4) because questions of law or fact common to the Class members may be certified and decided by this Court on a class wide basis.

## CAUSES OF ACTION

### Count I

**Unlawful Combination and Conspiracy in Restraint of Trade in Violation of Section 1 of the Sherman Act 15 U.S.C. § 1 (Against All Defendants)**

95. Plaintiffs re-allege and incorporate by reference the factual allegations set forth above.

96. On information and belief, the Defendants combined, conspired, or contracted to contemporaneously decide upon and enact a coordinated prohibition on the purchase of shares of GME, AMC, and Additional Stocks by Plaintiffs Class.

97. The Trading Platform Defendants have prohibited and continue to prohibit purchases of shares of GME, AMC, and Additional Stocks by Plaintiffs in an unreasonable restraint of trade in the stock market. Despite prohibiting purchases, the Trading Platform Defendants have continued to allow Plaintiffs to sell their shares.

98. As a result of Defendants' contract, combination, or conspiracy, the unreasonable restraint of trade in the stock market has caused injury to Plaintiffs by prohibiting their purchase of shares of GME, AMC, and Additional Stocks. Despite this prohibition, Trading Platform Defendants allow Plaintiffs to sell shares on their Platforms.

### Count II

**Attempted Monopolization of the Stock Market in Violation of Section 2 of the Sherman Act 15 U.S.C. § 2**

**(Against All Defendants)**

99. Plaintiffs re-allege and incorporate by reference the factual allegations set forth above.

100. By prohibiting Plaintiffs from purchasing the Stocks but not from selling the Stocks, Trading Platform Defendants engaged in and continue to engage in exclusionary conduct that is deleterious to consumers and to the anticompetitive benefit of the Trading Platform Defendants. Trading Platform Defendants engaged in and continue to engage in anticompetitive conduct.

101. Through the continued anticompetitive conduct of excluding Plaintiffs from the stock market as competitors by prohibiting Plaintiffs purchase of the Stocks, Trading Platform Defendants manifested and continue to manifest a specific intent to monopolize. Trading Platform Defendants' coordinated prohibition of Plaintiffs' purchase of the Stocks demonstrates Defendants' specific intent to monopolize the stock market.

102. Upon information and belief, the Trading Platform Defendants collectively control a majority share of trading within the stock market. Trading Platform Defendants' coordinated prohibition of Plaintiff's purchase of the Stocks is likely to increase Trading Platform Defendants' market share within the stock market. As a result, Trading Platform Defendants' anticompetitive conduct poses a dangerous probability of achieving monopoly.

**Count III**

**Restraint of Trade in Violation of the Cartwright Act**

**(Bus. & Prof. Code 16720 *et seq*.)**

**(Against All Defendants)**

103. Plaintiffs re-allege and incorporate by reference the factual allegations set forth above.

104. On information and belief, the Defendants combined, conspired, or contracted to contemporaneously decide upon and enact a coordinated prohibition on the purchase of shares of GME, AMC, and Additional Stocks by Plaintiffs.

105. The Trading Platform Defendants subsequently banned the purchasing of the stocks in question while still allowing selling of the stocks.

106. This constitutes an unreasonable restraint of trade as defined in the Cartwright act, via the conspiring to create or carry out restrictions in trade or commerce

107. As a result of the unreasonable restraint of trade via the actions of Trading Platform Defendants, Plaintiffs have suffered injury via their inability to purchase new shares of stock in GME, AMC, and Additional Stock.

**Count IV**

**Attempted Monopolization in Violation of the Cartwright Act**

**(Bus. & Prof. Code 16720 *et seq*.)**

**(Against All Trading Platform Defendants)**

108. Plaintiffs re-allege and incorporate by reference the factual allegations set forth above.

109. By prohibiting users to purchase stock in GME, AMC, and Additional Stocks, Trading Platform Defendants are partaking in exclusionary that is deleterious to consumers and to the anticompetitive benefit of the Trading Platform Defendants. Trading Platform Defendants engaged in and continue to engage in anticompetitive conduct.

110. This conduct being orchestrated by multiple firms in concert constitutes a trust as defined in the Cartwright Act.

111. Through this conduct constituting a trust under the Cartwright Act, Defendants have conspired to exclude Plaintiffs from the market as competitors for the purchase of GME, AMC, and Additional Stocks, and allow themselves the lion's share of the purchases. Trading Platform Defendants' coordinated prohibition of Plaintiffs' purchase of the Stocks demonstrates Defendants' specific intent to monopolize the stock market.

112. Trading Platform Defendants' prohibition of purchases of GME, AMC, and Additional Stocks on their services places a massive restriction, as Trading Platform Defendants collectively control a majority of trading within the stock market. Trading Platform Defendants' coordinated conduct is likely to increase their market share and therefore poses a dangerous probability of achieving monopoly.

**Count V**

**Breach of Contract**

113. Plaintiffs hereby incorporate by reference the factual allegations set forth above.

114. In order to use the Trading Platform Defendants' trading platform, a potential user must enter into the Customer Agreement with Trading Platform Defendants.

115. Plaintiff and all class members did enter into a Customer Agreement with Defendants before beginning to use the service.

116. Trading Platform Defendants breached its Customer Agreement by failing to disclose that its platform was going to arbitrarily restrict a security from being purchased on the app; that Trading Platform Defendants failed to provide adequate explanation to its users as to why the security was being pulled; that Trading Platform Defendants knowingly put their users at a disadvantage in the high-stakes and fast moving stock market compared to users who used other trading apps or services; that Trading Platform Defendants prohibited Plaintiffs from performing trades on the stock market in a timely manner (or at all) under the contract; that Trading Platform Defendants failed to comply with all applicable legal, regulatory, and licensing requirements in the running of a stock trading marketplace; and that Defendants failed to exercise trades and actions requested by users as is required under law.

117. As such, Trading Platform Defendants breached its Customer Agreement with Plaintiffs.

118. Trading Platform Defendants' failure to perform its duties and its breaches of the Customer Agreement resulted in damages and losses to Plaintiffs and exposes them to continuing harm due to Trading Platform Defendants' ongoing failure to perform its obligations under the Customer Agreement. These losses reflect damages to Plaintiffs in an amount to be determined at trial or separate proceedings as necessary.

## Count VI

## Breach of Implied Covenant of Good Faith & Fair Dealing

119. Plaintiffs hereby incorporate by reference the factual allegations set forth above.

120. Plaintiffs entered into the Customer Agreement with Trading Platform Defendants to open a trading account. They agreed to Trading Platform Defendants' Terms and Conditions in order to use Trading Platform Defendants' website and trading platform.

121. Plaintiffs and members of the Class and Subclass fulfilled their obligations under these contracts by adhering to the agreed upon terms and by using Trading Platform Defendants' trading services through its website, app, and trading platform.

122. Trading Platform Defendants was obligated to provide the trading services required under those contracts at all times, including but not limited to, trades for AMC and Additional Stocks.

123. When initially signing up for Trading Platform Defendants, Plaintiff and all those similarly situated could and most actually did trade AMC and Additional Stocks.

124. Trading Platform Defendants unfairly interfered with the rights of Plaintiffs and members of the Class and Subclass to receive the benefits of the Customer Agreement by, among other things, (i) failing to provide services necessary to timely execute a trade on the stock market; (ii) failing to allow its users to trade certain securities at all; (iii) failing to inform its users in a timely and effective manner of the drastic changes in trading abilities; and (iv) prohibiting plaintiffs from buying AMC and other stocks for Trading Platform Defendants' own pecuniary interest and not disclosing that interest to Plaintiffs and all Class and Subclass members.

125. Trading Platform Defendants acted in bad faith by placing its interests, and the interests of its associates (Defendants Melvin and Citadel), over its contractual duties to its users.

126. Trading Platform Defendants' conduct has caused Plaintiffs and members of the Class and Subclass harm, losses, and damages. These losses reflect damages to Plaintiffs and members of the Class and Subclass in an amount to be determined at trial or separate proceedings as necessary.

**Count VII**

**Negligence Per Se**

127. Plaintiffs hereby incorporate by reference the factual allegations set forth above.

128. Trading Platform Defendants had a duty to exercise reasonable care in conducting and facilitating transactions for its users.

129. Trading Platform Defendants had a statutory duty to exercise reasonable care in providing trades on the free, open market for its users.

130. Trading Platform Defendants unlawfully breached its statutory duties when it (i) restricted the purchases of AMC and Additional Stocks on its app; (ii) failed to provide its users

services related to AMC and Additional Stocks; (iii) failed to notify users in a timely manner of the AMC and Additional Stocks "blackout," or the total restriction of AMC and Additional Stocks purchases on its app.

131. Trading Platform Defendants' conduct as set forth in this Complaint was devoid of even the most minimum level of care, and its acts and omissions were and continue to be an extreme departure from the ordinary standard of care. Their actions breach the duty of care to their users, but are also inconsistent with the standard of care expected from similar firms in the stock marketplace industry.

132. Trading Platform Defendants completely disregarded the interests of its users by restricting their ability to purchase AMC and Additional Stocks, a breach of the standard of care that falls so far below normal conduct for a brokerage service that it amounts to a complete dereliction of its duties.

133. Trading Platform Defendants not only violated the relevant statute, ordinance, or regulation but failed to do what might reasonably be expected of a person of ordinary prudence, acting under similar circumstances, who desired to comply with the law.

134. Trading Platform Defendants' grossly negligent and wrongful breaches of its duties owed to Plaintiffs and members of the Class and Subclass proximately caused losses and damages that would not have occurred but for Defendants' gross breach of its duty of due care. These losses reflect damages to Plaintiffs in an amount to be determined at trial or separate proceedings as necessary.

**Count VIII**

**Negligence [Cal. Civ. Code § 1714]**

135. Plaintiffs hereby incorporate by reference the factual allegations set forth above. Trading Platform Defendants had a duty to exercise reasonable care in conducting and facilitating transactions for its users.

136. Trading Platform Defendants had a common law duty to exercise reasonable care in providing trades on the free, open market for its users.

137. Trading Platform Defendants unlawfully breached its common law duties when it (i) restricted the purchases of AMC and Additional Stocks on its app; (ii) failed to provide its users

services related to AMC and Additional Stocks; (iii) failed to notify users in a timely manner of the AMC and Additional Stocks "blackout," or the total restriction of AMC and Additional Stocks purchases on its app.

138. Trading Platform Defendants' conduct as set forth in this Complaint was devoid of even the most minimum level of care, and its acts and omissions were and continue to be an extreme departure from the ordinary standard of care. Their actions breach the duty of care to their users, but are also inconsistent with the standard of care expected from similar firms in the stock marketplace industry.

139. Trading Platform Defendants completely disregarded the interests of its users by restricting their ability to purchase AMC and Additional Stocks, a breach of the standard of care that falls so far below normal conduct for a brokerage service that it amounts to a complete dereliction of its duties.

140. Trading Platform Defendants' grossly negligent and wrongful breaches of its duties owed to Plaintiffs and members of the Class and Subclass proximately caused losses and damages that would not have occurred but for Trading Platform Defendants' gross breach of its duty of due care. These losses reflect damages to Plaintiffs in an amount to be determined at trial or separate proceedings as necessary.

**Count IX**

**Breach of Fiduciary Duty**

141. Plaintiff hereby incorporates by reference the factual allegations contained herein.

142. As a licensed provider of financial services, Trading Platform Defendants at all times relevant was a fiduciary to Plaintiffs and owed them the highest level of good faith and integrity in the course of performing financial services on their behalf, services that include the buying and selling of stock. Trading Platform Defendants also acted as a fiduciary to all users who agreed to the Customer Agreement.

143. Trading Platform Defendants breached its fiduciary duties to Plaintiffs by failing to disclose that it would restrict AMC and Additional Stocks purchases in a timely manner; actually restricting new purchases of AMC and Additional Stocks; restricting purchases of AMC and

Additional Stocks for its own pecuniary benefits; failing to provide access to its financial services in a timely manner; failing to comply with all applicable legal, regulatory, and licensing requirements; failing to exercise trades and actions requested by users in a complete and timely manner (also required by FINRA § 5310).

144. Trading Platform Defendants' conduct caused and continues to cause Plaintiffs harm, losses, and damages. These losses reflect damages to Plaintiffs in an amount to be determined at trial or separate proceedings as necessary.

**Count X**

**Constructive Fraud**

145. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

146. Trading Platform Defendants owed Plaintiffs fiduciary duties as their broker for selling securities.

147. Trading Platform Defendants owed Plaintiffs the utmost duty of care as their fiduciary, including the duty to fully disclose material facts relating to their brokerage relationship with Defendants Melvin and Citadel.

148. Trading Platform Defendants represented to Plaintiffs that it was a brokerage service dedicated to free trading and democratizing the stock market.

149. Plaintiffs chose Trading Platform Defendants as their brokerage service in part due to Defendants' assurances that it was consumer friendly as a firm that allows open trading.

150. Trading Platform Defendants subsequently restricted what Plaintiffs were able to buy on their brokerage, contrary to their representations.

151. Plaintiffs' reliance on Trading Platform Defendants' false representations were substantial factors in causing Plaintiff harm, as they were unable to trade with freedom given Trading Platform Defendants' restrictions.

**Count XI**

**Violation of California's Unfair Competition Law [Cal. Bus. & Prof. Code § 17200 et seq.]**

152. Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

153.     California's Unfair Competition Law ("UCL") is designed to protect consumers from unlawful, fraudulent, and/or unfair business practices. Trading Platform Defendants' restrictions on the trade of securities within their respective apps and/or websites constitutes an unlawful business practice.

154.     **Unlawful Practices**: A practice is "unlawful" if it violates a law other than the UCL. Trading Platform Defendants violated Plaintiffs' common law and California statutory rights when it failed to provide complete trading services as to AMC and other stocks. Trading Platform Defendants' negligence, breach of contract, and breach of fiduciary duty made Plaintiffs unable to trade stock in AMC and Additional Stocks and lose out on massive potential gains.

155.     These violations of common and state as the predicate violations under the unlawful prong of the UCL, as Trading Platform Defendants created private causes of action against it by damaging the property rights of Plaintiffs via its unlawful conduct.

156.     **Fraudulent Practices**: A practice is "fraudulent" if members of the general public were or are likely to be deceived. Defendant Robinhood's messaging that it was an open platform and its mission to "democratize" trading is likely to deceive users into believing that they are truly open to purchase how they please on Defendant Robinhood's marketplace, when in fact Defendant Robinhood will arbitrarily restrict what stocks its users can purchase. Other Trading Platform Defendants similarly advertised their trading services as allowing users open and free trading opportunities.

157.     **Unfair Practices**: The UCL gives courts maximum discretion to address improper business practices that are "unfair." Trading Platform Defendants' business practices have become, and will continue to be, unfair because Defendants users were assured that they would be able to trade freely on the Trading Platform Defendants service and not have what stocks they were able to trade in be arbitrarily restricted at the potentially nebulous whims of Trading Platform Defendants. The gravity of the harm caused to Trading Platform Defendants users, such as Plaintiff, far outweighs any business reason, justification, or motive Trading Platform Defendants may have had for engaging in its unfair business practices.

158.     As a result of Trading Platform Defendants' unlawful, fraudulent, and/or unfair business practices, Plaintiffs suffered injury in fact and have lost a property interest in the values of

their stock portfolios given their inability to effectively purchase new stock on the Trading Platform Defendants' platform.

159. Accordingly, Plaintiffs and the other Class members have suffered injury in fact including lost money or property as a result of Trading Platform Defendants' misconduct.

160. Plaintiffs seek to enjoin further unlawful, unfair, and/or fraudulent acts or practices.

161. Plaintiffs request that this Court enter such orders or judgments as may be necessary to enjoin Trading Platform Defendants from continuing its unfair, unlawful, and/or deceptive practices and to restore to Plaintiff and members of the Class any money it acquired by unfair competition, including restitution and/or restitutionary disgorgement, as provided in Cal. Bus. & Prof. Code § 17203 and Cal. Bus. & Prof. Code § 3345; and for such other relief set forth below.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, on behalf of herself and the Class, demands a jury trial and prays for relief that this Court enter judgment in their favor and that of the Proposed Class and the proposed Subclass, as defined herein, and against Defendants as follows:

i. Enter an immediate injunction requiring Trading Platform Defendants to fully reinstate AMC and all the other stocks it restricted in the announcement on January 28, 2021 on their trading platform;

ii. Restrain Trading Platform Defendants, their officers, agents, servants, employees, attorneys, and those in active concert or participation with them, from the continued and unauthorized restriction of trading ability of the Plaintiff and Proposed Class and proposed subclasses, as defined herein;

iii. Certify the Proposed Class as well as any suitable subclasses, under Fed. R. Civ. P. 23;

iv. Appoint Plaintiff and their legal counsel as both named representatives for the Proposed Class (or for any suitable subclasses), and as Class Counsel, respectively;

v. Award Plaintiffs and the Proposed Class (or any suitable subclass): (i) actual, compensatory, and consequential damages, (ii) punitive and treble damages, as allowed for under the relevant laws, (iii) restitution, disgorgement, reimbursement, and/or other equitable relief as the Court

deems just and proper, (iv) costs, including experts' fees and attorneys' fees and expenses, and any other reasonable costs, and (v) pre- and post-judgment interest, to the extent allowed under the relevant laws;

vi. For any such other and additional relief that this Court should deem as just and proper.

## JURY DEMAND

Plaintiffs respectfully demand a trial by jury of all matters so triable.

Dated: February 2, 2021

Respectfully submitted,

*s/ William M. Audet*

William M. Audet (SBN 117456)
waudet@audetlaw.com
"David" Ling Y. Kuang (SBN 296873)
lkuang@audetlaw.com
Kurt D. Kessler (SBN 327334)
kkessler@audetlaw.com
**AUDET & PARTNERS, LLP**
711 Van Ness Avenue, Suite 500
San Francisco, CA 94102-3275
Telephone: (415) 568-2555
Facsimile: (415) 568-2556

Robert L. Lieff (SBN 037568)
rlieff@lchb.com
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339
Telephone: (415) 956-1000
Facsimile: (415) 956-1008

Jack Russo (SBN 096068)
jrusso@computerlaw.com
**COMPUTER LAW GROUP, LLP**
401 Florence Street
Palo Alto, CA 94301
Telephone: (650) 327-9800
Facsimile: (650) 618-1863

*Attorneys for Plaintiff Elvia Curiel-Ruth, on behalf of herself and all others similarly situated*

28

**CLASS ACTION COMPLAINT**