# EXHIBIT 4

RICHARD C. DALTON, LLC
Richard C. Dalton (Cal. Bar No. )
P.O. Box 358
Carencro, Louisiana 70520
Telephone: (337) 371-0375
E-Mail: rick@rickdaltonlaw.com
Counsel for Plaintiff and the Putative Class

[Additional Counsel Listed on Signature Page]

## UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| **CHRISTIAN A. DALTON,**<br>**Individually and on Behalf**<br>**of All Others Similarly Situated,** | **CIVIL ACTION NO:**<br><br>**3:21-cv-00697** |
| **Plaintiffs,** | |
| **v.** | |
| **ROBINHOOD SECURITIES LLC;**<br>**ROBINHOOD FINANCIAL LLC; AND**<br>**ROBINHOOD MARKETS, INC.** | |
| **Defendants.** | **JURY TRIAL DEMANDED** |

Plaintiff CHRISTIAN A. DALTON ("Dalton" or "Plaintiff"), on behalf of himself and all other similarly situated (the "Class," as defined below), alleges as follows upon information and belief based, inter alia, upon investigation conducted by Plaintiff and his counsel, except as to those allegations pertaining to Plaintiff personally, which are alleged upon knowledge:

-1-

**INTRODUCTION**

1.     ROBINHOOD is an online brokerage firm.

2.     ROBINHOOD purposefully, willfully, and knowingly removed the stocks Gamestop Corp. "GME"; AMC Entertainment Holdings Inc "AMC"; BlackBerry Ltd "BB"; Nokia Oyj "NOK"; Bed Bath & Beyond, Inc. "BBBY"; Express, Inc. "EXPR"; Koss Corporation "KOSS"; and Naked Brand Group Ltd "NAKD" from its trading platform in the midst of an unprecedented stock rise thereby depriving retail investors the ability to invest in the open-market and manipulate the open-market.

3.     Plaintiff and the Class were damaged because they were prevented from using their accounts and making planned trades or exercising options, which would have been very lucrative.

**JURISDICTION, VENUE AND INTRADISTRICT ASSIGNMENT**

4.     This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2). The aggregate claims of all members of the proposed class exceed $5 million, exclusive of interest and costs, and there are more than 5,000 class members. Many members of the proposed class are citizens of a state different from Defendants.

5.     This Court is the proper venue for this action because a substantial part

of the events, omissions, and acts giving rise to the claims herein occurred in this District where ROBINHOOD is headquartered and where it provided the financial services which are the subject of the present complaint.

6. This Court has personal jurisdiction over ROBINHOOD because it is headquartered in and authorized to do business and does conduct business in California, and because it has sufficient minimum contacts with this state and/or sufficiently avails itself of the markets of this state to render the exercise of jurisdiction by this Court permissible.

7. Intradistrict assignment to the San Francisco Division is appropriate because substantial part of the events or omissions which give rise to the claims asserted herein occurred in this Division, including that Defendants reside in this Division.

## **PARTIES**

8. Plaintiff, CHRISTIAN A. DALTON, resides in Carencro, Louisiana and is a user of the ROBINHOOD platform.

9. Defendant ROBINHOOD MARKETS, INC. ("ROBINHOOD" or the "Company") is a financial services company headquartered in Menlo Park, California. ROBINHOOD is a trading app and platform that lets investors trade stocks, options, exchange-traded funds and cryptocurrency.

10.     ROBINHOOD FINANCIAL LLC and ROBINHOOD SECURITIES, LLC are wholly-owned subsidiaries of ROBINHOOD Markets, Inc.

11.     ROBINHOOD MARKETS, INC., ROBINHOOD FINANCIAL LLC, AND ROBINHOOD SECURITIES, LLC are collectively referred to as ROBINHOOD and/or "Defendants".

## STATEMENT TO FACTS

12.     ROBINHOOD is a U.S.-based financial services company headquartered in Menlo Park, California. The company offers a mobile app and website that offers people the ability to invest in stocks, ETFs, and options through ROBINHOOD Financial and crypto trading through ROBINHOOD Crypto. ROBINHOOD operates a website and mobile apps for iPhone, Apple Watch, and Android. The company has no storefront offices and operates entirely online.

13.     ROBINHOOD is a FINRA1-approved broker-dealer, registered with the U.S. Securities and Exchange Commission ("SEC"), and is a member of the Securities Investor Protection Corporation.

14.     ROBINHOOD has 10 million users.

15.     ROBINHOOD is an online brokerage firm. Its customers place securities trades through the firm's website, by using a web-based application (or "app"). ROBINHOOD permits customers to purchase and sell securities, including futures

contracts.

16.     ROBINHOOD has experienced significant growth as a relatively new online brokerage firm.

17.     In 2019, ROBINHOOD raised $323 million in funding at a $7.6 billion valuation. The firm markets itself primarily to younger investors and claims over 10 million users of its trading app.

18.     On or about March 23, 2016, ROBINHOOD's official Twitter account stated: "Let the people trade." They have since disregarded their mantra and have blocked access for millions of its customers to trade particular securities.

19.     On or around January 22, 2021, stocks in Gamestop Corp. "GME"; began to rise.

20.     At that time, ROBINHOOD allowed retail investors to trade GME on the open market.

21.     On or about January 28, 2021, ROBINHOOD deprived Plaintiff and the members of the Class the ability to use its services by intentionally, abruptly, purposefully, willfully and knowingly preventing the legitimate trading of Gamestop Corp. "GME"; AMC Entertainment Holdings Inc "AMC"; BlackBerry Ltd "BB"; Nokia Oyj "NOK"; Bed Bath & Beyond, Inc. "BBBY";  Express, Inc. "EXPR"; Koss Corporation "KOSS"; and Naked Brand Group Ltd "NAKD" from their app.

Meaning, retail investors could no longer invest, day trade or even search for the stocks on ROBINHOOD's app.

22. Upon information and belief, Defendants' actions were done purposefully, knowingly and intentionally to manipulate the market for the benefit of people and financial intuitions other than Defendants' own client investors.

23. Since pulling the stocks from their app, Defendants' have manipulated the stock prices to go both up and down, depriving its client investors of potential gains.

24. Additionally, Defendants deprived its client investors the ability to "short" the stocks while day trading.

25. The Defendants have completely blocked its client investors from purchasing the aforementioned stocks for no legitimate reason, thereby depriving its client investors the benefits of Defendants' services.

26. The Financial Industry Regulatory Authority ("FINRA"), which governs brokers like ROBINHOOD, espouses rule 5310 regarding "Best Execution and Interpositioning." Rule 5310.01 requires that ROBINHOOD "must make every effort to execute a marketable customer order that it receives promptly and fully." By failing to respond at all to its client investors' placing timely trades and outright blocking its clients investors from trading in stocks, the Defendants have breached their duty and

obligations to its client investors and caused substantial losses due solely to the Defendants' intentional acts.

27.     Upon information and belief, ROBINHOOD is pulling securities like Gamestop Corp. "GME"; AMC Entertainment Holdings Inc "AMC"; BlackBerry Ltd "BB"; Nokia Oyj "NOK"; Bed Bath & Beyond, Inc. "BBBY";  Express, Inc. "EXPR"; Koss Corporation "KOSS"; and Naked Brand Group Ltd "NAKD," from its platform in order to prevent its client investors the ability to trade the stocks in the open market, thereby, slowing growth which in turn helped benefit individuals and institutions who are not clients of ROBINHOOD but are ROBINHOOD's large institutional investors or potential investors.

28.     On January 28, 2021, Plaintiff used his ROBINHOOD app and was unable to purchase "GME" stock as planned for that day but was limited to only selling the stocks that Defendants' unlawfully blocked from purchasing.  At times, some members of the Class could not find the stocks on the ROBINHOOD app, although all of these stocks are publicly traded companies available on other platforms.

29.     Thus, Plaintiff and members of the Class lost out on earning and profit opportunities.

## CLASS ALLEGATIONS

30.     Plaintiff brings this action individually and on behalf of a Class, defined as "All customers of ROBINHOOD's trading platform." Excluded from the Class are Defendants, and any of their officers, directors, and employees, and their legal representatives, heirs, successors, or assigns.

31.     This action is properly maintainable as a class action because: (1) The Class is so numerous that joinder of all members is impracticable; (2) There are questions of law and fact which are common to the Class including, whether the Defendants violated various laws or were fraudulent or negligent, and whether the Class is entitled to damages, as a result of Defendants' wrongful conduct; (3) Plaintiff is committed to prosecuting this action and has retained competent counsel experienced in litigation of this nature; (4) Plaintiff's claims are typical of the claims of other members of the Class and Plaintiff has the same interests as the other members of the Class, such that Plaintiff will fairly and adequately represent the Class; (5) the prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class which would establish incompatible standards of conduct for Defendants, or adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of other members not

parties to the adjudications or substantially impair or impede their ability to protect their interests; and (6) a class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## CAUSES OF ACTION

## FIRST CAUSE OF ACTION – FRAUD AND DECEIT

32.     Plaintiff hereby incorporates all of the foregoing paragraphs.

33.     Upon information and belief, Defendants' conduct constitutes fraud against Plaintiff and the members of the Class.  Defendants, directly or through their agents and employees, prevented Plaintiff and the members of the Class the ability to use the ROBINHOOD app to buy Gamestop Corp. "GME"; AMC Entertainment Holdings Inc "AMC"; BlackBerry Ltd "BB"; Nokia Oyj "NOK"; Bed Bath & Beyond, Inc. "BBBY";  Express, Inc. "EXPR"; Koss Corporation "KOSS"; and Naked Brand Group Ltd "NAKD," stocks for no other legitimate reason but to manipulate the stock prices to decline.  Defendants intended to defraud Plaintiff and the Class by concealing that the service would block the legitimate buying and selling

-9-

of the aforementioned stocks; complete access to their accounts; or make trades and/or the ability to access their funds to transfer to another brokerage firm in order to make legitimate and lawful day trades.

34. Plaintiff and the Class justifiably relied on the Defendants representations and would not have invested in the ROBINHOOD app and services had they known that the Defendants would prevent them from legitimate day trading and access to their funds. As a result, Plaintiff and the members of the Class sustained damages.

35. Defendants, directly and indirectly, made substantially similar misrepresentations and material omissions to Plaintiff and each member of the Class.

36. On information and belief, Defendants were aware of the fraudulent nature of their actions which caused Plaintiff and members of the Class damages.

37. As a result of Defendants' wrongful conduct, Plaintiff and the members of the Class have suffered and continue to suffer economic losses and other general and specific damages.

38. Defendants' acts were done maliciously, oppressively, and with intent to defraud, and Plaintiff and the Class are entitled to punitive and exemplary damages in an amount to be shown according to proof at the time of trial.

## **SECOND CAUSE OF ACTION – VIOLATION OF CLRA**

39. Plaintiff incorporates by reference each and every allegation contained

above.

40.   The acts and practices of Defendants as described above were intended to deceive Plaintiff and the Class as described herein and have resulted in harm to Plaintiff and the Class.

41.   The actions violated and continue to violate the California Consumer Legal Remedies Act (CLRA) in at least the following aspects:

a.   In violation of Section 1770(a)(5) of the CLRA, Defendants' acts and practices constitute representations that the services have characteristics, uses or benefits, which they do not.

b.   In violation of Section 1770(a)(7) of the CLRA, Defendants' acts and practices constitute representations that the services are of a particular quality, which they are not.

42.   By committing the acts alleged above, Defendants have violated the CLRA.

43.   Pursuant to California Civil Code § 1780(a) Plaintiff and the Class are entitled to an order enjoining the above-described wrongful acts and practices of Defendants, restitution, an order awarding the payment of costs and attorneys' fees, and any other relief deemed appropriate and proper by the Court under California Civil Code § 1780.

-11-

## THIRD CAUSE OF ACTION – DECLARATORY RELIEF

44.Plaintiff incorporates by reference each and every allegation contained above

45. An actual controversy has arisen and now exists between Plaintiff and the

Defendants.  As described above, Plaintiff contends that Defendants' conduct

violated certain rights and duties.

46. A judicial determination of these issues and of the respective rights and duties

of Plaintiff and Defendants is necessary and appropriate at this time under the

circumstances, including, but not limited to, a determination of any question of

interpretation and validity of the written agreements between the parties and the

Defendants attempts to limit liability.

47.Plaintiff seeks a judicial determination of the duties Defendants owe to their

users, their duty to operate reliable services, and their duty not to prevent the

trading of Gamestop Corp. "GME"; AMC Entertainment Holdings Inc "AMC";

BlackBerry Ltd "BB"; Nokia Oyj "NOK"; Bed Bath & Beyond, Inc. "BBBY";

Express, Inc. "EXPR"; Koss Corporation "KOSS"; and Naked Brand Group Ltd

"NAKD."

48.Plaintiff seeks a judicial determination of the rights of Plaintiff and the class

under the circumstance alleged herein.

## FOURTH CAUSE OF ACTION – VIOLATION OF UCL

-12-

49.   Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth herein.

50.   California's Unfair Competition Law (Cal. Bus. & Prof. Code § 17200, et seq.) is designed to protect consumers from unlawful, unfair, or fraudulent business acts or practices, including the use of any deception, fraud, false pretense, misrepresentation, or the concealment, suppression, or omission of any material fact.

51.   Defendant has engaged, and continues to engage, in  unfair business practices with regard to its services, as alleged herein. Defendants' conduct is not outweighed by any countervailing benefits to consumers.

52.   Defendants' conduct is also fraudulent.  Defendants prevented Plaintiff and members of the Class from trading Gamestop Corp. "GME"; AMC Entertainment Holdings Inc "AMC"; BlackBerry Ltd "BB"; Nokia Oyj "NOK"; Bed Bath & Beyond, Inc. "BBBY";  Express, Inc. "EXPR"; Koss Corporation "KOSS"; and Naked Brand Group Ltd "NAKD" and prevented users from accessing their accounts and their actual investment funds.

53.   Defendants' conduct and the harm it caused, and continues to cause, is not  reasonably avoidable by Plaintiff and the Class members. Defendants intentionally prevented Plaintiff and the Class members from making legitimate trades in the Gamestop Corp. "GME"; AMC Entertainment Holdings Inc "AMC";

-13-

BlackBerry Ltd "BB"; Nokia Oyj "NOK"; Bed Bath & Beyond, Inc. "BBBY"; Express, Inc. "EXPR"; Koss Corporation "KOSS"; and Naked Brand Group Ltd "NAKD," stocks.

54. Had Plaintiff and the Class members known that the Defendants' would intentionally prevent them from trading Gamestop Corp. "GME"; AMC Entertainment Holdings Inc "AMC"; BlackBerry Ltd "BB"; Nokia Oyj "NOK"; Bed Bath & Beyond, Inc. "BBBY"; Express, Inc. "EXPR"; Koss Corporation "KOSS"; and Naked Brand Group Ltd "NAKD," and/or access to their accounts and actual investment funds, then they would not have used the Defendants' services.

55. Defendant's conduct is also unlawful, and violates FINRA rules requiring them to make required disclosures to consumers and not to make false and misleading advertising, as alleged herein.

56. Defendants' unfair, fraudulent, and unlawful business practices directly and proximately caused damages to Plaintiff and the Class members.

57. Pursuant to Cal. Bus. & Prof. Code § 17203, Plaintiff seeks an order: (a) requiring Defendants to cease the deceptive and unfair business practices alleged herein; (b) requiring Defendant to restore to Plaintiff and the Class members any money acquired by means of the deceptive and unfair business practices (restitution); and (c) awarding reasonable costs and attorneys' fees pursuant to Cal.

-14-

Civ. Code § 1021.5.

## FIFTH CAUSE OF ACTION – BREACH OF FIDUCIARY DUTY

58.     Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth herein.

59.     Defendants as brokers owe a fiduciary duty to their investors, including Plaintiff and the members of the Class. Plaintiff and the members of the Class are customers of Defendants and they trusted Defendants to provide the services the Defendants advertised and promised.

60.     The fiduciary duty arising from the relationship between Plaintiff and the members of the Class and Defendants was breached by the Defendants' intentionally preventing the Plaintiff and members of the Class from trading Gamestop Corp. "GME"; AMC Entertainment Holdings Inc "AMC"; BlackBerry Ltd "BB"; Nokia Oyj "NOK"; Bed Bath & Beyond, Inc. "BBBY";  Express, Inc. "EXPR"; Koss Corporation "KOSS"; and Naked Brand Group Ltd "NAKD" and access to their accounts and actual investment funds.

61.     Defendants breached their fiduciary duties directly and proximately caused damage to Plaintiff and the members of the Class.

# PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, on behalf of himself and the members of the Class, demands a jury trial and prays for judgment as follows:

A.     For a declaration of the rights and duties of the parties;

B.     For a declaratory judgment that Defendants' actions complained herein are violations of the laws set forth herein;

C.     Preliminarily and permanently enjoining Defendants from violating their duties and the rights of Plaintiffs as alleged herein;

D.     Declaring this action to be a proper class action and certifying Plaintiff as the Class Representative;

E.     Awarding Plaintiff and the other members of the Class compensatory damages against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

F.     Awarding punitive damages and restitution where available;

G.     Awarding Plaintiff and the other members of the Class pre-judgment and post-judgment interest, as well as reasonable attorneys' fees, expert witness fees, and other costs and disbursements; and

H.     Awarding Plaintiff and the other members of the Class such other and

further relief as the Court may deem just and proper.

## **JURY DEMAND**

62.    Plaintiff and members of the Class  hereby demand a trial by jury.

Dated: January 28, 2020

RESPECTFULLY SUBMITTED:

BY: /s/ *Richard C. Dalton*
Richard C. Dalton
Texas Bar No. 24033539
Louisiana Bar No. 23017
California Bar No. 268598
P.O. Box 358
Carencro, Louisiana 70520
rick@rickdaltonlaw.com
(337) 371-0375

ATTORNEY FOR PLAINTIFF

-17-

# EXHIBIT 5

1  BROWNE GEORGE ROSS
   O'BRIEN ANNAGUEY & ELLIS LLP
2  Matthew L. Venezia (State Bar No. 313812)
     mvenezia@bgrfirm.com
3  2121 Avenue of the Stars, Suite 2800
   Los Angeles, California 90067
4  Telephone: (310) 274-7100
   Facsimile: (310) 275-5697
5
   Attorney for Plaintiff Robert Days
6

7

8                    UNITED STATES DISTRICT COURT

9       NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION

10

11  ROBERT DAYS,                    Case No. 4:21-cv-00696-KAW

12            Plaintiff,            **FIRST AMENDED COMPLAINT FOR**

13       vs.                       **(1) BREACH OF CONTRACT;**
                                   **(2) CONCEALMENT;**
14  ROBINHOOD MARKETS, INC.;       **(3) NEGLIGENT**
   ROBINHOOD FINANCIAL, LLC; AND   **MISREPRESENTATION;**
15  ROBINHOOD SECURITIES, LLC,     **(4) BREACH OF IMPLIED COVENANT**
                                   **OF GOOD FAITH AND FAIR DEALING;**
16            Defendants.          **(5) BREACH OF FIDUCIARY DUTY;**
                                   **(6) INTENTIONAL INTERFERENCE**
17                                 **WITH PROSPECTIVE ECONOMIC**
                                   **ADVANTAGE;**
18                                 **(7) NEGLIGENT INTERFERENCE WITH**
                                   **PROSPECTIVE ECONOMIC**
19                                 **ADVANTAGE;**
                                   **(8) VIOLATION OF SEC RULE 10B-5;**
20                                 **(9) VIOLATION OF CALIFORNIA'S**
                                   **UNFAIR COMPETITION LAW; AND**
21                                 **(10) VIOLATION OF CALIFORNIA'S**
                                   **CONSUMER LEGAL REMEDIES ACT.**
22
                                   **JURY TRIAL DEMANDED**
23
                                   Trial Date:  None Set
24

25

26

27

28

1746981.1                                    Case No. 4:21-cv-00696-KAW

                          FIRST AMENDED COMPLAINT

Plaintiff Robert Days ("Plaintiff") brings this Complaint for damages, and equitable and declaratory relief, individually, and on behalf of all persons similarly situated, against defendants Robinhood Markets, Inc., Robinhood Financial, LLC, and Robinhood Securities, LLC (collectively "Robinhood"), and alleges as follows:

**PARTIES**

1.     Robert Days is an individual residing in Kansas City, Missouri.

2.     Plaintiff is informed and believes, and thereon alleges, that defendant Robinhood Markets, Inc. is a Delaware corporation with its principal place of business in Menlo Park, California.

3.     Plaintiff is informed and believes, and thereon alleges, that defendant Robinhood Financial, LLC is a Delaware limited liability company with its principal place of business in Menlo Park, California.

4.     Plaintiff is informed and believes, and thereon alleges, that defendant Robinhood Securities, LLC is a Delaware limited liability company with its principal place of business in Menlo Park, California.

**JURISDICTION AND VENUE**

5.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2)(A) because the amount in controversy well exceeds $5 million and Plaintiff represents a putative nationwide class that includes well in excess of 100 members, and the named plaintiff is diverse from the defendants, residing in Missouri where the defendants' principal place of business is located in California. Further, upon information and belief, the putative classes defined herein includes members from each of the 50 states.

6.     This Court also has subject matter jurisdiction over this action because Plaintiff's claim under SEC Rule 10b-5 raises a federal question pursuant to 28 U.S.C. § 1331, and supplemental jurisdiction for the related state law claims pursuant to 28 U.S.C. § 1367.

7.     Venue in this district is proper pursuant to 28 U.S.C. § 1391 because, upon information and belief, Robinhood's principal place of business is located within this district, Robinhood is subject to personal jurisdiction here, and a substantial part of the events or omissions

1  that gave rise to the claims asserted herein occurred within this district.

2        8.     This Court has personal jurisdiction over Robinhood because, upon information

3  and belief, Robinhood maintains its principal place of business in California, and specifically

4  within this judicial district. This Court also has personal jurisdiction over Robinhood because

5  Robinhood regularly markets and sells its services to customers in California, and the trading

6  restrictions discussed herein were imposed on California customers.

7  **GENERAL ALLEGATIONS**

8      A.     **The Robinhood Platform, and How Robinhood Makes Money**

9        9.     Founded in 2013, Robinhood provides a service allowing its customers to place

10  trades in the stock market, targeted at retail customers. Robinhood's platform is primarily app-

11  based and, as hinted by its name, Robinhood represents that it aims to "provide everyone with

12  access to the financial markets, not just the wealthy."

13       10.    Robinhood does more than simply allow its retail customers to place traditional

14  trades. It allows its retail customers to engage in riskier investments, such as purchasing options

15  and trading on margin, regardless of sophistication, on-demand from their cell phone.

16       11.    Robinhood has received significant capital investments, in excess of a billion

17  dollars, from entities like DST Global, Sequoia Capital, and D1 Capital Partners, among others.

18  The latest of these investments valued Robinhood at $11.2 billion.

19       12.    On or about January 28, 2021, Robinhood raised in excess of an additional billion

20  dollars in capital investments from a group of investors, which upon information and belief,

21  included Sequoia Capital and Ribbit Capital.

22       13.    Upon information and belief, Robinhood has enjoyed exponential growth, now

23  having more than 13 million registered users.

24       14.    While Robinhood advertises "commission-free stock trading[,]" Robinhood in fact

25  earns significant revenues from the trades placed on its platform. As a threshold matter,

26  Robinhood does charge its customers fees for certain services it provides, for example, providing

27  paper statements or its "Gold" membership, allowing customers instant access to a greater amount

28  of deposited funds and the ability to trade on margin.

FIRST AMENDED COMPLAINT

15.     Moreover, when a customer places a trade on Robinhood, Robinhood routes the trade to one of its "market maker" partners for execution. These market makers pay Robinhood a fee for routing the trade to them (often termed a "rebate"), and execute the trade—standing as a middle man between those looking to buy and sell a particular security. The market makers also receive valuable data concerning the trading behaviors of Robinhood users in this process.

16.     The aforementioned rebates are lucrative, upon information and belief, accounting for approximately $180 million in revenue to Robinhood in just the second quarter of 2020. By placing their trades on Robinhood, Robinhood users provide it the ability to earn these rebates from the market makers, and thus, valuable consideration.

17.     Because Robinhood earns these rebates on a per-transaction basis, Robinhood has traditionally been benefitted by its retail customers engaging in risky, high-frequency trading.

**B.     Rising Investor Interest in Heavily-Shorted Stocks, i.e., the "Short Squeeze"**

18.     Beginning in January of 2021, many retail investors began to purchase positions in highly-shorted securities, such as GameStop Corp. (GME).

19.     As to GME, these investors realized that because in excess of 100 percent of the outstanding shares were shorted, significant purchases of the stock would force those holding excessive short positions, i.e., hedge funds, to compete for available shares to close their short positions, raising the price for the stock.

20.     This trading strategy is known as a "short squeeze." The strategy is not new, tracing its roots back to 1931, when a businessman named Clarence Saunders attempted to purchase the available shares in his Piggly Wiggly grocery chain to combat significant shorting of the stock. A similar strategy was taken in regards to Volkswagen's stock in 2008, with hedge funds losing a reported **30 billion** dollars.

21.     The initial results of the increased investor interest in GME were noteworthy, the price of the stock rose from $17.69 per share on January 8, 2021, to $469.42 per share on the morning of January 28, 2021. The meteoric rise in GME naturally left investors looking for the next highly-shorted stock, and ample information was publicly available to investors indicating that there would be increased interest surrounding other highly-shorted securities, including AMC

1   Entertainment Holdings Inc. (AMC) and Nokia Oyj (NOK), among other similarly-situated stocks.

2       22.     As part of this trend, AMC saw its stock price rise from $2.14 per share on January

3   8, 2021, to $19.88 at the close of the day on January 27, 2021. NOK saw its stock price rise from

4   $3.93 per share on January 8, 2021, to $6.63 at the close of the day on January 27, 2021.

5       **C.**    <u>**The "Short Squeeze" Stands to Harm Robinhood, Its Investors, and Business**</u>

6       <u>**Partners Financially**</u>

7       23.     The increased popularity of short squeezes in the marketplace stood to cost

8   Robinhood and its investors and business partners a significant amount of money. Upon

9   information and belief, these financial interests were the motivating factor behind Robinhood's

10  below-discussed decision to halt purchases of certain securities and manipulate the market.

11      24.     To begin, upon information and belief, Robinhood routes in excess of 65 percent of

12  its trades to Citadel Securities, LLC, accounting for a large percentage of Robinhood's total

13  revenue. On or about January 25, 2021, Citadel LLC (Citadel Securities, LLC's parent) invested

14  $2 billion in Melvin Capital Management LP, upon information and belief, to bail out Melvin

15  Capital from its huge losses on its short positions in GME. This created a conflict of interest where

16  Robinhood was incentivized to curtail trading in GME in order to benefit its partner Citadel.

17      25.     While the short positions held by the large financial institutions that have invested

18  in and partner with Robinhood are not public information, upon information and belief, similar

19  conflicts of interest exist incentivizing Robinhood to curtail trading in AMC and NOK, amongst

20  other targeted stocks. Upon information and belief, Citadel and other financial institutions holding

21  short positions in AMC and NOK pressured Robinhood to restrict buying of those securities.

22      26.     Moreover, in its attempt to justify its actions in restricting the purchases of certain

23  securities, Robinhood issued a statement claiming that:

24          [C]learinghouses look at a firm's customer holdings as a portfolio.
        They use a volatility multiplier, looking at specific stocks, to

25          quantify their risk. The clearinghouse may assign significant
        additional charges based on how much of one stock a firm's

26          customers hold. If a firm's customers have more buy than sell
        orders, and the securities they're buying are more volatile, the

27          deposit requirement will be higher. Clearinghouses can also require
        additional deposits if certain thresholds are met.

28

. . .

> The amount required by clearinghouses to cover the settlement
> period of some securities rose tremendously this week. How much?
> To put it in perspective, this week alone, our clearinghouse-
> mandated deposit requirements related to equities increased ten-fold.
> And that's what led us to put temporary buying restrictions in place
> on a small number of securities that the clearinghouses had raised
> their deposit requirements on.

27.     Taking Robinhood at its word, what Robinhood explains is that in order to allow its customers continued access to purchasing GME, AMC, NOK, and other similarly-situated stocks, Robinhood would have been forced to deposit additional capital with a clearinghouse. Because access to capital generally has a cost, presumably this would have raised the operating costs for Robinhood to provide its trading platform.

28.     This demonstrates another financial interest of Robinhood in stemming the tide of short squeezes—i.e., per Robinhood, these kinds of trades are viewed as more volatile by Robinhood's clearinghouse, and thus, if the short squeezes failed and died out, Robinhood's deposit requirements would be lessened. For a company struggling to meet its deposit requirements, upon information and belief, this concern was an existential threat.

29.     Robinhood CEO Vlad Tenev provided additional details about this situation in a recent interview with Elon Musk. In that interview, Mr. Tenev asserts that early in the morning of January 28, 2021, the National Securities Clearing Corporation ("NSCC") requested an approximately $3 billion deposit. Mr. Tenev asserts that after a phone call, the NSCC lowered their request to approximately $1.4 billion. Then, approximately an hour before trading opened on January 28, 2021, the NSCC agreed to lower its deposit request to $700 million, on the condition that Robinhood would restrict trading of certain securities to sell only, as proposed by Robinhood.

30.     Thus, per Mr. Tenev's representations, the financial difference to Robinhood in restricting purchases of GME, AMC, NOK, and other similarly-situated stocks was an additional approximately $700 million that Robinhood was either unable, or unwilling, to deposit as collateral with the NSCC. To be clear, this is not a payment, but a deposit requirement to backstop the trades.

**D.** **Robinhood Bars, and Then Severely Restricts, the Trading of GME, AMC, NOK, and Similarly Situated Stocks on Its Platform**

31. Until January 28, 2021, Robinhood allowed its users to take positions in GME, AMC, NOK, and other similarly-situated securities, both buying and selling. Many Robinhood customers purchased AMC and NOK in reliance on the continued availability of the Robinhood platform, allowing the customers to buy and sell when most advantageous to do so, with no information to suggest Robinhood could be forced to restrict trading due to insufficient capitalization.

32. Plaintiff in fact previously purchased positions in AMC and NOK, and intended to purchase additional positions in those securities in the future, all through Robinhood. Plaintiff relied on the continued availability of Robinhood's platform, which he had been informed was backed by a reliable clearinghouse, and had no information concerning Robinhood's lack of required capitalization.

33. However, on January 28, 2021, after the rise in GME gained widespread media coverage, Robinhood barred its customers from buying several stocks, including AMC and NOK. After a groundswell of outrage, Robinhood announced it will allow "limited buys of these securities" starting on January 29, 2021. Limited was an understatement, and while the amounts of allowed shares have varied, on January 29, 2021, Robinhood users were limited to 1 share of AMC (an approximately $10–$15 investment) and 5 shares of NOK (an approximately $25 investment).

34. Robinhood's explanations for its actions in halting the trading of certain securities were not originally entirely consistent.

35. While the above-quoted language in paragraph 26 references increased deposit requirements from Robinhood's clearinghouse, in an e-mail sent to customers on January 28, 2021, Robinhood stated that its decision to restrict trading of certain securities was "made to best continue serving you[,]" with deposit requirements in place to "protect investors and the markets[.]" Similarly, in an interview with CNBC the same day, Robinhood CEO Vlad Tenev represented that the restrictions were put in place because to "protect the firm and ***protect our***

1   *customers* we had to limit buying in these stocks."

2       36.     Moreover, while Robinhood's public statements reference increased deposit

3   requirements, Robinhood has been careful not to say that it would have been impossible for it to

4   meet those deposit requirements, Mr. Tenev represented in his CNBC interview: "There was no

5   liquidity problem, and to be clear, this was done preemptively."

6       **E.      Plaintiff's and the Putative Classes' Positions in AMC and NOK Were**

7               **Harmed by This Market Manipulation, Whereas Robinhood Benefitted**

8       37.     Robinhood's action in first barring, and then severely limiting, the purchase of

9   AMC and NOK on its platform artificially deflated the price of the stocks, harming all investors

10  who held the stock, to the benefit of those holding short positions. This action further harmed

11  investors who intended to buy the stocks in the future, relying on a fair market to be available in

12  the securities.

13      38.     Ironically, this action was to the benefit of hedge funds that hold short positions in

14  these stocks, allowing them to cover their shorts at a much lower price than they otherwise would

15  have been required to purchase the shares. In other words, Robinhood stole from the poor to give

16  to the rich.

17      39.     The harm caused to shareholders of AMC and NOK by Robinhood's restriction of

18  their purchase on its platform was massive. As to AMC, the stock closed on January 27, 2021 at

19  $19.88 per share. After Robinhood barred purchases on January 28, 2021, AMC closed at $8.63

20  per share, a massive 56.6 percent one-day decrease. In one day, AMC's market capitalization

21  decreased from approximately $5.7 billion to approximately $2.5 billion.

22      40.     As to NOK, the stock closed on January 27, 2021 at $6.63 per share. After

23  Robinhood barred purchases on January 28, 2021, NOK closed at $4.69 per share, a significant

24  29.3 percent one-day decrease. In one day, NOK's market capitalization decreased from

25  approximately $37.3 billion to approximately $26.4 billion.

26      41.     However, even these numbers underestimate the harm caused to the AMC and

27  NOK stocks. Prior to Robinhood's restrictions on purchasing GME, AMC, NOK, and other

28  similarly-situated stocks, the price of GME was skyrocketing and attracting national attention, and

the prices for AMC and NOK were starting to take off as well, attracting increased investor attention as the possible "next GameStop." Retail investor's plans to purchase AMC and NOK on January 28, 2021, and the following days, were well-documented on the WallStreetBets subreddit and other similar platforms across the internet.

42.     Robinhood's restrictions not only stopped this momentum, but allowed a window for those holding short positions in AMC and NOK to cover those shorts at a largely deflated price, upon information and belief, saving hedge funds billions upon billions of dollars as opposed to what would have happened if Robinhood never restricted trading.

43.     Robinhood's manipulation of the market also squelched investor confidence in their ability freely and fairly invest in AMC and NOK, and other similarly-situated securities. Upon information and belief, Robinhood's actions in manipulating the market for these securities scared off a large number of investors who would have otherwise participated in short squeezes of AMC and NOK, massively deflating their stock prices in the short term, and the return available to those holding positions in AMC and NOK.

44.     Plaintiff is a retail customer of Robinhood, holding positions in both AMC and NOK prior to January 28, 2021. Those positions were purchased independently, and without any agreement to do so with any third party. Plaintiff purchased the positions through Robinhood relying upon the continued availability of the platform and free trading of the securities.

45.     Robinhood's action to bar purchases and then severely restrict purchases of those stocks significantly damaged the value of Plaintiff's holdings in AMC and NOK, as it did other holders of those stocks. As explained above, upon news that Robinhood would not allow those stocks to be purchased, only sold, their values fell precipitously.

46.     This left Plaintiff and other Robinhood customers with only two choices, either sell immediately at the rapidly falling price, or hold, and risk losing their entire investment.

47.     Robinhood's actions to restrict purchases of these stocks also disallowed Plaintiff from executing plans to buy additional positions in AMC and NOK, during the restricted period, which otherwise would have been profitable.

48.     Contrarily, Robinhood benefitted. As explained above, by barring and then severely

restricting purchases of AMC, NOK, and other similarly-situated stocks, Robinhood represents that it lowered its deposit requirements with the NSCC. By squelching retail investor interest in short squeezes—trading activity that Robinhood represents raises its deposit requirements—Robinhood would not only decrease its deposit requirements in the short term, but on an ongoing basis, if Robinhood is successful in killing the trend.

49. These deposit requirements are no small thing—with Robinhood being unable (or unwilling) to meet its deposit requirements on January 28, 2021, continued popularity of trading strategies deemed as "volatile" and requiring larger deposit requirements could quite literally put the firm out of business.

50. Moreover, it is clear from reports that Robinhood partner Citadel immediately benefitted from Robinhood's actions in barring trading of GME and depressing its price, allowing Citadel/Melvin Capital to cover their shorts at a lower price. Upon information and belief, other Robinhood investors and business partners benefitted similarly from Robinhood's restrictions on purchases of AMC and NOK.

51. Upon information and belief, this benefit to Robinhood's investors and business partners, in the form of being able to cover their short positions in AMC and NOK at a lower price, was one of Robinhood's motivating factors in its decision to restrict purchases of those securities.

52. Robinhood's actions are without substantial justification, and made to the detriment of its longstanding customers and the market. Where Robinhood claims it acted to protect its customers or the market, it in fact caused them great harm. Indeed, in Mr. Tenev's recent interview with Elon Musk, he admitted: "We knew this was a bad outcome for customers."

**F. Confidence in the Marketplace's Integrity Is Harmed**

53. Robinhood's actions received widespread coverage in the press, with their obvious manipulation of the stock market causing outrage. The SEC shared in the concern, releasing a statement that it would "closely review actions taken by regulated entities that may disadvantage investors or otherwise unduly inhibit their ability to trade certain securities."

54. In a rare moment of bipartisan agreement, both Democratic Representative

1    Alexandria Ocasio-Cortez and Republican Senator Ted Cruz agreed that Robinhood's actions in

2    restricting the purchases of GME, AMC, NOK, and other similarly-situated stocks, were

3    "unacceptable":



14       55.      Again, upon information and belief, this unfairness in the stock market, to the

15   benefit of large institutional investors like hedge funds, has already, and will continue to, prevent

16   many retail investors from participating in the market. Specifically, the understanding that hedge

17   funds play by a separate set of rules will prevent many retail traders from engaging in trading

18   strategies that stand to harm hedge funds, like a short squeeze of AMC or NOK, for fear that even

19   if the investment strategy is prudent, hedge funds and other powerful market participants will

20   manipulate the market in their favor.

                              **CLASS ACTION ALLEGATIONS**

22       56.      Plaintiff brings this action on behalf of himself and putative classes of Robinhood

23   customers who are similarly situated under Rules 23(a), (b)(2) and (b)(3) of the Federal Rules of

24   Civil Procedure.

25       57.      The AMC Class seeks monetary damages and injunctive relief, and is defined as

26   follows:

27       •        All persons or entities in the United States that held a position in AMC on January
                  28, 2021, purchased through Robinhood, or who intended to invest in AMC
28                through Robinhood during the time period in which Robinhood restricted such

trading, and were harmed by Robinhood's actions to bar and later restrict trading of the stock.

58.     The NOK Class seeks monetary damages and injunctive relief, and is defined as follows:

- All persons or entities in the United States that held a position in NOK on January 28, 2021, purchased through Robinhood, or who intended to invest in NOK through Robinhood during the time period in which Robinhood restricted such trading, and were harmed by Robinhood's actions to bar and later restrict trading of the stock.

59.     Upon information and belief, the AMC Class and NOK Class include millions of investors. The exact number and identities of members for the AMC Class and NOK Class is known or readily ascertainable by Robinhood through a review of records they should maintain. The number of persons who fall within the definition of both classes is so numerous and geographically dispersed as to make joinder of all members of the classes in their individual capacity impracticable, inefficient, and unmanageable so as to effectively deny each putative AMC Class and NOK Class member his, her, or their right to prosecute and obtain legal and equitable relief based on the claims and allegations made in this Complaint.

60.     There are common questions of law and fact as to the AMC Class and NOK Class, relating to and/or dispositive of the allegations made in the Complaint, and damages alleged therein, including, but not limited to:

- Whether Robinhood breached its user agreement when restricting purchasing of AMC and NOK stocks;

- Whether Robinhood's partners and investors held short positions in GME, AMC, NOK, and other similarly-situated stocks, and whether those short positions influenced Robinhood's decision to restrict purchasing of the stocks;

- Whether Robinhood concealed the fact that it lacked the capital to assure the availability of its trading platform;

- Whether Robinhood created a fiduciary duty with its customers by purporting to restrict purchases of certain securities to "protect" them, and whether Robinhood violated any such duty;

- Whether Robinhood intentionally or negligently interfered with its customers planned, profitable transactions in AMC and NOK;

- Whether Robinhood unlawfully manipulated the price of AMC and NOK and acted to squelch investor interest in short squeezes in violation of SEC Rule 10b-5;

- Whether Robinhood engaged in unfair competition pursuant to Cal. Bus. & Prof.

Code § 17200 et seq. by restricting the purchasing of AMC and NOK;

- Whether Robinhood violated California's Consumer Legal Remedies Act Unfair by restricting the purchasing of AMC and NOK; and

- The harm caused to the share price of AMC and NOK from Robinhood's restrictions on the purchasing of those stocks.

61.     The interests of Plaintiff, the AMC Class, and the NOK Class are aligned. Plaintiff seeks to establish that Robinhood is liable for financial harm suffered by its customers resulting from their inability to purchase AMC and NOK. Should Plaintiff succeed in establishing such liability, each of the other members of the AMC Class and NOK Class would then be entitled to similar compensation their damages.

62.     The claims of Plaintiff are typical of the claims of the AMC Class and NOK Class. Plaintiff purchased positions in AMC and NOK through Robinhood prior to January 28, 2021, those positions being harmed by the inability of Plaintiff and other Robinhood customers to trade in GME, AMC, NOK, and other similarly-situated stocks. Like many others, Plaintiff also intended to purchase further positions in AMC and NOK during the period in which such purchases were restricted.

63.     The AMC Class and NOK Class are represented by counsel who are competent and experienced in the prosecution and defense of similar claims and litigation, including class actions filed, prosecuted, defended, and litigated under California and federal law, in California and federal courts, in connection with claims and certification of nationwide classes. Counsel also has significant experience in high-stakes commercial litigation and securities-related matters.

64.     The prosecution of separate actions by individual members of the AMC Class and NOK Class would create a risk of inconsistent or varying adjudications.

65.     The questions of law and fact common to the members of the AMC Class and NOK Class predominate over any questions of law or fact affecting only individual members of the AMC Class or NOK Class. Primarily at issue is the appropriateness of the actions of Robinhood in restricting purchases of AMC and NOK.

66.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Treatment as a class action will permit a large number of

1   similarly situated persons to adjudicate their common claims in a single forum simultaneously,

2   efficiently, and without the duplication of effort and expense that numerous individual actions

3   would engender. Prosecution as a class action will eliminate the need for repetitious litigation—if

4   it were even feasible for many members of the AMC Class or NOK Class to proceed individually.

5       67.    Members of the AMC Class and the NOK Class have no cognizable interest in

6   individually litigating and controlling the claims asserted herein as a general matter. To the extent

7   any particular class members have larger claims they desire to individually litigate, such concerns

8   can be addressed by offering class members an opt-out.

9       68.    California is the proper and a desirable forum for the claims against Robinhood to

10  be litigated. Robinhood is based in California, and its user agreement specifies California law as

11  governing:

12          This Agreement and all transactions made in My Account shall be
            governed by the laws of the State of California (regardless of the
13          choice of law rules thereof), except to the extent governed by the
            federal securities laws, FINRA Rules, and the regulations, customs
14          and usage of the exchanges or market (and its clearing house) on
            which transactions are executed.

15

16  Thus, each of the contract-based claims brought against Robinhood must be governed by

17  California law. To the extent any tort-based claims could be held to escape the scope of this

18  governing law provision, California law provides appropriate remedies to each member of the

19  AMC Class and NOK Class.

20      69.    The AMC Class and NOK Class are readily ascertainable by review of

21  Robinhood's records, which would also include contact information for the members. Thus, there

22  does not exist any significant likely difficulties in managing the claims as a class action.

23                          **FIRST CAUSE OF ACTION**

24                            **(Breach of Contract)**

25      70.    Plaintiff re-alleges and incorporates herein by reference, as though set forth in full,

26  each of the allegations set forth in paragraphs 1 through 69 above.

27      71.    Robinhood, on one hand, and the Plaintiff and putative classes, on the other hand,

28  entered into contracts whereby the Plaintiff and putative classes were allowed to use the

Robinhood platform to place trades in the stock market, providing specifically as follows:

> All orders for the purchase of securities given for My Account will be authorized by Me and executed in reliance on My promise that an actual purchase is intended.

72.     In consideration for Plaintiff's and the putative classes' ability to use the Robinhood platform to trade, the Plaintiff and the putative classes provided consideration to Robinhood in the form of fees, and the ability to route their trades to market makers from which Robinhood receives additional fees, and access to trading data to sell to third parties, among other valuable consideration.

73.     While Robinhood's user agreement does purport to provide Robinhood with the ability to restrict trading in its "sole discretion[,]" that Robinhood only exercise such an option in good faith must be read into the contract or the contract would be rendered illusory.

74.     Here, Robinhood either restricted purchases of AMC and NOK, among other similarly-situated stocks, with the intent to benefit its investors and business partners holding short positions in the stocks, and/or to avoid additional operational costs associated with increased clearinghouse deposit requirements. Neither scenario constitutes a good faith reason to restrict the Plaintiff's nor the putative classes' ability to make purchases of the affected stocks.

75.     Moreover, the user agreement provides that:

> I understand that Robinhood Financial has entered into a clearing agreement with Robinhood Securities whereby Robinhood Financial will introduce My Account to Robinhood Securities, and Robinhood Securities will clear all transactions, on a fully-disclosed basis. I understand that Robinhood Securities carries My Account(s) and is responsible for the clearing and bookkeeping of transactions[.]

76.     To the extent Robinhood Securities refused to clear trades in AMC or NOK, it breached its duty to clear trades on behalf of Plaintiff and the putative classes under the user agreement.

77.     As a result of these breaches, the Plaintiff's and the putative classes' positions in AMC and NOK have been substantially harmed.

## **SECOND CAUSE OF ACTION**

### **(Concealment)**

78.     Plaintiff re-alleges and incorporates herein by reference, as though set forth in full, each of the allegations set forth in paragraphs 1 through 77 above.

79.     Robinhood disclosed to Plaintiff and the putative classes that it would clear trades in-house through Robinhood Securities. When doing so, Robinhood represented that:

> We've cut more fees and made Robinhood faster and more reliable by rebuilding our systems from the ground up.

80.     Robinhood further boasted:

> Before, Robinhood was only an introducing broker, which means that we used a clearing brokerage for "back office" support, like settling the trades you placed on Robinhood. Using a clearing broker is the industry norm when a company like Robinhood wants to let its users place trades. In fact, the top five clearing firms cleared 1,310 introducing firms in 2016.

> Now, Robinhood is also a clearing broker, which means we have complete control over giving you the best experience out there!

81.     What Robinhood failed to disclose—and what its current excuses for restricting purchasing of the affected securities suggests—is that Robinhood was undercapitalized and lacking in liquidity such that it could not provide sufficient capital deposits to allow certain trading on its platform (or would have incurred costs to raise the capital it was unwilling to incur). Indeed, this solution certainly was not "more reliable" than other established clearinghouses, which upon information and belief, were able to allow continued purchasing of GME, AMC, NOK, and other similarly-situated stocks.

82.     For the sake of comparison, Robinhood's old clearing broker, Apex Clearing Corporation, disclosed in excess of $4.3 billion in "[c]ash and securities segregated and on deposit for regulatory purposes" in its Financial Statements and Supplemental Schedules for the year of 2019. Robinhood, on the other hand, was unable or unwilling to meet the NSCC's $1.4 billion deposit request.

83.     This lack of disclosure is particularly troubling given Robinhood's business model, which encourages retail traders to engage in short-term trading using options and margin, risky by

its very nature. It was entirely foreseeable that Robinhood users could engage in trading deemed "volatile" by clearinghouses and thus raise deposit requirements, and if Robinhood had insufficient capital to cover such increased deposit requirements, that should have been disclosed to its customers.

84. Plaintiff and the putative classes were unaware that Robinhood was without sufficient capital to meet increased clearinghouse deposit requirements associated with risky or "volatile" trading.

85. Robinhood acted intentionally in concealing this information, knowing that a public admission it lacked sufficient capital to back the platform would decrease customer confidence, and thus lessen the amount of Robinhood users and revenue received by Robinhood.

86. Had Plaintiff or the putative classes been aware that Robinhood was without sufficient capital to meet increased clearinghouse deposit requirements associated with risky or "volatile" trading, they would have chosen to trade with another firm with sufficient capital to guarantee availability of the trading platform.

87. Plaintiff and the putative classes were harmed by this omission; their ability to trade in AMC and NOK being restricted, whereas had they chosen another trading platform with sufficient capitalization, this restriction and the resulting harm to their positions in AMC and NOK would not have occurred.

88. Robinhood's concealment of this information was a substantial factor in causing this harm. It resulted directly in the inability of Plaintiff and the putative classes to freely purchase AMC and NOK, and caused significant damage to the price of shares in those stocks as previously explained.

### THIRD CAUSE OF ACTION

### (Negligent Misrepresentation)

89. Plaintiff re-alleges and incorporates herein by reference, as though set forth in full, each of the allegations set forth in paragraphs 1 through 88 above.

90. As quoted above, Robinhood represented that use of Robinhood Securities as Robinhood's clearinghouse would make the Robinhood platform more reliable and "the best

1  experience out there!"

2       91.    Given the undercapitalization described above, resulting in Robinhood restricting

3  purchases of the affected securities, whereas, upon information and belief, other clearinghouses

4  were able to meet deposit requirements, these representations were not true.

5       92.    Robinhood, being aware of its own finances and lack of capitalization when

6  compared to well-established clearinghouses, had no reasonable grounds to believe its

7  representations were true.

8       93.    Robinhood intended that Plaintiff and the putative classes would rely on their

9  representation—the representation being made to assure Robinhood customers that Robinhood

10  would provide a reliable platform to trade in securities.

11       94.    Plaintiff and the putative classes reasonably relied on this misrepresentation, and

12  were harmed by that reliance in the manner described above.

13       95.    As explained above, reliance on this misrepresentation was a substantial factor in

14  the harm caused to the Plaintiff and putative classes, who otherwise would have chosen another

15  platform to trade.

16  **FOURTH CAUSE OF ACTION**

17  **(Breach of Implied Covenant of Good Faith and Fair Dealing)**

18       96.    Plaintiff re-alleges and incorporates herein by reference, as though set forth in full,

19  each of the allegations set forth in paragraphs 1 through 95 above.

20       97.    Robinhood, by virtue of its contracts with Plaintiff and the putative classes, had an

21  implied covenant of good faith and fair dealing under those contracts.

22       98.    Plaintiff and the putative classes performed or substantially performed under these

23  contracts by buying and selling securities using the Robinhood platform.

24       99.    Robinhood violated that covenant by restricting the ability of Plaintiff and the

25  putative classes to purchase AMC and NOK.

26       100.    This action was not taken in good faith, but upon information and belief, to

27  manipulate the market by disincentivizing a popular trading strategy that stood to harm Robinhood

28  by way of increased clearinghouse deposit requirements, and harm Robinhood's investors and

1  business partners holding significant short positions in the affected securities.

2      101.    As a result of these breaches, the Plaintiff's and the putative classes' positions in

3  AMC and NOK have been substantially harmed.

4  **FIFTH CAUSE OF ACTION**

5  **(Breach of Fiduciary Duty)**

6      102.    Plaintiff re-alleges and incorporates herein by reference, as though set forth in full,

7  each of the allegations set forth in paragraphs 1 through 101 above.

8      103.    Robinhood, by taking the action to restrict purchasing of AMC, NOK, and other

9  similarly-situated stocks, purportedly to "protect" it customers, created a fiduciary duty similar to

10 that of an investment advisor.

11     104.    Robinhood breached that duty by acting only in its own interests, to reduce

12 clearinghouse deposit requirements, and upon information and belief, to the financial interests of

13 its investors and business partners holding short positions on AMC and NOK.

14     105.    As a result of these breaches, the Plaintiff's and the putative classes' positions in

15 AMC and NOK have been substantially harmed.

16 **SIXTH CAUSE OF ACTION**

17 **(Intentional Interference with Prospective Economic Advantage)**

18     106.    Plaintiff re-alleges and incorporates herein by reference, as though set forth in full,

19 each of the allegations set forth in paragraphs 1 through 105 above.

20     107.    The Plaintiff and the putative classes, as set forth in detail herein, stood to make

21 significant profit by virtue of their holdings in and future purchases of AMC and NOK.

22 Specifically, Plaintiff and the putative classes intended to enter into transactions with third parties

23 to sell their shares at a profit in the future.

24     108.    Robinhood intentionally interfered with these future transactions by first barring

25 and then severely restricting purchases of AMC and NOK.

26     109.    This interference artificially depressed the price of shares in AMC and NOK, by

27 not allowing Robinhood customers to purchase these securities and sparking doubt about the

28 security of future trading in these securities more generally.

110. Robinhood had actual knowledge that its customers intended to enter into transactions involving AMC and NOK, the increased investor interest in those stocks receiving significant attention in the public domain, and their restriction being the subject of discussion with the NSCC.

111. Robinhood acted with improper motive in restricting purchases of AMC and NOK, motivated by manipulating the market to disincentive a trading strategy that was stretching its deposit requirements beyond comfort levels and, upon information and belief, benefit its investors and business partners holding short positions in the stocks.

112. This restriction of the ability to purchase AMC and NOK substantially harmed the profitability of Plaintiff's and the putative classes' planned sales of their shares.

<u>**SEVENTH CAUSE OF ACTION**</u>

**(Negligent Interference with Prospective Economic Advantage)**

113. Plaintiff re-alleges and incorporates herein by reference, as though set forth in full, each of the allegations set forth in paragraphs 1 through 112 above.

114. The Plaintiff and the putative classes, as set forth in detail herein, stood to make significant profit by virtue of their holdings in and future purchases of AMC and NOK. Specifically, Plaintiff and the putative classes intended to enter into transactions with third parties to sell their shares at a profit in the future.

115. Robinhood negligently interfered with these future transactions by first barring and then severely restricting purchases of AMC and NOK.

116. This interference artificially depressed the price of shares in AMC and NOK, by not allowing Robinhood customers to purchase these securities and sparking doubt about the security of future trading in these securities more generally.

117. Robinhood had actual knowledge that its customers intended to enter into transactions involving AMC and NOK, the increased investor interest in those stocks receiving significant attention in the public domain, and their restriction being the subject of discussion with the NSCC.

118. Robinhood failed to act with reasonable care when implementing these restrictions.

119.     Robinhood acted with improper motive in restricting purchases of AMC and NOK, motivated by manipulating the market to disincentive a trading strategy that was stretching its deposit requirements beyond comfort levels and, upon information and belief, benefit its investors and business partners holding short positions in the stocks.

120.     This restriction of the ability to purchase AMC and NOK harmed the profitability of Plaintiff's and the putative classes' planned sales of their shares, and was a substantial cause of the same.

**EIGHTH CAUSE OF ACTION**

**(Violation of SEC Rule 10b-5)**

121.     Plaintiff re-alleges and incorporates herein by reference, as though set forth in full, each of the allegations set forth in paragraphs 1 through 120 above.

122.     Robinhood engaged in a scheme to manipulate the market and disincentivize the trending short squeeze trading strategy by restricting purchases of GME, AMC, NOK, and other similarly-situated stocks, and thus artificially deflating their value.

123.     This cessation of purchases lowered the prices for these stocks not only because less buyers were in the market with Robinhood customers shut out, but by increasing fears related to market security in the future trading of these securities.

124.     Robinhood acted with scienter, i.e., Robinhood was motivated to stop its customers from engaging in a trading strategy perceived as volatile such that Robinhood's deposit requirements were being raised to a level it could not or was unwilling to meet. Instead of cutting some of its riskier services platform-wide, like options and margin trading, that it apparently could not afford to provide, or working with a third-party clearinghouse with greater access to capital, Robinhood did what it could to torpedo the short squeeze trading strategy.

125.     Moreover, upon information and belief, Robinhood was motivated to benefit its investors and business partners holding short positions in AMC, NOK, and other similarly-situated stocks. Upon information and belief, these investors and business partners exerted pressure on Robinhood to restrict trading, and Robinhood caved to that pressure.

126.     This market manipulation damaged the value of the Plaintiff's and putative classes'

holdings in AMC and NOK.

## NINTH CAUSE OF ACTION

### (Violation of California's Unfair Competition Law [Cal. Bus. & Prof. Code § 17200 et seq.])

127. Plaintiff re-alleges and incorporates herein by reference, as though set forth in full, each of the allegations set forth in paragraphs 1 through 126 above.

128. The aforementioned conduct by Robinhood is unlawful, violating California and Federal securities laws.

129. Robinhood engaged in unfair competition in the classic sense by purporting to offer a trading platform backed by sufficient capital, when it was not, thus stealing customers that otherwise would have chosen other platforms.

130. It also engaged in unfair competition in the classic sense by not allowing its customers to fairly compete with institutional investors when it comes to trading AMC and NOK, and other similarly-situated stocks.

131. Plaintiff and each member of the putative classes suffered an injury as a direct and proximate result of Robinhood's unlawful and anticompetitive conduct.

132. Upon information and belief, the above-described unlawful conduct occurred in significant portion within California.

## TENTH CAUSE OF ACTION

### (Violation of California's Consumer Legal Remedies Act Unfair [Cal. Civ. Code § 1750 et seq.])

133. Plaintiff re-alleges and incorporates herein by reference, as though set forth in full, each of the allegations set forth in paragraphs 1 through 132 above.

134. Robinhood has committed unlawful acts as defined by California Civil Code § 1770, by engaging in the unlawful practices described above.

135. Plaintiff and each member of the putative classes suffered an injury as a direct and proximate result of Robinhood's unlawful activity.

136. Unless enjoined, Robinhood will continue to unlawfully interfere in the market for highly-shorted stocks, like AMC and NOK.

137.    Upon information and belief, the above-described operations of Robinhood occur in California, where it is headquartered.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, the putative AMC Class, and the putative NOK Class, pray for relief against Robinhood as follows:

1.    For preliminary and permanent injunctions enjoining and restraining Robinhood from restraining or attempting to restrain its customers from trading in AMC or NOK, or other securities with significant short positions;

2.    For money damages in the form of the lessened value in their AMC and NOK positions, and loss of future profitable acquisitions of AMC and NOK positions, in an amount according to proof, but well in excess of $5 million;

3.    For punitive damages according to proof;

4.    For pre-judgment interest on all damages awarded by this Court;

5.    For reasonable attorneys' fees and costs of suit incurred herein; and

6.    For any other such relief as this Court deems just and proper.

DATED:  February 1, 2021

BROWNE GEORGE ROSS
O'BRIEN ANNAGUEY & ELLIS LLP
Matthew L. Venezia

By:    _/s/ Matthew L. Venezia_
Matthew L. Venezia
Attorney for Plaintiff Robert Days

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiff hereby demands a jury trial as provided by Rule 38(a) of the Federal Rules of Civil Procedure.

DATED:  February 1, 2021

BROWNE GEORGE ROSS
O'BRIEN ANNAGUEY & ELLIS LLP
Matthew L. Venezia

By:  _____*/s/ Matthew L. Venezia*_____
Matthew L. Venezia
Attorney for Plaintiff Robert Days

FIRST AMENDED COMPLAINT

# EXHIBIT 6

**MIGLIACCIO & RATHOD LLP**
Selin Demir (SBN 331418)
Nicholas Migliaccio, *pro hac vice* anticipated
Jason Rathod, *pro hac vice* anticipated
Bryan Faubus, *pro hac vice* anticipated
388 Market Street, Suite 1300
San Francisco, CA 94111

*Attorneys for Plaintiff and Proposed Class*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| MARK FEENEY AND JASON FOSSELLA, individually and on behalf of all others similarly situated, | CASE NO.: |
| | **CLASS ACTION COMPLAINT** |
| Plaintiff, | |
| | **(1) BREACH OF FIDUCIARY DUTY;** |
| vs. | **(2) BREACH OF FIDUCIARY DUTY (950 MASS. CODE REGS. 12.200, *et. seq.* );** |
| ROBINHOOD FINANCIAL, LLC, ROBINHOOD SECURITIES, LLC, AND ROBINHOOD MARKETS INC., | **(3) BREACH OF CONTRACT;** |
| | **(4) IMPLIED COVENANT OF GOOD FAITH & FAIR DEALING;** |
| | **(5) NEGLIGENCE;** |
| | **(6) GROSS NEGLIGENCE;** |
| | **(7) VIOLATIONS OF THE CALIFORNIA UNFAIR COMPETITION LAW; and** |
| Defendants. | **(8) UNJUST ENRICHMENT** |
| | **DEMAND FOR JURY TRIAL** |

Plaintiffs Mark Feeney and Jason Fossella (together, "Plaintiffs") bring this putative class action against Defendants Robinhood Financial, LLC ("Robinhood Financial"), Robinhood Securities, LLC ("Robinhood Securities"), and Robinhood Markets, Inc. ("Robinhood Markets") (collectively, "Robinhood" or the "Company"), and demand a trial by jury. Plaintiffs make the following allegations pursuant to the investigation of counsel, which included a review of, among other things, United States Securities and Exchange Commission ("SEC") filings by Robinhood, as well as regulatory filings and reports, press releases and other public statements issued by Robinhood, and based upon information and belief, except as to the allegations specifically pertaining to each individual Plaintiff, which are based on personal knowledge.

**NATURE OF THE ACTION**

1.  This is a class action on behalf of all clients of Robinhood who were harmed by Robinhood's manipulation of the market for the following securities and options contracts relating thereto: GameStop Corporation (symbol: GME), BlackBerry Ltd. (symbol: BB), Nokia Oyj (symbol: NOK), AMC Entertainment Holdings, Inc. (symbol: AMC), American Airlines Group Inc (symbol: AAL), Bed Bath & Beyond Inc. (symbol: BBBY), Castor Maritime Inc (symbol: CTRM), Express, Inc. (symbol: EXPR), Koss Corporation (symbol: KOSS), Naked Brand Group Ltd. (symbol: NAKD), Sundial Growers Inc (symbol: SNDL), Tootsie Roll Industries, Inc. (symbol: TR), and Trivago NV (symbol: TRVG) (collectively, the "Manipulated Stocks").[1] Specifically, between the 27th and 28th of January, 2021 (the "Crunch Period"), Robinhood (1) delisted these assets from its trading platform, (2) prohibited its users from purchasing shares of the Manipulated Stocks, only permitting them to sell shares they already owned, (3) unilaterally sold these assets at rock-bottom prices from the accounts of some unlucky

[1]     *See* Robinhood Blog, *Keeping Customers Informed Through Market Volatility* (Jan. 28, 2021) *available at* https://blog.robinhood.com/news/2021/1/28/keeping-customers-informed-through-market-volatility (*last visited* Jan. 30, 2021).

-2-

CLASS ACTION COMPLAINT

users without their knowledge or consent, and (4) accepted trade users' orders for these assets and cancelled them unilaterally. On information and belief, Robinhood took these extraordinary actions with the intent to drive down the price of the Manipulated Stocks in order to reduce its own obligations and potential liabilities relating to the Manipulated Stocks.

2.     Plaintiffs assert claims for breach of fiduciary duties, breach of contract, breach of the implied covenant of good faith and fair dealing, negligence, gross negligence, violations of the California Unfair Competition Law, and unjust enrichment, on behalf of themselves and all similarly-situated clients of Robinhood.

3.     Robinhood is a privately-owned financial services company that offers an online platform (typically accessed through their website or through its mobile application (the "App")) for retail investors to purchase and sell securities and similar assets, including stocks, ETFs, option contracts, and cryptocurrency, and engage in trading on margin. The company has no storefront offices and operates entirely online. Robinhood is a FINRA regulated broker-dealer.[1]

4.     The Company has experienced rapid growth since it was launched in 2015: in October 2016 Robinhood reported one million users and by April 2017 its active user base had doubled and was growing at a rate of 140,000 new accounts per month.[2] As of October 2018, Robinhood's users had "executed more than $150 billion in transactions."[3] By 2017 the Company

---

[2]     Josh Constine, *Robinhood Stock-trading App Confirms $110M Raise at $1.3B Valuation*, Techcrunch (April 26, 2017), *available at* https://techcrunch.com/2017/04/26/robincorn/ (*last visited* Jan. 30, 2021).
[3]     Simone Foxman, Julie Verhage, and Suzanne Woolley, *Robinhood Gets Almost Half Its Revenue in Controversial Bargain With High-Speed Traders*, Bloomberg.com (October 15, 2018), *available at* https://www.bloomberg.com/news/articles/2018-10-15/robinhood-gets-almost-half-its-revenue-in-controversial-bargain-with-high-speed-traders. (*last visited* Jan. 30, 2021).

CLASS ACTION COMPLAINT

1    was valued at $1.3 billion and one year later it received a valuation of $5.6 billion.[4] In 2019,

2    Robinhood raised $323 million in funding at a $7.6 billion valuation. The firm currently claims

3    over 10 million users of its App.

4        5.    Robinhood pioneered "commission-free investing," and offers its customers

5    "unlimited commission-free trades in stocks, funds, and options."[5] Robinhood's users do not pay

6    trade commissions, but they pay a hidden price with every trade.

7        6.    When a Robinhood user executes a trade, their order is sent to a private exchange

8    where it is executed by a third-party, generally on less favorable terms than if the trade had been

9    executed on the major exchanges. Robinhood's practice of selling its users orders to third parties

10   is known as selling "order flow," and Robinhood derives the majority of its profit from this

11   practice.[6] Retail order flow from Robinhood is generally executed in so-called "dark pools,"

12   private exchanges run by banks, hedge funds, high-frequency trading firms, and other financial

13   institutions. This is a lucrative arrangement for the dark pools, who extract profit from retail

14   customers and gather valuable information about market trends with each trade.

15       7.    Robinhood's order flow practices have landed it in hot water with the SEC, and

16   the Company is also subject to ongoing investigations by the SEC, FINRA, and state regulators

17   regarding how it handled service disruptions that left its users unable to trade during some of the

18

19   _____

20   [4]    Alex Wilhelm, *Thinking About Revenue Growth As Robinhood Said To Pursue New Capital, Higher Valuation*, Crunchbase (May 24, 2019) *available at*

21   https://news.crunchbase.com/news/thinking-about-revenue-growth-as-robinhood-said-to-pursue-new-capital-higher-valuation/ (*last visited* Jan. 30, 2021).

22   [5] *See* https://robinhood.com/.
     [6] Kate Rooney, *A Controversial Part of Robinhood's Business Tripled in Sales Thanks to High-Frequency Trading Firms*, CNBC.com (April 18 2019), *available at*

23   https://www.cnbc.com/2019/04/18/a-controversial-part-of-robinhoods-business-tripled-in-sales-thanks-to-high-frequency-trading-firms.html (*last visited* Jan. 30, 2021).

24

-4-

_____

CLASS ACTION COMPLAINT

biggest market swings of 2020 (costing them millions),[7] and "'unscrupulously' pushing unsophisticated customers into risky investments."[8]

8.    During its short history Robinhood has repeatedly mislead and mistreated its customers, but the Company hit a new low during the Crunch Period, when it openly used its trading platform to manipulate the price of certain securities at the expense of Plaintiffs and the putative class (the "Class").

9.    For example, on or around January 27, 2021, Robinhood abruptly restricted its users' ability to trade in shares and options relating to GameStop Corporation ("GME"). For approximately two weeks preceding this action, GME's price had increased from approximately $18.60, on January 11, 2021, to nearly $415, on January 27—an increase of over 2,200%. On the morning of January 27, Robinhood users who searched for GME discovered that Robinhood had restricted its users' ability to purchase GME shares or enter into options pertaining to GME. The stock was obscured on Robinhood's website and App, and users who found the listing were unable to enter purchase orders for GME. Users who already owned GME were permitted only to sell the shares they held. Further, Robinhood unilaterally cancelled some users' GME trades after accepting them and, incredibly, unilaterally and without prior notice sold GME shares in its users accounts at prices that were lower than the lowest recorded price of the day.

---

[7]    Kelly Anne Smith, *Robinhood Facing Multiple SEC Investigations Into Its Business Practices*, Forbes.com (Sep. 3, 2020), *available at* https://www.forbes.com/sites/advisor/2020/09/03/robinhood-investigation-sec-finra/?sh=178f09214d61 (last visited Jan. 30, 2021).

[8]    Nathaniel Popper and Michael J. de la Merced, Robinhood Pays $65 Million Fine to Settle Charges of Misleading Customers (Dec. 17, 2020), *available at* https://www.nytimes.com/2020/12/17/business/robinhood-sec-charges.html (*last visited* Jan. 30, 2021).

CLASS ACTION COMPLAINT

10.     Around the same time, Robinhood took similar actions regarding the other Manipulated Stocks. Like GME, those securities had also experienced a rally in the previous two weeks. Their listings were similarly obscured on Robinhood's website and users were restricted from purchasing shares in these companies or entering into options on them. Robinhood permitted its millions of users only to sell the Manipulated Stocks, giving them no way to purchase through its platform. Robinhood also unilaterally cancelled orders and sold these assets from its users' accounts without prior notice.

11.     As a direct consequence of Robinhood's actions, the value of the Manipulated Stocks and related options dropped precipitously—by the end of January 28, 2021 AMC had fallen by nearly 50%, GME by nearly 25%, NOK by nearly 25%, and BB by nearly 35%. The other Manipulated Stocks also experienced marked declines in their values after Robinhood restricted trading in them.

12.     On January 28, Robinhood released a statement claiming that it limited trading in the Manipulated Stocks to comply with "SEC net capital obligations and clearinghouse deposits" and to "protect investors and the markets."[9] The statement continues: "To be clear, this was a risk-management decision, and was not made on the direction of the market makers we route to."

13.     This explanation is false and misleading: on information and belief, Robinhood took these unprecedented actions with the intent to drive down the price of the Manipulated Shares to benefit Robinhood and "the market makers [they] route to." By manipulating the market to lower the prices of the Manipulated Stocks, Robinhood (1) saved likely hundreds of millions of dollars in costs relating to call options on the Manipulated Stocks, (2) artificially lowered its

---

[9]     Robinhood Blog, *An Update on Market Volatility* (Jan. 28, 2021) *available at* https://blog.robinhood.com/news/2021/1/28/an-update-on-market-volatility (*last visited* Jan. 30, 2021).

margin requirement and capital obligations that result from Robinhood operating an in-house clearing service subject to Depository Trust and Clearing Corporation ("DTCC") regulation; and (3) reduced the costs of shorting the Manipulated Stocks, which benefitted Robinhood's close institutional partners and reduced the Company's exposure to short positions.

14.     Robinhood's Hail Mary worked: it reduced its obligations and its risk exposure, but at the direct expense of its retail users. Preventing users from purchasing Manipulated Stocks during the Crunch Period unfairly and unlawfully deprived them of the benefit of their bargain with Robinhood, which promised "unlimited commission-free trades in stocks, funds, and options" for trading on its platform, as well as the benefits they otherwise would have received from the upwards price trends. In fact, the latter is true of the entire market: Robinhood's actions caused significant losses for all long positions in the Manipulated Stocks and options related thereto. And Robinhood breached its duties to its users when it cancelled retail purchases and liquidated its holdings of the Manipulated Securities to boost the supply of Manipulated Stocks.

15.     Robinhood's behavior constitutes negligence, breaches of contract and fiduciary duties, and violates FINRA regulations. Per FINRA regulations, Robinhood has a duty to process trades timely and at the best prices for its users. Robinhood is also required to have a business continuity plan identifying a procedure relating to an emergencies or significant business disruptions. During the Crunch Period, Robinhood failed to process trades in a timely manner, or at all, and sold its users' holdings for its own benefit. Robinhood's trading restrictions, trade cancellations, and unilateral sales of customer assets caused concrete, particularized, and actual damages for the Class.

16.     At all relevant times, Robinhood failed to disclose that orders on its platform would be subject to extraordinary measures that subordinated the financial interests of its retail clients to its own financial interests. On January 27, 2021, Robinhood decided that, by the next

CLASS ACTION COMPLAINT

1  day, it would impose extraordinary measures – including the unilateral cancelation or sale of

2  Manipulated Stocks – and also decided that it would *not* inform its clients, but rather, continue to

3  accept the orders, telling clients that such orders would be executed in the same manner as any

4  other order.

5      17.    Plaintiffs hereby seek to recover, on behalf of themselves and all similarly situated

6  clients of Robinhood, the value they lost on account of Robinhood's self-interested market

7  manipulation as well as restitution of benefits unjustly received by Robinhood at their expense.

8                        **JURISDICTION AND VENUE**

9      18.    This Court has subject matter jurisdiction over the claims asserted herein pursuant

10  to the Class Action Fairness Act, 28 U.S.C. § 1332 (d)(2), since some of the members of the

11  putative class (defined below) are citizens of a State different from that of the Defendant and,

12  upon the original filing of this Complaint, members of the putative class resided in states around

13  the country; there are more than 100 putative class members; and the amount in controversy

14  exceeds $5 million, exclusive of interest and costs.

15      19.    The Court has personal jurisdiction over the parties because Robinhood conducts

16  a major part of its national operations, advertising, and sales through continuous business activity

17  in this District.

18      20.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because

19  Robinhood and Robinhood Markets both reside in this District. The principal executive office of

20  both companies is located at 85 Willow Road, Menlo Park, CA 94025. Further, many of the acts

21  alleged herein that give rise to the injuries suffered by the Plaintiffs and the Class occurred in

22  substantial part in this District.

23

24

25

–8–

CLASS ACTION COMPLAINT

**PARTIES**

21.     Plaintiff Feeney is a client of Robinhood and was continuously during the Class Period. Plaintiff Feeney is a resident of the Commonwealth of Massachusetts.

22.     Plaintiff Fossella is a client of Robinhood and was continuously during the Class Period. Plaintiff Fossella is a resident of the state of Missouri.

23.     Defendant Robinhood Markets, Inc. is a Delaware corporation, with its principal executive offices at 85 Willow Road, Menlo Park, CA 94025. Defendant Robinhood Markets is the corporate parent of Defendants Robinhood Financial and Robinhood Securities.

24.     Defendant Robinhood Securities, LLC is a Delaware corporation with its principal place of business at 500 Colonial Center Parkway, Suite 100, Lake Mary, Florida 32746. It is a wholly- owned subsidiary of Defendant Robinhood Markets.

25.     Defendant Robinhood Financial, LLC is a Delaware limited liability company, with its principal executive offices at 85 Willow Road, Menlo Park, CA 94025. It is a wholly-owned subsidiary of Robinhood Markets. Robinhood Financial is registered as a broker-dealer with the U.S. Securities & Exchange Commission ("SEC"). Defendant Robinhood Financial acts as an introducing broker and has a clearing arrangement with its affiliate Defendant Robinhood Securities.

**FACTUAL BACKGROUND**

***Robinhood's Business Model***

26.     Robinhood was founded in 2013 by Vlad Tenev and Baiju Bhatt, who met each other at Stanford University in 2005. After teaming up on several ventures, including a high-speed trading firm, they created Robinhood.[8]

27.     The Company has experienced rapid growth since it was launched in 2015: in October 2016 Robinhood reported one million users and by April 2017 its active user base had

CLASS ACTION COMPLAINT

doubled and was growing at a rate of 140,000 new accounts per month.[10] As of October 2018, Robinhood's users had "executed more than $150 billion in transactions."[11] By 2017 the Company was valued at $1.3 billion and one year later it received a valuation of $5.6 billion.[12] In 2019, Robinhood raised $323 million in funding at a $7.6 billion valuation. The firm currently claims over 10 million users of its App.

28.    Robinhood offers its users the ability to invest in stocks, ETFs, and options through an electronic trading platform. Robinhood competes with other online and traditional retail brokerages by not charging up-front fees for trades. Robinhood also competes with traditional financial institutions by offering more user-friendly digital services, which has made Robinhood very popular, especially with younger traders. In July of 2020, Robinhood said it had over 13 million users on its platform. In August 2020, after raising $200 million in Series G funding, Robinhood was valued at $11.2 billion.[13]

### *Robinhood's Services, How it Makes Money, and How it Minimizes Short-Term Costs*

29.    When a user opens an account with Robinhood, they enter into a Customer Agreement with "Robinhood Financial LLC, Robinhood Securities, LLC, and their agents and

---

[10]    Josh Constine, *Robinhood Stock-trading App Confirms $110M Raise at $1.3B Valuation*, Techcrunch (April 26, 2017), *available at* https://techcrunch.com/2017/04/26/robincorn/ (*last visited* Jan. 30, 2021).

[11]    Simone Foxman, Julie Verhage, and Suzanne Woolley, *Robinhood Gets Almost Half Its Revenue in Controversial Bargain With High-Speed Traders*, Bloomberg.com (October 15, 2018), *available at* https://www.bloomberg.com/news/articles/2018-10-15/robinhood-gets-almost-half-its-revenue-in-controversial-bargain-with-high-speed-traders. (*last visited* Jan. 30, 2021).

[12]    Alex Wilhelm, *Thinking About Revenue Growth As Robinhood Said To Pursue New Capital, Higher Valuation*, Crunchbase (May 24, 2019) *available at* https://news.crunchbase.com/thinking-about-revenue-growth-as-robinhood-said-to-pursue-new-capital-higher-valuation/ (*last visited* Jan. 30, 2021).

[13]    Kate Rooney, *Robinhood snags third mega-investment of the year, boosting valuation to $11.2 billion,* CNBC (August 17, 2020) https://www.cnbc.com/2020/08/17/robinhood-announces- another-mega-round-valuation-soars-to-11point2b.html (*last visited* Jan. 30, 2021).

CLASS ACTION COMPLAINT

assigns." Robinhood offers a paid subscription product called "Gold." Users who purchase Gold memberships pay $5 a month to have faster deposit processing, access to professional research, the ability to see additional information about stock prices, and the ability to invest on margin.[14]

30.     Robinhood generates the majority of its revenue from "payment for order flow" fees. In fact, payment for order flow fees are reportedly Robinhood's primary revenue stream— greatly exceeding what it earns from Robinhood Gold, or from the interest it makes on cash balances in customer accounts, which is another source of Robinhood's revenue.

31.     Third-party market makers pay Robinhood for "order flow," the right to execute trades for Robinhood's users. For example, if a Robinhood user purchases a share of Apple through their account, Robinhood sends that order to a large market maker like Citadel Securities and receives a few pennies in return—*i.e.*, the "payment for order flow" fees. Citadel, meanwhile, makes a few pennies itself by completing the trade for a higher price than it paid for a share of Apple.[15]

32.     For Robinhood, those fees add up. According to a recent SEC filing, Citadel Securities and several other firms paid Robinhood nearly $100 million in the first quarter of 2020[16] And in the second quarter of 2020 Robinhood made $180 million selling order flow, almost doubling the prior quarter.[17]

---

[14]     A margin account is a brokerage account in which the broker lends the investor money to buy more securities than what they could otherwise buy with the balance in their account.
[15]     Jeff John Roberts, David Z. Morris, *Robinhood makes millions selling your stock trades ... is that so wrong?,* Fortune (July 8, 2020), https://fortune.com/2020/07/08/robinhood-makes-millions-selling-your-stock-trades-is-that-so-wrong/ (*last visited* Jan. 30, 2021).
[16] *Id.*
[17]     Kate Rooney, Maggie Fitzgerald, *Here's how Robinhood is raking in record cash on customer trades — despite making it free*, CNBC (August 13, 2020), https://www.cnbc.com/2020/08/13/how-robinhood-makes-money-on-customer-trades- despite-making-it-free.html?__source=iosappshare%7Ccom.apple.UIKit.activity.Mail (*last visited* Jan. 30, 2021).

CLASS ACTION COMPLAINT

33.     Robinhood's order flow practices have landed it in hot water with the SEC. On December 17, 2020, the SEC announced that it had charged Robinhood "for repeated misstatements that failed to disclose the firm's receipt of payments from trading firms for routing customer orders to them, and with failing to satisfy its duty to seek the best reasonably available terms to execute customer orders."[18] The SEC found that Robinhood's practices "had deprived customers of $34.1 million even after taking into account the savings from not paying a commission." The Company paid $65 million to settle the charges.

34.     Robinhood offers its customers the ability to buy and sell options, including "calls."[19] A call is "an option contract under which the holder of the option has the right, in accordance with the terms of the option, to purchase the number of units of the underlying security" at a specific price—known as the "strike price."[20] A call option is a bet that the value of a security will increase. A call option will expire at a predetermined date; typically options expire in batches at regular intervals. If a call is "in the money," *i.e.*, the market price is higher than the strike price, on or before the expiration date, the call holder will exercise the right to purchase the shares, and the counterparty is obligated to sell the securities at the strike price.

35.     On information and belief, Robinhood sold call options on the Manipulated Stocks that expired on January 29, 2021.

---

[18]     Press Release, SEC, *SEC Charges Robinhood Financial With Misleading Customers About Revenue Sources and Failing to Satisfy Duty of Best Execution* (Dec. 17, 2020), *available at* https://www.sec.gov/news/press-release/2020-321 (*last visited* Jan. 30, 2021).
[19]     *See* Robinhood Support, *Placing an Options Trade*, *available at* https://robinhood.com/us/en/support/articles/placing-an-options-trade/ (*last visited* Jan. 30, 2021).
[20]     FINRA 2360. Options https://www.finra.org/rules-guidance/rulebooks/finra-rules/2360 (*last visited* Jan. 30, 2021).

36.     Robinhood also allows its users to "short" securities. A short trade is a "trading strategy where you borrow shares of a stock, sell them at the current price, and hope the price falls so that you can repay the borrowed shares at a lower price."[21] A short seller is required to pay regular "interest" to keep the short position open, and when the price of a shorted stock rises the amount of interest required rises as well, necessitating additional collateral from the short seller. If a short seller wishes to exit the trade they are required to purchase shares at the market price to return to the lender, settling the trade.

37.     On information and belief, Robinhood lent securities to both its users and to institutions like hedge funds for the purpose of being used in short trades.

38.     Robinhood exposed itself to risk by operating its own clearing service rather than, as most brokers do, paying an external clearing house to reconcile trades between buyers and sellers. It typically takes roughly two days for an equities trade to legally settle. By "self-clearing," Robinhood takes on the risk of one side defaulting and the trade not settling. To manage risk to the market, the DTCC requires clearing brokers to post margin. Perceived market volatility and trading surges prompt DTCC to demand more collateral. Robinhood has knowingly created the conditions for persisting volatility and trading surges, but refused to hold adequate collateral to meet its self-clearing obligations without relying on exploitation of its clients.

39.     Robinhood knew of the risks posed by self-clearing but transitioned to the model in 2018 because doing so enabled it to maximize short-term profit through rapidly building its

---

[21]    *See* Robinhood Support, *What is Short Selling?*, *available at* https://learn.robinhood.com/articles/7CPnasX4CZXQioJgHTMeXg/what-is-short-selling/ (*last visited* Jan. 30, 2021).

subscriber base and also saving on costs paid to an external clearing house.[22] To its clients, it never disclosed such risks, opting instead to tout self-clearing as "pass[ing] more savings to our customers," "accelerat[ing] future product iterations," and aligning with Robinhood's "mission of **democratizing access to the financial markets**." (emphasis in original).[23]

### *The Crunch Period*

40.     Or around January 27, 2021, Robinhood abruptly restricted its users' ability to trade in shares and options relating to the Manipulated Stocks. For approximately two weeks preceding this date, the value of these stocks had risen dramatically. For example, GME's price had increased from approximately $18.60, on January 11, 2021, to nearly $415, on January 27— an increase of over 2,200%. On the morning of January 27, Robinhood users who searched for Manipulated Stocks on the website or App found a message that "This stock is not supported on Robinhood."[24]

41.

---

[22]     *See* Josh Constine, Robinhood cuts trading fees, grows profits with in-house clearing, Tech Crunch (Oct. 10, 2018), available at https://techcrunch.com/2018/10/10/robinhood-clearing/ (*last visited* Jan. 31, 2021).

[23]     *See* Hongxia Zong, Under the hood of clearing by Robinhood (Oct. 16, 2018), available at https://robinhood.engineering/under-the-hood-of-clearing-by-robinhood-3ed7ab09d60 (*last visited* Jan. 31, 2021).

[24]     Josh Fineman, Robinhood locks out traders from GameStop, AMC, Nokia and others, SeekingAlpha.com (Jan. 28, 2021), *available at* https://seekingalpha.com/news/3655535-watch-gamestop-amc-as-robinhood-reportedly-locking-out-traders (*last visited* Jan. 30, 2021).

CLASS ACTION COMPLAINT



42.     Robinhood also restricted its users' ability to purchase shares or enter into options pertaining to them. Users could not buy the Manipulated Stocks Users; their "buy" option on Robinhood's platform had been rendered non-operational. Users who already owned GME were permitted only to sell the shares they held.

43.

CLASS ACTION COMPLAINT

44.     Further to these actions, Robinhood reneged on purchases of the Manipulated Stocks after accepting them, unilaterally cancelling these orders and wrongfully ascribing the cancellation to the users. Robinhood also sold GME shares from its users accounts unilaterally and without prior notice. Worse still, at least some of these forced liquidations were at a price lower than the lowest recorded price of the day—$118.93 versus the nadir of $132.

CLASS ACTION COMPLAINT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18



19   46.   On information and belief, Robinhood's actions regarding the Manipulated Stocks,

20   that is, its all-out effort to reduce the price of those stocks, were motivated by its need to reduce

21   its own mounting obligations under options contracts and potential liabilities relating to short

22   positions on the Manipulated Stocks.

23   47.   A large number of call options on the Manipulated Stocks were scheduled to expire

24   on Friday, January 29, 2021. Due to the massive increase in the value of the Manipulated Stocks

25

-17-

1  over the previous two weeks, the vast majority of those calls were in-the-money and therefore

2  likely to be exercised. When the buyers exercised those calls, Robinhood would be obligated to

3  provide shares for purchase at the strike price. If Robinhood had not already covered these calls,

4  *e.g.*, by holding shares of the Manipulated Stocks in its own inventory, Robinhood would be

5  forced to purchase shares at the then market price, which likely was much higher than the strike

6  prices of the expiring options.

7       48.    On information and belief, Robinhood saved hundreds of millions of dollars by

8  manipulating the market for the Manipulated Stocks. It cost Robinhood much less to cover its call

9  option liabilities after depressing the price of the Manipulated Stocks.

10       49.    Robinhood's scheme also benefitted its institutional partners who were shorting

11  the Manipulated Stocks.

12       50.    Prior to the Crunch Period, short sellers had taken large positions against the

13  Manipulated Stocks, GME in particular. In fact, as of the date of the Crunch Period, there were

14  more GME shares sold short (*i.e.*, borrowed and sold at one price with an obligation to purchase

15  and return the shares in the future) than there were GME shares in circulation.[25] This is possible

16  because one share can be borrowed and sold multiple times.

17       51.    As discussed above, the majority of Robinhood's income is derived from selling

18  order flow to hedge funds for execution in dark pools. Robinhood's biggest order flow customer

19  is Citadel Securities LLC, the sister company of hedge fund Citadel LLC.[26]  Days prior to the

---

[25]    Dan Caplinger, *Yes, a Stock Can Have Short Interest Over 100% -- Here's How*, The Motley Fool (Jan. 28, 2021), *available at* https://www.fool.com/investing/2021/01/28/yes-a-stock-can-have-short-interest-over-100-heres/ (*last visited* Jan. 30, 2021).

[26] *See* Jeff John Roberts, David Z. Morris, *Robinhood makes millions selling your stock trades ... is that so wrong?,* Fortune (July 8, 2020), https://fortune.com/2020/07/08/robinhood-makes-millions-selling-your-stock-trades-is-that-so-wrong/ (*last visited* Jan. 30, 2021); Simone Foxman,

Crunch Period, Citadel LLC came into a very large short position (as large as $2 billion) against GME and possibly other of the Manipulated Stocks after it contributed $2 billion to bail out another hedge fund, Melvin Capital Management, after it lost nearly one third of its assets in January 2021.[27] Melvin Capital's losses were in large part attributable to its sizable short position on GME. Citadel LLC received "revenue shares" in Melvin Capital Management, and its contribution "reduc[ed] Melvin's reliance on borrowed money," effectively making their short positions less expensive to maintain.[28]

52.     Robinhood's extraordinary actions further reduced the cost of maintaining short positions on the Manipulated Stocks, as well as the cost of exiting those positions (*i.e.*, buying shares at the then market price). It is clear that Robinhood benefitted from the reduced cost of maintaining and exiting short positions on the Manipulated Stocks.

53.     The reduction in the prices of the Manipulated Stocks was a boon to short sellers and, consequentially, a relief to broker-dealers who are exposed to short positions by virtue of being involved in those trades. That is, broker-dealers who lend shares for short sales are exposed to counterparty risk: if the short seller counterparty is unable to provide collateral to maintain their position or close out the trade by covering the position (for example, due to insolvency), then the broker-dealer has a potentially expensive problem.

---

Julie Verhage, and Suzanne Woolley, *Robinhood Gets Almost Half Its Revenue in Controversial Bargain With High-Speed Traders*, Bloomberg.com (October 15, 2018), *available at* https://www.bloomberg.com/news/articles/2018-10-15/robinhood-gets-almost-half-its-revenue-in-controversial-bargain-with-high-speed-traders (*last visited* Jan. 30, 2021).

[27]     Juliet Chung, Citadel, Point72 to Invest $2.75 Billion Into Melvin Capital Management, WSJ.com (Jan. 25, 2021), *available at* https://www.wsj.com/articles/citadel-point72-to-invest-2-75-billion-into-melvin-capital-management-11611604340 (*last visited* January 30, 2021).

[28]     *Id.*

54.     On information and belief, Robinhood lent shares of the Manipulated Stocks for the purpose of short selling and as a result was exposed to counterparty risk arising from the possibility that its short counterparties would be unable to maintain or exit their trades. As the price of the Manipulated Stocks rose, short sellers were required to provide more collateral/pay higher fees to maintain their positions. And if they chose to exit their positions, they would have to purchase shares at the market price. The cost of maintaining or exiting a short position can be immense when the shorted stock rises suddenly, as here, over two thousand per cent for GME. By reducing the value of the manipulated shares, Robinhood made the short position less expensive to maintain or exit, and thereby reduced the risk of an insolvent counterparty and the potential liabilities arising therefrom.

55.     Robinhood also had growing collateral obligations from the DTCC. In one day, the industry collateral requirements for the entire equity market grew from $26 billion to $33.5 billion, an amount easy to weather for established players who appropriately plan for such contingencies, but less so for Robinhood who did not.

56.     It is clear that Robinhood was feeling pressure resulting from the rising prices of the Manipulated Stocks and its collateral obligations to the DTCC. The Company faced not just risk but mounting expenses tied to the Manipulated Stocks, so much so that it was forced to raise over $1 billion the night of January 28th from investors to "shore up its balance sheet."[29] Robinhood also drew down an additional $500 million from various credit lines "to ensure it had

---

[29]     Maggie Fitzgerald, *Robinhood raises $1 billion and taps credit lines to make trading of GameStop available to customers*, CNBC.com (Jan. 29, 2021), *available at* https://www.cnbc.com/2021/01/29/robinhood-raises-1-billion-and-taps-credit-lines-to-make-trading-of-gamestop-available-to-customers.html (*last visited* January 30, 2021).

CLASS ACTION COMPLAINT

1    the capital required to keep allowing its clients to trade heavily shorted stocks like GameStop and

2    AMC Entertainment."[30]

3    57.    Without its extraordinary actions earlier in the day to reduce the price of the

4    Manipulated Stocks, Robinhood would have required an infusion even larger than $1.5 billion.

5    Robinhood's savings, however, came at the expense of its customers, who were prevented from

6    purchasing the Manipulated Stocks, whose orders were limited or unilaterally cancelled, and

7    whose holdings were unilaterally liquidated at rock-bottom prices.

8    ***Plaintiffs' Experiences***

9       **Mark Feeney**

10   58.    Plaintiff Feeney is a Robinhood client.

11   59.    On the evening of January 27, 2021, Plaintiff Feeney placed a market buy order

12   for GME and received confirmation at around 10:30 p.m. that the order would be executed. At

13   around 9:30 a.m. the next morning, Plaintiff Feeney received – in his spam folder of his email –

14   a notification of cancelation of the order. At 9:30 a.m., GME was trading at $265 a share.

15   60.    At closing on January 28, 2021, Plaintiff Feeney was led to believe that trading

16   of GME had reopened and placed another market buy order. This order, too, was canceled

17   because Robinhood had restricted trading of fractional shares. Plaintiff Feeney then placed

18   another buy order before trading reopened on January 29, 2021, but it was not filled until 10:30

19   a.m. and, then, executed at one of the highest prices of the previous days, at $355 for one share.

20   61.    Plaintiff Feeney suffered losses because he could have bought at a lower price had

21   Robinhood executed the trade in accordance with its duty as a broker and promises made to

22   customers. Thereafter, the stock price would have continued to rise but for Robinhood's market

23

24   [30]   *Id.*

25

1   manipulation.

2       62.     Had Plaintiff Feeney known his orders would be canceled, he would not have

3   placed the orders and would have arranged for the trades with another brokerage. Since the

4   incident, Plaintiff Feeney has established a brokerage account with Fidelity. Unfortunately,

5   though, bank approval is required before he can start using that account, which will take 4-6

6   business days.

7       **Jason Fossella**

8       63.     Plaintiff Fossella is a Robinhood client.

9       64.     On the evening of January 27, 2021, Plaintiff Fossella placed a market buy order

10  for shares of NOK and received confirmation at 1:16 a.m. on January 28, 2021. The message

11  did not indicate the possibility that the order could be canceled; rather it said: "You have

12  submitted a market order to buy 9.541984 shares of NOK. You can check on the status of this

13  order on Robinhood. We will notify you when this order has been executed."

14      65.      At 9:35 a.m. the next morning, Plaintiff Fossella received a notification of

15  cancelation of the order. At 9:30 a.m., NOK was trading at $5.18 a share.

16      66.     Plaintiff Fossella suffered losses because he could have bought at a lower price

17  had Robinhood executed the trade in accordance with its duty as a broker and promises made to

18  customers. Thereafter, the stock price would have continued to rise but for Robinhood's market

19  manipulation.

20      67.     Had Plaintiff Fossella known his order would be canceled, he would not have

21  placed the order with Robinhood and would have arranged for the trades with another

22  brokerage.

23

24

25

–22–

1

### *Regulatory Framework*

2      68.     As a broker-dealer, Robinhood is subject to various rules and regulations that

3  impact many aspects of its business.

4      69.     Under federal and state securities laws, securities industry rules, and industry best

5  practices, brokerage firms that offer online trading services to their customers are required to,

6  among other things, ensure that customers receive the best execution of trades. FINRA, which

7  superseded the NASD, and now governs brokers like Robinhood, promulgated rule 5310

8  regarding "Best Execution and Interpositioning." Rule 5310.01 requires that Robinhood "must

9  make every effort to execute a marketable customer order that it receives promptly and fully." By

10 accepting and cancelling its customers' trades, and in fact, preventing them from buying

11 altogether, Robinhood has breached these obligations and caused its customers substantial losses

12 due solely to its own negligent and fraudulent actions.

13     70.     Brokers engaged in routing orders for their clients are under a duty of "best

14 execution," pursuant to Rule 5310. Rule 5310 sets forth a non-exhaustive list of factors to be

15 considered by brokers when routing order flow:

16
> In any transaction for or with a customer or a customer of another broker-dealer,
> a member and persons associated with a member shall use reasonable diligence
17 > to ascertain the best market for the subject security and buy or sell in such
> market so that the resultant price to the customer is as favorable as possible
18 > under prevailing market conditions. Among the factors that will be considered
> in determining whether a member has used "reasonable diligence" are:
> (A) the character of the market for the security (*e.g.*, price, volatility, relative
19 >      liquidity,
> and pressure on available communications);
20
> (B) the size and type of transaction;
21
> (C) the number of markets checked;
22 > (D) accessibility of the quotation; and
23
> (E) the terms and conditions of the order which result in the transaction, as
24 > communicated to the member and persons associated with the member.

25

71.     The SEC, in Order Execution Obligations Release, No. 34-37619A (the "SEC Release"), instructs that a "broker-dealer's duty of best execution derives from common law agency principles and fiduciary obligations, and is incorporated in [self-regulatory organization] rules and, through judicial and SEC decisions, the antifraud provisions of the federal securities laws. This duty of best execution requires a broker-dealer to seek the most favorable terms reasonably available under the circumstances for a customer's transactions." That is, brokers have a responsibility to execute orders in a manner that is most beneficial to their clients and are prohibited from taking actions that are not in their clients' best interests.

72.     The SEC Release further states that:

> The duty of best execution evolves as changes occur in the market that give rise to improved executions for customer orders, including opportunities to trade at more advantageous prices. As these changes occur, broker-dealers' procedures for seeking to obtain best execution for customer orders also must be modified to consider price opportunities that become "reasonably available."

73.     States also impose regulatory requirements on brokers, including a fiduciary duty to clients. For example, Massachusetts imposes a fiduciary duty on broker-dealers that requires them to adhere to duties of utmost care and loyalty to clients. The duty of care requires a broker-dealer to use the care, skill, prudence, and diligence that a person acting in a like capacity and familiar with such matters would use, taking into consideration all of the relevant facts and circumstances. The duty of loyalty requires a broker-dealer to: (1) disclose all material conflicts of interest; (2) make all reasonably practicable efforts to avoid conflicts of interest, eliminate conflicts that cannot reasonable be avoided, and mitigate conflicts that cannot reasonably be avoided or eliminated and (3) make recommendations and provide investment advice without regard to the financial or any other interest of any party other than the customer. On December 16, 2020, the Massachusetts Securities Division of the Office of the Secretary of the

Commonwealth sued Robinhood for numerous violations of Robinhood's fiduciary duty to customers.

## CLASS ALLEGATIONS

74.     Plaintiffs bring this action as a class action pursuant to Rule 23(a) and (b)(2) and/or (b)(3) of the Federal Rules of Civil Procedure for the purpose of asserting the claims alleged in this Complaint on a common basis. Plaintiffs bring this action on behalf of themselves and all members of the following Nationwide Class comprised of:

> **All clients of Robinhood in the United States who, from January 27, 2021, to January 29, 2021 (1) placed orders in the Manipulated Stocks that were not executed, or (2) possessed Manipulated Stocks that Robinhood sold without their consent.**

75.     Plaintiff Feeney also brings this action on behalf of himself and a Massachusetts Subclass comprised of:

> **All clients of Robinhood in Massachusetts who, from January 27, 2021, to January 29, 2021 (1) placed orders in the Manipulated Stocks that were not executed, or (2) possessed Manipulated Stocks that Robinhood sold without their consent.**

76.     Excluded from the Class and Subclass are the officers, directors, and employees of Robinhood. Also excluded are the judge to whom this case is assigned any member of the judge's immediate family.

77.     Plaintiffs reserves the right to modify or amend the definitions of the Class as the case proceeds.

78.     Numerosity. *Rule 23(a)(1)*. The members of the Class are so numerous that their individual joinder is impracticable. Defendants service over three million brokerage accounts. Plaintiffs are informed and believe that the proposed Class contains at least hundreds of thousands of Defendants' clients who have been damaged by Robinhood's conduct as alleged herein. Record owners and other members of the Class may be identified from records

maintained by Robinhood and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

79. *Existence of Common Questions of Law and Fact. Rule 23(a)(2).* This action involves common questions of law and fact, which include, but are not limited to, the following:

a. whether Defendants' promises to provide, and assertions that they do provide, best execution of their clients' orders upon due consideration of the delineated regulatory factors, as discussed herein, are true, or are reasonably likely to deceive, given the omissions of material fact described above;

b. whether statements made by the Defendants' officers, directors, and employees to the investing public during the Class Period failed to disclose material information about Robinhood's policies that would have rendered Defendants' best execution promises not misleading;

c. whether Defendants' statements about providing best execution of their clients' orders were merely recitations of their legal obligations and not consistent with their actual practices;

d. whether Plaintiffs and the other members of Class are entitled to damages; and

e. whether Plaintiffs and the Class are entitled to injunctive relief, restitution, other equitable relief, and/or other relief as may be proper.

80. *Typicality. Rule 23(a)(3).* All members of the Class have been subject to and affected by the same conduct and omissions by Defendants. The claims alleged herein are based on the same violations by Defendants that harmed Plaintiffs and members of the Class. By placing orders in connection with which Defendants failed to act upon due consideration of their duty of best execution, all members of the Class were subjected to the same wrongful conduct. Plaintiffs' claims are typical of the Class' claims and do not conflict with the interests of any other members

of the Class. Defendants' unlawful, unfair, deceptive, and/or fraudulent actions and breaches of the duty of best execution concern the same business practices described herein irrespective of where they occurred or were experienced.

81. *Adequacy. Rule 23(a)(4).* Plaintiffs will fairly and adequately protect the interests of the members of the Class. Plaintiffs have retained counsel experienced in complex consumer fraud class action litigation, and Plaintiffs intend to prosecute this action vigorously. Plaintiffs have no interest adverse or antagonistic to those of the Class.

82. *Injunctive and Declaratory Relief. Rule 23(b)(2).* Defendants' actions regarding the misleading statements and omissions relating to their routing of client orders are uniform as to members of the Class. Defendants have acted or refused to act on grounds that apply generally to the Class, so that final injunctive relief as requested herein is appropriate respecting the Class as a whole.

83. *Predominance and Superiority of Class Action. Rule 23(b)(3).* Questions of law or fact common to the Class predominate over any questions affecting only individual members and a class action is superior to other methods for the fast and efficient adjudication of this controversy, for at least the following reasons:

    a.    Absent a class action, members of the Class as a practical matter will be unable to obtain redress. Defendants' violations of their legal obligations will continue without remedy, additional clients will be harmed, and Defendants will continue to retain their ill-gotten gains;

    b.    It would be a substantial hardship for most individual members of the Class if they were forced to prosecute individual actions;

    c.    When the liability of Defendants has been adjudicated, the Court will be able to determine the claims of all members of the Class;

CLASS ACTION COMPLAINT

d.    A class action will permit an orderly and expeditious administration of each Class member's claims and foster economies of time, effort, and expense;

e.    A class action regarding the issues in this case does not create any problems of manageability;

f.    Defendants have acted on grounds generally applicable to the members of the Class, making class-wide monetary relief appropriate;

g.    As a result of Defendants' actions and policies, each member of the Class suffered damages to an extent within the peculiar knowledge of the Defendants.

## CAUSES OF ACTION

## COUNT I

## BREACH OF FIDUCIARY DUTY

## (ON BEHALF OF THE NATIONWIDE CLASS)

84.    Plaintiffs hereby incorporate by reference the factual allegations contained herein.

85.    As a provider of financial services and a registered securities investment broker-dealer, at all times relevant herein Robinhood was a fiduciary to Plaintiffs and Class members and owed them the highest good faith and integrity in performing its financial services and acting as a securities broker-dealer on their behalf. As a broker-dealer, Robinhood provides securities trading services by taking, entering, and executing orders, and provides information and advice to customers on investments and investment strategies.

86.    Additionally, because Robinhood provides securities trading services through web and app-based services that accept orders 24 hours a day for execution during trading hours, it maintains a specific fiduciary duty to promptly notify its clients when it will be undertaking extraordinary measures, such as those described herein, that run counter to a client's directions and interests.

CLASS ACTION COMPLAINT

87. Robinhood breached its fiduciary duties to Plaintiffs and Class members by, among other things, failing to disclose in a timely manner that it would cancel and restrict buy orders of the Manipulated Stocks; actually canceling and restricting buy orders; canceling and restricting buy orders of the Manipulated Stocks for its own monetary gain; failing to provide timely access to trading services; failing to timely process securities trades, including taking orders, entering orders, and executing orders; failing to keep records of trades (including attempted trades); and by failing to comply with applicable legal regulatory requirements and industry standards of care, including those set by FINRA and its predecessor authorities; and by making unauthorized transactions on customers' accounts.

88. Robinhood's conduct has caused Plaintiffs' and Class members' harm, losses, and damages and continues to expose them to harm because Robinhood continues to breach its fiduciary duties. These losses reflect damages to Plaintiffs and Class members in an amount to be determined at trial or separate proceedings as necessary.

## COUNT II

### BREACH OF FIDUCIARY DUTY (950 MASS. CODE REGS. 12.200, *et seq.*)
### (ON BEHALF OF THE MASSACHUSETTS SUBCLASS)

89. Plaintiffs hereby incorporate by reference the factual allegations contained herein.

90. Plaintiff Feeney brings this count on behalf of himself and the putative Massachusetts Subclass.

91. As a provider of financial services and a registered securities investment broker-dealer, at all times relevant herein Robinhood was a fiduciary to Plaintiffs and Class members and owed them the highest good faith and integrity in performing its financial services and acting as a securities broker-dealer on their behalf. As a broker-dealer, Robinhood provides

CLASS ACTION COMPLAINT

1    securities trading services by taking, entering, and executing orders, and provides information

2    and advice to customers on investments and investment strategies.

3        92.    Massachusetts' law imposes a fiduciary duty on broker-dealers that requires

4    them to adhere to duties of utmost care and loyalty to clients. The duty of care requires a

5    broker-dealer to use the care, skill, prudence, and diligence that a person acting in a like

6    capacity and familiar with such matters would use, taking into consideration all of the relevant

7    facts and circumstances. The duty of loyalty requires a broker-dealer to: (1) disclose all material

8    conflicts of interest; (2) make all reasonably practicable efforts to avoid conflicts of interest,

9    eliminate conflicts that cannot reasonable be avoided, and mitigate conflicts that cannot

10   reasonably be avoided or eliminated and (3) make recommendations and provide investment

11   advice without regard to the financial or any other interest of any party other than the customer

12       93.    Additionally, because Robinhood provides securities trading services through

13   web and app-based services that accept orders 24 hours a day for execution during trading

14   hours, it maintains a specific fiduciary duty to promptly notify its clients when it will be

15   undertaking extraordinary measures, such as those described herein, that run counter to a

16   client's directions and interests.

17       94.    Robinhood breached its fiduciary duties to Plaintiffs and Class members by,

18   among other things, failing to disclose in a timely manner that it would cancel and restrict buy

19   orders of the Manipulated Stocks; actually canceling and restricting buy orders; canceling and

20   restricting buy orders of the Manipulated Stocks for its own monetary gain; failing to provide

21   timely access to trading services; failing to timely process securities trades, including taking

22   orders, entering orders, and executing orders; failing to keep records of trades (including

23   attempted trades); and by failing to comply with applicable legal regulatory requirements and

24

–30–

industry standards of care, including those set by FINRA and its predecessor authorities; and by making unauthorized transactions on customers' accounts.

95.     Robinhood's conduct has caused Plaintiffs' and Class members' harm, losses, and damages and continues to expose them to harm because Robinhood continues to breach its fiduciary duties. These losses reflect damages to Plaintiffs and Class members in an amount to be determined at trial or separate proceedings as necessary.

**COUNT III**

**BREACH OF CONTRACT**

**(ON BEHALF OF THE NATIONWIDE CLASS)**

96.     Plaintiffs hereby incorporate by reference the factual allegations contained herein.

97.     In order to use the Robinhood trading platform, a potential client must enter into a Customer Agreement with Robinhood.  The agreement is a standardized contract of adhesion imposed on Robinhood's clients as conditions of use and are not subject to negotiation.

98.     Robinhood breached its contracts with clients by failing to disclose in a timely manner that it would cancel and restrict buy orders of the Manipulated Stocks; actually canceling and restricting buy orders; knowingly disadvantaging its clients in a high stakes and fast moving market and hindering their ability to use another platform by leading them to believe that orders would be executed; canceling and restricting buy orders of the Manipulated Stocks for its own monetary gain and at the expense of Plaintiffs and class members; failing to provide timely access to trading services; and by failing to comply with applicable legal regulatory requirements and industry standards of care, including those set by FINRA.

99.     Robinhood's failure to perform and its breaches of the Customer Agreement and applicable contracts resulted in damages and losses to Plaintiffs and Class members and

continues to expose them to harm because Robinhood continues to fail to perform under the Customer Agreement. These losses reflect damages to Plaintiffs and Class members in an amount to be determined at trial.

100.    Additionally, because damages may not be a full and complete remedy due to the ongoing nature of the relationship between the parties and the continuing risk of future harm, Plaintiffs and Class members seek specific performance of the contracts to ensure Robinhood refrains from similar conduct in the future.

## COUNT IV

### BREACH OF IMPLIED COVENANT OF GOOD FAITH & FAIR DEALING

101.    Plaintiffs hereby incorporate by reference the factual allegations contained herein.

102.    As set forth above, Plaintiffs, Class members and Robinhood are parties to the Customer Agreement and related contracts.

103.    Robinhood unfairly interfered with Plaintiffs' and Class members' rights to receive the benefits of the Customer Agreement and related contracts by failing to perform under the contracts. This failure to perform specifically includes, but is not limited to, failing to disclose in a timely manner that it would cancel buy orders of the Manipulated Stocks after Robinhood had told its customers that such orders would be executed. It also includes actually canceling and restricting buy orders; canceling and restricting buy orders of the Manipulated Stocks for its own monetary gain; failing to provide timely access to trading services; failing to timely process securities trades, including taking orders, entering orders, and executing orders; failing to keep records of trades (including attempted trades); and by failing to comply with applicable legal regulatory requirements and industry standards of care, including those set by

CLASS ACTION COMPLAINT

1    FINRA and its predecessor authorities; and by making unauthorized transactions on customers'

2    accounts.

3        104.    To the extent the contract gave Robinhood discretion regarding matters in the

4    foregoing paragraph, Robinhood exercised its discretion in bad faith to maximize its own

5    pecuniary benefit at the expense of Plaintiffs and class members.

6        105.    Robinhood's conduct has breached the implied covenant of good faith and fair

7    dealing because it has caused Plaintiffs and Class members' harm, losses, and damages, and

8    continues to expose them to harm because Robinhood continues to fail to perform under the

9    Customer Agreement. These losses reflect damages to Plaintiffs and Class members in an

10   amount to be determined at trial.

11       106.    Additionally, because damages may not be a full and complete remedy due to the

12   ongoing nature of the relationship between the parties and the continuing risk of future harm,

13   Plaintiffs and Class members seek specific performance of the contracts to ensure Robinhood

14   refrains from similar conduct in the future.

### COUNT V

### NEGLIGENCE

### (ON BEHALF OF THE NATIONWIDE CLASS)

18       107.    Plaintiffs hereby incorporate by reference the factual allegations contained

19   herein.

20       108.    As a provider of financial services and registered securities investment broker-

21   dealer, Robinhood had a duty to exercise reasonable care, skill, and ability in conducting and

22   facilitating financial services and transactions for its customers.

23       109.    Robinhood unlawfully breached its duties by, among other things, failing to

24   disclose in a timely manner that it would cancel and restrict buy orders of the Manipulated

Stocks; actually canceling and restricting buy orders; knowingly disadvantaging its clients in a high stakes and fast moving market and hindering their ability to use another platform by leading them to believe that orders would be executed; canceling and restricting buy orders of the Manipulated Stocks for its own monetary gain and at the expense of Plaintiffs and class members; failing to provide timely access to trading services; and by failing to comply with applicable legal regulatory requirements and industry standards of care, including those set by FINRA.

110.     As set forth below, Robinhood's conduct was so want of even scant care that its acts and omissions were and continue to be an extreme departure from the ordinary standard of conduct, rendering Robinhood not just negligent, but grossly negligent.

111.     Robinhood's negligence and breaches of its duties owed to Plaintiffs and Class members proximately caused losses and damages that would not have occurred but for Robinhood's breach of its duty of due care. These losses reflect damages to Plaintiffs and Class members in an amount to be determined at trial.

## COUNT VI

### GROSS NEGLIGENCE

### (ON BEHALF OF THE NATIONWIDE CLASS)

112.     Plaintiffs hereby incorporate by reference the factual allegations contained herein.

113.     As a provider of financial services and registered securities investment broker-dealer, Robinhood had a duty to exercise reasonable care, skill, and ability in conducting and facilitating financial services and transactions for its customers.

114.     Robinhood unlawfully breached its duties by, failing to disclose in a timely manner that it would cancel and restrict buy orders of the Manipulated Stocks; actually

_____

canceling and restricting buy orders; knowingly disadvantaging its clients in a high stakes and fast moving market and hindering their ability to use another platform by leading them to believe that orders would be executed; canceling and restricting buy orders of the Manipulated Stocks for its own monetary gain and at the expense of Plaintiffs and class members; failing to provide timely access to trading services; and by failing to comply with applicable legal regulatory requirements and industry standards of care, including those set by FINRA.

115. Robinhood's conduct as set forth in this Complaint was want of even scant care and its acts and omissions were and continue to be an extreme departure from the ordinary standard of conduct. Robinhood manipulated the market to disadvantage Plaintiffs and class members so that it could shore up its own balance sheet and satisfy its monetary obligations including to the DTCC. Robinhood's reckless disregard for its customers continues to fall so far below the standard of care required of it that it constitutes gross negligence.

116. Robinhood's gross negligence and breaches of its duties owed to Plaintiffs and Class members proximately caused their losses and damages that they would not have occurred but for Robinhood's gross breaches of its duty of due care. These losses reflect damages to Plaintiffs and Class members in an amount to be determined at trial.

## COUNT VII

### VIOLATIONS OF THE CALIFORNIA UNFAIR COMPETITION LAW

### (Cal. Bus. & Prof. Code § 17200, et seq.) ("UCL")

### (ON BEHALF OF THE NATIONWIDE CLASS)

117. Plaintiffs hereby incorporate by reference the factual allegations contained herein.

118. Robinhood has engaged in unfair competition within the meaning of California Business & Professions Code section 17200, *et seq.*, because Robinhood's conduct is unlawful and unfair as herein alleged.

CLASS ACTION COMPLAINT

119. Plaintiffs, the members of the Class, and Robinhood are a "person" or "persons," within the meaning of Section 17201 of the California Unfair Competition Law ("UCL").

120. The UCL prohibits any unlawful and unfair business practices or acts. Robinhood's conduct, as alleged herein, constitutes an unlawful and unfair business practice that occurred in connection with the provision of its financial and investment broker services.

121. **Unlawful prong:** Robinhood's conduct, as described within, violated the UCL's unlawful prong because it: (1) constitutes negligence and/or gross negligence; (2) constitutes a breach of fiduciary duty; (3) constitutes a breach of contract and/or a breach of the implied covenant of good faith and fair dealing; (4) it violated applicable regulatory laws and guidance including from the SEC and FINRA such as FINRA Rule 5310 which requires best execution of orders fully and promptly; and (5) has unlawfully and unjustly enriched Robinhood.

122. **Unfair prong:** Robinhood's conduct, as described within, violated the UCL's unfair prong because its conduct violates established public policy intended to regulate financial services to consumers, and because it is immoral, unethical, oppressive, or unscrupulous and has caused injuries to the Plaintiffs and the Class that outweigh any purported benefit. The utility of Robinhood's conduct to subordinate the financial interests of its clients to its own financial interests – including through the unilateral cancelation or sale of Manipulated Stocks is far outweighed by the gravity of harm to consumers who have now incurred losses and damages they would not have otherwise.

123. Plaintiffs have standing to pursue this claim because they have been injured by virtue of suffering a loss of money and/or property as a result of the wrongful conduct alleged herein.

124. The UCL is, by its express terms, a cumulative remedy, such that remedies under its provisions can be awarded in addition to those provided under separate statutory schemes

CLASS ACTION COMPLAINT

1    and/or common law remedies, such as those alleged in the other Counts of this Complaint.  See

2    Cal. Bus. & Prof. Code § 17205.

3        125.    As a direct and proximate cause of Robinhood's conduct, which constitutes

4    unlawful and unfair business practices, as herein alleged, Plaintiffs and Class members have

5    been damaged and suffered ascertainable losses, thereby entitling them to recover restitution

6    and equitable relief, including disgorgement or ill-gotten gains, refunds of moneys, interest,

7    reasonable attorneys' fees, filing fees, and the costs of prosecuting this class action, as well as

8    any and all other relief that may be available at law or equity.  Additionally, because Plaintiffs

9    and Class members continue to have accounts and investments with Robinhood and intend to

10   use Robinhood's services in the future, injunctive relief is warranted.

11                          **COUNT VIII**

12                      **UNJUST ENRICHMENT**

13          **(ON BEHALF OF THE NATIONWIDE CLASS)**

14       126.    Plaintiffs hereby incorporate by reference the factual allegations contained

15   herein.

16       127.    By its wrongful conduct described herein, Robinhood has obtained a benefit

17   from Plaintiffs and Class members that includes, but is not limited to, satisfying financial

18   obligations imposed by the DTCC, saving likely hundreds of millions of dollars in costs relating

19   to call options on the Manipulated Stocks, and reducing the costs of shorting the Manipulated

20   Stocks, which benefited Robinhood's close institutional partners and reduced Robinhood's

21   exposure to short positions. Robinhood also continues to maintain accounts for Plaintiffs and

22   class members, receiving their personal data, receiving payments for order flow, maintaining

23   deposited funds, charging and/or receiving interest on accounts and margin balances, charging

24   and/or receiving fees, commissions and Gold Membership fees, and increased capital

–37–

1  fundraising due to the high number of new and continuing users of its platform, which also

2  drives up Robinhood's valuation.

3       128.    Since Robinhood's profits, benefits, and other compensation were obtained by

4  improper means, Robinhood was unjustly enriched at the expense of Plaintiffs and Class

5  members and is not legally or equitably entitled to retain any of the benefits, compensation or

6  profits it realized.

7       129.    Plaintiffs and Class members seek an order of this Court requiring Robinhood to

8  refund, disgorge, and pay as restitution any profits, benefits, and other compensation obtained

9  by Robinhood from its wrongful conduct and/or the establishment of a constructive trust from

10  which Plaintiffs and Class members may seek restitution.

11  **PRAYER FOR RELIEF**

12  WHEREFORE, Plaintiffs pray for judgment against Robinhood, as follows:

13      a.   For an order certifying the proposed class and subclass and appointing Plaintiffs

14          and their counsel to represent the class and subclass;

15      b.   Finding that Robinhood's conduct violates the statutes and laws referenced herein;

16      c.   Finding in favor of Plaintiffs, the Class, and Subclass on all counts asserted herein;

17      d.   Granting restitution, disgorgement and other equitable monetary relief to

18          Plaintiffs, the Class, and Subclass;

19      e.   Granting declaratory and injunctive relief to enjoin Robinhood from engaging in

20          the unlawful practices described in this complaint;

21      f.   Granting compensatory damages, the amount of which is to be determined at trial

22          or through another separate proceeding;

23      g.   Granting pre- and post-judgment interest on all amounts awarded;

24      h.   Granting injunctive relief as pleaded or as the Court may deem proper;

CLASS ACTION COMPLAINT

i.   Awarding Plaintiffs and the class members reasonable attorneys' fees and costs of suit, including expert witness fees; and

j.   For an order awarding such other and further relief as this Court may deem just and proper.

### DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury on all issues so triable.

Dated: February 2, 2021

By:   */s/ Selin Demir*

Selin Demir, Esq. (SBN 331418)
**MIGLIACCIO & RATHOD LLP**
388 Market Street, Suite 1300
San Francisco, CA 94111
Tel: (415) 489-7004

Nicholas A. Migliaccio, Esq.*
Jason S. Rathod, Esq.*
Bryan Faubus, Esq.
**MIGLIACCIO & RATHOD LLP**
412 H Street N.E.,
Washington, DC 20002
Tel: (202) 470-3520

* *pro hac vice* anticipated

*Attorneys for Plaintiff*

CLASS ACTION COMPLAINT

# EXHIBIT 7

SOLOMON B. CERA (Bar No. 099467)
PAMELA A. MARKERT (Bar No. 203780)
CERA LLP
595 Market St. Suite 1350
San Francisco, CA 94105
Telephone: +1 (415) 777-2230
Fax: +1 (415) 777-5189
Email: scera@cerallp.com
Email: pmarkert@cerallp.com

JEFFREY A. KLAFTER (*pro hac vice to be requested*)
AMIR ALIMEHRI (*pro hac vice to be requested*)
KLAFTER OLSEN & LESSER LLP
2 International Drive, Suite 350
Rye Brook, New York
Telephone: +1 (914) 934-9200
Fax: +1 (914) 934-9220
Email: jak@klafterolsen.com
Email: amir.alimehri@klafterolsen.com

*Counsel for Plaintiffs and the Proposed Class*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PATRYK KRASOWSKI and NICK PARKER, on behalf of themselves and all others similarly situated, | Case No. 21-cv-00758 |
| Plaintiffs, | **CLASS ACTION COMPLAINT** |
| | **JURY TRIAL DEMANDED** |
| v. | |
| ROBINHOOD FINANCIAL LLC; ROBINHOOD SECURITIES LLC; CITADEL SECURITIES LLC; CITADEL ENTERPRISE AMERICAS LLC F/K/A CITADEL LLC | |
| Defendants. | |

Plaintiffs Patryk Krasowski and Nick Parker, by and through their undersigned counsel, bring this action against Defendants Robinhood Financial LLC and Robinhood Securities LLC, (together, "Robinhood"), and Citadel Securities LLC ("Citadel Securities") and Citadel Enterprise Americas LLC f/k/a Citadel LLC ("Citadel"), (collectively with Robinhood, "Defendants") and allege as follows based upon information and belief, except as to the allegations specifically pertaining to them, which are based on personal knowledge.

## NATURE OF THE ACTION

1.      This is a class action lawsuit on behalf of: (1) all Robinhood customers who owned any of the Restricted Securities listed below or options to buy such securities up until the time Robinhood began restricting "buy" orders on the Restricted Securities, and who have been damaged and continued to be damaged by Robinhood's initial blocking of, and now significant limitation on, any purchases of the Restricted Securities; (2) all Robinhood customers whose sales of any Restricted Securities were delayed by Robinhood and were damaged thereby; and (3) all Robinhood customers who were unable to purchase any Restricted Securities on January 28, 2021 and those subject to any limitations Robinhood continues to impose on any of the Restricted Securities who were harmed.  The Restricted Securities are:  AAL, AMC, BB, BBBY, CTRM, EXPR, GME, KOSS, NAKD, NOK, SNDL, TR, and TRVG, (collectively, "Restricted Securities").

## PARTIES

2.      Plaintiff Patryk Krasowski is a citizen of Illinois.  As of the close on January 27, 2021, Plaintiff Kasowski held 9 options to buy GME (GameStop Corp.) at $170 per share and GameStop opened on January 28 at $265 per share and rose to $469 at 10 AM when Robinhood's actions, as alleged herein drove GameStop stock down to $197 per share, Plaintiff could not exercise the options and had to sell them resulting in Plaintiff losing approximately $220,000.00. Plaintiff Krasowski also owned 6 call options to purchase GameStop at $60.  Just before Robinhood restricted purchases of GameStop stock, this position could have been exercised and proceeds realized of approximately $400,000.00, but Plaintiff was blocked from exercising these calls.  This position is now worth $200,000.

3.     Plaintiff Nick Parker is a citizen of Georgia.  As of the open of trading on January 28, 2021, Plaintiff Parker held 0.050654 shares of GME (GameStop Corp.), which shares similarly plummeted in value, and further Plaintiff was prevented by Defendants from purchasing additional shares freely on January 28, 2021 to the present.

4.     Defendant Robinhood Financial LLC ("Robinhood Financial") is a Delaware corporation with its principal place of business at 85 Willow Road, Menlo Park, CA 94025. Robinhood Financial is an introducing broker-dealer registered with the Securities and Exchange Commission and provides online and mobile application-based discount stock brokerage services. Robinhood Financial routes 100% of it orders to the market through its affiliate Robinhood Securities LLC.

5.     Defendant Robinhood Securities LLC ("Robinhood Securities") is a Delaware corporation with its principal place of business at 85 Willow Road, Menlo Park, CA 94025. Robinhood Securities is an affiliate of Robinhood Financial and is the custodian and servicer of brokerage accounts on the Robinhood platform.  Robinhood Securities executes, clears, and settles trades occurring on the Robinhood brokerage platform.  It also prepares and distributes account statements and trade confirmations, and extends credit to margin accounts.

6.     Robinhood Financial and Robinhood Securities are collectively referred to as "Robinhood."

7.     Defendant Citadel Securities LLC ("Citadel Securities") is a Delaware corporation with its principal place of business at 131 South Dearborn Street, Chicago, IL 60603.  Citadel Securities provides market-making services to Robinhood through its Citadel Execution Services line of business.

8.     Defendant Citadel Enterprise Americas LLC f/k/a Citadel LLC ("Citadel") is a Delaware corporation with its principal place of business at 131 South Dearborn Street, Chicago, IL 60603.  Citadel provides operational and administrative services to Citadel Securities.  Citadel also has its Global Controller sign off on Annual Broker Dealer Reports with the SEC for Citadel Securities.  Citadel Securities and Citadel operate their trademarks under the common ownership and control of Citadel LLC n/k/a Citadel.

1      9.     Citadel Securities and Citadel are collectively referred to as "Citadel."

2

3                         **JURISDICTION AND VENUE**

4      10.    The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2)(A),

5 as modified by the Class Action Fairness Act of 2005, because at least one member of the Class,

6 as defined below, is a citizen of a different state than Defendants, there are more than 100

7 members of the Class, and the aggregate amount in controversy exceeds $5,000,000 exclusive of

8 interests and costs.

9      11.    This Court has personal jurisdiction over Defendants because Robinhood

10 maintains their principal place of business in this District, and Citadel conducts business in this

11 District.

12     12.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because Defendants

13 reside and conduct business in this District.

14                          **FACTUAL ALLEGATIONS**

15     13.    Plaintiff and Class Members are clients and users of the Robinhood platforms.

16 They buy and sell securities, including the Restricted Securities.

17     14.    Robinhood's Mission Statement is "to democratize finance for all. We believe that

18 everyone should have access to the financial markets, so we've built Robinhood from the ground

19 up to make investing friendly, approachable, and understandable for newcomers and experts

20 alike." As a result of this Mission Statement, the ease of its trading platform and the ability to

21 trade fractional shares for as little as one dollar, Robinhood had grown to about 13 million

22 customers in 2020. Contrary to its mission of providing a democratized trading platform that

23 provided everyone unfettered access to the financial markets, commencing on January 28, 2021,

24 Robinhood would not allow any of its customers to purchase any of the Restricted Securities,

25 options on such securities or exercise options to purchase any of these securities and, as of

26 January 29, 2021, only allows extremely limited buying of the Restricted Securities.

27 Robinhood's actions in choking off purchases of the Restricted Securities and only allowing sales

28 has caused them to lose significant value to the detriment of members of the Class.

15. Although Robinhood customers have been bullish about the Restricted Securities and have been driving them higher, these higher prices squeezed hedge funds and other Wall Street investors who were betting on a decline of the share prices of Restricted Securities. Among the victims of this short squeeze was Defendant Citadel. Robinhood routes over 50% of customer orders to the market through Citadel Securities. Citadel Securities is the primary market-maker for Robinhood, providing liquidity for over half of the trades entered on the Robinhood platform. As part of this relationship, Robinhood receives revenue from Citadel for directing its order flow to Citadel. For example, as of June 2020, Robinhood received $39 million in revenue from order flows directed to Citadel, which represents over 35% of Robinhood's platforms' revenues.

16. Citadel is also an investor in Melvin Capital Management LP, an investment advisor that had a significant short position in GME (GameStop Corp.), one of the Restricted Securities. Melvin Capital was pressured to close out its entire short position on the afternoon of Tuesday, January 26, 2021, given the extreme buy-side volume. Though the precise dollar amount of its loss has yet to be disclosed, it was a significant loss. It has been reported that Melvin Capital has lost nearly 30% since the start of 2021.

17. The loss to Melvin Capital on this GME (GameStop Corp.) short squeeze was so large that later that on January 25, 2021, it reportedly desperately obtained a cash infusion of nearly $3 billion from Citadel and another investment firm, Point72, with both firms taking non-controlling revenue shares in Melvin Capital.

18. Defendant Citadel also took short positions in many of the Restricted Securities immediately prior to the imposition of the restrictions on the Restricted Securities.

19. Another hedge fund adversely impacted by this short squeeze is D1 Capital Partners, which is a large investor in Robinhood, having recently invested $200 million in a Series G capital raising, bringing Robinhood's valuation to $11.7 billion. Betting AMC would decline, D1 Capital Partners was down 20% of its $20 billion dollar portfolio. The restrictions Robinhood imposed and continues to impose depressed AMC stock from $19.88 at the close on

January 27 to an $8.63 close on January 28, thereby allowing D1 Capital Partners to exit its short positions with minimal losses.

20.     The restrictions Robinhood commenced imposing on January 28, 2021 were to benefit these and potentially other financial partners, who were under no restrictions as to the Restricted Securities.  Robinhood has therefore become the Sheriff of Nottingham!

21.     Robinhood announced on the morning of January 28, 2021 that it would be restricting certain trading on the Restricted Securities.  Within minutes of the announcement, the share price of each of the Restricted Securities fell significantly, due to a severe drop in "BUY" demand and a resultant "SELL"-heavy market.

22.     Robinhood restricted purchases of the following securities:

    a.     AAL (American Airlines Group Inc.)



;

    b.     AMC (AMC Entertainment Holdings Inc.)



;

    c.     BB (Blackberry Ltd.)



;

CLASS ACTION COMPLAINT

d.  BBBY (Bed Bath & Beyond Inc.)



;

e.  CTRM (Castor Maritime Inc.)



;

f.  EXPR (Express, Inc.)



;

g.  GME (GameStop Corp.)



;

h.  KOSS (Koss Corporation)



;

CLASS ACTION COMPLAINT

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

      i.   NAKD (Naked Brand Group Ltd.)



;

      j.   NOK (Nokia Oyj)



;

      k.   SNDL (Sundial Growers Inc.)



;

      l.   TR (Tootsie Roll Industries, Inc.)



; and

      m.  TRVG (Trivago NV – ADR)



.

CLASS ACTION COMPLAINT

23.     As is readily apparent, the Restricted Securities all had the same consistent significant decline in share price following Robinhood's revocation of Plaintiffs' and the Class's ability to "BUY" shares of the Restricted Securities and only sell them. Many such sales initiated by members of the Class were delayed by Robinhood as the share prices were declining imposing additional damage on such Class members.

24.     Many, if not all, of the Restricted Securities had large volumes of orders placed through Robinhood in the preceding days before Robinhood restricted purchases of the Restricted Securities. As a result, when Robinhood restricted "BUY" orders on the Restricted Securities, it resulted in a "SELL"-heavy market, thereby deflating the price of the shares since buy orders placed by Robinhood customers on the evening of January 27 were cancelled by Robinhood and no further "BUY" orders were able to placed on January 28.

25.     Later that day, after the market had closed and the dust had settled and millions (if not billions) of dollars were lost by the Class, Robinhood issued an announcement that the following trading day it would now ALLOW "limited buys of the[] [Restricted Securities]."

26.     To be sure, the overall market did not react the same way the Restricted Securities did on January 28, 2021:

   a.   Dow Jones Industrial Average



;

   b.   S&P 500



; and

CLASS ACTION COMPLAINT

c. Nasdaq Inc.



27.     Not surprisingly, Robinhood users expressed their outrage when they realized they were restricted from trading freely on Robinhood platforms in the Restricted Securities even though hedge funds and Wall Street traders were and remain free to trade the Restricted Securities and options on them, without limitation.

28.     Plaintiffs and the Class members are therefore entitled to damages to be proven at trial for the amounts they lost as a result of their securities values being depressed or for their losses incurred in selling the Restricted Securities at a loss and entitled to injunctive relief requiring Robinhood to lift all restrictions on trading the Restricted Securities.

## **CLASS ACTION ALLEGATIONS**

29.     Plaintiffs bring this case individually and pursuant to Rule 23(b)(3) and (b)(2) of the Federal Rules of Civil Procedure, on behalf of the following classes (the "Damages Class"):

(a)     all Robinhood customers who owned any of the Restricted Securities listed below or options to buy such securities up until the time Robinhood began restricting "buy" orders on the Restricted Securities, and who have been damaged and continued to be damaged by Robinhood's initial blocking of, and now significant limitation on, any purchases of the Restricted Securities; (2) all Robinhood customers whose sales of any Restricted Securities were delayed by Robinhood and were damaged thereby; and (3) all Robinhood customers who were unable to purchase any Restricted Securities on January 28, 2021 and those subject to any limitations Robinhood continues to impose on any of the Restricted Securities who were harmed.  The Restricted Securities are:  AAL, AMC, BB, BBBY, CTRM, EXPR, GME, KOSS, NAKD, NOK, SNDL, TR, and TRVG (the "Damages Class")

(b)     all Robinhood customers who were unable to purchase any Restricted Securities on January 28, 2021 and those subject to any limitations Robinhood continues to impose on any of the Restricted Securities.  (the "Injunctive Class")

1   Collectively, the "Classes".

2       30.     This action has been brought and may properly be maintained on behalf of the Class

3   proposed herein under the criteria of Rule 23 of the Federal Rules of Civil Procedure.

4       31.     The requirements of Rule 23(a)(1) have been met.  The Classes are so numerous

5   that joinder of all members is impracticable.  Although the precise number of Class members is

6   unknown to Plaintiffs, Robinhood has over ten million users of its platforms and the millions of

7   shares in the Restricted Securities traded on January 27, 2021 alone.  Robinhood is generally

8   home to a significant volume of investors of the Restricted Securities.  For example, it is

9   estimated that approximately 50% of Robinhood's 13 million users own shares of GME

10  (GameStop Corp.).  The identity of all members of the Classes is known to Robinhood and can be

11  identified through their records.  All members of the Classes may be notified of the pendency of

12  this action by recognized, Court-approved notice dissemination methods, which may include U.S.

13  Mail, electronic mail, Internet postings, and/or published notice.

14      32.     The requirements of Rule 23(a)(2) have been met.  There are questions of law and

15  fact common to the members of the Classes including, without limitation:

16          a.      Whether Robinhood owed Plaintiffs and the members of the Classes a

17      fiduciary duty;

18          b.      Whether Robinhood breached its fiduciary duty to Plaintiffs and the

19      members of the Classes due to its restrictions on purchases of any of the Restricted

20      Securities;

21          c.      Whether Citadel aided and abetted Robinhood in breaching its fiduciary

22      duty to Plaintiffs and the members of the Classes when Citadel induced, encouraged, and

23      pressured Robinhood to restrict purchase orders of the Restricted Securities;

24          d.      The amount of damages and other relief to be awarded to Plaintiffs and the

25      members of the Damage Class; and

26          e.      Whether the Plaintiffs and the members of the Injunctive Class are entitled

27      to an injunction requiring Robinhood to lift all restrictions on trading the Restricted

28      Securities.

33.     The requirements of Rule 23(a)(3) have been met.  Plaintiffs' claims are typical of the claims of the members of the Classes because Plaintiffs and the other members of the Classes each were owed fiduciary duties from Defendants to not suffer an interference in their ability to buy shares in the Restricted Securities.

34.     The requirements of Rule 23(a)(4) have been met.  Plaintiffs are adequate class representatives because their interests do not conflict with the interests of the other members of the Classes who they seek to represent, Plaintiffs have retained competent counsel who are experienced in complex class action litigation, and Plaintiffs intend to prosecute this action vigorously.  The interests of the members of the Classes will be fairly and adequately protected by Plaintiffs and their counsel.

35.     Class certification of Plaintiffs' claims is also appropriate pursuant to Rule 23(b)(3) because the above questions of law and fact that are common to the Damage Class predominate over questions affecting only individual members of the Damage Class, and because a class action is superior to other available methods for the fair and efficient adjudication of this litigation.  It would be virtually impossible for the Damage Class members, on an individual basis, to obtain effective redress for the wrongs committed against them.  Furthermore, individualized litigation would create the danger of inconsistent or contradictory judgments arising from the same set of facts.  Individualized litigation would also increase the delay and expense to all parties and the court system from the issues raised by this action.  By contrast, the class action device provides the benefits of adjudication of these issues in a single proceeding, economies of scale, and comprehensive supervision by a single court

36.     Class certification of Plaintiffs' claims is appropriate pursuant to FED. R. CIV. P. 23(b)(2) because Robinhood has acted or refused to act on grounds generally applicable to the members of the Injunctive Class, making appropriate both declaratory and injunctive relief with respect to the Injunctive Class under the causes of action set forth herein, which are alleged in the alternative.  The members of the Injunctive Class are also entitled to injunctive relief to end Robinhood's common and uniform restrictive trading policy under the claims set forth herein.

37. Plaintiffs know of no difficulty that would be encountered in the management of this litigation that would preclude its maintenance as a class action.

## FIRST CLAIM FOR RELIEF

### BREACH OF FIDUCIARY DUTY
### (Against Robinhood)

38. Plaintiffs repeat and re-allege the allegations in Paragraphs 1-28, above, as if fully alleged herein.

39. Plaintiffs bring this claim individually and on behalf of the members of the Classes.

40. Robinhood owed a fiduciary duty to its customers to, among other things, provide an open trading platform free of self-imposed trading restrictions.

41. Robinhood breached those fiduciary duties by imposing the trading restrictions alleged herein to benefit Citadel, D1 Capital Partners and possibly others. Such actions were contrary to the interests of Plaintiffs and the members of the Classes.

42. Consequently, Plaintiffs and the members of the Damages Class have suffered damages amounting to hundreds of millions of dollars and Plaintiffs and the members of the Injunctive Class have been denied a trading platform free of restrictions on the Restricted Securities and are entitled to declaratory and injunctive relief.

## SECOND CLAIM FOR RELIEF

### AIDING AND ABETTING BREACH OF FIDUCIARY DUTY
### (Against Citadel)

43. Plaintiffs repeat and re-allege the allegations in Paragraphs 1 -28, above, as if fully alleged herein.

44. Citadel owed a duty to Plaintiffs and the Damages Class by virtue of serving as the market maker for a significant portion of their trades on the Robinhood platforms.

45. Citadel knew Robinhood had a fiduciary duty to Plaintiff and the Class to allow for the free-flow and uninterrupted placement and execution of purchase orders of the Restricted Securities.

46.     Citadel is Robinhood's primary market maker and is well aware of the requirements for providing liquidity and for Robinhood allowing unrestricted purchases of the Restricted Securities.

47.     Citadel, having a financial incentive to do so, as well as financial leverage over Robinhood, given the significant revenue stream for Robinhood from Citadel, induced, encouraged, and pressured Robinhood to restrict purchase orders of the Restricted Securities.

48.     Without Citadel's inducement, encouragement, and undue pressure on Robinhood to restrict purchase orders on Restricted Securities, Robinhood would likely have continued to allow the free-flow of purchase orders of the Restricted Securities, as it had allowed in the previous days and weeks despite the same or similar levels of volatility and market participation.

49.     Accordingly, Citadel aided and abetted Robinhood's breach of its fiduciary duties to Plaintiffs and the Classes.

### THIRD CLAIM FOR RELIEF

**NEGLIGENCE**
**(Against Robinhood)**

50.     Plaintiffs repeat and re-allege the allegations in Paragraphs 1-48 above, as if fully alleged herein.

51.     As a provider of financial services and registered securities investment broker-dealer, Robinhood had a duty to exercise reasonable care, skill, and ability in conducting and facilitating financial services and transactions for its customers.

52.     Robinhood unlawfully breached its duties by, among other things, filing to maintain a reliably functioning electronic trading platform with sufficient operating capability and adequate infrastructure to process customer transactions, including during volatile and high-volume trading sessions; by failing to adequately design, test, and monitor its infrastructure necessary to timely process customers' transactions; by failing to timely process securities trades, including taking orders, entering orders, and executing orders; by failing to comply with applicable legal regulatory requirements and industry standards of care, including those set by FINRA.

53.    Robinhood's conduct was so want of care that its acts and omissions were and continue to be an extreme departure from the ordinary standard of conduct, rendering Robinhood not just negligent, but grossly negligent.

54.    Robinhood's negligence and breaches of its duties owed to Plaintiffs and Class members proximately caused losses and damages that would not have occurred but for Robinhood's breaches of its duty of due care.  These losses reflect damages to Plaintiffs and Class members in an amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that judgment be entered in favor of Plaintiffs and the members of the Classes against Defendants as follows:

(a)    For an order certifying the Damages Class under Rule 23 and 23(b)(3) of the Federal Rules of Civil Procedure and naming Plaintiffs as representatives of the Damages Class and Plaintiffs' attorneys as class counsel to represent the Damages Class;

(b)    For an order certifying the Injunctive Class under Rule 23 and 23(b)(2) of the Federal Rules of Civil Procedure and naming Plaintiffs as representatives of the Injunctive Class and Plaintiffs' attorneys as class counsel to represent the Injunctive Class;

(c)    For an order finding in favor of Plaintiffs and the Classes on all counts asserted herein;

(d)    For compensatory damages in an amount to be determined by the trier of fact;

(e)    For injunctive and declaratory relief against Robinhood to lift all trading restrictions on the Restricted Securities;

(f)    Awarding Plaintiff's reasonable attorneys' fees, costs, and expenses;

(g)    Awarding pre- and post-judgment interest on any amounts awarded; and,

(h)    Awarding such other and further relief as may be just and proper.

## DEMAND FOR TRIAL BY JURY

Pursuant to the Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of

any and all issues in this action so triable of right.

DATED: January 29, 2021          **CERA LLP**

By: /s/ *Solomon B. Cera*
     Solomon B. Cera

SOLOMON B. CERA (Bar No. 099467)
PAMELA A. MARKERT (Bar No. 203780)
595 Market St. Suite 1350
San Francisco, CA 94105
Telephone: +1 (415) 777-2230
Fax: +1 (415) 777-5189
Email: scera@cerallp.com
Email: pmarkert@cerallp.com

**KLAFTER OLSEN & LESSER LLP**
JEFFREY A. KLAFTER (*pro hac vice to be requested*)
AMIR ALIMEHRI (*pro hac vice to be requested*)
2 International Drive, Suite 350
Rye Brook, New York
Telephone: +1 (914) 934-9200
Fax: +1 (914) 934-9220
Email: jak@klafterolsen.com
Email: amir.alimehri@klafterolsen.com

*Counsel for Plaintiffs and the Proposed Class*