# EXHIBIT 8

**BURSOR & FISHER, P.A.**
L. Timothy Fisher (State Bar No. 191626)
1990 North California Boulevard, Suite 940
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
E-Mail: ltfisher@bursor.com

**BURSOR & FISHER, P.A.**
Andrew J. Obergfell*
888 Seventh Avenue
New York, NY 10019
Telephone: (646) 837-7150
Facsimile: (212) 989-9163
E-Mail: aobergfell@bursor.com

*\* Pro Hac Vice Application Forthcoming*

*Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JORDAN KRUMENACKER, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>ROBINHOOD FINANCIAL, LLC, a Delaware LLC, ROBINHOOD SECURITIES, LLC a Delaware LLC, ROBINHOOD MARKETS, INC., a Delaware Corporation, and CHARLES SCHWAB & CO., INC., a California Corporation,<br><br>Defendants. | Case No.<br><br>**CLASS ACTION COMPLAINT**<br><br><u>**JURY TRIAL DEMANDED**</u> |

Plaintiff Jordan Krumenacker ("Plaintiff"), individually and on behalf of all others similarly situated, by and through his attorneys, makes the following allegations pursuant to the investigation of his counsel and based upon information and belief, except as to allegations specifically pertaining to himself and his counsel, which are based on personal knowledge.

## NATURE OF THE ACTION

1.      This is a class action brought against Robinhood Financial, LLC ("Robinhood Financial"), Robinhood Securities, LLC ("Robinhood Securities"), Robinhood Markets, Inc. ("Robinhood Markets") (collectively, "Robinhood"), and Charles Schwab & Co., Inc. ("Charles Schwab") (collectively, "Defendants") for prohibiting their customers from buying multiple publicly traded stock options, including but not limited to GameStop ("GME"), AMC Entertainment ("AMC"), Nokia ("NOK"), BlackBerry Limited ("BB"), Bed Bath & Beyond ("BBBY"), Express ("EXPR"), Koss Corporation ("KOSS"), and Naked Brand Group ("NAKD") (collectively, the "Stocks"), during an unprecedented rise in valuation for the aforementioned Stocks.

2.      Robinhood is a multi-billion-dollar online brokerage firm founded in 2013. Robinhood's popularity has soared among retail investors and currently has an estimated 13 million active users.  However, none of these users were able to purchase the publicly traded Stocks on Defendant's platform during the dates in question.

3.      Charles Schwab is a multi-billion-dollar brokerage firm founded in 1971.  Charles Schwab has an estimated 30 million accounts.  However, none of these users were able to purchase the publicly traded Stocks on Defendant's platform during the dates in question.

4.      Defendants actions not only deprived their customers from taking advantage of the rise of the Stocks valuation but also manipulated the free and open market, causing a substantial decrease in the Stocks valuation, all in violation of federal securities laws and state common law.

5.      Specifically, the story begins with a "short" position held by major hedge funds, most notably hedge fund Melvin Capital Management, on GameStop Corp. stock (ticker

"GME").[1]  A "short" position is where a market participant, anticipating a certain security will decrease in value, borrows shares of the security and sells the borrowed shares at market price, with the goal of repurchasing the shares back at a later date at a lesser value, thereby pocketing the difference.

6.      However, this was no ordinary short sale, because the short interest in GME was *well over 100% of the shares of the stock that existed in the market*.  As Forbes noted:  "Indeed, Short interest for GameStop is estimated at almost 140% of its float[2]. That's extremely high. Short interest for Bed Bath and Beyond and AMC is at close to 70%. These are big numbers, typically short interest of 20% would be considered high. These stocks have massive short interest."[3]  This means that as it relates to GME, there was a claim on more than 100% of the shares in short positions alone, let alone call options coming to fruition and daily purchases of shares.

7.      This overexposure of short sellers created a unique opportunity for other investors to effectuate a "short squeeze," wherein a competing group of investors could purchase large volumes of shares of the stock, causing the stock price to increase rapidly.  When the stock price surges upward, it causes the short investor higher and higher potential losses, and incentivizes the short seller to abandon the short position, buy back the stock, and "close" their short position. The rapid buying to effectuate the "short squeeze" also limits supply of the outstanding stock that the short investor can buy back to cover their short positions.

8.      This is exactly what happened, albeit from an unlikely source, to wit a large group of retail investors marshalled to action through Reddit forums and other social media platforms,

---

[1] https://www.businessinsider.com/melvin-capital-lost-53-percent-january-after-gamestop-shares-skyrocketed-2021-1 (last visited 1/31/21).
[2] The term "float" refers to all the shares in existence.
[3] https://www.forbes.com/sites/simonmoore/2021/01/25/after-sky-rocketing-gamestops-short-squeeze-saga-continues-but-its-less-unusual-than-you-might-think/?sh=5ec5d6e25083 (last visited 1/31/21).

many of whom use Robinhood and Charles Schwab to effectuate their purchases of GME and the rest of the Stocks.

9.     The short squeeze was sensationally effective, causing the price of GME to soar more than 1,500% this year.[4]  Correspondingly, hedge funds that were short on GameStop recorded losses to the tune of approximately $19 billion.[5]  The other Stocks showed similar trends.

10.     This chain of events placed tremendous pressure on Robinhood, which ultimately chose to unlawfully manipulate the market to the detriment of retail investors, including Plaintiff and Class members.

11.     The short squeeze threatened the solvency of hedge funds heavily short GME, who otherwise would be in the market to buy back as many shares as possible of GME to cover their short positions (i.e. return the shares that they borrowed).  Thus, the hedge funds would be required to cover their own losses.  But if they default, the losses would have to be covered by the clearinghouses, which have default funds to ameliorate such risks.

12.     Clearinghouses "stand between two parties in a trade to guarantee payment if either side reneges."[6]  To protect against default risk, "clearinghouses require their members — banks and brokers — to be well-capitalized, to deposit collateral and to pay into a default fund."[7]  If the broker (i.e. Robinhood) cannot collect from the losers on the short side, then it "must have sufficient capital to cover losses to the clearinghouse."[8]  As such, Robinhood itself was at risk

---

[4] https://markets.businessinsider.com/news/stocks/short-sellers-sitting-on-19-billion-of-losses-on-gamestop-data-shows-2021-1-1030020684 (last visited 1/31/21).
[5] *Id.*
[6]
https://www.marketwatch.com/discover?url=https%3A%2F%2Fwww.marketwatch.com%2Famp%2Fstory%2Fpeterffy-calls-robinhood-decision-to-allow-limited-buys-of-gamestop-troubling-im-not-comfortable-11611876619&link=sfmw_tw#https://www.marketwatch.com/amp/story/peterffy-calls-robinhood-decision-to-allow-limited-buys-of-gamestop-troubling-im-not-comfortable-11611876619?mod=dist_amp_social (last visited 1/31/21).
[7] *Id.*
[8] *Id.*

because it had to raise large amounts of money due to the volatility of the Stocks. Both CNBC and Bloomberg News reported that Robinhood had tapped each of its credit lines.[9]

13. Robinhood itself admits this. In its "Under The Hood" blog, Robinhood explained:

> Clearinghouses are SEC-registered organizations that act as the central depository for securities. They keep a record of the stocks owned through a brokerage. Clearing brokerages, like Robinhood Securities, are members of clearinghouses. These clearinghouses have membership rules, approved by the SEC, that govern the activity of their members. Clearinghouses establish financial requirements for members including deposit requirements designed to reduce risk to the clearinghouse.

> . . .

> The amount required by clearinghouses to cover the settlement period of some securities rose tremendously this week. How much? To put it in perspective, this week alone, our clearinghouse-mandated deposit requirements related to equities increased ten-fold. And that's what led us to put temporary buying restrictions in place on a small number of securities that the clearinghouses had raised their deposit requirements on.

> It was not because we wanted to stop people from buying these stocks. We did this because the required amount we had to deposit with the clearinghouse was so large—with individual volatile securities accounting for hundreds of millions of dollars in deposit requirements—that we had to take steps to limit buying in those volatile securities to ensure we could comfortably meet our requirements. [10]

14. Faced with these hazards, someone had to lose, the overly shorted hedge funds, Robinhood, or the ordinary retail investor. Robinhood made the executive decision that the ordinary retail investor should lose, and unlawfully manipulated the market to restrict buying of

---

[9] *Id.*; https://www.cnbc.com/2021/01/28/robinhood-will-allow-limited-buying-of-restricted-securities-friday-gamestop-jumps-after-hours.html (last visited 1/31/21); https://www.bloomberg.com/news/articles/2021-01-28/robinhood-is-said-to-draw-on-credit-lines-from-banks-amid-tumult (last visited 1/31/21).

[10] https://blog.robinhood.com/ (last visited 1/31/21).

the Stocks (allowing only selling), which benefitted Robinhood and its hedge fund partners, but gravely injured the retail investors who were relying on a free market to trade these Stocks.

15.     To save itself (and likely its hedge fund investors), Robinhood halted all buying of GME and the other Stocks on its platform on Thursday, January 27, 2021, and only allowed selling.  Thereafter, it heavily restricted how many shares a retail purchaser could buy.  This had the effect of substantially depreciating the value of the Stocks, causing harm to Plaintiff and the Class.  Indeed, when Robinhood restricted further buying, and only selling, of the Stocks, GME closed down 44% from the highs earlier in the week.[11]

16.     Defendants actions are textbook market manipulation securities fraud, for which Plaintiff and the Class have a private right of action pursuant to 17 CFR § 240.10b-5.

17.     Specifically, Defendants engaged in manipulative acts by interfering with and manipulating the market as it relates to these Stocks by limiting trading of the same by disallowing any buying of the Stocks and only allowing selling.  This had the effect of depressing the share price for the Stocks by creating something of a one-way ratchet by depressing purchases while incentivizing selling.

18.     Plaintiff and the Class suffered damage because the value of the Stocks plummeted as a result of Defendants' market manipulation.

19.     Plaintiff and Class members relied on the assumption that the market was free of manipulation because prior to Defendants halting purchasing of the Stocks and only allowing selling, the Stocks were traded in a market free of manipulation.

20.     Defendants acted with scienter because they made the decision to specifically interfere in the market for their own benefit and to the detriment of Plaintiff and Class members.

21.     Plaintiff brings this action on behalf of himself and the putative class against Defendants for: (1) Violation of Section 10(b) of the Securities Exchange Act of 1934 and

---

[11] https://www.cnbc.com/2021/01/28/robinhood-will-allow-limited-buying-of-restricted-securities-friday-gamestop-jumps-after-hours.html (last visited 1/31/21).

Rule 10b-5 for market manipulation; (2) violation of Florida's Securities and Investor Protection Act ("FSIPA"); and (3) *per se* violation of Florida's Deceptive and Unfair Trade Practices Act ("FDUPTA").

22.     Plaintiff seeks an order for relief including, but not limited to, the following: (1) requiring Defendants to pay damages and restitution to Plaintiff and the putative Class; (2) statutory damages; (3) attorneys' fees and costs; and (4) enjoining the Defendants from further legal violations of prohibiting buying options on publicly traded stocks.

## PARTIES

23.     Plaintiff Jordan Krumenacker is a Florida resident who lives in Port St. Lucie, Florida.  Mr. Krumenacker opened an account with Robinhood.  At the time that the Robinhood Defendants ceased allowing buying of the Stocks, Mr. Krumenacker was actively invested in GME and AMC.  As to GME, his Robinhood application advised him that "[y]ou can close out your position in this stock, but you cannot purchase additional shares."  As to AMC, his Robinhood application advised him that "[y]ou can close out your position in this option, but you can't buy additional contracts."  As a result of the Robinhood Defendants' conduct, Plaintiff Krumenacker suffered significant losses on his investments.

24.     Defendant Robinhood Financial, LLC is a Delaware LLC with a principal place of business located at 85 Willow Road, City of Menlo Park, California.  Defendant Robinhood Financial is a brokerage firm regulated by the Financial Industry Regulatory Authority, Inc. ("FINRA").

25.     Defendant Robinhood Securities, LLC is a Delaware LLC with a principal place of business located at 85 Willow Road, City of Menlo Park, California.  Defendant Robinhood Securities is a brokerage firm regulated by FINRA.

26.     Defendant Robinhood Markets, Inc. is a Delaware Corporation with a principal place of business located at 85 Willow Road, City of Menlo Park, California.  Defendant Robinhood Markets is the parent company of Robinhood Financial and Robinhood Securities.

27.     Defendant Charles Schwab & Co., Inc. is a California Corporation with a principal place of business located at 211 Main Street, San Francisco, California.  Defendant Charles Schwab is a brokerage firm regulated by FINRA.

## JURISDICTION AND VENUE

28.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2)(A) because this case is a class action where the aggregate claims of all members of the proposed class are in excess of $5,000,000.00, exclusive of interest and costs, and at least one member of the proposed class is citizen of state different from Defendants.

29.     This Court has personal jurisdiction over Defendants because they are headquartered in this District, and many of the acts and transactions giving rise to this action occurred in this District.

30.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because many of the acts and transactions giving rise to this action occurred in this District, and because Defendants reside in this District.

## FACTS COMMON TO ALL CLAIMS

### *Background*

31.     Robinhood offers self-directed securities brokerage services to customers by means of its website and smartphone applications.  Defendants are Commission-registered broker-dealers and members of FINRA.

32.     Robinhood Financial acts as an introducing broker and has a clearing arrangement with Robinhood Securities.  Beginning in November 2019, Robinhood began sending all customer orders for trade execution to Robinhood Securities.  When customers open accounts with Robinhood, they enter into a customer agreement with Robinhood Financial and Robinhood Securities.

33.     Pursuant to FINRA rule 5310, broker-dealers such as Defendants owe their customers a duty of "best execution."  Best execution requires that a broker-dealer endeavor to

execute customer orders on the most favorable terms reasonably available in the market under the circumstances.

34. On or about January 11, 2021, stocks in GME, AMC, and NOK, among other, began to rise.

35. However, on or around January 27, 2021, these Stocks were no longer available for purchase from retail investors on Defendants' platforms. For example, on Robinhood, the Stocks featured an icon that read, "This stock is not supported on Robinhood":



36. Defendants prohibited the purchase of the stocks by its retail investors purposefully, knowingly, and willingly.

37. By prohibiting the purchase of the Stocks, Defendants denied its consumers the ability to purchase shares of stocks rapidly rising in valuation.

38. Defendants' prohibition on purchasing the Stocks had a direct impact on lowering their valuation, resulting in losses for those consumers who already purchased the Stocks.

39. Defendants prohibited further purchasing of the Stocks in direct violation of its duty of best execution.

***Defendants Engaged In Market Manipulation***

**A. The Securities And Exchange Act of 1934**

40. The Securities And Exchange Act of 1934 states:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—

. . .

**(b)** To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, or any securities-based swap agreement[] any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b).

41. 17 C.F.R. § 240.10b-5 ("10b-5") states:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

42. One way that Rule 10b-5 can be violated is through market manipulation. *See Desai v. Deutsche Bank Sec. Ltd.*, 573 F.3d 931, 938 (9th Cir. 2009) ("Misrepresentations and most omissions fall under the prohibition of Rule 10b–5(b), whereas manipulative conduct typically constitutes 'a scheme ... to defraud' in violation of Rule 10b–5(a) or a 'course of business which operates ... as a fraud or deceit upon any person' in violation of Rule 10b–5(c).");

*Halbert v. Credit Suisse AG*, 402 F. Supp. 3d 1288, 1305 (N.D. Ala. 2019) ("Rule 10b-5 creates two types of claims under Section 10(b): misrepresentation/nondisclosure claims pursuant to Rule 10b-5(b), and scheme liability/market manipulation claims pursuant to Rule 10b-5(a) and (c).").

43.     "To plead a claim based on market manipulation, a plaintiff must allege, *inter alia,* that the defendant engaged in manipulative acts, that the plaintiff suffered damage, which was caused by his or her reliance on an assumption that the market was free of manipulation, and that the defendant acted with scienter." *In re Bank of Am. Corp.*, 2011 WL 740902, at *6 (N.D. Cal. Feb. 24, 2011).

44.     Here, Defendants engaged in market manipulation by intentionally restricting trading of the Stocks, specifically by only allowing selling of the Stocks combined with completely restricted and/or heavily restricted buying of the Stocks.

**1. Defendants Engaged In Manipulative Acts**

45.     Simply put, Defendants engaged in manipulative conduct by restricting market activity regarding the Stocks.  The Robinhood Defendants completely restricted buying of the Stocks, and only allowed selling.  Thereafter, the Robinhood Defendants continued to engage in market manipulation by heavily restricting buying, but still permitting selling of the Stocks. Indeed, in its January 28, 2021 blog post, Robinhood stated:  "Amid this week's extraordinary circumstances in the market, we made a tough decision today to temporarily limit buying for certain securities," to wit the Stocks.[12]  Robinhood further notes that "[s]tarting tomorrow [Friday, January 29, 2021], we plan to allow limited buys of these securities."[13]

46.     Defendant Charles Schwab engaged in similar restrictions both through its own platform and through TD Ameritrade, which it owns, engaged in similar market manipulative tactics to restrict the free market in the trading of the Stocks.[14]

---

[12] https://blog.robinhood.com/ (last visited 2/2/21).
[13] *Id.*
[14] https://www.marketwatch.com/story/gamestop-amc-trading-is-now-being-restricted-at-td-ameritrade-11611769804 (last visited 2/2/21).

47.     These tactics undertaken by Defendants were willful acts designed to deceive and/or defraud investors by controlling or artificially affecting the price of securities.

48.     Specifically, Defendants manipulative tactics caused severe losses in the value of the restricted securities, losses that would not have happened had Defendants not engaged in manipulation of the market.

49.     The Robinhood Defendants admitted that this market manipulation was done to protect themselves (and by extension their hedge fund business partners[15]) from losses at the expense of Plaintiff and Class members.

50.     Indeed, Robinhood advertises to consumers that its mission is to "democratize finance for all."[16]  Robinhood further explains that "We believe that everyone should have access to the financial markets, so we've built Robinhood from the ground up to make investing friendly, approachable, and understandable for newcomers and experts alike."[17]

51.     But when its mission was put to the test, Robinhood folded and protected itself at the expense of its customers.

52.     Based on Robinhood's representations to Plaintiff and Class members, and Plaintiffs and Class members customary practice prior to the shutdown of freely trading securities such as the Stocks, Plaintiff and Class members were erroneously (as we now know) lead to believe that the prices for the Stocks were driven by the natural interplay of supply and demand, not rigged by manipulators.  But Defendants, despite leading Plaintiff and Class members to believe they were operating in a free market, rigged and manipulated the market for the Stocks.

---

[15] https://www.cnbc.com/2019/04/18/a-controversial-part-of-robinhoods-business-tripled-in-sales-thanks-to-high-frequency-trading-firms.html (last visited 2/2/21);
https://www.equities.com/news/robinhood-is-said-to-get-40-revenue-from-hft-firms-like-citadel (last visited 2/2/21).
[16] https://robinhood.com/us/en/support/articles/our-mission/ (last visited 2/2/21).
[17] *Id.*

53.     Plaintiff and Class members had no reason to believe that Defendants would so rig and manipulate the market for the Stocks until Defendants did so.

54.     In short, the Robinhood Defendants and Defendant Charles Schwab engaged in market manipulation by restricting and manipulating the free market for the Stocks in question, as discussed above.  The manipulative acts were performed beginning on or around January 27, 2021, and, upon information and belief, continue to the present day to a lesser degree. Defendants' manipulative conduct had a clear impact in the market for the securities at issue, each fell precipitously, causing investors losses.[18]

**2.  Defendants Acted With Scienter**

55.     Defendants made false and misleading statements either intentionally or with deliberate recklessness.

56.     As set forth above, the Robinhood Defendants represented to consumers that their platform was intended to democratize finance and provide access to the financial markets.  These statements ultimately proved to be false.

57.     Defendants' conduct also evidences a strong inference of scienter.

58.     Indeed, Robinhood has revealed that it acted intentionally to the detriment of investors.  Robinhood's CEO, Vlad Tenev, stated publicly in an interview with Elon Musk that "as a clearing broker, and this is where Robinhood Securities comes in, we have to put up money to the NSCC [National Securities Clearing Corporation]," and that the NSCC gave Robinhood a file requesting deposit of $3 billion dollars, later lowered to $1.4 billion through negotiations, and again reduced to $700 million, which Robinhood paid.  Elon Musk then asked Mr. Tenev "[i]s anyone holding you hostage right now?"  To which Mr. Tenev answered "no."  In discussing the decision to have position closing only, Mr. Tenev said "**we knew this was a bad outcome for customers**."[19]

---

[18] https://www.cnbc.com/2021/02/01/gamestop-slide-continues-after-hours-trading.html (last visited 2/2/21).

[19] https://www.realclearpolitics.com/video/2021/02/01/elon_musk_interviews_robinhood_ceo_vl ad_tenev_on_stock_tradigin_restrictions_on_clubhouse_app.html (last visited 2/2/21).

59.     Thus, this Court need not look beyond Robinhood's own admission regarding its state of mind to evaluate scienter.  Robinhood's own CEO stated that Robinhood elected to manipulate the market on the Stocks and acted knowing that its actions would cause a bad outcome for customers.

60.     While these statements alone raise a strong inference of scienter, a broader holistic view of the circumstances described herein create a strong inference of intentional conduct or deliberate recklessness.  This includes the heavily shorted hedge funds, some of whom were heavily involved with Robinhood, who stood to lose if trading remained open.  A holistic view establishes, at minimum, that Defendants manipulated the market to protect themselves at the expense of their customers.

61.     Any reasonable person would deem Plaintiff's allegations of scienter as cogent and at least as compelling as any opposing inferences.

**3.  Reliance**

62.     Plaintiff and Class members specifically relied on Defendants' representations and their course of dealing with Defendants.  Specifically, Plaintiff chose to use Robinhood based on the understanding that he would be able to freely trade securities, including the Stocks.  Plaintiff's belief was informed by Robinhood's representations that it sought to democratize finance and provide him open access to the markets.  Plaintiff used Charles Schwab based on the assumption that we would have access to the markets.  His course of dealing with both companies informed that analysis.

63.     Plaintiff and the Class are also entitled to a presumption of reliance based on the "fraud-on-the-market presumption."  "The fraud-on-the-market presumption is available when the securities at issue trade on an 'efficient' market."  *In re Bank of Am. Corp.*, 2011 WL 740902, at *13.  Plaintiff and the Class justifiably relied on a free and open market for the Stocks.  There was no reason to believe Defendants would interfere with that market.

**4. Loss Causation**

64.     Plaintiff and Class members directly suffered as a result of Defendants' securities fraud.

65.     It is a matter of objective fact that the Stock price fell after Defendants placed these artificial restrictions on trading for the Stocks.  Before the restrictions, the Stocks were rising in value rapidly.  There can be no reasonable dispute that Defendants' conduct caused Plaintiff's and the Class' losses.

***Defendants Violated Florida State Securities Laws and FDUPTA***

66.     It is well settled that "State securities laws operate in conjunction with the federal laws; federal laws do not supersede state laws." *Rousseff v. E.F. Hutton Co.*, 867 F.2d 1281, 1283 (11th Cir. 1989).

67.     The Florida Securities and Investor Protection Act contains provisions similar to Rule 10b-5, Fla. Stat. Ann. § 517.301 states, in pertinent part:

(1) It is unlawful and a violation of the provisions of this chapter for a person:

(a) In connection with the rendering of any investment advice or in connection with the offer, sale, or purchase of any investment or security, including any security exempted under the provisions of s. 517.051 and including any security sold in a transaction exempted under the provisions of s. 517.061, directly or indirectly:

1. To employ any device, scheme, or artifice to defraud;

2. To obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or

3. To engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon a person.

---

68.    "The elements of a cause of action under Section 301 are identical to those under Rule 10b–5 of the Exchange Act, 'except that the scienter requirement under Florida law is satisfied by [a] showing of mere negligence,' *Grippo v. Perazzo,* 357 F.3d 1218, 1223 (11th Cir.2004) (citing *Gochnauer v. A.G. Edwards & Sons, Inc.,* 810 F.2d 1042, 1046 (11th Cir.1987)), and a plaintiff does not need to prove loss causation under Florida law."  *Arnold v. McFall*, 839 F. Supp. 2d 1281, 1286 (S.D. Fla. 2011).

69.    For the reasons stated above, Plaintiff satisfies each element of his claim under the FSIPA because the elements are similar to a 10b-5 claim but even less stringent, lowering the scienter requirement to mere negligence and not requiring proof of loss causation.

70.    Because Defendants violated the FSIPA, they also *per se* violated Florida's consumer-protection statute, FDUPTA.

## CLASS ALLEGATIONS

71.    Plaintiff brings this action on behalf of himself and as a representative of all similarly situated individuals pursuant to Fed. R. Civ. P. 23 and proposes the following Class definition: All persons within the United States who maintained a Robinhood and/or Charles Schwab account from January 1, 2021 through present (the "Nationwide Class").  Excluded from the Class are Defendants and their affiliates, parents, subsidiaries, employees, officers, agents, and directors, as well as any judicial officers presiding over this matter and the members of their immediate families and judicial staff.

72.    Plaintiff also seeks to represent a subclass of all persons in the State of Florida who maintained a Robinhood and/or Charles Schwab account from January 1, 2021 through present (the "Florida Subclass") (the Nationwide Class and Florida Subclass are collectively referred to as the "Class").

73.    Members of the Class are so numerous that their individual joinder herein is impracticable.  Robinhood has millions of active users nationwide.  By that metric alone, individual joinder of Class members is impracticable.  The precise number of Class members and their identities are unknown to Plaintiff at this time but may be determined through discovery,

specifically through Defendants' records.  Class members may be notified of the pendency of

this action by mail and/or publication through the distribution records of Defendants.

74.     Common questions of law and fact exist as to all Class members and predominate

over questions affecting only individual Class members.  Common legal and factual questions

include, but are not limited to:

A.   Whether federal securities laws were violated by Defendants' acts as alleged

herein;

B.   Whether Defendants' conduct violated Florida's securities laws;

C.   Whether Defendants' conduct constitutes a *per se* violation of FDUPTA;

D.   Whether Defendants' acted with scienter and whether their conduct was

negligent;

E.   Whether Defendants engaged in market manipulation in restricting trading of

the Stocks on their platforms; and

F.   Whether Plaintiff and Class members suffered damages.

75.     The claims of the named Plaintiff are typical of the claims of the Class because

the named Plaintiff, like all other class members, held an account with Robinhood and Charles

Schwab and was subject to the same conduct and omissions by Defendants.  Plaintiff, like all

other class members, was prohibited from purchasing the Stocks on or around January 27, 2021

onward.  There are no defenses that Defendants may have that are unique to Plaintiff.

76.     Plaintiff is an adequate representative of the Class because his interests do not

conflict with the interests of the Class members he seeks to represent, he has retained competent

counsel experienced in prosecuting complex class actions, and he intends to prosecute this action

vigorously.  The interests of Class members will be fairly and adequately protected by Plaintiff

and his counsel.

77.     The class mechanism is superior to other available means for the fair and efficient

adjudication of the claims of Class members.  Each individual Class member may lack the

resources to undergo the burden and expense of individual prosecution of the complex and

extensive litigation necessary to establish Defendants' liability.  Individualized litigation

increases the delay and expense to all parties and multiplies the burden on the judicial system

presented by the complex legal and factual issues of this case.  Individualized litigation also

presents a potential for inconsistent or contradictory judgments.  In contrast, the class action

device presents far fewer management difficulties and provides the benefits of single

adjudication, economy of scale, and comprehensive supervision by a single court on the issue of

Defendants' liability.  Class treatment of the liability issues will ensure that all claims and

claimants are before this Court for consistent adjudication of the liability issues.

78.     Plaintiff brings all claims in this action individually and on behalf of members of

the Class against Defendants.

**COUNT I**
**Violation of Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5**
**(On Behalf Of Plaintiff And The Nationwide Class)**

79.     Plaintiff repeats the allegations contained in the foregoing paragraphs as if fully

set forth herein.

80.     This Count is based upon Section 10(b) of the Securities Exchange Act, 15 U.S.C.

§ 78(j)(b), and Rule 10b-5 promulgated thereunder by the SEC.

81.     Defendants, as described at length above, engaged in illegal market manipulation

in violation of federal securities law.

82.     Defendants committed a manipulative act by restricting trading of the Stocks on

their platforms, as described above.  Robinhood permitted only selling of the Stocks followed by

limited buying, and by doing so manipulated the market and impacted the value of the Stocks.

83.     Defendants acted with scienter because they knew that their conduct would cause

harm to Plaintiff and Class members, and proceeded to manipulate the market regardless.

Perhaps the clearest evidence of Robinhood's scienter is that its CEO publicly admitted that he

and Robinhood knew that its actions would be harmful to its customers, and restricted selling of

the Stocks fully aware of this fact.  Even from a holistic view of the circumstances, it is clear

Defendants intentionally manipulated and interfered with the market in violation of the law, and to the detriment of Plaintiff and members of the Nationwide Class.

84.     Plaintiff specifically relied on Defendants' representations to his detriment.  As to Robinhood, Plaintiff relied on Robinhood's representations and promises that he would have free and open access to the markets, including the Stocks.  As to all Defendants, Plaintiff relied on his course of dealing with Defendants wherein he was able to freely trade securities, including the Stocks.

85.     Plaintiff and the Class are entitled to a presumption of reliance based on the fraud-on-the-market presumption.  Specifically, Plaintiff and Class members had the right to rely on a free and open market for the Stocks at issue (i.e. a market free of manipulation).

86.     Plaintiff and members of the Nationwide Class suffered damages as a direct and proximate result of Defendants' conduct, to wit a rapid and precipitous decline in the value of the Stocks directly caused by Defendants' conduct.

87.     Plaintiff and members of the Nationwide class are entitled to damages, statutory damages, and attorneys' fees and costs of suit.

## COUNT II
### Violation Of The Florida Securities And Investor Protection Act
### (On Behalf Of Plaintiff And The Florida Subclass)

88.     Plaintiff repeats the allegations contained in the foregoing paragraphs as if fully set forth herein.

89.     Defendants, as described at length above, engaged in illegal market manipulation in violation of FSIPA.

90.     Defendants committed a manipulative act by restricting trading of the Stocks on their platforms, as described above.  Robinhood permitted only selling of the Stocks followed by limited buying, and by doing so manipulated the market and impacted the value of the Stocks.

91.     Defendants acted with scienter because they knew that their conduct would cause harm to Plaintiff and Class members, and proceeded to manipulate the market regardless. Perhaps the clearest evidence of Robinhood's scienter is that its CEO publicly admitted that he

and Robinhood knew that its actions would be harmful to its customers, and restricted selling of the Stocks fully aware of this fact. Even from a holistic view of the circumstances, it is clear Defendants intentionally manipulated and interfered with the market in violation of the law, and to the detriment of Plaintiff and members of the Nationwide Class.

92.     At minimum, Defendants actions were negligent, which is all that is required to state a claim under FSIPA.

93.     Plaintiff specifically relied on Defendants' representations to his detriment. As to Robinhood, Plaintiff relied on Robinhood's representations and promises that he would have free and open access to the markets, including the Stocks. As to all Defendants, Plaintiff relied on his course of dealing with Defendants wherein he was able to freely trade securities, including the Stocks.

94.     Plaintiff and the Class are entitled to a presumption of reliance based on the fraud-on-the-market presumption. Specifically, Plaintiff and Class members had the right to rely on a free and open market for the Stocks at issue (i.e. a market free of manipulation).

95.     Plaintiff and members of the Nationwide Class suffered damages as a direct and proximate result of Defendants' conduct, to wit a rapid and precipitous decline in the value of the Stocks directly caused by Defendants' conduct.

96.     Plaintiff and members of the Nationwide class are entitled to damages, statutory damages, and attorneys' fees and costs of suit.

## COUNT III
### Violation of Florida's Deceptive and Unfair Trade Practices Act
### (On Behalf Of Plaintiff And The Florida Subclass)

97.     Plaintiff repeats the allegations contained in the foregoing paragraphs as if fully set forth herein.

98.     FDUPTA protects "the consuming public and legitimate business enterprises from those who engage in unfair methods of competition or unconscionable, deceptive or unfair acts or practices in the conduct of any trade or commerce." Fla. Stat. § 501.212(2).

99.     Plaintiff and Florida Subclass members are "consumers" within the meaning of FDUPTA.  Fla. Stat. Ann. § 501.203(7) ("Consumer" means an individual; child, by and through its parent or legal guardian; business; firm; association; joint venture; partnership; estate; trust; business trust; syndicate; fiduciary; corporation; any commercial entity, however denominated; or any other group or combination.").

100.    By soliciting investor funds as described in detail above, Defendants engaged in "trade and commerce" within the meaning of Fla. Stat. Ann. § 501.203(8).

101.    Defendants have committed a *per se* violation of FDUPTA by virtue of their violation of The Florida Securities And Investor Protection Act, which is a statute designed for consumer protection and proscribes unfair methods of competition and deceptive acts and practices.

102.    Defendants caused injury to Plaintiff and Florida Subclass members because Defendants' actions, described above, caused the value of the Stocks to precipitously decline thereby harming the value of Plaintiff's and the Florida Subclass' investments.  Plaintiffs and Florida Subclass members suffered a substantial loss proximately caused by Defendants' conduct.

103.    Accordingly, Defendants are liable to Plaintiffs and the Class for damages in amounts to be proven at trial, including attorneys' fees and costs.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, seeks judgment against Defendants, as follows:

(a)     For an order certifying the Class under Rule 23 and naming Plaintiff as the representative of the Class and Plaintiff's attorneys as Class Counsel to represent the Class;

(b)     For an order declaring that the Defendants' conduct violates the statutes referenced herein;

(c) For an order finding in favor of Plaintiff and the Class on all counts asserted herein;

(d) For compensatory, punitive, and statutory damages in amounts to be determined by the Court and/or jury;

(e) For prejudgment interest on all amounts awarded;

(f) For injunctive relief as pleaded or as the Court may deem proper; and

(g) For an order awarding Plaintiff and the Class their reasonable attorneys' fees and expenses and costs of suit.

## **DEMAND FOR TRIAL BY JURY**

Pursuant to Federal Rules of Civil Procedure 38(b), Plaintiff demands a trial by jury of all issues so triable.

Dated:  February 2, 2021                    Respectfully submitted,

**BURSOR & FISHER, P.A.**

By:  */s/ L. Timothy Fisher*
                    L. Timothy Fisher

L. Timothy Fisher (State Bar No. 191626)
1990 North California Boulevard, Suite 940
Walnut Creek, CA  94596
Telephone: (925) 300-4455
Facsimile:  (925) 407-2700
E-Mail: ltfisher@bursor.com

**BURSOR & FISHER, P.A.**
Andrew J. Obergfell*
888 Seventh Ave.
New York, NY 10019
Telephone: (212) 837-7150
Facsimile:  (212) 989-9163
Email: aobergfell@bursor.com

**BURSOR & FISHER, P.A.**
Stephen A. Beck*
701 Brickell Avenue, Suite 1420
Miami, FL 33131

Telephone: (305) 330-5512
Facsmile:   (305) 679-9006
E-Mail: sbeck@bursor.com

*\* Pro Hac Vice Application Forthcoming*

*Attorneys for Plaintiff*

# EXHIBIT 9

Eric M. Poulin
CA State Bar No. 298476
Roy T. Willey, IV (*Pro Hac Vice Forthcoming*)
Blake G. Abbott (*Pro Hac Vice Forthcoming*)
ANASTOPOULO LAW FIRM, LLC
32 Ann Street
Charleston, SC 29403
P: (843) 614-8888
F: (843) 494-5536
Email: eric@akimlawfirm.com
        roy@akimlawfirm.com
        blake@akimlawfirm.com

ATTORNEYS FOR PLAINTIFFS

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| DAVID MOODY and JULIE MOODY, on behalf of themselves and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>ROBINHOOD FINANCIAL, LLC, ROBINHOOD SECURITES, LLC, ROBINHOOD MARKETS, INC., CITADEL SECURITIES LLC, CITADEL ENTERPRISE AMERICAS LLC F/K/A CITADEL LLC<br><br>Defendants. | **CLASS ACTION COMPLAINT**<br>**JURY TRIAL DEMANDED** |

Plaintiffs David Moody and Julie Moody (collectively, "Plaintiffs") by and through undersigned counsel, bring this action against Robinhood Financial, LLC ("Robinhood Financial"), Robinhood Securities, LLC ("Robinhood Securites") & Robinhood Markets, Inc. ("Robinhood Markets") (collectively, "Robinhood"), and Citadel Securities LLC ("Citadel Securities") and Citadel Enterprise Americas LLC f/k/a Citadel LLC ("Citadel") (collectively, "Citadel"). Plaintiffs make the following allegations upon personal knowledge as to their own acts, and upon information and belief, and investigation, as to all other matters, alleging as follows:

## PRELIMINARY STATEMENT

1.      Plaintiffs bring this case as a result of Robinhood's decision to remove the stock GameStop ("GME") from its trading platform, along with American Airlines ("AAL"), AMC Entertainment Holdings ("AMC"), Blackberry Ltd ("BB"), Bed Bath & Beyond, Inc. ("BBBY"), Castor Maritime, Inc. ("CTRM"), Express, Inc. ("EXPR"), Koss Corporation ("KOSS"), Naked Brand Group ("NAKD"), Nokia ("NOK"), Sundial Growers, Inc. ("SNDL"), Tootsie Roll Industries ("TR"), Trivago N.V. ("TRVG"), thereby manipulating the open-market.

2.      In so doing, Robinhood and Citadel (collectively, "Defendants") created a one-way buy-sell situation by which the only option of retail investors who had already purchased the above securities and others to sell/liquidate their holdings, thus depriving these stocks of buy liquidity to counter selling pressure by permitting purchase of the equity to take place. Plaintiffs and other members of the Class that held them suffered massive losses.

3.      Numerous retail investors were forcefully stopped out of their positions by Defendants at incredibly low prices as a result of these attacks, suffering massive financial losses.

4.      In so doing, Defendants created a situation in which the only entities which were permitted to purchase these equities were equity firm insiders and hedge fund operators, many of

whom were leveraged heavily "short" against the equities and had a vested interest in seeing the equity prices depressed so they could cover their short sales at a lower cost.

5.    Robinhood has refused and continues to refuse full participation by retail investors in GME as well as other stocks in the so-called "open market."

6.    Plaintiffs bring this class action on behalf of Robinhood customers who were denied full access to GME, along with other select stocks, and for the many including themselves, who suffered losses as a result of the restrictions on trading.  Plaintiffs assert putative class action claims generally including breach of contract, negligence, breach of fiduciary duty, violations of California's False Advertising Laws and violations of California's Unfair Competition Law.

7.    Plaintiffs seek damages, restitution, disgorgement and declaratory relief.

**PARTIES**

8.    Robinhood Financial is a Delaware LLC with its principal place of business in Menlo Park, California.  It is a wholly-owned subsidiary of Robinhood Markets.  Robinhood Financial is registered as a broker-dealer with the U.S. Securities & Exchange Commission ("SEC").  Defendant Robinhood Financial acts as an introducing broker and has a clearing arrangement with its affiliate Defendant Robinhood Securities.

9.    Robinhood Securities, is a Delaware LLC with its principal place of business in Lake Mary, Florida.  It is a wholly-owned subsidiary of Robinhood Markets.

10.    Robinhood Markets, Inc. is a Delaware corporation with its principal place of business in Menlo Park, California.  Robinhood Markets is the corporate parent of Robinhood Financial and Robinhood Securities.

11.    Citadel Securities LLC ("Citadel Securities") is a Delaware corporation with its principal place of business at 131 South Dearborn Street, Chicago, IL 60603.  Citadel Securities

provides market-making services to Robinhood through its Citadel Execution Services line of business.

12. Defendant Citadel Enterprise Americas LLC f/k/a Citadel LLC ("Citadel") is a Delaware corporation with its principal place of business at 131 South Dearborn Street, Chicago, IL 60603. Citadel provides operational and administrative services to Citadel Securities. Citadel also has its Global Controller sign off on Annual Broker Deal Reports with the SEC for Citadel Securities. Citadel Securities and Citadel operate their trademarks under the common ownership and control of Citadel LLC n/k/a Citadel.

13. Plaintiff David Moody is an individual and a resident and citizen of the state of South Carolina.

14. Plaintiff Julie Moody is an individual and a resident and citizen of the state of South Carolina.

## JURISDICTION AND VENUE

15. Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

16. This Court has jurisdiction over this action pursuant to the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d), because at least one class member is of diverse citizenship from one Defendant, there are more than 100 Class members, and the aggregate amount in controversy exceeds $5 million, exclusive of interest and costs.

17. This Court has personal jurisdiction over Defendants because Defendants conduct business in California and has sufficient minimum contacts with California.

18. Venue is proper in this District under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims occurred in this District.

## BACKGROUND FACTS

19.     Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

20.     Robinhood is an online brokerage firm founded in 2013 that states it is "a pioneer in commission-free investing."  Robinhood customers can place securities trades through the firm's website and by using a web-based application (or "app").  Robinhood permits customers to purchase and sell securities, including option contracts, and engage in trading on margin.  The company has no storefront offices and operates entirely online.  Robinhood is a FINRA[1] regulated broker-dealer.[2]

**K. Governing Law.**

This Agreement and all transactions made in My Account shall be governed by the laws of the State of California (regardless of the choice of law rules thereof), except to the extent governed by the federal securities laws, FINRA Rules, and the regulations, customs and usage of the exchanges or market (and its clearing house) on which transactions are executed.

21.     Robinhood offers people the ability to invest in stocks, ETFs and options through an electronic trading platform, both online and through an app.

22.     Robinhood spends a great deal of energy marketing itself as born out of the Occupy Wall Street movement and champions a mission to "democratize finance for all."

23.     When visitors go to the Robinhood website, they are greeted with the following:[3]



Investing for Everyone

---

[1] Financial Industry Regulatory Authority, Inc. (FINRA) is a private corporation that acts as a non-governmental, self-regulatory organization that regulates member brokerage firms and exchange markets.

[2] https://cdn.robinhood.com/assets/robinhood/legal/Customer%20Agreement.pdf, pg. 29(Last accessed Jan. 29, 2021).

[3] https://robinhood.com/us/en/ (Last accessed Jan. 28, 2021)

24.     Upon information and belief, Robinhood gets its name from its mission to "provide everyone with access to the financial markets, not just the wealthy."

25.     Robinhood offers user-friendly digital services, which has made Robinhood very popular, especially with younger traders.

26.     Robinhood's original product was commission-free trades of stocks and exchange-traded funds.  As Robinhood grew, it added more risky and complex products-like options and margin trading.  Those products, combined with Robinhood's game-like interface, have been a hit with millennials, and its typical customer is 31 years old on average.[4]

27.     According to an analysis of new filings from nine brokerage firms by the research firm Alphacution for the New York Times, in the first quarter of 2020, Robinhood users traded nine times as many shares as E-Trade customers and 40 times as many shares as Charles Schwab customers. They also bought and sold 88 times as many options contracts as Schwab customers, relative to the average account size.[5]



**Velocity of Options Trading at Leading Retail Brokers**
Options contracts traded for every dollar in the average customer's account.

| | |
|---|---|
| Robinhood | 25,840 |
| TD Ameritrade | 2,188 |
| E-Trade | 1,844 |
| Charles Schwab | 292 |

———

Note:   Figure is the number of options contracts traded in the first quarter of 2020, per dollar in the average customer account. Robinhood does not provide data on customer holdings, but Alphacution estimated that the average account holds $4,800, based on customer cash holdings listed in financial filings.

By The New York Times | Source: Alphacution Research Conservatory based on company filings

---

[4] https://www.businessinsider.com/robinhood- office-installed-bulletproof-glass-after-frustrated-traders-visited-report-2 (Last accessed Jan. 29, 2021).
[5] https://www.nytimes.com/2020/07/08/technology/robinhood-risky-trading.html?searchResultPosition=2 (Last accessed Jan. 29, 2021).

28.     Robinhood makes money primarily through "payment for order flow" fees.

29.     Payment for order flow fees are paid to Robinhood from electronic market makers for passing on customer orders.  For example, if a Robinhood user purchases a share of GME through their account, Robinhood sends that order to a large market maker like Citadel Securities and receives money in return-i.e., the "payment of order flow" fees.  Citadel, meanwhile, completes the trade and makes money for itself as well.

30.     Robinhood routes over 50% of customer orders to the market through Citadel Securities.  Citadel Securities is the primary market-maker for Robinhood, providing liquidity for over half of the trades entered on the Robinhood platform.

31.     According to a recent SEC filing, Citadel Securities and several other firms paid Robinhood approximately $91 million in the first quarter of 2020.  And in the second quarter of 2020 – Robinhood made $180 million off trades, roughly double from the prior quarter.[6]

32.     Citadel is also an investor in Melvin Capital Management LP, an investment advisor that had a significant short position in GME.  Melvin Capital was pressured to close out its entire short position on the afternoon of Tuesday, January 26, 2021.  It is reported that Melvin Capital has lost nearly 30% since the start of 2021.

33.     The loss to Melvin Capital on this GME short squeeze was so large that later on January 25, 2021, it reported obtained a cash infusion of nearly $3 billion from Citadel, in which Citadel took a non-controlling revenue share in Melvin Capital.

34.     Citadel also took short positions in many of the listed restricted securities in this Complaint immediately prior to the restrictions by Robinhood.

35.     Another hedge fund adversely impacted by the short squeeze is D1 Capital Partners, which is a large investor in Robinhood.

---

[6] https://www.businessofapps.com/data/robinhood-statistics/ (Last accessed Feb. 1, 2021).

36.     Betting AMC would decline, D1 Capital Partners was down $4 billion before the restrictions to the securities in this Complaint.  The restrictions Robinhood imposed depressed AMC stock from $19.88 at the close on January 27 to an $8.63 close on January 28, thereby allowing D1 Capital Partners to exit its short positions with minimal losses.

37.     Upon information and belief, Robinhood is valued at approximately $11.2 billion.[7]

38.     On or around January 11, 2021, stocks in GameStop Corp. ("GME") began to rise, funded in part by purchases of Robinhood users.

39.     At that time, Robinhood allowed retail investors to trade GME on the open market.

40.     On or about January 27, 2021, Robinhood, in order to slow the growth of GME and deprive their customers of the ability to use their service, abruptly, purposefully, willfully and knowingly pulled GME from their app.

41.     Upon information and belief, more than half Robinhood users have exposure to GME.

42.     On or about January 27, 2021, Robinhood, in order to slow the growth of other select stocks such as AAL, AMC, BB, BBBY, CTRM, EXPR, KOSS,  NAKD, NOK, SNDL, TR, TRVG, and deprive their customers of the ability to use their service, abruptly, purposefully, willfully and knowingly pulled these stocks from their app.

43.     Upon information and belief, Robinhood is pulling securities like GME from its platform to slow growth and help benefit individuals and institutions who are not Robinhood customers but are Robinhood large institutional investors or potential investors.

44.     Such actions constitute negligence, breaches of contract and fiduciary duties, and are violations of FINRA regulations.  Per FINRA regulations, Robinhood has a duty to process trades timely and at the best prices for its users.

---

[7] Kate Rooney, Robinhood snags third mega-investment of the year, boosting valuation to $11.2 billion, CNBC (August 17, 2020) https://www.cnbc.com/2020/08/17/robinhood-announces-another-mega-round-valuation-soars-to-11point2b.html (Last accessed Jan. 29, 2021).

45. In fact, Robinhood commits itself to the execution of orders.[8]

# Our execution quality

Every time you place a trade, your trust is in our hands—and we're committed to seeking a quality execution on every order.

46. Pursuant to FINRA rule 5310 (known as "Best Execution and Interpositioning"), Robinhood "must make every effort to execute a marketable customer order that it receives promptly and fully." By preventing customers' timely trades, Robinhood breached these obligation and caused its customers substantial losses.

47. Robinhood acknowledges that arbitration does not apply to class actions filed against it.[9]

**38. Arbitration.**

**A. This Agreement contains a pre-dispute arbitration clause. By signing an arbitration agreement, the parties agree as follows: (1) All parties to this Agreement are giving up the right to sue each other in court, including the right to a trial by jury, except as provided by the rules of the arbitration forum in which a claim is filed. (2) Arbitration awards are generally final and binding; a party's ability to have a court reverse or modify an arbitration award is very limited. (3) The ability of the parties to obtain documents, witness statements and other discovery is generally more limited in arbitration than in court proceedings. (4) The arbitrators do not have to explain the reason(s) for their award unless, in an eligible case, a joint request for an explained decision has been submitted by all parties to the panel at least 20 days prior to the first scheduled hearing date. (5) The panel of arbitrators will typically include a minority of arbitrators who were or are affiliated with the securities industry. (6) The rules of some arbitration forums may impose time limits for bringing a claim in arbitration. In some cases, a claim that is ineligible for arbitration may be brought in court. (7) The rules of the arbitration forum in which the claim is filed, and any amendments thereto, shall be incorporated into this Agreement. B. Any controversy or claim arising out of or relating to this Agreement, any other agreement between Me and Robinhood, any Account(s) established hereunder, any transaction therein, shall be settled by arbitration in accordance with the rules of FINRA Dispute Resolution, Inc. ("FINRA DR"). I agree to arbitrate any controversy or claim before FINRA DR in the State of California. C. This agreement to arbitrate constitutes a waiver of the right to seek a judicial forum unless such a waiver would be void under the federal securities laws. If I am a foreign national, non-resident alien, or if I do not reside in the United States, I agree to waive My right to file an action against Robinhood in any foreign venue. D. No person shall bring a putative or certified class action to arbitration, nor seek to enforce any pre-dispute arbitration agreement against any person who has initiated in court a putative class action; or who is a member of a putative class who has not opted out of the class with respect to any claims encompassed by the putative class action until: (1) the class certification is denied; or (2) the class is decertified; or (3) the customer is excluded from the class by the court. Such forbearance to enforce an agreement to arbitrate shall not constitute a waiver of any rights under this Agreement except to the extent stated herein.**

ACCEPTED AND AGREED: I acknowledge that I have read the preceding terms and conditions of this Agreement, that I understand them and that I hereby manifest my assent to, and my agreement to comply with, those terms and conditions by accepting this agreement. **I ALSO UNDERSTAND THAT BY ACCEPTING THIS AGREEMENT I HAVE ACKNOWLEDGED THAT THIS AGREEMENT CONTAINS A PREDISPUTE ARBITRATION CLAUSE IN SECTION 38 HEREIN. I ALSO AGREE (1) THAT ANY OF MY MARGIN ACCOUNT SECURITIES MAY BE BORROWED BY ROBINHOOD OR LOANED TO OTHERS; (2) I HAVE RECEIVED OF A COPY OF THIS AGREEMENT AND (3) I HAVE REVIEWED A COPY OF THE MARGIN DISCLOSURE STATEMENT.**

---

[8] https://robinhood.com (Last accessed Feb. 1, 2021)
[9] *Id.* (Last accessed Jan. 29, 2021).

48.     Robinhood admits to liability of losses or damages if they do not complete a transaction to or from a user's Account with limited exceptions:[10]

**9. Our Liability.**

If we do not complete a transaction to or from your Account on time or in the correct amount according to our Agreement with you, we will be liable for your losses or damages. However, there are some exceptions. We will not be liable, for instance:

1. If through no fault of Robinhood or the Bank, you do not have enough Available Funds in your Account to complete the transaction;

2. If a merchant refuses to accept your Card;

3. If an electronic terminal where you are making a transaction does not operate properly, and you knew about the problem when you initiated the transaction;

4. If access to your Card has been blocked after you reported your Card lost or stolen;

5. If there is a hold or your funds are subject to legal or administrative process or other encumbrance restricting their use;

6. If Robinhood or the Bank have reason to believe the requested transaction is unauthorized;

7. If circumstances beyond the control of Robinhood or the Bank (such as fire, flood, or computer or communication failure) prevent the completion of the transaction, despite reasonable precautions that Robinhood or the Bank have taken; or

8. For any other exception stated in this Agreement with you or by applicable law.

49.     The loss of access to GME stock and other stocks on Robinhood's trading platform caused concrete, particularized and actual damages for Robinhood customers and lost potential for those who held GME stock and other restricted securities identified in this Complaint.

**Plaintiff David Moody**

50.     Plaintiff David Moody is a customer of Robinhood and entered into a Customer Agreement in order to use Robinhood's online trading systems.

51.     On January 27, 2021, Plaintiff David Moody ("DC") used his Robinhood app to submit an order for $200 worth of AMC.

---

[10] https://cdn.robinhood.com/assets/robinhood/legal/Customer%20Agreement.pdf, pg. 32 (Last accessed Jan. 29, 2021)

## Your Order Has Been Confirmed

Hi DC,

You have submitted a market order to buy 9.298085 shares of AMC. You can check on the status of this order on Robinhood. We will notify you when this order has been executed.

If you have any questions, you can **contact us**.

– The Robinhood Team

52.     On the morning of January 28, 2021, Plaintiff David Moody was informed from Robinhood that the order had been cancelled.

## Your Order Has Been Canceled

Hi DC,

Your market order to buy $204.00 of AMC was canceled on January 28th, 2021 at 9:21 AM.

You can check out our **Help Center** for more information, and please feel free to respond to this email if you have any additional questions. We're here to help.

– The Robinhood Team

53.     Once Plaintiff David Moody had learned Robinhood had cancelled his order, Plaintiff searched for AMC on the app, but found it to be unavailable.

54.     As a result of Robinhood's actions, Plaintiff David Moody suffered substantial damages.

**Plaintiff Julie Moody**

55.     Plaintiff Julie Moody is a customer of Robinhood and entered into a Customer Agreement in order to use Robinhood's online trading systems.

56.     On January 27, 2021 Plaintiff Julie Moody used her Robinhood app to submit an order for $800 worth of NAKD and NOK.

57.     On the morning of January 28, 2021, Plaintiff Julie Moody was informed from Robinhood that the order had been cancelled.

58.     As a result of Robinhood's actions, Plaintiff Julie Moody suffered substantial damages.

**The Class**

59.     On the morning of January 28, 2021, Robinhood announced "In light of recent volatility, we are restricting transactions for certain securities to position closing only, including AAL, AMC, BB, BBBY, CTRM, EXPR, GME, KOSS, NAKD, NOK, SNDL, TR and TRVG."[11]

60.     In the same announcement, Robinhood announced, "We fundamentally believe that *everyone should have access* to financial markets."[12] (emphasis added).

61.     In the afternoon of January 28, 2021, Robinhood announced, "we stand in support of our customers and the freedom of retail investors to shape their own financial future."[13]

62.     Upon information and belief, Robinhood even forced short sells of stock of GME and other stocks.

---

[11] https://blog.robinhood.com (Last accessed Jan. 28, 2021)
[12] *Id.* (Last accessed Jan. 28, 2021)
[13] *Id.* (Last accessed Jan. 28, 2021)

63.     Plaintiffs and members of the Proposed Class were deprived of all earning opportunities associated with GME, and other stocks listed above.

## CLASS ACTION ALLEGATIONS

64.     Plaintiffs incorporates by reference all preceding allegations as though fully set forth herein.

65.     Plaintiffs bring this action on behalf of themselves and as a class action, pursuant to the provisions of Rule 23 of the Federal Rules of Civil Procedure on behalf of the following Classes:

**The Class:**

All Robinhood customers.

66.     Excluded from the Class are any Robinhood entities, and any of their respective members, affiliates, parents, subsidiaries, officers, directors, employees, successors, or assigns; and the judicial officers, and their immediate family members, and Court staff assigned to this case.  Also excluded from the Class are any Citadel entities, and any of their respective members, affiliates, parents, subsidiaries, officers, directors, employees, successors, or assigns; and the judicial officers, and their immediate family members, and Court staff assigned to this case.  Plaintiff reserves the right to modify or amend the Class definitions, as appropriate, during the course of this litigation.

67.     Certification of Plaintiffs' claims for class-wide treatment is appropriate because Plaintiffs can prove the elements of their claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

68.     This action has been brought and may be properly maintained on behalf of the Class proposed herein under Federal Rule of Civil Procedure 23.

**Numerosity: Fed. R. Civ. P. 23(a)(1)**

69.     The members of the Class are so numerous and geographically dispersed that individual joinder of all members is impracticable.  Plaintiffs are informed and believe that there are

thousands of members of the Class, the precise number being unknown to Plaintiffs, but such number being ascertainable from Defendants' records. Members of the Class may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. mail, electronic mail, internet postings, and/or published notice.

**Commonality and Predominance: Fed. R. Civ. P. 23(a)(2)**

70.   This action involves common questions of law and fact, which predominate over any questions affecting individual members of the Class, including, without limitation:

i.    Whether Robinhood engaged in the conduct alleged herein;

ii.   Whether Robinhood knowingly failed to provide the financial services that were needed to handle reasonable consumer demand, including trading securities that are available on every other competitive trading platform;

iii.  Whether Robinhood failed to provide the duty of care to their customers when they purposefully removed GME and other securities;

iv.   Whether Robinhood removed GME and other securities purposefully to harm their customers' positions in GME and other securities and benefit their own potential financial gains;

v.    Whether Robinhood violated FINRA Rule 5310, among other FINRA rules, state rules and federal regulations;

vi.   Whether Robinhood violated consumer protection laws in failing to disclose that its services would not include the ability to trade on GME, and other securities, for substantial periods of time;

vii.  Whether Robinhood was in breach of its legal, regulatory and licensing requirements by failing to provide adequate access to financial services;

viii. Whether Robinhood was in breach of its contracts and/or the implied covenant of good faith and fair dealing in connection with its failure to provide financial services;

ix.   Whether Robinhood was negligent or grossly negligent by failing to provide financial service in a timely manner due to its own possible nefarious desires;

x.    Whether Robinhood was unjustly enriched by its conduct;

xv.   Whether Robinhood violated California's Unfair Competition Law, Bus. & Prof. Code Section 17200, *et seq.*;

xix.    Whether Robinhood violated California's False Advertising Laws, Bus. & Prof. Code Section 17500, *et seq.*;

xx.     Whether Citadel aided and abetted a Robinhood in a breach of fiduciary duty;

xxi.    Whether Citadel intentionally interfered with the contact between Plaintiffs and the members of the Class and Robinhood;

xxii.   Whether certification of any or all of the classes proposed herein is appropriate under Fed. R. Civ. P. 23;

xxiii.  Whether Class members are entitled to declaratory, equitable, or injunctive relief, and/or other relief; and

xxiv.   The amount and nature of relief to be awarded to Plaintiffs and the other members of the Class.

**Typicality: Fed. R. Civ. P. 23(a)(3)**

71.    Plaintiffs' claims are typical of the claims of other members of the Class because, among other things, all such members were similarly situated and were comparably injured through Defendants' wrongful conduct as set forth herein.

**Adequacy: Fed. R. Civ. P. 23(a)(4)**

72.    Plaintiffs are adequate representatives for the Class because their interests do not conflict with the interests of other members of the Class they seek to represent.  Plaintiffs have retained counsel competent and experienced in complex litigation and Plaintiffs intend to prosecute the action vigorously.  The interests of the Class will be fairly and adequately protected by Plaintiffs and their counsel.

**Superiority: Fed. R. Civ. P. 23(b)(3)**

73.    A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action.  The damages or other financial detriment suffered by Plaintiffs and other members of the Class are relatively small compared to the burden and expense that would be

required to individually litigate their claims against Defendants', so it would be impracticable for members of the Class to individually seek redress for Defendants' wrongful conduct.

74.　Even if members of the Class could afford individual litigation, the Court system likely could not. Individualized litigation creates a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, comprehensive supervision by a single court, and finality of the litigation.

**Certification of Specific Issues: Fed. R. Civ. P. 23(c)(4)**

75.　To the extent that any described Class herein does not meet the requirements of Rules 23(b)(2) or (b)(3), Plaintiffs seek the certification of issues that will drive the litigation toward resolution.

**Declaratory and Injunctive Relief: Fed. R. Civ. P. 23(b)(2)**

76.　Defendants has acted or refused to act on grounds generally applicable to Plaintiffs and the other members of the Class, thereby making appropriate final injunctive relief and declaratory relief, as described herein, with respect to the members of the Class as a whole.

**FOR A FIRST COLLECTIVE CAUSE OF ACTION**
**BREACH OF CONTRACT**
**(Against Robinhood)**

**(Plaintiffs and the Other Members of the Class)**

77.　Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

78.　Plaintiffs bring this count on behalf of themselves and other members other the Class.

79.　In order to use the Robinhood trading platform, a potential customer must enter into the Customer Agreement with Robinhood.

80.     Plaintiffs and all members of the Class entered into a Customer Agreement with Robinhood.

81.     The rights and privileges contained therein form the basis of the bargain on which prospective customers agree to accept Robinhood's offer to enter into a contract in exchange for opening one or more accounts.

82.     Accordingly, it is clear that Robinhood offered to provide access to their trading platform with complete access to the open market through their services as an online brokerage firm.

83.     Based on this mutual assent, Plaintiffs and the other members of the Class fulfilled their end of the bargain when they registered for "My Account."

84.     Robinhood furnished consideration to Plaintiffs and Class members in the form of access to Robinhood's online trading platform, enabling them to trade securities and options listed on U.S. securities exchanges.  In exchange, Robinhood received consideration from Plaintiffs and Class members including, but not limited to, order flow data, which it sold to market makers to generate revenue, interested generates on cash balances in accounts, commissions and fees based on trades placed, interest on margins and other fees.

85.     However, after accepting such consideration from Plaintiffs and other members of the Class, Robinhood breached its Customer Agreement by, among other things, failing to disclosure that its platform was going to randomly pull stocks from its platform; that Robinhood knowingly put their customers at a disadvantage compared to customers who used other means; that Robinhood failed to provide access to its own financial incentives to pull certain securities including GME; that Robinhood's prohibited Plaintiffs and members of the Class from performing under the contract; that Robinhood failed to comply with all applicable legal, regularly and licensing requirement; and that Robinhood failed to exercise trades and actions requested by customers.

86.     Moreover, by its own terms, Robinhood admits liability for its actions on January 28, 2021.[14]

87.     As a direct and proximate result of Robinhood's breach, Plaintiffs and other members of the Class suffered damages and losses to and are continually exposed to harm because Robinhood continues to fail to perform under the Customer Agreement.  These losses reflect damages to Plaintiffs and Class members in an amount to be determined at trial or separate proceedings as necessary.

**FOR A SECOND COLLECTIVE CAUSE OF ACTION**
**BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING**
**(Against Robinhood)**

**(Plaintiffs and Other Members of the Class)**

88.     Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

89.     Plaintiffs bring this count on behalf of themselves and other members of the Class.

90.     As set forth above, Plaintiffs, Class members and Robinhood are parties to the Customer Agreement and related contracts.

91.     Robinhood was obligated to provide the trading services required under those contracts at all times, including but not limited to, trades for GME.

92.     Robinhood unfairly interfered with Plaintiffs' and Class members' rights to receive the benefits of the Customer Agreement and related contracts by, failing to perform under the contract by, among other things, (i) failing to provide services necessary to carry out a trade; (ii) failing to provide certain trading services whatsoever; (iii) failing to inform individuals in a timely manner of the drastic changes to trading abilities; and (iv) prohibiting Plaintiffs from buying GME and other

---

[14] https://cdn.robinhood.com/assets/robinhood/legal/Customer%20Agreement.pdf (Last accessed Jan. 28, 2021).

securities for Robinhood's own pecuniary interest and not disclosing those interests to Plaintiffs and all Class members.

93.     Robinhood's conduct has breached the implied covenant of good faith and fair dealing because it has caused Plaintiffs and Class members' harm, losses and damages, and continues to expose them to harm because Robinhood continues to fail to perform under the Customer Agreement. These losses reflect damages to Plaintiffs and Class members in an amount to be determined at trial.

94.     Additionally, because damages may not be a full and complete remedy due to the ongoing nature of the relationship between the parties and the continuing risk of future harm, Plaintiffs and Class members seek specific performance of the contract to ensure Robinhood permits complete access to the open market in the future.

### FOR A THIRD COLLECTIVE CAUSE OF ACTION
### VIOLATION OF CALIFORNIA UNFAIR COMPETITION LAW, Cal. Bus. & Pro. Code §§ 17200, *et seq.*
### (Against Robinhood)

### (Plaintiffs and Other Members of the Class)

95.     Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

96.     Plaintiffs bring this count on behalf of themselves and other members of the Class.

97.     Robinhood has engaged in unfair competition within the meaning of California Business & Professions Code section 17200, *et seq.*, because Robinhood's conduct is unlawful and unfair as herein alleged.

98.     Plaintiffs, the members of the Class, and Robinhood are a "person" or "persons," within the meaning of Section 17201 of the California Unfair Competition Law ("UCL").

99.     The UCL prohibits any unlawful and unfair business practices or acts.  Robinhood's conduct, as alleged herein, constitutes an unlawful and unfair business practice that occurred in connection with the provision of its financial and investment broker services.

100.   **Unlawful prong:**      Robinhood's conduct, as described within, violated the UCL's unlawful prong because it: (1) constitutes negligence and/or gross negligence; (2) constitutes a breach of fiduciary duty; (3) constitutes a breach of contract and/or a breach of the implied covenant of good faith and fair dealing; (4) it violated applicable regulatory laws and guidance such as FIRNA Rule 5310 which requires best execution of orders fully and promptly; and (5) has unlawfully and unjustly enriched Robinhood.

101.   **Unfair Prong:**      Robinhood's conduct, as described within, violated the UCL's unfair prong because its conduct violates established public policy intended to regulate financial services to consumers, and because it is immoral, unethical, oppressive, or unscrupulous and has caused injuries to the Plaintiffs and the Class that outweigh any purported benefit.

102.   Plaintiffs have standing to pursue this claim because they have been injured by virtue of suffering a loss of money and/or property as a result of the wrongful conduct alleged herein.

103.   The UCL is, by its express terms, a cumulative remedy, such that remedies under its provisions can be awarded in addition to those provided under separate statutory schemes and/or common law remedies, such as those alleged in the other Counts of this Complaint.

104.   As a direct and proximate cause of Robinhood's conduct, which constitutes unlawful and unfair business practices, as herein alleged, Plaintiffs and Class members have been damaged and suffered ascertainable losses, thereby entitling them to recover restitution and equitable relief, including disgorgement or ill-gotten gains, refunds of moneys, interest, reasonable attorneys' fees, filing fees, and the costs of prosecuting this class action, as well as any and all other relief that may be available at law or equity.  Additionally, because Plaintiffs and Class members continue to have accounts and investments with Robinhood and intend to use Robinhood's services in the future, injunctive relief is warranted.

## FOR A FOURTH COLLECTIVE CAUSE OF ACTION
### VIOLATION OF CALIFORNIA'S FALSE ADVERTISING LAW, Cal. Bus. & Pro. Code §§ 17500, *et seq.*
### (Against Robinhood)

### (Plaintiffs and Other Members of the Class)

105.    Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

106.    Plaintiffs bring this count on behalf of themselves and other members of the Class.

107.    Cal. Bus. & Prof. Code § 17500 provides:

It is unlawful for any…corporation…with intent…to dispose of…personal property…to induce the public to enter into any obligation relating thereto, to make or disseminate or cause to be made or disseminated…from this state before the public in any state, in any newspaper or other publication, or any advertising device, or by public outcry or proclamation, or in any other manner or means whatever, including over the Internet, any statement…which is untrue or misleading, and which is know, or which by the exercise of reasonable care should be know, to be untrue or misleading…"

(Emphasis added).

108.    Robinhood's advertisement and promises to execute placed orders in their advertisements as well as in their Customer Agreement contracts with their users was an unfair, untrue and misleading practice.  This deceptive marketing practice gave consumers the false impression that when the users placed orders to purchase securities, Robinhood would execute those purchases at market price.   Robinhood instead manually removed securities from its platform, unilaterally cancelled user orders, and even short sold shares of securities listed in this Complaint.

109.    Robinhood's advertisement and promises to "democratize finance for all" and "investing is for everyone" was an unfair, untrue and misleading practice.  The deceptive marketing campaign gave consumers the false impression that they would be able to trade on the open market like all hedge funds.

110.    Robinhood misled consumers by making untrue and misleading statements and failing to disclose what is required as stated in the Code alleged above.

111. As a direct and proximate result of Barneys' leading and false advertisements, Plaintiffs and Class members have suffered injury in fact and have lost money. As such, Plaintiffs request that this Court order Robinhood to restore this money to Plaintiffs and all Class members, and to enjoin Barneys from continuing these unfair practices in violation of the UCL in the future. Otherwise, Plaintiffs, Class members, and the broader general public, will be irreparably harmed and/or denied an effective and complete remedy.

## FOR A FIFTH COLLECTIVE CAUSE OF ACTION
## NEGLIGENCE
### (Against Robinhood)

### (Plaintiffs and Other Members of the Class)

112. Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

113. Plaintiffs bring this count on behalf of themselves and other members of the Class.

114. As a provider of financial services and registered securities investment broker-dealer, Robinhood had a duty to exercise reasonable care, skill, and ability in conducting and facilitating financial services and transactions for its customers.

115. Robinhood unlawfully breached its duties by, among other things, (i) removing GME and other securities without notice from its trading app; (ii) failing to provide financial services related to GME and other securities; and (iii) failing to notify customers in a timely manner of the lockout of GME and other securities.

116. Robinhood's conduct as set forth in this complaint was so want of even scant care that its acts and omissions were and continue to be an extreme departure from the ordinary standard of conduct, rendering Robinhood negligent.

117. Robinhood's negligence and breaches of its duties owed to Plaintiffs and the Class members proximately causes losses and damages that would not have occurred but for Robinhood's

breach of its duty of due care. These losses reflect damages to Plaintiffs and Class members in an amount to be determined at trial.

## FOR A SIXTH COLLECTIVE CAUSE OF ACTION
## BREACH OF FIDUCIARY DUTY
### (Against Robinhood)

### (Plaintiffs and Other Members of the Class)

118. Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

119. Plaintiffs bring this count on behalf of themselves and other members of the Class.

120. As a licensed provider of financial services, Robinhood at all times relevant herein was a fiduciary to Plaintiffs and Class members and owed them the highest good faith and integrity in performing its financial services on their behalf. Robinhood also acted as a fiduciary to each and every customer who agreed to the Customer Agreement.

121. Robinhood beached its fiduciary duties to Plaintiffs and Class members by, among other things, failing to disclose that its platform was going to remove GME and other security purchases in a timely manner; actually removing GME and other securities from its trading platform; removing GME and other securities for its own pecuniary benefits; that Robinhood failed to comply with all applicable legal, regulatory, and licensing requirements; and that Robinhood failed to exercise trades and actions requested by customers in a complete and timely manner (also required by FINRA Rule 5310).

122. Robinhood's conduct has caused Plaintiffs' and Class members' harm, losses and damages and continues to expose them to harm because Robinhood continues to breach its fiduciary duties. These losses reflect damages to Plaintiffs and Class members in an amount to be determined at trial.

**FOR A SEVENTH COLLECTIVE CAUSE OF ACTION**
**UNJUST ENRICHMENT**
**(Against Robinhood)**

**(Plaintiffs and Other Members of the Class)**

123.    Plaintiffs hereby incorporate by reference the factual allegations contained herein.

124.    Plaintiffs bring this cause of action on behalf of themselves and other members of the Class.

125.    By its wrongful conduct described herein, Robinhood has obtained a benefit from Plaintiffs and Class members that includes, but is not limited to, maintaining their accounts, receiving their personal data, receiving payments for order flow, maintaining deposited funds, charging and/or receiving interest on accounts and margin balances, charging and/or receiving fees, commissions, and increased capital fundraising due to the high number of new and continuing users of its platform, all of which also drives up Robinhood's valuation.

126.    Since Robinhood profits, benefits, and other compensation were obtained by improper means, Robinhood was unjustly enriched at the expense of Palintiffs and Class members and is not legally or equitably entitled to retain any of the benefits, compensation or profits it realized.

127.    Plaintiffs and Class members seek an order of this Court requiring Robinhood to refund, disgorge, and pay as restitution any profits, benefits, and other compensation obtained by Robinhood from its wrongful conduct and/or the establishment of a constructive trust from which Plaintiffs and Class members may seek restitution.

**FOR AN EIGHTH COLLECTIVE CAUSE OF ACTION**
**AIDING AND ABETTING BREACH OF FIDUCIARY DUTY**
**(Against Citadel)**

**(Plaintiffs and Other Members of the Class)**

128.    Plaintiffs hereby incorporate by reference the factual allegations contained herein.

129.    Plaintiffs bring this cause of action on behalf of themselves and other members of the Class.

130.    Citadel owed a duty to Plaintiffs and the Class by virtue of serving as the market maker for a significant portion of their trades on the Robinhood platforms.

131.    Citadel knew Robinhood had a fiduciary duty to Plaintiffs and the Class to allow for the free-flow and uninterrupted placement and execution of purchase orders of GME and the other securities identified in this Complaint.

132.    Citadel is Robinhood's primary market maker and is well aware of the requirements for providing liquidity and for Robinhood allowing unrestricted purchases of GME and the other securities identified in this Complaint.

133.    Citadel, having a financial incentive to do so, as well as financial leverage over Robinhood, given the significant revenue stream for Robinhood from Citadel, induced, encouraged, and pressured Robinhood to restrict purchase orders of GME and the other securities identified in this Complaint.

134.    Without Citadel's inducement, encouragement and undue pressure on Robinhood to restrict purchase orders on GME and the other securities identified in this Complaint, Robinhood would likely have continued to allow the free-flow of purchase orders of GME and the other securities identified in this Complaint, as it had allowed in the previous days and weeks despite the same or similar levels of volatility and market participation.

135.    Accordingly, Citadel aided and abetted Robinhood's breach of its fiduciary duties and to Plaintiffs and the Class.

**FOR A NINTH COLLECTIVE CAUSE OF ACTION**
**INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONS**
(Against Citadel)

**(Plaintiffs and Other Members of the Class)**

136.    Plaintiffs hereby incorporate by reference the factual allegations contained herein.

137.    Plaintiffs bring this cause of action on behalf of themselves and other members of the Class.

138.    Plaintiffs and members of the Class formed contractual relationships through the Customer Agreement in which Robinhood offered to provide access to their trading platform with complete access to the open market through their services as an online brokerage firm.

139.    Upon information and belief, Citadel had knowledge that Robinhood had these contractual relationships and prospective contractual relationship with Plaintiffs and members of the Class as Citadel is the primary market-maker for Robinhood, providing liquidity for over half of the trades entered on the Robinhood platform.

140.    Upon information and belief, Citadel prevented Robinhood from performing under the contracts between Plaintiffs and members of the Class and Robinhood.

141.    Upon information and belief, Citadel acted intentionally to interfere with the contracts and prospective contracts between Plaintiffs and members of the Class and Robinhood.

142.    As the result of Citadel's actions as alleged herein, Plaintiffs and members of the Class have been irreparably, materially, and substantially harmed and damages in an amount to be proven at trial.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs, individually and on behalf of members of the Class, pray for judgment in their favor and against Defendants as follows:

a.    Certifying the Class as proposed herein, designating Plaintiffs as Class representatives, and

appointing undersigned counsel as Class Counsel;

b.  Declaring that Defendants are financially responsible for notifying the Class members of the pendency of this action;

c.  Declaring that Defendants has wrongfully interfered with the free market purchase of GME and other securities identified in this Complaint;

d.  For an order declaring that Robinhood's conduct violates the statues referenced herein;

e.  Requiring that Defendants disgorge amounts wrongfully obtained for payment for order flow and orders for trades of GME and other securities identified in this complaint;

f.  For compensatory, punitive, and statutory damages in amounts to be determined by the Court and/or jury;

g.  Awarding injunctive relief as permitted by law or equity, including enjoining Defendants from limiting or restricting GME and other securities mentioned in this complaint;

h.  For an order of restitution and all other forms of equitable monetary relief;

i.  Scheduling a trial by jury in this action;

j.  Awarding Plaintiffs' reasonable attorneys' fees, costs and expenses, as permitted by law;

k.  Awarding pre and post-judgment interest on any amounts awarded, as permitted by law; and

l.  Awarding such other and further relief as may be just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs demand trial by jury in this action of all issues so triable.

Dated February 3, 2021

**ANASTOPOULO LAW FIRM, LLC**

/s/        *Eric M. Poulin*
Eric M. Poulin
CA State Bar No. 298476
Roy T. Willey, IV (*Pro Hac Vice Forthcoming*)
Blake G. Abbott (*Pro Hac Vice Forthcoming*)
32 Ann Street
Charleston, SC 29403
Tel: (843) 614-888
Email: eric@akimlawfirm.com
         roy@akimlawfirm.com
         blake@akimlawfirm.com

**ATTORNEYS FOR PLAINTIFFS AND THE PROPOSED CLASS**

# EXHIBIT 10

1  Evan Selik (SBN 251039)
2  Christine Zaouk (SBN 251355)
   McCATHERN LLP
3  523 West Sixth Street, Suite 830
4  Los Angeles, California 90014
   (213) 225-6150 / Fax (213) 225-6151
5  eselik@mccathernlaw.com
6  czaouk@mccathernlaw.com

7  Attorneys for Plaintiff,
8  JEAN-PAUL SALIBA

9              UNITED STATES DISTRICT COURT

10           NORTHERN DISTRICT OF CALIFORNIA

11

12  JEAN-PAUL SALIBA, individually        )  CASE NO.
    and on behalf of other persons similarly )
13  situated,                             )  CLASS ACTION COMPLAINT
                                          )
14              Plaintiff,                )  1.   BREACH OF CONTRACT
                                          )
15        vs.                             )  2.   BREACH OF IMPLIED
                                          )       COVENANT OF GOOD
16                                        )       FAITH AND FAIR
                                          )       DEALING
17  ROBINHOOD MARKETS, INC.;              )
    ROBINHOOD FINANCIAL, LLC;             )  3.   NEGLIGENCE
18  FINANCIAL SECURITIES, LLC;            )
19  ROBINHOOD CRYPTO, LLC and             )  4.   UNFAIR COMPETITION
    DOES 1-100                            )       (Cal. Bus. & Prof Code.
20                                        )       §§17200 *et seq.*)
                                          )
21              Defendants.               )  5.   VIOLATION OF
                                          )       CONSUMERS LEGAL
22                                        )       REMEDIES ACT (Cal. Civil
                                          )       Code §§1750 *et seq.*)
23                                        )
                                          )  DEMAND FOR JURY TRIAL
24                                        )

25  _____

26  ///
27

28

McCATHERN LLP
523 West Sixth Street, Suite 830
Los Angeles, CA 90014
(213) 225-6150

1

**COMPLAINT**

Plaintiff, Jean-Paul Saliba, on behalf of himself, and all others similarly situated, complains and alleges as follows

## INTRODUCTION

1. This is a class action lawsuit pursuant to Fed. R. Civ. P. Rule 23, seeking damages for the conduct of Defendants, Robinhood Markets, Inc.; Robinhood Financial, LLC; Robinhood Securities, LLC; Robinhood Crypto, LLC (hereinafter "Robinhood") which caused damages to Plaintiff and those similarly situated.

## JURISDICTION AND VENUE

2. This Court has jurisdiction over this action pursuant to diversity jurisdiction under 28 U.S. Code §1332(a)(1). Plaintiff is a citizen of Texas and all Defendants are Delaware corporations and have its principal place of business for the purposes of citizenship in Menlo Park, California and Lake Mary, Florida.

## PARTIES

3. Plaintiff is, and at all relevant times was, a Texas resident residing within the Dallas, Texas. Within the statute of limitations for the claims made herein, Plaintiff experienced damage as a result of Defendants.

4. Plaintiff appears in this action on behalf of himself and on behalf of all others similarly situated.

5. Plaintiff is informed and believes that Defendants provide a "commission free" platform for consumers to buy, sell and trade different companies

McCATHERN LLP
523 West Sixth Street, Suite 830
Los Angeles, CA 90014
(213) 225-6150

2

**COMPLAINT**

stock and securities.

6.    Plaintiff is informed an believes that DOES 1 through 100 are corporations, individuals, limited liability partnerships, limited liability companies, general partnerships, sole proprietorships or are other business entities or organizations of a nature not currently known to Plaintiff.

7.    Plaintiff is unaware of the true names of Defendants DOES 1 through 100.  Plaintiff sues said defendants by said fictitious name, and will amend this complaint when the true names and capacities are ascertained or when such facts pertaining to liability are ascertained, or as permitted by law or by the Court. Plaintiff is informed and believe that each of the fictitiously named Defendants is in some manner responsible for the events and allegations set forth in this Complaint.

8.    Plaintiff is informed and believes, and based thereon alleges that at all relevant times, each Defendant was an employer, was the principal, agent, partner, joint venture, officer, director, controlling  shareholder, subsidiary affiliate, parent corporation, successor in interest and/or predecessor in interest of some or all of the other Defendants, and was engaged with some or all of the other Defendants in a joint enterprise for profit and bore such other relationships to some or all of the other Defendants so as to be liable for their conduct with respect to the matters alleged in this complaint. Plaintiffs are further informed and believe and thereon allege that each Defendant acted pursuant to and within the scope of the relationships alleged

3

**COMPLAINT**

above, and that at all relevant times, each Defendant knew or should have known about, authorized, ratified, adopted, approved, controlled, aided and abetted the conduct of all other Defendants.  As used in this Complaint "Defendant" means "Defendants and each of them," and refers to the Defendants named in the particular cause of action and DOES 1 through 100.

9.     At all times mentioned herein, each Defendant was the co-conspirator, agent, servant, employee, and/or joint venture of each of the other Defendants and was acting within the course and scope of said conspiracy, agency, employment, and/or joint venture and with the permission and consent and knowledge of each of the other Defendants.

## FACTS COMMON TO ALL CAUSES OF ACTION

10.     Robinhood is an online brokerage firm that provides an online platform for consumers to buy and sell securities.  It has been valued at over $7 billion with over 10 million consumers.

11.     As or about January 11 and 12, 2021, the value in stocks of the company, GameStop with a ticker symbol of GME, increased significantly. Robinhood had allowed its users to trade GME open market.

12.     On or about January 27 or 28 2021, Robinhood disabled and completely restricted the trading of GME.  This was done without Plaintiff and the putative class's consent.  In Fact, Robinhood went as far to pulling GME from the

McCATHERN LLP
523 West Sixth Street, Suite 830
Los Angeles, CA 90014
(213) 225-6150

**COMPLAINT**

Robinhood's platform so no consumer could trade or even find GME on Robinhood.

13.     On January 28, 2021, Plaintiff attempted to sell his shares of GME but could not do so due to Robinhood's improper conduct.

14.     Robinhood's conduct left Plaintiff and the putative class with no opportunity to lower their average costs, no opportunity (if GME's price went up) to receive gains or no opportunity (if GME's price went down) to short GME.

15.     In other words, instead of acting simply as a conduit for trading, Robinhood acted as a regulator and refused to allow its users to trade GME for no reason, thereby precluding its consumers from using Robinhood's services.

16.     Plaintiff is informed and believes and based thereon alleges that Robinhood's conduct violated Financial Industry Regulatory Authority ("FINRA"), rule 5310, *et seq.*   Rule 5310.01 (supplemental material) requires that Robinhood "must make every effort to execute a marketable customer order that it receives promptly and fully."   By refusing to let Plaintiff and the putative class trade GME in any way, Robinhood violated this FINRA rule 5310.01 (supplemental material).

## CLASS DEFINITION AND CLASS ALLEGATIONS

17.     Plaintiff brings this action on behalf of himself and on behalf of all other similarly situated persons as a class action pursuant to Fed. R. Civ. P. Rule 23.

///

///

McCATHERN LLP
523 West Sixth Street, Suite 830
Los Angeles, CA 90014
(213) 225-6150

5

**COMPLAINT**

The members of the Class are defined as follows:

**All Robinhood consumers in the United States whose ability to trade GameStop (GME) was affected due to Robinhood's refusal to allow its consumers to trade GME**.

18.     This action has been brought and may be properly maintained as a class action pursuant to the provisions of Fed. R. Civ. P. Rule 23 and other applicable law.

19.     <u>**Numerosity of the Classes**</u>: Members of the Classes are so numerous that their individual joinder is impracticable.  Plaintiff estimate that there are no less than 10,000 persons in the identified classes.  The precise number of Class members and their addresses are unknown to Plaintiff.  However, Plaintiff is informed and believes and thereon alleges that the number can be obtained from Defendants' business and transaction records.  Class members may be notified of the pendency of this action by conventional mail, electronic mail, the Internet, or published notice.

20.     <u>**Existence of Predominance of Common Questions of Fact and Law**</u>: Common questions of law and fact exist as to all members of the Classes.  These questions predominate over any questions effecting only individual members of the classes.  These common factual and legal questions include:

        (a)     Whether Defendant breached its contract it had with Plaintiff and the putative class;

        (b)     Whether Plaintiff and those similarly situated were consumers pursuant to Cal. Civil Code §§1750 *et seq.*

McCATHERN LLP
523 West Sixth Street, Suite 830
Los Angeles, CA 90014
(213) 225-6150

**COMPLAINT**

(c)     Whether Defendants' conduct as alleged herein violated Cal. Civil Code §§1750 *et seq.*

(d)     Whether Defendants' conduct as alleged herein resulted in a windfall of profits that Defendants were not entitled;

(e)     Whether Defendants' committed unlawful business practices or acts within the meaning of Cal. Business & Professions Code §§17200 *et seq.*;

(f)     Whether Defendants' owed a duty or care to Plaintiff and the putative class, which it breached by refusing to let Plaintiff and the putative class trade GME;

(g)      Whether Defendants violated FINRA rule 5310.01 (supplemental material).

(h)     Whether Defendants raise any affirmative defenses that are universal in application.

21.     **Typicality**:  Plaintiff's claims are typical of the claims of the members of the respective Classes because Plaintiff was affected by Robinhoods conduct as alleged herein above.  Plaintiff sustained the same types of damages that the putative class members sustained.  Plaintiff is subject to the same affirmative defenses as the members of the putative class.

22.     **Adequacy**:  Plaintiff will adequately and fairly protect the interests of the members each of the Class.  Plaintiff has no interest adverse to the interests of

absent Class members. Plaintiff is represented by legal counsel who has substantial class action experience in civil litigation.

23.  **Superiority**:  A class action is superior to other available means for fair and efficient adjudication of the claims of the Class and would be beneficial for the parties and the court.  Class action treatment will allow a large number of similarly situated persons to prosecute their common claims in a single forum, simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions would require.  The monetary amounts due to many individual class members are likely to be relatively small, and the burden and expense of individual litigation would make it difficult or impossible for individual members of each Class to seek and obtain relief.  A class action will serve an important public interest by permitting such individuals to effectively pursue recovery of the sums owed to them.  Further, class litigation prevents the potential for inconsistent or contradictory judgments raised by individual litigation.

### FIRST CAUSE OF ACTION
### BREACH OF CONTRACT
### (By Plaintiff and the Class against all Defendants)

24.  Plaintiff incorporates paragraphs 1 through 23 of this complaint as though fully alleged herein.

25.  Plaintiff, and those similarly situated, entered into a Customer User Agreement (hereinafter the "Contract"), with implied provisions, with Robinhood.

McCATHERN LLP
523 West Sixth Street, Suite 830
Los Angeles, CA 90014
(213) 225-6150

8

**COMPLAINT**

The terms of the Contract were that Robinhood was required to must make every effort to execute a marketable customer order that it receives promptly and fully and not preclude or refuse to allow its users to trade.

26. As more fully set forth in the paragraphs incorporated herein, Defendants breached the contract when it precluded and refused Plaintiff and the putative class from trading GME.

27. Plaintiff and the putative class has performed all covenants and conditions required under the contract or have been excused from doing so due to Defendants' breach.

28. As a proximate result of Defendants' breach, Plaintiff and the putative class suffered economic loss.

**SECOND CAUSE OF ACTION**
**BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING**
**(By Plaintiff and the Class against all Defendants)**

29. Plaintiff incorporates paragraphs 1 through 28 of this complaint as though fully alleged herein.

30. Plaintiff, and those similarly situated, entered into the Contract with Robinhood. The Contract required Robinhood to fulfill trade orders that were placed properly and in a timely manner. Robinhood did the opposite and restricted and refused to allow Plaintiff and the putative class from trading GME.

McCATHERN LLP
523 West Sixth Street, Suite 830
Los Angeles, CA 90014
(213) 225-6150

**COMPLAINT**

McCATHERN LLP
523 West Sixth Street, Suite 830
Los Angeles, CA 90014
(213) 225-6150

31.     Robinhood's conduct violated numerous legal authorities, including FINRA and the SEC.  Robinhood's conduct was unreasonable and done with reckless disregard for the rights of Plaintiff and the putative class.

32.     Therefore, Plaintiff is informed and believes and thereon alleges that Robinhood breached the Contract and implied covenant of good faith and fair dealing that was incorporated into the Contract by restricting and refusing to allow Plaintiff and the putative class to trade GME.

33.     As proximate result of Defendants' conduct, Plaintiff and the putative class suffered significant economic loss.  Plaintiff and the putative is entitled to punitive damages in an amount that the trier of fact finds reasonable.

## THIRD CAUSE OF ACTION
### NEGLIGENCE
**(By Plaintiff and the Class against all Defendants)**

34.     Plaintiff incorporates paragraphs 1 through 33 of this complaint as though fully alleged herein.

35.     Plaintiff is informed and believed and thereon alleges that Robinhood owed Plaintiff and the putative class a duty of care in providing its services.

36.     Robinhood breached that duty of care by restricting and refusing to allow Plaintiff and the putative class to trade GME.

37.     Robinhood's conduct was a proximate cause to the harm suffered by Plaintiff and those similarly situated.

**COMPLAINT**

38.     Plaintiff is informed and believes and thereon alleges that Robinhood's breach was not excused for any reason.

39.     Plaintiff and the putative class suffered harm as a result of Robinhood's conduct.

## FOURTH CAUSE OF ACTION
## VIOLATION OF THE CONSUMERS LEGAL REMEDIES ACT (CLRA)
### (By Plaintiff and the Class against all Defendants)

40.     Plaintiff incorporates paragraphs 1 through 39 of this complaint as though fully alleged herein.

41.     At all relevant times, Plaintiff and the putative class were consumers of Defendants covered by Cal. Civil Code §§1750 *et seq.*

42.     Cal. Civil Code §§1770(a)(9) prohibits "[A]dvertising goods or services with intent not to sell them as advertised."

43.     Cal. Civil Code §§1770(a)(10) prohibits "[A]dvertising goods or services with intent not to supply reasonably expectable demand, unless the advertisement discloses a limitation of quantity."

44.     Cal. Civil Code §§1770(a)(16) prohibits [R]epresenting that the subject of a transaction has been supplied in accordance with a previous representation when it has not."

45.     As a result of Defendants' conduct as alleged herein, Defendant violated the above provisions.

McCATHERN LLP
523 West Sixth Street, Suite 830
Los Angeles, CA 90014
(213) 225-6150

**COMPLAINT**

46.     On February 3, 2021, prior to the filing of this Complaint, a CLRA notice letter was served on Defendants that complies in all respects with Cal. Civil Code §1782(a).   Plaintiff sent Defendants these letters via certified mail, return receipt requested.  A true and correct copy of Plaintiff's CLRA letters are attached, collectively, hereto as **Exhibit 1**.

47.     Pursuant to Cal. Civil Code §1780(a), Plaintiff and the putative class seek actual damages, an order of this Court enjoining Defendants from engaging in the methods, act or practices alleged herein, restitution of property and punitive damages.

## FIFTH CAUSE OF ACTION
### UNFAIR COMPETITION
### (By Plaintiff and the Class against all Defendants)

48.     Plaintiff incorporates paragraphs 1 through 47 of this complaint as though fully alleged herein.

49.     This cause of action is brought pursuant to the Unfair Competition Law of the Cal. Business & Professions Code §§17200 *et seq*.   Defendants' conduct constitutes unfair, unlawful and fraudulent business practices within the meaning of Cal. Business & Professions Code §17200.

50.     Plaintiff brings this cause of action on behalf of the general public solely in their capacities as private attorneys general pursuant to Cal. Business & Professions Code §17204.

51.    At all times during the liability period, Defendants' represented they would make every effort to execute a marketable customer order that it receives promptly and fully.  However, Defendants did the opposite by precluding, refusing and not allowing Plaintiff and the putative class to trade GME.

52.    By restricting the trading of GME, Defendants unfairly made more money.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff on behalf of himself and all others similarly situated, pray for relief and judgment against Defendants as follows:

1.    That this action be certified as a class action pursuant to Fed. R. Civ. P. Rule 23;

2.    An order finding Defendants' conduct was negligent;

3.    An order finding Defendants' conduct violated the CLRA;

4.    An order enjoining Defendants from restricting and refusing trades without prior notice

5.    Awarding prejudgment and post-judgment interest at the maximum legal rate;

6.    Awarding attorneys' fees according to proof;

7.    Awarding costs of suit herein; and

///

McCATHERN LLP
523 West Sixth Street, Suite 830
Los Angeles, CA 90014
(213) 225-6150

**COMPLAINT**

8. All such other and further relief as the Court deems just.

Date: February 3, 2021

Respectfully Submitted,

McCATHERN LLP

By: _Evan Selik_

Evan Selik
Christine Zaouk
Attorney for Plaintiff,
JEAN-PAUL SALIBA

**COMPLAINT**

McCATHERN LLP
523 West Sixth Street, Suite 830
Los Angeles, CA 90014
(213) 225-6150

# DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury for himself and the Class on all claims so triable.


Date:  February 3, 2021                    Respectfully Submitted,

McCATHERN LLP


By:  *Evan Selik*
_____
Evan Selik
Christine Zaouk
Attorney for Plaintiff,
JEAN-PAUL SALIBA

15                                    **COMPLAINT**

# EXHIBIT 11

1   Eric Lechtzin (State Bar No.248958)
    **EDELSON LECHTZIN LLP**
2   3 Terry Drive, Suite 205
    Newtown, PA 18940
3   Telephone: (215) 867-2399
    Facsimile: (267) 685-0676
4   Email: elechtzin@edelson-law.com
5
    *Counsel for Individual and Representative Plaintiffs*
6   *Sabrina Clapp and Denise Redfield*
7
8              **UNITED STATES DISTRICT COURT**
9            **NORTHERN DISTRICT OF CALIFORNIA**
10
11  SABRINA CLAPP and DENISE REDFIELD,          Case No. 3:21-cv-00896
    individually and on behalf of others similarly
12  situated,                                    **CLASS ACTION COMPLAINT**
13                      Plaintiffs,
                   v.
14                                               **DEMAND FOR JURY TRIAL**
15  ALLY FINANCIAL INC.;
    ALPACA SECURITIES LLC;
16  CASH APP INVESTING LLC;
    SQUARE INC.;
17  DOUGH LLC;
    MORGAN STANLEY SMITH BARNEY LLC;
18  E*TRADE SECURITIES LLC;
    E*TRADE FINANCIAL CORPORATION;
19  E*TRADE FINANCIAL HOLDINGS, LLC;
    ETORO USA SECURITIES, INC.;
20  FREETRADE, LTD.;
    INTERACTIVE BROKERS LLC;
21  M1 FINANCE, LLC;
    OPEN TO THE PUBLIC INVESTING, INC.;
22  ROBINHOOD FINANCIAL, LLC;
    ROBINHOOD MARKETS, INC.;
23  ROBINHOOD SECURITIES, LLC; IG GROUP
    HOLDINGS PLC;
24  TASTYWORKS, INC.;
    TD AMERITRADE, INC.;
25  THE CHARLES SCHWAB CORPORATION;
    CHARLES SCHWAB & CO. INC.;
26  FF TRADE REPUBLIC GROWTH, LLC;
    TRADING 212 LTD.;
27  TRADING 212 UK LTD.;
    WEBULL FINANCIAL LLC;
28  FUMI HOLDINGS, INC.;
    STASH FINANCIAL, INC.;
    BARCLAYS BANK PLC;

                                                        CLASS ACTION COMPLAINT

CITADEL ENTERPRISE AMERICAS, LLC;
CITADEL SECURITIES LLC;
MELVIN CAPITAL MANAGEMENT LP;
SEQUOIA CAPITAL OPERATIONS LLC;
APEX CLEARING CORPORATION;
THE DEPOSITORY TRUST & CLEARING
CORPORATION,

        Defendants.

CLASS ACTION COMPLAINT

# TABLE OF CONTENTS

Page(s)

INTRODUCTION .................................................................................................... 1

JURISDICTION AND VENUE ............................................................................... 3

PARTIES ................................................................................................................. 4

      A.     Plaintiff Sabrina Clapp ........................................................... 4

      B.     Plaintiff Denise Redfield ......................................................... 5

      C.     Brokerage Defendants ............................................................. 5

      D.     Fund Defendants ..................................................................... 10

      E.     Clearinghouse Defendants ...................................................... 10

AGENTS AND CO-CONSPIRATORS .................................................................. 11

CLASS ALLEGATIONS ........................................................................................ 11

FACTUAL ALLEGATIONS .................................................................................. 13

CLAIMS FOR RELIEF .......................................................................................... 36

COUNT ONE .......................................................................................................... 36

COUNT TWO .......................................................................................................... 38

COUNT THREE ...................................................................................................... 40

COUNT FOUR ........................................................................................................ 41

COUNT FIVE .......................................................................................................... 42

COUNT SIX ............................................................................................................ 43

COUNT SEVEN ...................................................................................................... 44

COUNT EIGHT ...................................................................................................... 45

COUNT NINE ......................................................................................................... 45

PRAYER FOR JUDGMENT .................................................................................. 46

JURY TRIAL DEMANDED ................................................................................... 48

      CLASS ACTION COMPLAINT

Plaintiffs Sabrina Clapp and Denise Redfield, on behalf of themselves and all others similarly situated, bring this Class Action Complaint against Defendants for violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, Section 16 of the Clayton Act, 15 U.S.C. § 26, state antitrust and consumer protection laws, and the common law as follows:

## INTRODUCTION

1.      This case is about individual investors (the "Retail Investors") who invested their hard-earned money in the stock market and were stripped of the rights to control their investments due to a large, overarching conspiracy to prevent the market from operating freely and to stop the Defendants from hemorrhaging losses as a result of their highly speculative short selling strategies.

2.      Retail Investors or individual investors are non-professional investors who make investments on their own behalf. Retail Investors purchase assets such as stocks, bonds, options, mutual funds, and exchange traded funds (ETFs). They execute their personal trades through websites, apps and trading platforms provided by brokerage firms or other investment service providers. Retail Investors tend to invest smaller amounts, as compared to institutional investors, and they have little ability to influence market prices or market dynamics on their own.

3.      Generally, Retail Investors pay brokerages a fee or commission for personal trades to their brokerages.

4.      Some brokerages, like Defendant Robinhood, do not charge their investors a fee per transaction, but instead earn revenue through rebates, kickbacks and other payments from market makers like the Clearinghouse Defendants (defined below).

5.      Some individual investors are members of online financial discussion forums on Reddit, Facebook, TikTok and elsewhere, where they are able to share and discuss their market research and observations and help like-minded peers benefit from their research and potentially identify good opportunities for investment.

6.      Based on their research, and observations, the Retail Investors, through stock brokerages, including the Brokerage Defendants (defined below), purchased and invested in certain stocks—GameStop (GME), AMC Theaters (AMC), American Airlines (AAL), Bed Bath & Beyond (BBBY), BlackBerry (BB), Express (EXPR), Koss (KOSS) Naked Brand Group (NAKD), Nokia (NOK), Sundial Growers Inc.

(SNDL), Tootsie Roll Industries (TR), and Trivago NV (TRVG) (collectively, the "Relevant Securities")—that they believed would grow, increase in price and serve as good investment opportunities.

7.      Several large hedge funds and investment firms, including Citadel Enterprise Americas LLC, Citadel Securities LLC, Melvin Capital Management LP, and other unnamed co-conspirators, acquired and possessed massive "short" positions in the Relevant Securities.

8.      "Short" sellers borrow shares or other interests in corporate stock or other securities. In so doing, they bet that prices of such securities will decrease. If the stock prices in fact drop, a short seller buys the stock back at a lower price and returns it to the lender. The difference between the sell price and the buy price is the profit. Short sellers essentially bet on a stock's failure or decline rather than its success or increase.

9.      The Fund Defendants (defined below), and other unnamed co-conspirators, made short selling investments in the Relevant Securities. In so doing, they made highly speculative bets. When the Relevant Securities increased in value, due in large part to Retail Investors purchasing the Relevant Securities and increasing stock prices, the Fund Defendants, Clearinghouse Defendants and unnamed co-conspirators were exposed to potential losses of several billion dollars.

10.      As Retail Investors and others continued to purchase the Relevant Securities, the Fund Defendants, Clearinghouse Defendants and unnamed co-conspirators were caught in a classic "short squeeze." A "short squeeze" occurs when a stock or other shorted security rises sharply in value, distressing short positions. Short selling investors are faced with a rapid increase in the shorted asset's value, exposing the short seller to increased and theoretically limitless loss. As the price of the asset rises, short sellers may face pressure to buy back stock to exit their short positions to mitigate their potential losses. In the absence of intervention, as short sellers exit their short positions to buy back stocks to cover their shorts, the purchase of stock further increases the price of the stock.

11.      The Brokerage Defendants, Fund Defendants and Clearinghouse Defendants (together the "Defendants") conspired to prevent the Retail Investors from buying any further stock and forcing Retail Investors to sell their Relevant Securities to artificially suppress stock prices of the Relevant Securities.

12.      On January 27, 2021, after the close of the stock market and before the open of the the next trading day, the Fund Defendants coordinated and planned increased short volumes in anticipation of short calls on January 28, 2021.

CLASS ACTION COMPLAINT

13.     The Brokerage Defendants—that operate through websites and mobile applications—disabled all buy features on their platforms and thereby left the Retail Investors with no choice but to sell or hold their rapidly dwindling stocks. The Brokerage Defendants did so to ensure that the stock prices for the Relevant Securities would go down in furtherance of the conspiracy. Other Brokerage Defendants displayed loading graphics on the landing pages for these Relevant Securities to prevent users from purchasing any more Relevant Securities. Plaintiffs and Class members, faced with an imminent decrease in the price of their positions in the Relevant Securities due to the inability of Retail Investors to purchase shares, were induced to sell their shares in the Relevant Securities at a lower price than they otherwise would have. Additionally, Class members that would have purchased more stock in the Relevant Securities given the upward trend in price could not do so.

14.     By doing so, the Defendants and their co-conspirators forced Retail Investors to choose between selling the Relevant Securities at a lower price or holding their rapidly declining positions in the Relevant Securities. Defendants did so to drive the price of the Relevant Securities down.

15.     Defendants and their co-conspirators conspired to prevent the Retail investors from buying further stock in order to mitigate the Fund Defendants' exposure in their short positions. By forcing the Retail Investors to sell their Relevant Securities at lower prices than they otherwise would have, Defendants artificially reduced the value of the Relevant Securities that Retail Investors either sold or held on to.

## JURISDICTION AND VENUE

16.     Plaintiffs bring this action on their own behalf as well on behalf of the members of the Class to recover damages, including treble damages, costs of suit, and reasonable attorneys' fees arising from Defendants' violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, Section 16 of the Clayton Act, 15 U.S.C. § 26, as well as any and all equitable relief afforded to them under the federal laws pleaded herein.

17.     This Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331 because the case arises under the Constitution, laws, or treaties of the United States.

18.     This Court also has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1332(d) and 1367, in that (a) this is a class action in which the matter or controversy exceeds the sum of $5,000,000, exclusive of interest and costs, and in which some members of the proposed Class are citizens of a state different from

some defendants; and (b) Plaintiffs' state law claims form part of the same case or controversy as their federal claims under Article III of the United States Constitution.

19. Jurisdiction and venue are proper in this judicial District pursuant to 28 U.S.C. § 1391(b), (c) and (d), because a substantial part of the events giving rise to Plaintiffs' claims occurred in this District, a substantial portion of the affected interstate trade and commerce was carried out in this District, and one or more of the Defendants reside in this District or are licensed to do business in this District. Each Defendant has transacted business, maintained substantial contacts, or committed overt acts in furtherance of the illegal scheme and conspiracy throughout the United States, including in this District. The conspiracy occurred in this judicial District. The conspiracy has been directed at, and has had the intended effect of, causing injury to persons residing in, located in, or doing business throughout the United States, including in this District.

20. This Court has personal jurisdiction over each Defendant because, each Defendant: (a) transacted business throughout the United States, including in this District; (b) transacted in substantial amounts of the Relevant Securities throughout the United States; (c) had substantial contacts with the United States, including this District; and/or (d) engaged in an antitrust conspiracy that was directed at and had a direct, foreseeable, and intended effect of causing injury to the business or property of persons residing in, located in, or doing business throughout the United States, including in this District.

21. The activities of the Defendants and all co-conspirators—whether unnamed or as of yet unknown—as described herein, were within the flow of, were intended to, and did have direct, substantial, and reasonably foreseeable effects on the foreign and interstate commerce of the United States.

**PARTIES**

**A.      Plaintiff Sabrina Clapp**

22. Plaintiff Sabrina Clapp is a resident of the State of Kentucky. Before January 28, 2021, Plaintiff Clapp purchased and owned securities in Nokia on Robinhood. Plaintiff Clapp bought these Relevant Securities with cash and not on margin.

23. On January 27, 2021, Plaintiff Clapp attempted to purchase Relevant Securities but was unable to do so because Defendants had deactivated the "buy" features on their applications due to the anticompetitive scheme.

CLASS ACTION COMPLAINT

24.     Plaintiff Clapp was unable to search for the Relevant Securities on Defendant Robinhood's platform on January 28, 2021.

**B.     Plaintiff Denise Redfield**

25.     Plaintiff Denise Redfield is a resident of the Commonwealth of Pennsylvania. On January 28, 2021, Plaintiff Redfield attempted to purchase Relevant Securities including BlackBerry, and Nokia via market order on Robinhood. Plaintiff, Redfield attempted to buy these Relevant Securities with cash and not on margin. Plaintiff, Redfield, was unable to buy these Relevant Securities, but was instead informed by Robinhood that her market orders had been cancelled.

26.     On January 29, and again on February 1, 2021, Plaintiff Redfield attempted to purchase Relevant Securities on Defendant Robinhood but was prohibited or limited from doing so due the anticompetitive scheme. Plaintiff, Redfield attempted to buy these Relevant Securities with cash and not on margin. Plaintiff, Redfield was unable to buy these Relevant Securities as she wished, but was instead informed by Robinhood that her market orders had been either cancelled or filled but limited to the purchase of either one share of five shares of specific Relevant Securities.

**C.     Brokerage Defendants**

**a.     Defendant Ally Financial Inc.**

27.     Defendant Ally Financial Inc. ("Ally") is a Delaware corporation, with its headquarters located at Ally Detroit Center 500, Woodward Ave., Floor 10, Detroit, Michigan. Ally provides financial services including an electronic trading platform to trade financial assets. Ally sold Relevant Securities directly to members of the Class during the Class Period.

**b.     Defendant Alpaca Securities LLC**

28.     Defendant Alpaca Securities LLC ("Alpaca") is a Delaware corporation, with its headquarters at 20 N San Mateo Drive Suite 10, San Mateo, California. Alpaca provides financial services including an electronic trading platform to trade financial assets. Alpaca sold Relevant Securities directly to members of the Class during the Class Period.

**c.     Defendant Cash App**

29.     Defendant Cash App Investing LLC ("Cash App Investing") is a Delaware corporation headquartered at 920, SW 6th Avenue Ste. 1200, Portland, Oregon. Cash App Investing is a wholly owned

subsidiary of Square Inc. Cash App Investing provides financial services including an electronic trading platform to trade financial assets. Cash App Investing sold Relevant Securities directly to members of the Class during the Class Period. Square Inc. and Cash App Investing LLC are referred collectively as "Cash App."

30. Defendant Square Inc. is a Delaware corporation with its headquarters located at 1455 Market Street, Suite 600, San Francisco, California.

### d. Defendant Dough

31. Defendant Dough LLC ("Dough") is a Delaware limited-liability corporation, with its headquarters located at 327 N. Aberdeen Street, Chicago, Illinois. Dough provides financial services including an electronic trading platform to trade financial assets. Dough sold Relevant Securities directly to members of the Class during the Class Period.

### e. Defendant E*Trade

32. Defendant Morgan Stanley Smith Barney LLC ("Morgan Stanley") is a Delaware limited-liability corporation and parent company of E*Trade, with its headquarters located at 1585 Broadway Avenue, New York, New York. Morgan Stanley is the owner and ultimate parent of E*Trade Securities LLC, E*Trade Financial Corporation, and E*Trade Financial Holdings. Morgan Stanley, E*Trade Securities LLC, E*Trade Financial Corporation, and E*Trade Financial Holdings are collectively referred to as "E*Trade."

33. Defendant E*Trade Securities LLC is a Delaware limited-liability corporation, with its headquarters at 671 North Glebe Road, Ballston Tower, Arlington, Texas.

34. Defendant E*Trade Financial Corporation is a Delaware corporation, with its headquarters at 671 North Glebe Road, Ballston Tower, Arlington, Texas.

35. Defendant E*Trade Financial Holdings, LLC is a Delaware limited-liability corporation, with its headquarters at 671 North Glebe Road, Ballston Tower, Arlington, Texas.

### f. Defendant eToro

36. Defendant Etoro USA Securities, Inc. ("eToro") is a Delaware corporation and owner of the application eToro, headquartered at 221 River St., 9th Floor, Hoboken, New Jersey. eToro provides financial services including an electronic trading platform to trade financial assets. eToro sold Relevant Securities directly to members of the Class during the Class Period.

CLASS ACTION COMPLAINT

**g. Defendant Freetrade**

37.     Defendant Freetrade, Ltd. ("Freetrade") is a company incorporated in the United Kingdom, headquartered at 32-38 Leman Street, London, United Kingdom. Freetrade provides financial services including an electronic trading platform to trade financial assets. Freetrade sold Relevant Securities directly to members of the Class during the Class Period.

**h. Defendant Interactive Brokers**

38.     Defendant Interactive Brokers LLC ("Interactive Brokers") is a Delaware limited-liability corporation headquartered at 1 Pickwick Plaza, Greenwich, Connecticut. Interactive Brokers provides financial services including an electronic trading platform to trade financial assets. Interactive Brokers sold Relevant Securities directly to members of the Class during the Class Period.

**i. Defendant M1 Finance**

39.     Defendant M1 Finance, LLC ("M1 Finance") is a Delaware corporation headquartered at 200 North La Salle Street, Suite 800, Chicago, Illinois. M1 Finance provides financial services including an electronic trading platform to trade financial assets. M1 Finance sold Relevant Securities directly to members of the Class during the Class Period.

**j. Defendant Public.com**

40.     Defendant Open To The Public Investing, Inc. ("Public.com") is a New York corporation, headquartered at 1 State Street Plaza, 10th Floor, New York, New York. Public.com provides financial services including an electronic trading platform to trade financial assets. Public.com sold Relevant Securities directly to members of the Class during the Class Period.

**k. Defendant Robinhood**

41.     Defendant Robinhood Markets, Inc. is a Delaware corporation with its principal place of business at 85 Willow Road, Menlo Park, California. Defendant Robinhood Markets, Inc. is the corporate parent of and controls the affairs of Defendants Robinhood Financial, LLC and Robinhood Securities, LLC.

42.     Defendant Robinhood Financial, LLC is a Delaware corporation with its principal place of business at 85 Willow Road, Menlo Park, California. It is a wholly- owned subsidiary of Robinhood Markets, Inc.

43.     Defendant Robinhood Securities, LLC is a Delaware corporation with its principal place of

business at 500 Colonial Center Parkway, Suite 100, Lake Mary, Florida. It is a wholly owned subsidiary of Defendant Robinhood Markets, Inc. Defendant Robinhood Financial (collectively, with Robinhood Financial, LLC and Robinhood Markets, Inc. as "Robinhood").

44.     Robinhood provides financial services including an electronic trading platform to trade financial assets. Robinhood sold Relevant Securities directly to members of the Class during the Class Period.

### l.   Defendant Stash

45.     Defendant Barclays Bank PLC is a company incorporated in the United Kingdom, and headquartered at 745 7th Ave New York, New York. Barclays Bank PLC is the ultimate corporate parent of, and controls the affairs of Stash Financial, Inc.

46.     Defendant Stash Financial, Inc. ("Stash") is a Delaware corporation and owner of the application Stash, headquartered at 500 7th Avenue,18th Floor, New York, New York. Stash is a wholly-owned subsidiary of Barclays Bank PLC. Stash provides financial services including an electronic trading platform to trade financial assets. Stash sold Relevant Securities directly to members of the Class during the Class Period.

### m.  Defendant Tastyworks

47.     Defendant IG Group Holdings PLC is a Delaware public limited company and ultimate corporate parent of and controls the affairs Tastyworks, Inc., headquartered at 200 West Jackson Blvd., Suite 1450, Chicago, Illinois.

48.     Defendant Tastyworks, Inc. is a Delaware corporation and wholly-owned subsidiary of IG Group Holdings PLC, headquartered at 100 West Fulton Market Street, Suite 220, Chicago, Illinois (IG Holdings and Tastyworks, Inc. collectively, "Tastyworks").

49.     Tastyworks provides financial services including an electronic trading platform to trade financial assets. Tastyworks sold Relevant Securities directly to members of the Class during the Class Period.

### n.   Defendant TD Ameritrade

50.     Defendant The Charles Schwab Corporation is a Delaware corporation with its principal place of business at 211 Main Street, San Francisco, California. The Charles Schwab Corporation is the ultimate corporate parent of and controls the affairs of Charles Schwab & Co., Inc. and TD Ameritrade Inc.

51.     Defendant Charles Schwab & Co. Inc. is a California corporation with its principal place of

business at 211 Main Street, San Francisco, California. Charles Schwab & Co. Inc. is a wholly owned subsidiary of The Charles Schwab Corporation.

52.     Defendant TD Ameritrade, Inc., is a New York corporation with its principal place of business in Illinois. As of October 2020, The Charles Schwab Corporation acquired TD Ameritrade, Inc. The Charles Schwab Corporation, Charles Schwab & Co., Inc. and TD Ameritrade, Inc. collectively, "TD Ameritrade." TD Ameritrade provides financial services including an electronic trading platform to trade financial assets. TD Ameritrade sold Relevant Securities directly to members of the Class during the Class Period.

### o.   Defendant Trade Republic

53.     Defendant FF Trade Republic Growth, LLC ("Trade Republic") is a Delaware corporation, headquartered at One Letterman Drive, Building D, 5th Floor, San Francisco, California. Trade Republic provides financial services including an electronic trading platform to trade financial assets. Trade Republic sold Relevant Securities directly to members of the Class during the Class Period.

### p.   Defendant Trading 212

54.     Defendant Trading 212 Ltd. is a Bulgarian company headquartered at 3 Lachezar Stanchev Str., Litex Tower, Floor 10, Sofia 1797, Bulgaria. Trading 212 Ltd. is the ultimate corporate parent of and controls the affairs of Trading 212 UK Ltd.

55.     Defendant Trading 212 UK Ltd. is a company incorporated in the United Kingdom headquartered at 107 Cheapside, London, United Kingdom. Trading 212 UK Ltd. a wholly-owned subsidiary of Trading 212 Ltd. (Trading 212 Ltd. and Trading 212 UK Ltd. collectively, "Trading 212"). Trading 212 provides financial services including an electronic trading platform to trade financial assets. Trading 212 sold Relevant Securities directly to members of the Class during the Class Period.

### q.   Defendant WeBull

56.     Defendant Fumi Holdings, Inc. is a Chinese corporation. Fumi Holdings, Inc. and headquartered in Hunan, China. Fumi Holdings, Inc. is the corporate parent of, and controls the affairs of Webull Financial LLC.

57.     Defendant Webull Financial LLC ("WeBull") is a Delaware corporation and wholly-owned subsidiary of Fumi Holdings, Inc., headquartered at 44 Wall Street, Ste 501, New York, New York. WeBull

is a wholly-owned subsidiary of Fumi Holdings, Inc. WeBull provides financial services including an electronic trading platform to trade financial assets. WeBull sold Relevant Securities directly to members of the Class during the Class Period.

### D. Fund Defendants

#### a. Defendant Citadel

58. Defendant Citadel Enterprise Americas LLC is a Delaware limited-liability corporation, headquartered at 131 South Dearborn Street, Chicago, Illinois. Citadel Enterprise Americas LLC is the corporate parent of, and controls the affairs of Citadel Securities LLC.

59. Defendant Citadel Securities LLC is a Delaware limited-limited corporation, headquartered at 131 South Dearborn Street, Chicago, Illinois. Citadel Securities LLC is a wholly-owned subsidiary of Citadel Enterprise Americas LLC. Citadel Enterprise Americas, LLC and Citadel Securities LLC collectively, "Citadel."

60. Defendant Citadel took short positions in the Relevant Securities. Citadel actively participated in the conspiracy and the wrongful acts alleged herein.

#### b. Defendant Melvin Capital

61. Defendant Melvin Capital Management LP (hereinafter "Melvin Capital") is a Delaware limited partnership headquartered at 535 Madison Avenue, 22nd Floor, New York, New York.

62. Defendant Melvin Capital took short positions in the Relevant Securities. Melvin Capital actively participated in the conspiracy and the wrongful acts alleged herein.

#### c. Defendant Sequoia

63. Defendant Sequoia Capital Operations LLC ("Sequoia") is a Delaware limited-liability corporation, headquartered at 2800 Sand Hill Road, Suite 101, Menlo Park, California.

64. Defendant Sequoia actively participated in the conspiracy and the wrongful acts alleged herein.

### E. Clearinghouse Defendants

#### a. Defendant Apex

65. Defendant Apex Clearing Corporation ("Apex") is a New York corporation headquartered at One Dallas Center, 350 N. St. Paul, Suite 1300, Dallas, Texas.

CLASS ACTION COMPLAINT

66. Defendant Apex participated in the conspiracy and the wrongful acts alleged herein.

**b. Defendant Depository Trust & Clearing Corporation**

67. Defendant The Depository Trust & Clearing Corporation ("DTCC") is a New York company headquartered at 55 Water Street, New York, New York.

68. Defendant DTCC participated in the conspiracy and the wrongful acts alleged herein.

## AGENTS AND CO-CONSPIRATORS

69. The anticompetitive and unlawful acts alleged against the Defendants in this class action complaint were authorized, ordered or performed by the Defendants' respective officers, agents, employees, representatives, or shareholders while actively engaged in the management, direction, or control of the Defendants' businesses or affairs.

70. The Defendants' agents operated under the explicit and apparent authority of their principals.

71. Each Defendant, and its subsidiaries, affiliates and agents operated as a single unified entity.

72. Various persons and/or firms not named as Defendants herein may have participated as co-conspirators in the violations alleged herein and may have performed acts and made statements in furtherance thereof.

73. Each Defendant acted as the principal, agent, or joint venture of, or for other Defendants with respect to the acts, violations, and common course of conduct alleged herein.

## CLASS ALLEGATIONS

74. Plaintiffs bring this action for damages and injunctive relief on behalf of themselves and all others similarly situated as a class action pursuant to Rules 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure, on behalf of the following Class:

> All persons or entities in the United States that directly purchased securities in GameStop Corp. (GME), AMC Entertainment Holdings Inc. (AMC), American Airlines Group Inc. (AAL), Bed Bath & Beyond Inc. (BBBY), BlackBerry Ltd. (BB), Express, Inc. (EXPR), Koss Corporation (KOSS), Naked Brand Group Ltd. (NAKD), Nokia Corp. (NOK), Sundial Growers Inc. (SNDL), Tootsie Roll Industries, Inc. (TR), or Trivago N.V. (TRVG) from one or more of the Defendants between January 1, 2021 through and until the anticompetitive effects of Defendants' unlawful conduct cease (the "Class Period").

75. This Class definition specifically excludes the following person or entities:

CLASS ACTION COMPLAINT

a. Any of the Defendants named herein;

b. Any of the Defendants' co-conspirators;

c. Any of Defendants' parent companies, subsidiaries, and affiliates;

d. Any of Defendants' officers, directors, management, employees, subsidiaries, affiliates, or agents;

e. All governmental entities; and

f. The judges and chambers staff in this case, as well as any members of their immediate families.

76. Plaintiffs do not know the exact number of Class members, because such information is in the exclusive control of Defendants. Plaintiffs are informed and believe that, due to the nature of the trade and commerce involved, there are millions of Class members geographically dispersed throughout the United States and elsewhere, such that joinder of all Class members in the prosecution of this action is impracticable.

77. Plaintiffs' claims are typical of the claims of their fellow Class members because Plaintiffs directly purchased stocks and instruments via the Brokerages. Plaintiffs and all Class members were damaged by the same wrongful conduct of Defendants as alleged herein, and the relief sought herein is common to all members of the Class.

78. Plaintiffs will fairly and adequately represent the interests of the Class because they purchased the Relevant Securities directly from the one or more of the Defendants and have no conflicts with any other members of the Class. Furthermore, Plaintiffs have retained sophisticated and competent counsel who is experienced in prosecuting antitrust class actions, as well as other complex litigation.

79. Numerous questions of law or fact common to the entire Class—including, but not limited to those identified below—arise from Defendants' anticompetitive and unlawful conduct:

a. whether Defendants combined or conspired with one another to artificially suppress prices for the Relevant Securities at any time during the Class Period to purchasers in the United States;

b. whether Defendants combined or conspired with one another to fix, raise, maintain, stabilize and/or suppress prices for Relevant Securities at any time during the Class

CLASS ACTION COMPLAINT

Period to purchasers in the United States;

    c.   whether Defendants' conduct caused the prices of the Relevant Securities, sold or held by the Retail Investors in the United States at any time during the Class Period to be artificially fixed, suppressed, maintained or stabilized;

    d.   whether Plaintiffs and the other members of the Class were injured by Defendants' conduct and, if so, the appropriate Class-wide measure of damages; and

    e.   whether Plaintiffs and other members of the Class are entitled to, among other things, injunctive relief, and, if so, the nature and extent of such relief.

80.    These and other questions of law and fact are common to the Class and predominate over any questions affecting the Class members individually.

81.    Defendants have acted on grounds generally applicable to the Class, thereby making final injunctive relief appropriate with respect to the Class as a whole. This class action is superior to alternatives, if any, for the fair and efficient adjudication of this controversy. Prosecuting the claims pleaded herein as a class action will eliminate the possibility of repetitive litigation. There will be no material difficulty in the management of this action as a class action.

82.    The prosecution of separate actions by individual Class members would create the risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

## FACTUAL ALLEGATIONS

83.    Retail Investors participate in online financial discussion forums, including but not limited to Reddit, Facebook, and TikTok. Through these forums, and elsewhere, Retail Investors are able to trade information about their market observations and help like-minded peers benefit from their research. During the Relevant Period, Retail Investors communicated and exchanges information regarding the Relevant Securities, among other things.

84.    Based on their research, the Retail Investors, through stockbrokers such as the Brokerage Defendants, invested in the Relevant Securities that they believed would increase in price and grow.

85.    The Fund Defendants and unnamed co-conspirators purchased and held "short" positions in the Relevant Securities. By the nature of the short positions, the Fund Defendants, the Clearinghouse Defendants and certain unnamed co-conspirators stood to benefit and substantially profit were the prices of

    CLASS ACTION COMPLAINT

the Relevant Securities to decrease. Short-selling is highly speculative. In a free and open market, there would be substantial financial risk that prices might increase causing the short sellers to cover the contract at a loss.

86.     The Fund Defendants, Clearinghouse Defendants and unnamed co-conspirators predicted incorrectly. The Relevant Securities grew in value, exposing the Defendant Funds and Clearing Houses to billions of dollars in losses.

87.     Rather than facing the consequences of their risky bets, the Fund Defendants, Clearinghouse Defendants and their co-conspirators entered into an agreement and conspiracy to prevent the market from operating, to prevent decrease in prices of the Relevant Securities, to avoid their own financial losses and to cause financial losses to Plaintiffs and the members of the Class.

*** Background ***

88.     Retail Investors or individual investors are non-professional investors that execute their personal trades through brokerage firms or investment accounts.

89.     Retail Investors discuss and exchange information regarding investments including the Relevant Securities on financial discussion forums on social networking sites like Reddit, Facebook, Twitter, TikTok and Discord.

90.     Many of the Brokerage Defendants represented to the Retail Investors that they were offering free brokerage services to facilitate fair trading in the stock market.

91.     The Brokerage Defendants are stockbrokers that run online platforms from which Plaintiffs and other Retail Investors directly purchase and sell securities during the Class Period.

92.     The Retail Investors identified as early as 2019, that GameStop's (GME) stock price was lower than they expected it to be based on GameStop's publicly available financial disclosures and future prospects.

93.     GameStop, for example, despite being a brick-and-mortar store specializing in video games that can now be downloaded from a person's home, possessed ample cash reserves, was regularly paying off its debts and was presented new opportunity with the release of the next generation of gaming platforms. Despite this, in 2019, GameStop's stock was valued as low as $3 per share. Retail Investors correctly deduced that GameStop was undervalued because large financial institutions had taken large short positions, essentially betting on GameStop's failures. Due to GameStop's low stock price, the Retailer Investors

CLASS ACTION COMPLAINT

correctly determined GameStop represented a good investment opportunity.

94. In addition to GameStop, Retail Investors invested in the other Relevant Securities based on their valuation and anticipated business performance. For example, Retail Investors invested in Nokia (NOK) because Nokia, which had historically focused its business on the manufacture and sale of mobile phone handsets, had been expanding in other industries, including investing in 5G communication networks, including towers and other infrastructure.

95. Like other Retail Investors, Plaintiffs purchased "long" positions in these companies, including stocks, option contracts and other securities.

96. In a free and open market, stock prices are determined by the laws of supply and demand as purchasers and sellers bid and ask stock prices. As more investors buy a certain stock, and bid up the stock's prices, the market price for the stock rises. Conversely, as investors sell stock, the stock price is bid down and the market price for the stock declines.

97. If an investor has a long position, it means that the investor has bought and owns those shares of stocks (in contrast to a short position, where the investor owes those stocks to someone, but does not actually own them yet). Investors holding long positions generally own the stock with the expectation that it will rise in value and it will be worth more than they paid for it. When the investor sells a long position, the profit or loss from the same is the difference between the purchase price of the security and the sale price of the security.

98. Retail Investors took long positions in the Relevant Securities with the expectation that the stock would increase in value, generally because they believed that the respective companies' business prospects were improving. Investors in the Relevant Securities generally believed they were good investment opportunities, and that prices of their securities would rise as can be expected when a market is operating freely, without fraud, conspiracy or manipulation.

99. Institutional investors, including the Fund Defendants and unnamed co-conspirators, acquired massive "short" positions in the Relevant Securities.

100. As indicated above, "short" sellers borrow shares of an asset that they believe will fall in price only to buy them after the asset declines in value. Short sellers essentially bet on an asset's failure rather than its success. Profit is made in the difference between the value lost at the time sold versus when the time

CLASS ACTION COMPLAINT

when the short position is bought. For example, a short seller borrows a share of Company X (for a fee) from a broker which is presently valued at $10. The short seller immediately sells the share and waits for the value of the share to drop. The share price then falls to $4. The short seller then purchases the share at the reduced value of $4 and returns it to the lender and earns the difference of $6. Short sales are often time limited. On the other hand, if the price of the share rises to $20, the short seller would need to purchase the share at $20 to return it to the lender, thereby incurring a loss of $10.

101.    To a short seller, the more a stock price increases, the greater the loss to the short seller. The theoretical loss to a short investor who predicts wrongly is potentially infinite. Should a short seller want to exit a short position in the face of rapidly increasing stock price, they must "buy back" the stock at the higher price to return to the institution they borrowed the share from. Risk from bad short selling investments is potentially ruinous and catastrophic.

102.    On the other hand, an investor who purchases a stock "long" is limited to a maximum loss of the price of an asset potentially decreasing to zero.

103.    Defendant Melvin Capital, for example, shorted approximately 140% of GameStop's total stock. The practice of short selling more shares than exists is itself an illegal practice known as "naked shorting." In a "naked" short sale, a seller does not borrow or arrange to borrow the necessary securities in time to deliver them to the buyer within the standard three-day settlement period. Although abusive "naked" short selling is not defined in the federal securities laws, it refers generally to selling short without having stock available for delivery and intentionally failing to deliver stock within the standard three-day settlement period.

104.    As a result of Retail Investors purchasing long positions in the Relevant Securities, the stock price of these companies began to rise. As the value of the Relevant Securities increased, this resulted in a "short squeeze."

105.    A short squeeze occurs when a stock or other asset rises sharply in value, distressing short positions in the asset. A short squeeze therefore is when investors in short positions are faced with a rapid increase in the shorted asset's value, exposing the short seller to increased loss. As the price of the asset rises, short sellers may face pressure to buy back stock to exit their short positions to mitigate their losses. In the

CLASS ACTION COMPLAINT

absence of intervention, as short sellers exit their short positions to buy back stocks to cover their shorts, the purchase of stock further increases the price of the stock.

106. For example, with regard to GameStop, a popular Reddit user who also creates content on YouTube under the handle Roaring Kitty ("Roaring Kitty") had reason to believe that hedge funds had entered into these short positions with respect to GameStop's stock. Based on his own financial analysis, Roaring Kitty determined that GameStop was actually undervalued due to coordinated shorting of GameStop by numerous funds and made an initial purchase of $50,000 of GameStop stock and published his investments on the Reddit financial discussion forum WallStreetBets.

107. WallStreetBets is a financial discussion forum on Reddit. WallStreetBets is characterized by a particular culture centered around discussion of financial investments and memes. Many users on WallStreetBets are sophisticated, financially savvy Retail Investors with business acumen.

108. Roaring Kitty regularly updated and continued to publish information and analysis that GameStop stocks were undervalued. In August 2020, Roaring Kitty posted an in-depth analysis of GameStop's stock on his YouTube channel, walking his subscribers through his extensive analysis of the value proposition of the stock.

109. Attention to GameStop's stock was not limited to online financial communities and discussion forums. Dr. Michael Burry (who gained fame for his investment decisions in relation with correctly predicting the 2008 financial crisis as presented in the film *The Big Short*) and his investment firm Scion Asset Management, LLC, spent nearly $15 million to purchase stock in GameStop in 2019 at share prices between $2 and $4.20 per share for a 5% ownership position in GameStop. Retail Investors took notice and GameStop's price steadily increased.

110. Ryan Cohen, the co-founder and former CEO of the pet e-commerce website Chewy.com, invested $76 million and acquired a 12.9% stake in GameStop in 2020. Several Retail Investors were optimistic about Ryan Cohen's involvement in GameStop, who joined the board of directors on January 11, 2021.

111. Institutional investors, holding large short positions in GameStop's stock and other Relevant Securities began to push back and attempted to message on media and elsewhere that the Relevant Securities were not as valuable as the Retail Investors thought. For example, on January 21, 2021, when GameStop was

valued at approximately $20 per share, Andrew Left, the founder of Citron Research, a capital research and investment firm, gave an interview explaining why he was shorting GameStop.

112. In response, Retail Investors further went long on GameStop and other Relevant Securities. Given the operation of a free and open market, the prices of GameStop and other Relevant Securities was bid up and prices increased. This exposed short sellers in those stocks, including the Fund Defendants, to substantial loses. It was a textbook short squeeze.

113. On January 21, 2021, the Relevant Securities' stock prices increased substantially. For example, on January 8, 2021, GameStop's stock was priced at $17.69 per share. On January 27, 2021, driven by investments from Retail Investors, GameStop's stock closed at $347.51. Other Relevant Securities experienced similar increases.

114. The chart below summarizes the prices of GameStop stock from December 28, 2020 through January 29, 2021.



115.    The chart below summarizes the prices of Nokia Corporation stock from December 28, 2020 through January 29, 2021.



116.    The chart below summarizes the prices of American Airlines Group Inc. stock from December 28, 2020 through January 29, 2021.



CLASS ACTION COMPLAINT

117. The chart below summarizes the prices of Sundial Growers Inc. stock from December 28, 2020 through January 29, 2021.



118. The chart below summarizes the prices of Naked Brand Group Limited stock from December 28, 2020 through January 29, 2021.



CLASS ACTION COMPLAINT

119.    The chart below summarizes the prices of AMC Entertainment Holdings, Inc. stock from December 28, 2020 through January 29, 2021.



120.    The chart below summarizes the prices of Koss Corporation stock from December 28, 2020 through January 29, 2021.



CLASS ACTION COMPLAINT

121. The chart below summarizes the prices of Trivago stock from December 28, 2020 through January 29, 2021.



122. The chart below summarizes the prices of Bed Bath & Beyond stock from December 28, 2020 through January 29, 2021.



CLASS ACTION COMPLAINT

123. The chart below summarizes the prices of Express stock from December 28, 2020 through January 29, 2021.



124. The chart below summarizes the prices of Tootsie Roll Industries Inc. stock from December 28, 2020 through January 29, 2021.



CLASS ACTION COMPLAINT

125.    The chart below summarizes the prices of BlackBerry stock from December 28, 2020 through January 29, 2021.



126.    The tremendous growth in the Relevant Securities' stock price resulted in significant and potentially disastrous exposure of institutional investors, and hedge funds, including the Fund Defendants and their co-conspirators holding short positions in the Relevant Securities.

127.    Defendant Citadel Investments, for example, holds a significant interest in Defendant Melvin Capital (who held an illegal naked 140% short position) and was forced to inject around $3 billion along with another fund, Point72, to bailout Melvin Capital from its distressed short position.

128.    In essence, small Retail Investors concluded that institutional investors had severely undervalued the Relevant Securities by shorting them, presenting a good investment opportunity. By investing in the undervalued Relevant Securities, the Retail Investors were outfoxing Wall Street at its own game.

### The Illegal Scheme

129.    Rather than use their financial acumen to compete and invest in good opportunities in the market to recoup the loss in their short positions the growth in the Relevant Securities' prices represented,

or paying the price for their highly speculative bad bets, Defendants instead hatched an anticompetitive scheme to limit trading in the Relevant Securities.

130. After the market closed on January 27, 2021, after-hours revealed suspicious coordinated trading activity. After-hours trading is not available for individual Retail Investors and is restricted to institutional investors such as hedge funds.

131. Analytics revealed a significant volume of GME short volume immediately prior to the markets opening on January 28, *i.e.*, after-hour traders were taking more short positions suggesting after-hour traders were trading in anticipation of a GME sell-off. The grey lines in chart below represent the volume of short positions in GME. As demonstrated by the grey lines below, the volume of short positions was much higher before January 28, 2021 than any of the prior days and had steadily increased the week prior.



CLASS ACTION COMPLAINT

132.     As described above, Retail Investors cannot engage in after-hours trading. It is likely that this increase in short volume is the result of institutional investors, like the Fund Defendants, taking new short positions.

133.     The dramatic increase in short positions was counterintuitive. Chatter in various financial discussion forums indicated high excitement and motivation on the part of Retail Investors to continue investing in the Relevant Securities. Many Retail Investors announced plans to increase positions in the Relevant Securities on January 28, 2021, which would mean the prices for the Relevant Securities were likely to go further up, not down.

### The Events of January 28, 2021

134.     As the markets opened on January 28, 2021, Retail Investors woke up to find that the Brokerage Defendants and other unnamed brokerages had suddenly and without notice restricted their ability to buy long positions in the Relevant Securities. Pursuant to the anticompetitive scheme, the Brokerage Defendants implemented these changes on or about the same time. It would not have been in their economic interest to do so, but for the illegal conspiracy.

135.     Retail Investors that used Robinhood as their brokerage could no longer click on the "buy" option for any of the Relevant Securities. The "buy" button was deactivated as a feature, leaving users with no option but to sell their securities.

136.     Defendant Robinhood addressed the "Why don't I see a buy button?" question on its website here:     https://robinhood.com/us/en/support/articles/why-dont-i-see-a-buy-button/.     It offers three reasons for the buy button being unavailable on a user's account. The three reasons are: (a) "It's a foreign stock, which we don't support." (b) "It's an over-the-counter (OTC) stock or a warrant, which Robinhood generally doesn't support." (c) "It's a stock undergoing corporate action. The stock will be tradable again once the corporate action has been finalized." Defendant Robinhood's explanations made little sense, however, because the Relevant Securities were not foreign stocks, OTC stocks or stocks undergoing corporate actions during the Class Period. Robinhood does not warn users of any situation where it could prevent users from buying stock out of its own volition. This explanation was incomplete and untrue and did not disclose the conspiracy underlying the change.

CLASS ACTION COMPLAINT

137.   Retail Investors who had queued purchase orders overnight on January 27, 2021 to purchase stock when the markets opened on January 28, 2021 discovered that their purchase orders had been cancelled without their consent. Some received messages that claimed, "You canceled your order," despite having never having done so.

Jan 27, 18:04


We've received your order to buy $100.00 of NOK.

If this order isn't filled by the end of market hours (4pm ET) on the next trading day, it will expire.

Jan 28, 08:27


You've canceled your order to buy $100.00 of NOK.

08:27

138.   The restrictions on trading took different forms but had the same effect. Retail Investors were prohibited from opening new long positions in the Relevant Securities. In other words, Retail Investors were not permitted to purchase new positions but only permitted to sell their long positions but not buy more.

139.   On Defendant Robinhood's web platform and mobile app, Retail Investors were blocked from searching for the Relevant Securities in Robinhood's app. In fact, their respective ticker symbols were not even searchable by Retail Investors. The market was essentially shut down with the purpose of benefitting the participants in the conspiracy and with the intent to harm Plaintiffs and the members of the Class.

140.   Defendant Stash prohibited users from viewing tickers for the Relevant Securities, and the pages only displayed loading graphics (shown below). Other tickers were under no such restriction and were easily searchable on the platform. Because of the Stash platform's design, a Retail Investor who cannot view

the page for a particular asset cannot trade in that asset. As a result, Retail Investors were unable to access the page for the Relevant Securities to open new long positions in the Relevant Securities.



141.    While there had been reports of increasing government attention from the SEC in relation to these rapidly increasing prices of the Relevant Securities, there was no formal governmental guidance issued to restrict trading in these stocks in advance of January 28, 2021.

142.    Reporting throughout January 28, 2021, revealed that the ban on purchasing stock of the Relevant Securities was widespread among brokerages. On information and belief, the Brokerage Defendants adopted similar if not identical restrictions to Retail Investors from opening new positions in all, or at least one or more of the Relevant Securities. It is unlikely that they would have done so, but for the conspiratorial agreement. The market was essentially shut down with the purpose of benefitting the participants in the conspiracy and with the intent to harm Plaintiffs and the members of the Class.

143.    Pursuant to the illegal anticompetitive scheme, the coordinated prohibition on buying any new Relevant Securities—through the Brokerage Defendants' forced foreclosure on Retail Investors from

buying Relevant Securities—led to a massive sell-off. This resulted in a steep decline in the stock prices for the Relevant Securities.

144.     For example, on January 28, 2021, GameStop's stock fell 44.11% and closed at $193.60 per share. Retail Investors who wanted to take advantage of the price drop to buy more stock were unable to due to the coordinated ban on purchasing.

145.     The prohibition on purchasing stock did not apply to all investors. Large investment firms such as the Fund Defendants faced no restrictions to purchasing the Relevant Securities. Whereas Retail Investors were excluded from purchasing securities at the reduced rate. Investment firms holding short positions were permitted to cover their short positions by buying securities at the artificially reduced price.

146.     The coordinated prohibition on purchasing placed on Retail Investors quickly resulted in scrutiny from journalists and lawmakers. Defendant Robinhood in particular drew criticism from lawmakers on both sides of the aisle, including calls for Congressional and DOJ investigations.

147.     In response to the events of January 28, 2021, the SEC issued a formal letter that it was investigating the situation on January 29, 2021.

148.     Robinhood's conflict-ridden relationship with the Fund Defendants quickly came to light. In addition to its financial interest in Defendant Melvin Capital, it was revealed that Defendant Citadel regularly worked closely with Defendant Robinhood, serving as Defendant Robinhood's market maker over 60% of the time.

149.     Defendant Citadel also pays Defendant Robinhood for order flow. Payment for order flow is a kickback that a brokerage firm receives for directing orders to third party-market makers, like Citadel, for trade execution.

150.     Reporting revealed that Defendant Citadel had "reloaded" their short positions before instructing Defendant Robinhood to prohibit the purchases of GameStop and other stocks.

151.     Employees of the Brokerage Defendants began to emerge as whistleblowers in online forums. A purported Robinhood employee reported on Reddit that Robinhood's founder and other c-level executives had received calls from Defendant Sequoia Capital pressuring Robinhood into restricting trading in one or more of the Relevant Securities.

152.     Other brokerage firms took overt acts in furtherance of the anticompetitive scheme. Certain

brokerages sold off long positions in stocks without the permission of the investor.

153. The Verge reported that several Retail Investors reported that they had purchased and filled orders of GME and AMC on Robinhood, but discovered that the stock had been sold without their permission on January 28, 2021. Another Retail Investor reported that a purchase of Naked Brand stock (NAKD) had been filled but subsequently sold without their consent. While Robinhood had warned investors that it may automatically sell off option contracts or assets purchased on margin, these investors denied that they had purchased stocks on margin and did not purchase option contracts. These Retail Investors had purchased cash positions in the Relevant Securities that were sold off without their consent.

154. Defendants were aware that they were colluding to manipulate the market. In an interview



Robinhood

---

## Important Information About Your Robinhood Account

Hi ███████

In light of recent volatility, we are restricting transactions for certain securities to position closing only. However, due to the unreasonable risk involved in brokering your position, we have closed your 4,500 shares of GME for an average price of $118.93 on January 28th, 2021 at 11:24 AM.

given by Defendant Interactive Brokers' chairman Thomas Peterffy, Mr. Peterffy admitted that Interactive Brokers had restricted trading in order to "protect ourselves."

155. The anticompetitive conspiracy was authorized, ordered or performed by the Defendants' respective officers, agents, employees, representatives, or shareholders while actively engaged in the management, direction, or control of the Defendants' businesses or affairs.

156. At least 18 brokerages together prohibited Retail Investors from opening new positions in GME, AMC and other Relevant Securities on January 28, 2021. Some restricted Retailer Investors from opening new long positions in securities wholesale, whereas others restricted purchasing options only. No brokerages restricted selling of Relevant Securities by any investor, whether by a retail investor or large institutional investor.

157.    Not all brokerages banned the purchase of the Relevant Securities. Even in the cases where brokerages were allowing Retail Investors to open new long positions, however, the Clearinghouse Defendants began to raise fees to purchase securities or otherwise instruct brokerages to not consummate purchase orders.

158.    Brokerages route trades through clearinghouses which streamlines the trading process. Some brokerages, such as Defendant Robinhood, serve as their own clearinghouse. By increasing fees to purchase a particular stock, the clearinghouse can suppress the amount of purchases of that stock and affect the stock's price.

159.    The Clearinghouse Defendants raised the fees for consummating purchases of the Relevant Securities to the non-conspiring brokerages, further facilitating the Fund Defendants covering of their short positions in furtherance of the conspiracy.

160.    Nondefendant brokerage SoFi momentarily had trading in the Relevant Securities forcibly suspended by Clearinghouse Defendant Apex.



//

CLASS ACTION COMPLAINT

161. SoFi quickly objected to Defendant Apex's attempt to restrict trading in the Relevant Securities on SoFi's platform and trading was soon permitted on SoFi without restriction.

162. Anthony Denier, the CEO of Defendant Webull Financial LLC, a brokerage which had restricted trading in the Relevant Securities, placed the blame squarely on its clearinghouse, Defendant Apex Clearing, for the restrictions on trading the stocks. According to Denier, the collateral required by Apex for GameStop increased by 100% and Apex had informed him that Webull needed to shut off the ability to open new positions in certain stocks. Denier further said that the restrictions originated the morning of January 28, 2021 and was informed that Apex was instructed by the Defendant Depository Trust & Clearing Corporation that it was increasing the collateral needed to settle trades for the Relevant Securities.

163. Denier further said that the restrictions originated the morning of January 28, 2021 and was informed that Defendant Apex was instructed by the Defendant Depository Trust & Clearing Corporation that it was increasing the collateral needed to settle trades for stocks such as GameStop.

164. Other brokerages such as Defendants Ally Financial Inc., M1 Finance, Tastyworks, and Public.com also reported that Defendant Apex had halted all opening transactions of GameStop, AMC and Koss, which they blamed for trading restrictions of the Relevant Securities on their platforms.

165. Similarly, Defendant Freetrade blamed Clearinghouse Defendant Barclay's PLC for its restrictions of the Relevant Securities on its platform.

166. Defendant Trading212 uses Defendant Interactive Brokers as its intermediary and said Defendant Interactive Brokers was at fault for Defendant Freetrade's restrictions on the Relevant Securities.

167. Defendants' conspiratorial acts resulted in lockstep price movements of the Relevant Securities that can only be explained by coordinated lockstep actions by Defendants, in particular when considering Retail Investors were only permitted to sell positions in the Relevant Securities.

168. As demonstrated by the charts below, the stock prices of the Relevant Securities moved almost in parallel with each other throughout January 28, 2021. The charts revealed a coordinated rise in the prices of the Relevant Securities at approximately 11:00-11:30 a.m. after the Relevant Securities took a steep dive after the markets opened. At that time, few if any Retail Investors were permitted to purchase positions in the Relevant Securities and only institutional investors such as the Fund Defendants were permitted to purchase.

CLASS ACTION COMPLAINT



***The Anticompetitive Scheme is Ongoing***

169.  Even in the face of increased scrutiny, Defendants continued their anticompetitive scheme to suppress the price of the Relevant Securities.

170.  Partly as a result of criticism, the Brokerage Defendants nearly all permitted Retail Investors to open new long positions in the Relevant Securities as the market opened on January 29, 2021.

//
//
//
//
//
//
//
//
//
//

CLASS ACTION COMPLAINT

171.    Defendant Freetrade, a brokerage based in the United Kingdom, citing concerns from its foreign exchange provider, restricted trades in United States securities altogether on January 29, 2021, after restricting purchases on January 28, 2021.



172.    While purchases were permitted, they were heavily restricted by the Brokerage Defendants. Nevertheless, Retail Investors, still believing in the value of these assets, continued to purchase stock in the Relevant Securities once they were permitted to.

173.    Many of the Brokerage Defendants restricted trading of long option contracts and announced to Retail Investors they would close out their profitable option positions automatically.



174.     The Relevant Securities began to regain the value lost the prior day as a result of Defendants' coordinated action to suppress the value of the stocks.

175.     Because the Fund Defendants and other unnamed conspirators still had distressed short positions outstanding, this threatened their ill-gotten gains achieved the day before.

176.     Defendant Robinhood limited users to purchasing a limited amount of stock. With respect to GameStop, for example, Defendant Robinhood first restricted Retail Investors to purchasing only five shares of GameStop, which resulted in a rapid decline in the value of GameStop. As GameStop's stock price recovered, Defendant Robinhood further limited purchases to two shares.

### Error

This order will exceed the maximum allowed GME shares you can hold at this time. You currently have 5 shares purchased or pending - including this order - which exceeds the limit of 2 shares.

**Dismiss**

177.     When the value of GameStop again began to recover, Defendant Robinhood later instituted a one share limit to acquisitions of GameStop, further causing the value of GameStop to decrease.

178.     Brokerage Defendants instituted similar restrictions as to other Relevant Securities.

### Error

This order will exceed the maximum allowed AMC shares you can hold at this time. You currently have 17 shares purchased or pending - including this order - which exceeds the limit of 1 share.

**Done**

CLASS ACTION COMPLAINT

179.    Each artificial limitation in the amount of securities a Retail Investor could purchase correlated with a subsequent decrease in stock value. As purchases of the Relevant Securities were limited, more investors were pressured to sell who otherwise would not have in the presence of a free and open market.



180.    The extent and scope of the conspiracy is still as of yet unknown. Plaintiffs believe the anticompetitive scheme is ongoing. In the evening of January 29, 2021, Defendant Robinhood announced it was increasing the number of restricted stocks from 13 to 50. On January 30, 2021, Reuters reported that Defendant IG Group was continuing to suspend trading in the Relevant Securities.

**CLAIMS FOR RELIEF**

**COUNT ONE**

**CONSPIRACY TO RESTRAIN TRADE**
**IN VIOLATIONOF SECTION 1 OF THE SHERMAN ACT,**
**15 U.S.C. § 1**
**(Against all Defendants)**

181.    Plaintiffs hereby incorporate by reference the factual allegations as set forth above.

182.    On information and belief, the Defendants conspired and entered into an anticompetitive scheme to fix, raise, stabilize, maintain or suppress the price of the Relevant Securities.

CLASS ACTION COMPLAINT

183. Faced with potentially disastrous losses due to their illegal short position, the Fund Defendants, rather than engage in competition, conspired, combined, agreed and colluded with the Brokerage Defendants and Clearinghouse Defendants to restrict purchases in stocks by retailer investors and to manipulate and artificially suppress the price of stock, through which they could cover their short positions.

184. Defendants conspired and agreed with one another with the intent to artificially lower the price of the relevant stocks.

185. Defendants coordinated a collective shutdown of the stock brokerage market with respect to the Relevant Securities, prohibiting market participants with the exception of the Fund Defendants from purchasing stock in the Relevant Securities. Pursuant to the conspiracy, the restriction of stock purchases resulted in a sell-off of stocks, driving down prices in the Relevant Securities to levels that would not have been obtained, but for the conspiracy, combination, agreement and restraint of trade.

186. In furtherance of the conspiracy, combination, agreement and restraint of trade, on January 27, 2021, after the close of the stock market and before the open of the market the next day, the Fund Defendants coordinated and planned increased short volumes in anticipation of short calls on January 28, 2021.

187. In furtherance of the conspiracy, combination, agreement and restraint of trade, the Brokerage Defendants have prohibited, continue to prohibit, or unreasonably restrict the purchases of shares of the Relevant Securities by Plaintiffs in restraint of trade.

188. As a direct and intended result of Defendants contract, combination, agreement and restraint of trade or conspiracy, Defendants caused injury to Plaintiffs by restricting purchases of Relevant Securities. The Brokerage Defendants deactivated the buy option on their platforms and left Plaintiffs with no option but to sell shares of the stocks on their platforms. Plaintiffs and Class members, faced with an imminent decrease in the price of their positions in the Relevant Securities due to the inability of Retail Investors to purchase shares, were induced to sell their shares in the Relevant Securities at a lower price than they otherwise would have, but for the conspiracy, combination, agreement and restraint of trade. Additionally, Class members that would have purchased more stock in the Relevant Securities given the upward trend in price could not do so.

189.     Pursuant to the contract, combination, agreement, conspiracy and restraint of trade, the Brokerage Defendants permitted the Fund Defendants to purchase stocks at the artificially deflated prices. The Fund Defendants, who were in exposed short positions due to the short squeeze, purchased the artificially price-suppressed stocks to cover their short positions.

190.     Not all brokerages joined in the anticompetitive scheme with the Brokerage Defendants. To induce compliance and to limit the effects non-complying brokerages could have in disrupting Defendants' anticompetitive scheme, the Clearinghouse Defendants raised the fees and/or removed the ability to fill purchases of the Relevant Securities to the non-conspiring brokerages, further facilitating the Fund Defendants covering of their short positions in furtherance of the conspiracy.

191.     Defendants' anticompetitive and unlawful conduct is per se illegal.

192.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and Class members were injured in their business and property.

193.     Plaintiffs and the Class further seek equitable and injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable law, to correct the anticompetitive effects caused by Defendants' unlawful conduct.

## COUNT TWO

### CONSPIRACY TO RESTRAIN TRADE
### IN VIOLATION OF THE CALIFORNIA CARTWRIGHT ACT,
### CAL. BUS. & PROF. CODE § 16700 et seq.
### (Against all Defendants)

194.     Plaintiffs hereby incorporate by reference the factual allegations as set forth above.

195.     On information and belief, the Defendants and their conspirators entered into an unlawful agreement and engaged in a continuing unlawful trust in restraint of trade and commerce as described herein in violation of California Business and Professions Code § 16720 to fix, stabilize, maintain or suppress the price of the Relevant Securities.

196.     Faced with potentially disastrous losses due to their illegal short position, the Fund Defendants, rather than engage in competition, conspired, combined, agreed and colluded with the Brokerage Defendants and Clearinghouse Defendants to restrict purchases in stocks by retailer investors and to manipulate and artificially suppress the price of stock, through which they could cover their short

positions.

197.    Defendants conspired and agreed with one another with the intent to artificially lower the price of the Relevant Securities. Defendants agreed to pool, combine or directly or indirectly unite their interests such that the price of the Relevant Securities would be fixed, stabilized, maintained, suppressed.

198.    Defendants coordinated a collective shutdown of the stock brokerage market with respect to the Relevant Securities prohibiting market participants with the exception of the Fund Defendants from purchasing stock in the Relevant Securities. Pursuant to the conspiracy, the restriction of stock purchases resulted in a sell-off of stocks, driving down prices in the Relevant Securities to levels that would not have been obtained, but for the conspiracy, combination, agreement and restraint of trade.

199.    In furtherance of the unlawful trust and restraint of trade, on January 27, 2021, after the close of the stock market and before the open of the market the next day, the Fund Defendants coordinated and planned increased short volumes in anticipation of short calls on January 28, 2021.

200.    In furtherance of the unlawful trust and restraint of trade, the Brokerage Defendants have prohibited, restricted, and continue to prohibit and unreasonably restrict the purchases of shares of the Relevant Securities by Plaintiffs in restraint of trade.

201.    As a direct and intended result of Defendants' unlawful trust and restraint of trade, Defendants caused injury to Plaintiffs by restricting purchases and sales of shares Relevant Securities. The Brokerage Defendants deactivated the buy option on their platforms and left Plaintiffs with no option but to sell shares of the stocks on their platforms. Plaintiffs and Class members, faced with an imminent decrease in the price of their positions in the Relevant Securities due to the inability of Retail Investors to purchase shares, were induced to sell their shares in the Relevant Securities at a lower price than they otherwise would have, but for the conspiracy, combination, agreement and restraint of trade. Additionally, Class members that would have purchased more stock in the Relevant Securities given the upward trend in price could not do so.

202.    Pursuant to the unlawful trust and restraint of trade, the Brokerage Defendants permitted the Fund Defendants to purchase stocks at the artificially deflated prices. The Fund Defendants, who were in exposed short positions due to the short squeeze, purchased the artificially price-suppressed stocks to cover their short positions.

203.     Not all brokerages joined in the anticompetitive scheme with the Brokerage Defendants. To induce compliance and to limit the effects non-complying brokerages could have in disrupting Defendants' anticompetitive scheme, the Clearinghouse Defendants raised the fees for consummating purchases of the relevant stocks to the non-conspiring brokerages, further facilitating the Fund Defendants covering of their short positions in furtherance of the conspiracy.

204.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and Class members were injured in their business and property.

205.     Plaintiffs and the Class seek treble damages and their cost of suit, including attorneys' fee, equitable and injunctive relief pursuant to California Business and Professions Code § 16750(a), and other applicable law, to correct the anticompetitive effects caused by Defendants' unlawful conduct.

## COUNT THREE

### UNFAIR COMPETITION IN VIOLATION OF CALIFORNIA BUSINESS AND PROFESSIONS CODE § 17200 *et seq.*
### (Against All Defendants)

206.     Plaintiffs hereby repeat and incorporate by reference each preceding and succeeding paragraph as though fully set forth herein.

207.     The California Unfair Competition Law ("UCL") codified at California Business and Professions Code § 17200 *et seq.* prohibits any unlawful, unfair or fraudulent business practices and unfair, deceptive, untrue or misleading advertisement.

208.     Under California Business and Professions Code § 17200 *et seq.*, a business act or practice is "unlawful" if it violates any established state or federal law.

209.     Defendants engaged in an unlawful contract, combination or conspiracy in the restraint of trade to artificially suppress the stock price of the Relevant Securities.

210.     Brokerage Defendants violated the UCL by engaging in unlawful, unfair, and fraudulent business acts or practices in furtherance of the conspiracy, including but not limited to: (a) knowingly and intentionally prohibiting Retailer Investors from purchasing any Relevant Securities; (b) forcing Retail Investors to sell their Relevant Securities by deactivating several features on their platforms; and (c) selling Retail Investors' Relevant Securities without their consent.

211.    The Clearinghouse Defendants violated the UCL by engaging in unlawful, unfair, and fraudulent business acts or practices in furtherance of the conspiracy by increasing fees and inducing brokerages to restrict trading in the Relevant Securities to Retail Investors.

212.    The Fund Defendants, by engaging in unlawful, unfair, and fraudulent business acts or practices in furtherance of the conspiracy by directing the Brokerage Defendants and Clearinghouse Defendants to restrict trading in the Relevant Securities to Retail Investors in order to artificially suppress the share price of the Relevant Securities.

213.    Defendants engaged in and continue to engage in exclusionary, anticompetitive conduct that is deleterious to consumers and to the benefit of Defendants.

### COUNT FOUR

### DISSEMINATION OF UNTRUE AND MISLEADING PUBLIC STATEMENTS IN VIOLATION OF CALIFORNIA BUSINESS AND PROFESSIONS CODE § 17500 *et seq.* (Against All Defendants)

214.    Plaintiffs hereby repeat and incorporate by reference each preceding and succeeding paragraph as though fully set forth herein.

215.    Defendants violated the California Business and Professions Code § 17500 *et seq.* by making or disseminating, or causing to be made or disseminated, before the public, untrue or misleading statements in connection with the sale of goods or services, that Defendants knew or should have known were untrue or misleading, including but not limited to statements concerning the reliability, fairness, and accuracy of the value of the Relevant Securities, and continue to do so with the intent to induce the Retail Investors to sell their shares of the Relevant Securities at artificially suppressed prices.

216.    Brokerage Defendants executed trades on their customers' behalves without their consent and made false and misleading statements regarding the reasons for executing such trades.

217.    Fund Defendants made misstatements about their role in the conspiracy to the public.

218.    Clearinghouse Defendants made misleading statements to the public about their involvement in the conspiracy while demanding significantly more collateral from member brokers to facilitate the conspiracy.

## COUNT FIVE

## BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING
### (Against the Brokerage Defendants)

219.     Plaintiffs hereby repeat and incorporate by reference each preceding and succeeding paragraph as though fully set forth herein.

220.     Plaintiffs and members of the Class entered into agreements with the Brokerage Defendants. They agreed to Brokerage Defendants' Terms and Conditions by using the Brokerage Defendants' websites, apps and trading platforms.

221.     Plaintiffs and members of the Class fulfilled and performed their obligations under these contracts by adhering to their terms and using Brokerage Defendants' trading services through its website and trading platform.

222.     The Brokerage Defendants made the implied promise that they would not do anything to unfairly interfere with the rights of any other party to receive the benefits of the contract.

223.     The Brokerage Defendants did not act in good faith or with honesty of purpose. To the contrary, they acted with the intention of misleading or taking unfair advantage of plaintiffs and the Class. The Brokerage Defendants was obligated to provide the trading services required under those contracts at all times, including but not limited to, trades for Relevant Securities.

224.     When initially signing up to use the Brokerage Defendants' websites, apps and trading platforms, Plaintiffs and all those similarly situated could and actually did trade in the Relevant Securities.

225.     The Brokerage Defendants unfairly interfered with the rights of Plaintiffs to receive the benefits of the agreements by, among other things: (i) failing to provide services necessary to carry out a trade; (ii) failing to provide certain trading services whatsoever; (iii) failing to inform individuals in a timely member of the drastic changes in trading abilities; and (iv) prohibiting plaintiffs from buying Relevant Securities for the Brokerage Defendants own interest and not disclosing those interest to Plaintiffs and all Class members.

226.     The Brokerage Defendants' conduct has caused Plaintiffs and members of the Class harm, losses, and damages.

## COUNT SIX

## NEGLIGENCE
### (Against the Brokerage Defendants)

227.     Plaintiffs hereby repeat and incorporate by reference each preceding and succeeding paragraph as though fully set forth herein.

228.     The Brokerage Defendants had a common law duty to exercise reasonable care in conducting and facilitating transactions for its customers.

229.     The Brokerage Defendants had a common law duty to exercise reasonable care in providing trades on the free and open market for its customers.

230.     The Brokerage Defendants unlawfully breached their duties by, among other things, (i) removing the Relevant Securities without notice from their websites, apps and trading platforms; (ii) failing to provide financial services related to Relevant Securities; and (iii) failing to notify Retail Investors in a timely manner of the prohibition in purchasing of the Relevant Securities.

231.     The Brokerage Defendants' conduct departed from the ordinary standard of care expected of a stockbroker. If volatility was truly a concern, trading entirely should have been halted in the Relevant Securities. Instead, the Brokerage Defendants permitted Retail Investors to only sell their positions in the Relevant Securities. Further, non-Retail Investors were permitted to trade in the Relevant Securities without restriction.

232.     The Brokerage Defendants breached their duty of care to the Retail Investors by selectively restricting purchases of Relevant Securities to the Retail Investors who wanted to purchase more stock in the Relevant Securities.

233.     Brokerage Defendants negligent and wrongful breaches of its duties owed to Plaintiffs and Class members proximately caused losses and damages that would not have occurred but for the Brokerage Defendants' gross breach of their duty of care.

234.     Plaintiffs and Class members suffered actual injury as a result of Brokerage Defendants' breach of their duty.

235.     Plaintiffs and Class members' injury was proximately and directly caused by Brokerage Defendants breach of their duty.

## COUNT SEVEN

## NEGLIGENCE PER SE
### (Against Brokerage Defendants)

236.    Plaintiffs hereby repeat and incorporate by reference each preceding and succeeding paragraph as though fully set forth herein.

237.    The Brokerage Defendants had a statutory duty to exercise reasonable care in conducting and facilitating transactions for its customers.

238.    The Brokerage Defendants had a statutory duty to exercise reasonable care in providing trades on the free and open market for its customers.

239.    The Brokerage Defendants unlawfully breached their duties by, among other things, (i) removing the Relevant Securities without notice from their websites, apps and trading platforms; (ii) failing to provide financial services related to Relevant Securities; and (iii) failing to notify Retail Investors in a timely manner of the prohibition in purchasing of the Relevant Securities.

240.    The Brokerage Defendants' conduct departed from the ordinary standard of care expected of a stockbroker. If volatility was truly a concern, trading entirely should have been halted in the Relevant Securities. Instead, the Brokerage Defendants permitted Retail Investors to only sell their positions in the Relevant Securities. Further, non-Retail Investors were permitted to trade in the Relevant Securities without restriction.

241.    The Brokerage Defendants breached its duty of care by selectively restricting purchases of Relevant Securities to the Retail Investors who wanted to purchase more stock in the Relevant Securities.

242.    The Brokerage Defendants' negligent and wrongful breaches of the duties owed to Plaintiffs and Class members proximately caused losses and damages that would not have occurred but for the Brokerage Defendants' gross breach of their duty of care.

243.    Plaintiffs and Class members suffered actual injury as a result of Brokerage Defendants' breach of their duty.

244.    Plaintiffs and Class members' injury was proximately and directly caused by Brokerage Defendants' breach of their duties.

CLASS ACTION COMPLAINT

## COUNT EIGHT

### BREACH OF FIDUCIARY DUTY
**(Against Brokerage Defendants)**

245.    Plaintiffs hereby repeat and incorporate by reference each preceding and succeeding paragraph as though fully set forth herein.

246.    As licensed providers of financial services, the Brokerage Defendants at all relevant times herein were fiduciaries to the Plaintiffs and Class members and owed them the highest good faith and integrity in performing its financial services on their behalf. Each Brokerage Defendant also acted as a fiduciary to each and every customer who agreed to their respective terms and conditions.

247.    The Brokerage Defendants breached their fiduciary duties to Plaintiff and Class members by, among other things, failing to disclose that its platform was going to remove Relevant Securities purchases in a timely manner; actually removing Relevant Securities; removing Relevant Securities for their own pecuniary benefits; misrepresenting and omitting material information; that the Brokerage Defendants failed to provide access to its financial services in a timely manner; that Brokerage Defendants failed to comply with all applicable legal, regulatory, and licensing requirements; and that Brokerage Defendants failed to exercise trades and actions requested by customers in a complete and timely manner.

248.    The Brokerage Defendants' conduct has caused the Plaintiffs and Class members' harm, losses, and damages and continues to expose them to harm because the Brokerage Defendants continue to breach their fiduciary duties.

## COUNT NINE

### CONSTRUCTIVE FRAUD
**(Against Brokerage Defendants)**

249.    Plaintiffs hereby repeat and incorporate by reference each preceding and succeeding paragraph as though fully set forth herein.

250.    The Brokerage Defendants had a duty to exercise reasonable care in conducting and facilitating securities transactions for its customers.

251.    The Brokerage Defendants owed the Plaintiffs and Class members a fiduciary duty to fully disclose material facts as relates to their brokerage relationship.

CLASS ACTION COMPLAINT

252.    The Brokerage Defendants represented to Plaintiffs and Class members that they were brokerage services offering free and fair trading in the stock market.

253.    Plaintiffs and Class members chose to use the Brokerage Defendants websites, apps and trading platforms in part due to assurances that they would be able to trade on the stock market.

254.    The Brokerage Defendants subsequently and selective restricted and limited the securities that Plaintiffs and Class members were able to buy on their websites, apps and trading platforms, contrary to their representations.

255.    Plaintiffs and Class members' reliance on the Brokerage Defendants' false representations were substantial factors in causing Plaintiffs' harm as they were prohibited from trading freely given the Brokerage Defendants' restrictions.

## PRAYER FOR JUDGMENT

WHEREFORE, Plaintiffs request that the Court enter judgment on their behalf and on behalf of the Class defined herein, by adjudging and decreeing that:

256.    This action may proceed as a class action, with Plaintiffs serving as Class Representatives, and with Plaintiffs' counsel as Class Counsel;

257.    Defendants have contracted, combined, and conspired in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and that Plaintiffs and the Class have been injured in their business and property as a result of Defendants' violations;

258.    Plaintiffs and the Class are entitled to pre-judgment and post-judgment interest on the damages awarded them, and that such interest be awarded at the highest legal rate from and after the date this class action complaint is first served on Defendants;

259.    Defendants are to be jointly and severally responsible financially for the costs and expenses of a Court-approved notice program through post and media designed to give immediate notification to the Class;

260.    Plaintiffs and the Class recover their costs of this suit, including reasonable attorneys' fees as provided by law;

261.    Plaintiffs and the Class are entitled to equitable relief appropriate to remedy Defendants' past and ongoing restraint of trade, including:

CLASS ACTION COMPLAINT

a. A judicial determination declaring the rights of Plaintiffs and the Class, and the corresponding responsibilities of Defendants;

b. Issuance of a permanent injunction against Defendants and their parents, subsidiaries, affiliates, successors, transferees, assignees and the respective officers, directors, partners, agents, and employees thereof and all other persons acting or claiming to act on their behalf from continuing and maintaining the conspiracy or agreements herein;

c. A constructive trust over any ill-gotten property or assets, including but not limited to stocks in the Relevant Securities received as a result of the conspiracy or agreement or other wrongful conduct as alleged herein;

262. Plaintiffs and the Class receive such other or further relief as may be just and proper.

//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//

CLASS ACTION COMPLAINT

## JURY TRIAL DEMANDED

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury of all the claims asserted in this Complaint so triable.

Dated: February 4, 2021

By:      */s/ Eric Lechtzin*
         Eric Lechtzin

Eric Lechtzin (State Bar No. 248958)
Marc H. Edelson (*Pro Hac Vice* to be applied for)
**EDELSON LECHTZIN LLP**
3 Terry Drive, Suite 205
Newtown, PA 18940
Telephone: (215) 867-2399
Facsimile: (267) 685-0676
Email: electzin@edelson-law.com
        medelson@edelson-law.com

Joshua Grabar (*Pro Hac Vice* to be applied for)
**GRABAR LAW OFFICE**
One Liberty Place
1650 Market Street, Suite 3600
Philadelphia, PA 19103
Telephone: (267) 507-6085
Facsimile: (267) 507-6048
Email: jgabar@grabarlaw.com

*Counsel for Individual and Representative Plaintiffs*
*Sabrina Clapp and Denise Redfield*